**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00511 |
| U.S. DOGE SERVICE, *et al.*, | **HEARING REQUESTED** |
| Defendants. | |

<u>**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 4

    I.     Establishment of DOGE and USDS ........................................................ 4

    II.    USDS's Operations ................................................................................. 8

    III.   Procedural History ................................................................................ 12

JURISDICTION ................................................................................................. 15

LEGAL STANDARD .......................................................................................... 16

ARGUMENT .................................................................................................... 17

    I.     CREW is likely to succeed on the merits .............................................. 17

        A.   CREW is entitled to complete production of responsive records before government funding expires on March 14, 2025. ................................................................ 17

            i.    OMB and USDS are subject to FOIA and the FRA. .................................. 18

            ii.   CREW is entitled to production before the congressional appropriations process concludes ................................................................................................ 25

        B.   CREW is entitled to preservation of relevant records pending litigation. ............... 29

    II.    CREW will suffer irreparable injury absent the preliminary injunction ................... 32

        A.   CREW will suffer irreparable injury absent expedited processing and production of responsive records ....................................................................................... 32

        B.   CREW will suffer irreparable injury if records are not preserved. ......................... 38

    III.   The balance of equities and public interest favor granting a preliminary injunction. 40

CONCLUSION ................................................................................................. 44

# TABLE OF AUTHORITIES

**Cases**

*AFL-CIO v. Dep't of Labor*, No. 25-cv-339-JDB, ECF No. 34 (D.D.C. Feb. 14, 2025) ............ 21

*Aguilera v. F.B.I.*, 941 F. Supp. 144 (D.D.C. 1996) ...................................................................... 16

*Am. First Legal Found. v. Becerra*, No. CV 24-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024)................................................................................................................. 16, 31, 40

*Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222 (D.D.C. 1980)...................................... 41

*Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32 (D.D.C. 2020)... 15, 25, 35

*Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182 (D.D.C. 2019) ............... 15, 18, 27, 35

*Armstrong v. Bush*, 807 F. Supp. 816 (D.D.C. 1992) ...................................................... 16, 39, 41

*Armstrong v. Exec. Off. of the President*, 90 F.3d 553 (D.C. Cir. 1996)..................................... 18

*Brennan Ctr. for Just. at NYU Sch. of Law. v. U.S. Dep't of Com.*, 498 F. Supp. 3d 87 (D.D.C. 2020)........................................................................................ 15, 18, 26, 29, 35, 42

*Cause of Action Inst. v. Off. of Mgmt. & Budget,* 10 F.4th 849 (D.C. Cir. 2021)................. 19, 21

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ................................... 17

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)...................... 16

*Competitive Enter. Inst. v. Off. of Sci. and Tech. Policy*, No. 14-cv-765, 2016 WL 10676292 (D.D.C. Dec. 12, 2016) ........................................................................................................ 30

*CREW v. Cheney*, 577 F. Supp. 2d 328 (D.D.C. 2008) ................................................... 16, 31, 40

*CREW v. Office of Admin.*, 565 F. Supp. 2d 23 (D.D.C. 2008).................................. 16, 29, 30, 40

*CREW v. Office of Admin.*, 566 F.3d 219 (D.C. Cir. 2009) ................................................... 19, 25

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5 (D.D.C. 2019)... 15, 25, 26, 27, 28, 34, 35, 42

*Ctr. to Prevent Handgun Violence v. U.S. Dep't of the Treasury*, 49 F. Supp. 2d 3 (D.D.C. 1999) ................................................................................................................................. 42

*D.A.M. v. Barr*, 474 F. Supp. 3d 45 (D.D.C. 2020) ..................................................................... 16

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96 (D.D.C. 2017)........................................................................................................................... 35

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 416 F. Supp. 2d 30 (D.D.C. 2006) ......... 15, 25, 26, 36

*Heritage Found. v. U.S. Dep't of State*, No. 24-cv-2862-TJK, 2024 WL 4607501  (D.D.C. Oct. 29, 2024)...................................................................................................................... 3, 33

*Heritage Found. v. U.S. Env't Prot. Agency*, No. 23-cv-748, 2023 WL 2954418 (D.D.C. Apr. 14, 2023)............................................................................................................................. 27

*Landmark Legal Found. v. Env't Prot. Agency*, 910 F. Supp. 2d 270 (D.D.C. 2012) ................. 31

*Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005) .................. 15, 25, 35

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ....................... 17, 32, 41

*Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993) .......................................................... 20

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ............................... 34

*Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ........................................... 21

*Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, No. 22-1043, 2024 WL 3443596 (D.D.C. July 15, 2024) ............................................................................................ 17

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................... 40

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ................................. 41

*Pac. Legal Found. v. Council on Env't. Quality*, 636 F.2d 1259 (D.C. Cir. 1980) ..................... 20

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263 F. Supp. 3d 293 (D.D.C. 2017). 15, 36

*Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132 (D.D.C. 2020) 15, 35

*R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015) .................................................. 41

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971)........................................................... 20

*U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749 (1989) ....................... 42

*Wash. Post v. U.S. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61 (D.D.C. 2006). 15, 18, 26, 35, 42

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................ 40

*Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7 (D.D.C. 2011) ............................. 41

iv

**Statutes**

44 U.S.C. § 3101 ......................................................................................................... 44

44 U.S.C. §§ 3101 ....................................................................................................... 47

5 C.F.R. § 1303.1 ........................................................................................................ 21

5 U.S.C. § 552 ........................................................................................... 16, 19, 21, 44

**Other Authorities**

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ............................... 6, 7, 19

Exec. Order No. 14170, 90 Fed. Reg. 8621, 8621 (Jan. 30, 2025) ............................. 7

Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ...................................... 8

Presidential Mem., 90 Fed. Reg. 8247 (Jan. 28, 2025) .............................................. 7

The U.S. Digital Service, Report to Congress – December 2016 (2016),
    https://www.usds.gov/resources/USDS-2016-Impact-Report.pdf ............................. 6

U.S. Gov't Accountability Off., GAO-16-602, Digital Service Programs: Assessing Results and
    Coordinating with Chief Information Officers Can Improve Delivery of Federal Projects (Aug.
    15, 2016), https://www.gao.gov/products/gao-16-602 ............................................. 6

U.S. Gov't Accountability Off., GAO-22-104492, Information Technology: Digital Service
    Programs Need to Consistently Coordinate on Developing Guidance for Agencies (Dec. 10,
    2021), https://www.gao.gov/products/gao-22-104492 ............................................. 6

## INTRODUCTION

If ever there were a Freedom of Information Act ("FOIA") and Federal Records Act ("FRA") case warranting a preliminary injunction, this is it. Plaintiff Citizens for Responsibility and Ethics in Washington ("CREW") seeks expedited production and preservation of documents relating to the newly-established United States DOGE Service ("USDS"). The records concern USDS's organization and clandestine operations, about which taxpayers have been kept in the dark. All the while, USDS personnel have seized control of Executive Branch agencies and destabilized critical federal operations. USDS's actions are not only unprecedented, they are occurring at warp speed: In the few weeks since President Trump's inauguration, USDS has attempted to unilaterally and unlawfully "delete" independent agencies authorized by Congress, taken over others, claimed credit for cancelling billions of dollars in federal contracts, and forced non-partisan civil servants to give USDS employees access to sensitive and classified government data, including the confidential information of millions of Americans. USDS has done all of this without the public having the faintest hint of how USDS is constituted, how it operates, whether conflicts of interest in USDS leadership are impacting its work, and under what legal authorities (if any) it is taking these extreme actions. Plaintiff and the public have an urgent need to understand what has happened and continues to happen at USDS as soon as possible.

In particular, Plaintiff and the American public need to access the requested records sufficiently in advance of the expiration of the current continuing resolution to fund the government on March 14, 2025, to facilitate informed public and congressional debate about how USDS has impacted, and will continue to impact, the operations and form of the federal government, and its attendant funding obligations as Congress decides how to continue to fund

1

the government. In just a few weeks, OMB has already approved a series of apportionments

totaling $39,121,156 to USDS.[1] As the public has observed USDS's actions and the formal

debate on appropriations has grown closer, Senate Minority Leader Chuck Schumer has placed

USDS squarely in the middle of the debate regarding how the government will be funded, stating

on February 12, 2025, that USDS "is using a meat axe. And they're cutting things that are

efficient and effective . . . If you want to make cuts, then you do it through a debate in Congress,

not lawlessly by just implementing it."[2] Meanwhile, Senator Rand Paul has reportedly said that

USDS "is really doing good stuff, but ultimately, that money's going to be sent back to us as a

rescission package. I don't think they can just not spend."[3] Senator Susan Collins, chair of the

---

[1] Off. of Mgmt. & Budget, January 27, 2025 Apportionment, Iteration No. 1 for TAFS 011-X-0041 (approved Jan. 27, 2025, 08:29 PM) ($750,000 for the United States DOGE Service account), https://openomb.org/file/11409026#tafs_11409026--011-0041--1--2025; Off. of Mgmt. & Budget, January 30, 2025 Apportionment, Iteration 2 for TAFS 011-X-0041 (approved Jan. 30, 2025, 04:51 PM) (additional $6,000,000), https://openomb.org/file/11409329#tafs_11409329--011-0041--2--2025; Off. of Mgmt. & Budget, February 8, 2025 Apportionment, Iteration 3 for TAFS 011-X-0041 (approved Feb. 8, 2025, 11:33 AM), https://openomb.org/file/11410065#tafs_11410065--011-0041--3--2025 (additional $7,693,147); Off. of Mgmt. & Budget, February 8, 2025 Apportionment, Iteration No. 1 for TAFS 011-2024-2028-0041 (approved Feb. 8, 2025, 11:33 AM) ($2,559,689), https://openomb.org/file/11410064#tafs_11410064--011-0041-2024-2028--1--2025; Off. of Mgmt. & Budget, February 8, 2025 Apportionment, Iteration No. 1 for TAFS 011-2022-2031-0041 (approved Feb. 8, 2025, 11:33 AM) ($8,151,078), https://openomb.org/file/11410067#tafs_11410067--011-0041-2022-2031--1--2025; Off. of Mgmt. & Budget, February 8, 2025 Apportionment, Iteration No. 1 for TAFS 011-2025-2025-0041 (approved Feb. 8, 2025, 11:33 AM) ($13,967,242), https://openomb.org/file/11410066#tafs_11410066-011-0041-2025-2025--1--2025. OMB is required to post documents apportioning an appropriation on its website. 31 U.S.C. § 1513 note; *see also* OMB, *Approved Apportionments*, https://apportionment-public.max.gov/ (last visited Feb. 19, 2025).

[2] Alexander Bolton, *Schumer: Democrats will use spending bills to curb Musk*, The Hill (Feb. 11, 2025), https://thehill.com/homenews/senate/5139019-schumer-spending-bills-musk/.

[3] Igor Bobic (@igorbobic), X (Feb. 11, 2025, 12:55 PM), https://x.com/igorbobic/status/1889372604227551474; *CNN NewsNight with Abby Phillip*, CNN Transcripts (Feb. 11, 2025), https://transcripts.cnn.com/show/cnap/date/2025-02-11/segment/01.

Senate Appropriations Committee, reportedly raised questions about how USDS was proceeding with USAID without the involvement of Congress.[4] Defendant Musk himself has commented that President Trump's latest Executive Order on USDS "is the only way to balance the budget."[5] Despite this, the administration has not disclosed basic information about USDS's operations, and Republicans in the House of Representatives have blocked a subpoena for Mr. Musk to testify about the work that USDS is doing.[6]

It is clear that USDS's operations are at the heart of the ongoing debate about how the government will continue to be funded—a debate that will formally begin on March 10, when Congress is back in session, and will culminate on March 14, when the current legislation funding the government expires. It follows that a preliminary injunction is necessary because "the requested documents are time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost.'" *Heritage Found. v. U.S. Dep't of State*, No. 24-cv-2862-TJK, 2024 WL 4607501, at *4 (D.D.C. Oct. 29, 2024).

Each preliminary injunction factor weighs strongly in favor of relief: CREW is likely to succeed in its demand for production by a date certain, CREW will suffer irreparable injury absent an injunction, and the public interest and balance of the equities weigh in favor of the

---

[4] Deirdre Walsh, *Republicans in Congress mostly shrug as Musk and DOGE set sights on spending*, NPR (Feb. 5, 2025), https://www.npr.org/2025/02/05/nx-s1-5286426/congress-republicans-musk-doge-usaid.
[5] Elon Musk (@elonmusk), X (Feb. 11, 2025, 9:02 PM), https://x.com/elonmusk/status/1889495373024051513.
[6] Ivan Pereira & Jay O'Brien, *Republicans block Musk from congressional subpoena as DOGE continues to access government data*, ABC News (Feb. 5, 2025), https://abcnews.go.com/Politics/republicans-block-musk-congressional-subpoena-doge-continues-access/story?id=118487749.

requested relief. This Court should therefore issue a preliminary injunction requiring Defendants to (1) fully process and produce all non-exempt records responsive to its FOIA requests sufficiently in advance of March 14, 2025, no later than March 10, 2025; and (2) preserve all potentially relevant records pending final resolution of the case, inclusive of appeals.

## BACKGROUND

### I.  Establishment of DOGE and USDS

On November 13, 2024, President-elect Donald Trump announced the formation of the "Department of Government Efficiency" ("DOGE"),[7] which would be led by Elon Musk and Vivek Ramaswamy and would "pave the way for [the Trump] Administration to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies."[8] Messrs. Musk and Ramaswamy described DOGE's strategic plan in the Wall Street Journal, including the pursuit of "three major kinds of reform: regulatory rescissions, administrative reductions and cost savings."[9] They stated that DOGE would operate with "embedded appointees" at federal agencies and pledged to identify and provide a list of "thousands" of unlawful regulations so that President Trump could "nullif[y]" them, pursue "mass head-count reductions across the federal bureaucracy" to "identify[] pinpoint executive actions that would result in immediate savings for taxpayers," and to conduct "[l]arge-scale

---

[7] Donald J. Trump (@realDonaldTrump), X (Nov. 13, 2024, 6:21 AM), https://x.com/realDonaldTrump/status/1856658569124262092.

[8] *Id.*

[9] Elon Musk & Vivek Ramaswamy, *Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government*, WSJ (Nov. 20, 2024), https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020?mod=hp_opin_pos_0.

audits" to reform the "procurement process."[10] Mr. Musk repeatedly stated that his goal is to use DOGE to cut $2 trillion out of the federal budget.[11]

DOGE formed and began operating before President Trump's inauguration on January 20, 2025. Those working under its auspices included close business associates of Mr. Musk.[12] Its operations prior to President Trump's inauguration included "sending representatives to agencies across the federal government . . . to begin preliminary interviews" with agency officials.[13]

During this period, individuals associated with DOGE conducted DOGE's work using the ephemeral messaging application Signal.[14] Signal is widely used for its auto-delete functionality, which allows users to set Signal to automatically and permanently delete messages and their associated metadata.[15] DOGE did not publicly disclose the identities or positions of its

---

[10] *Id.*

[11] Alex Gangitano, *Musk: Cutting $2T through DOGE 'best-case outcome'*, The Hill (Jan. 9, 2025), https://thehill.com/homenews/administration/5076095-elon-musk-doge-2t-spending-cut-goal/; Justin Lahart & Rosie Ettenheim, *Musk Wants $2 Trillion of Spending Cuts. Here's Why That's Hard.*, Wall St. J. (Nov. 26, 2024), https://www.wsj.com/politics/policy/government-spending-doge-elon-musk-trump-administration-60477bc5.

[12] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 4, 2024, 12:50 PM), https://truthsocial.com/@realDonaldTrump/posts/113595819146944245; Josh Gerstein, *Trump's next White House counsel is 'the exception to the rule' of Trump lawyers,* Politico (Nov. 11, 2024), https://www.politico.com/news/2024/11/18/trump-william-mcginley-white-house-counsel-00190101; Ken Thomas et al., *Inside the Early Days of DOGE*, Wall St. J. (Jan. 17, 2025), https://www.wsj.com/politics/policy/doge-federal-reform-musk-ramaswamy-118a3833; The All-In Podcast (@theallinpod), X (Feb. 7, 2025, 9:44 PM), https://x.com/theallinpod/status/1888056229294965223 (Antonio Gracias describing his part-time work with DOGE); *Antonio Gracias,* Valor Equity Partners, https://www.valorep.com/team/antonio-gracias (last visited Feb. 13, 2025).

[13] Faiz Siddiqui et al., *DOGE is dispatching agents across U.S. government*, Wash. Post (Jan. 10, 2025), https://www.washingtonpost.com/business/2025/01/10/musk-ramaswamy-doge-federal-agencies.

[14] Theodore Schleifer & Madeleine Ngo, *Inside Elon Musk's Plan for DOGE to Slash Government Costs*, N.Y. Times (Jan. 23, 2025), https://www.nytimes.com/2025/01/12/us/politics/elon-musk-doge-government-trump.html.

[15] *Set and manage disappearing messages*, Signal Support, https://support.signal.org/hc/en-us/articles/360007320771-Set-and-manage-disappearing-messages (last visited Feb. 18, 2025).

personnel, and neither DOGE nor those who publicly associated themselves with it disavowed its use of Signal in the course of conducting DOGE's business.

On January 20, 2025, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency" ("First USDS EO").[16] The First USDS EO renames the United States Digital Service as the United States DOGE Service and reorganizes it within the Executive Office of the President.[17] The United States Digital Service was previously a component of OMB, and its operations were supervised by OMB's Deputy Director of Management.[18] The First USDS EO establishes the role of the U.S. DOGE Service Administrator (the "USDS Administrator") in the Executive Office of the President, reporting to the White House Chief of Staff.[19]

The EO purports to authorize USDS "to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."[20] It also purports to establish "within USDS, in accordance with section 3161 of title 5, United States Code, a temporary organization known as 'the U.S. DOGE Service

---

[16] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).
[17] *Id.*
[18] *See* The U.S. Digital Service, Report to Congress – December 2016 at 4 (2016), https://www.usds.gov/resources/USDS-2016-Impact-Report.pdf (explaining that "[a]t its creation, USDS was administratively placed within the Office of the Federal CIO," but later reorganized within OMB and directly supervised by "the Deputy Director of Management"); *see also* U.S. Gov't Accountability Off., GAO-22-104492, Information Technology: Digital Service Programs Need to Consistently Coordinate on Developing Guidance for Agencies (Dec. 10, 2021), https://www.gao.gov/products/gao-22-104492 (characterizing U.S. Digital Service as a component within OMB); U.S. Gov't Accountability Off., GAO-16-602, Digital Service Programs: Assessing Results and Coordinating with Chief Information Officers Can Improve Delivery of Federal Projects (Aug. 15, 2016), https://www.gao.gov/products/gao-16-602 (same).
[19] First USDS EO, 90 Fed. Reg. at 8441.
[20] *Id.*

6

Temporary Organization,'" that is headed by the USDS Administrator, mandated to terminate on July 4, 2026,  and "dedicated to advancing the President's 18-month DOGE agenda."[21]

The EO also requires the establishment of "DOGE Teams" within each agency to be appointed by each agency head in consultation with the USDS Administrator. Agency heads are required to "ensure that DOGE Team Leads coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda.[22] However, the First USDS EO does not delegate any statutory authority to USDS.

Another executive order directs the Assistant to the President for Domestic Policy, in consultation with the USDS Administrator, the Director of OMB, and the Director of the OPM, to develop "a Federal Hiring Plan that brings to the Federal workforce only highly skilled Americans dedicated to the furtherance of American ideals, values, and interests."[23] A separate presidential memorandum orders "a freeze on the hiring of Federal civilian employees, to be applied throughout the executive branch" and directs the Director of OMB, in consultation with the USDS Administrator and Director of OPM, to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition," which, when issued by OMB, would lift the hiring freeze for all agencies "with the exception of the Internal Revenue Service (IRS)."[24] The hiring freeze at IRS will remain in effect "until the Secretary of the Treasury, in consultation with the Director of OMB and the Administrator of USDS, determines that it is in the national interest to lift the freeze."[25]

---

[21] *Id.*

[22] *Id.*

[23] Exec. Order No. 14170, 90 Fed. Reg. 8621, 8621 (Jan. 30, 2025).

[24] Presidential Mem., 90 Fed. Reg. 8247, 8247 (Jan. 28, 2025).

[25] *Id.*

The latest USDS executive order, issued on February 11, 2025, entitled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," requires that "[e]ach Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas," purports to empower "DOGE Team Leads" at each agency to decide whether "vacancies for career appointments . . . should not be filled," and requires each agency "DOGE Team Lead" to provide the USDS Administrator "with a monthly hiring report for the agency."[26]

## II.    USDS's Operations

In just one month, USDS has wielded expansive power over all manner of federal operations—far exceeding its limited authority as a non-statutory entity. For example, USDS has taken over the Office of Personnel Management ("OPM"),[27] contributed to a humanitarian crisis and the loss of 50,000 jobs by unlawfully attempting to shutter the Congressionally-authorized U.S. Agency for International Development, and touted its success in cancelling $1 billion in contracts across 25 agencies and cutting $900 million in education funding.[28] It has, through its control of OPM, offered virtually every civilian employee a buyout in emails with the subject

---

[26] Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).
[27] Will Steakin & Laura Romero, *OPM, implementing Musk's DOGE plans, sends federal workers 2nd 'Fork in the Road' email,* ABC News (Feb. 3, 2025), https://abcnews.go.com/US/opm-implementing-musks-doge-plans-sends-federal-workers/story?id=118401375; Chas Danner, *All the Federal Agencies DOGE Has Gotten Access To,* NY Mag. (Feb. 10, 2025), https://nymag.com/intelligencer/article/doge-elon-musk-what-federal-agencies-access-lawsuits.html.
[28] Charles Creitz, *DOGE announces more than $1B in savings after canceling 104 federal DEI contracts*, FOX News (Jan. 31, 2025), https://www.foxnews.com/politics/doge-announces-more-than-1b-savings-after-canceling-104-federal-dei-contracts; *Savings*, Dep't of Gov't Efficiency, https://www.doge.gov/savings (last visited Feb. 19, 2025); Zach Montague & Dana Goldstein, *Musk Team Announces Millions in Cuts to Education Dept. Amid Legal Pushback*, N.Y. Times (Feb. 11, 2025), https://www.nytimes.com/2025/02/11/us/politics/musk-doge-education-data.html.

line "Fork in the Road" that mimic the name and terms of buy-outs previously offered by Mr. Musk to his personal employees.[29]

USDS has also obtained access to some of the most sensitive data systems in the federal government, including a "massive trove" of personal identifying and financial information of millions of federal employees and applicants for federal jobs,[30] a Treasury Department payment system that Treasury uses to disburse trillions of dollars every year,[31] and classified information at USAID—some of which USDS posted on the internet.[32] USDS has also accessed secure databases, some of which including large amounts of personal identifying information and

---

[29] Danner, *supra* note 27; *see* Fork in the Road, OPM, https://www.opm.gov/fork (last visited Feb. 19, 2025); Victor Ordonez, *Commit 'hardcore' or leave, Elon Musk tells Twitter employees*, ABC News (Nov. 16, 2022), https://abcnews.go.com/Business/commit-hardcore-leave-elon-musk-tells-twitter-employees/story?id=93411363.

[30] Isaac Stanley-Becker et al., *Musk's DOGE agents access sensitive personnel data, alarming security officials*, Wash. Post (Feb. 6, 2025), https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-doge-access-personnel-data-opm-security/; Andrea Shalal & Doina Chiacu, *Musk's DOGE agents access sensitive government personnel data, Washington Post reports*, Reuters (Feb. 6, 2025), https://www.reuters.com/world/us/musks-doge-agents-access-sensitive-opm-personnel-data-washington-post-reports-2025-02-06/.

[31] Fatima Hussein, *Elon Musk's DOGE commission gains access to sensitive Treasury payment systems: AP sources*, AP News (Feb.1, 2025), https://apnews.com/article/donald-trump-elon-musk-doge-treasury-5e26cc80fcb766981cea56afd57ae759; Kate Gibson, *Elon Musk's access to Treasury's payment system is raising alarms. Here's what to know.*, CBS News (Feb. 5, 2025), https://www.cbsnews.com/news/musk-treasury-social-security-access-federal-payment-system-trump/.

[32] Abigail Williams et al., *USAID security leaders removed after refusing Elon Musk's DOGE employees access to secure systems*, NBC News (Feb. 2, 2025), https://www.nbcnews.com/politics/national-security/usaid-security-leaders-removed-refusing-elon-musks-doge-employees-acce-rcna190357; Ellen Knickmeyer & Matthew Lee, *USAID security chiefs put on leave after trying to stop Musk's team from accessing classified info, officials say*, PBS News (Feb. 2, 2025), https://www.pbs.org/newshour/politics/usaid-security-chiefs-put-on-leave-after-trying-to-stop-musks-team-from-accessing-classified-info-officials-say;

sensitive payment systems, at nine other agencies spanning the functions of the federal government.[33]

USDS secured access to at least some of these systems over the objections of agency personnel charged with their care and in contravention of safeguards required to access them,[34] and in some cases locked civil servants who had previously maintained the data out of those systems.[35] At other times, USDS has enlisted or invoked the authority of the United States Marshals Service to achieve its objectives, such as when its representatives reportedly caused the Marshals to pressure judges of this Court to speed up the release of individuals pardoned for crimes relating to the January 6, 2021 attack on the Capitol,[36] and threatened to call in the Marshals when two USAID security chiefs tried to prevent USDS representatives from, in the chiefs' view, unlawfully accessing a secure compartmentation information facility.[37]

---

[33] Danner, *supra* note 27; Aileen Graef & Veronica Stracqualursi, *Homeland Security Secretary Noem says DOGE team has access to agency data*, CNN (Feb. 9, 2025), https://www.cnn.com/2025/02/09/politics/noem-homeland-security-doge-musk-cnntv/index.html; Jennifer Jacobs, *DOGE gets access into Consumer Financial Protection Bureau as OMB's Russell Vought takes over as acting head of federal consumer watchdog agency*, CBS News (Feb. 8, 2025), https://www.cbsnews.com/news/doge-access-consumer-financial-protection-bureau-omb-russel-vough-acting-head/; Anna Wilde Mathews & Liz Essley Whyte, *DOGE Aides Search Medicare Agency Payment Systems for Fraud*, Wall St. J. (Feb. 5, 2025), https://www.wsj.com/politics/elon-musk-doge-medicare-medicaid-fraud-e697b162;

[34] Ellen Knickmeyer, *USAID security leaders on leave after trying to keep Musk's DOGE from classified info, officials say*, LA Times (Feb. 2, 2025), https://www.latimes.com/world-nation/story/2025-02-02/usaid-security-leaders-on-leave-after-trying-to-keep-musks-doge-from-classified-info-officials-say.

[35] Tim Reid, *Exclusive: Musk aides lock workers out of OPM computer systems*, Reuters (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31/.

[36] Ruth Marcus, *Pardon me: What were the folks at DOGE thinking?*, Wash. Post (Jan. 23, 2025), https://www.washingtonpost.com/opinions/2025/01/23/doge-jan-6-marshals-federal-judges/.

[37] Andrew Roth, *Senior USAid officials put on leave after denying access to Musk's Doge team*, The Guardian (Feb. 3, 2025), https://www.theguardian.com/us-news/2025/feb/02/usaid-officials-put-on-leave-musk-doge; Ellen Knickmeyer, *Elon Musk says President Donald Trump has*

USDS has, at the same time, conducted much of its business outside of official government systems. This has included individuals associated with USDS reportedly installing a server from outside of the agency to store data,[38] USDS's use of its official "Department of Government Efficiency" X account to solicit employment applications via direct message on X (a solicitation that was made before USDS was created but remains active today),[39] and the same account soliciting public comments about prospective government action via direct messages on X to accounts associated with DOGE Teams at various agencies.[40]

USDS has done all of this without publicly disclosing its personnel, their positions, their roles, or their employment status vis-a-vis the federal government, including their civil service classifications, security clearances, or even if they are government employees. Indeed, USDS personnel have refused to identify themselves to government employees from whom they have demanded information about the workings of the government.[41] Mr. Musk indicated that

---

*'agreed' USAID should be shut down*, Associated Press (Feb. 3, 2025), https://apnews.com/article/doge-musk-trump-classified-information-usaid-security-35101dee28a766e0d9705e0d47958611.

[38] Rebecca Beitsch, *OPM employees file suit to block use of new email system*, The Hill (Feb. 4, 2025), https://thehill.com/homenews/administration/5126073-opm-email-system-battle/; Dell Cameron, *Federal Workers Sue to Disconnect DOGE Server*, WIRED (Feb. 4, 2025), https://www.wired.com/story/federal-workers-sue-over-doge-server/.

[39] Department of Government Efficiency (@DOGE), X (Nov. 14, 2024, 10:03 AM), https://x.com/DOGE/status/1857076831104434289 (soliciting employment applications via direct message).

[40] Department of Government Efficiency (@DOGE), X (Feb. 16, 2025, 7:49 PM), https://x.com/doge/status/1891288881674240070?s=46&t=-tkA4Plhw0ldXWGtY5kv1A (coordinating submissions of public comments via direct message to USDS affiliates at other agencies)

[41] Conrad Quilty-Harper, *Musk's DOGE Minions Refuse to Reveal Their Names When Grilling Civil Servants*, The Daily Beast (Feb. 4, 2025), https://www.thedailybeast.com/musks-doge-minions-refuse-to-reveal-their-names-when-grilling-civil-servants/?utm_source=twitter_owned_tdb&utm_medium=socialflow&via=twitter_page&utm_campaign=owned_social; Benjamin Siegel et al., *'What's going to break?' DOGE staffers 'scorching the earth' as they reshape federal government*, ABC News (Feb. 6, 2025),

individuals simply revealing the names of those associated with USDS could be committing a crime.[42] Even legacy employees of the United States Digital Service who have remained at USDS have reportedly been kept in the dark about who, if anyone, formally holds the position of USDS Administrator.[43]

The one thing that has been clear about USDS is that it is actually being administered and directed by Mr. Musk. Mr. Musk's own conduct and statements—including publicly plotting USDS's course, publicly referring to USDS's work as his own, accepting correspondence as USDS's head—are buttressed by the President's and his representatives' repeated admissions that President Trump "signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge."[44]

## III.    Procedural History

On December 19, 2024, CREW submitted a FOIA request to OMB ("First OMB Request") for records, from November 5, 2024 to the date the request is processed, of communications between OMB personnel and various persons purporting to have an affiliation with DOGE, persons affiliated with the "Delivering Outstanding Government Efficiency Caucus," or certain members of Congress and other DOGE-related documents. Decl. ¶ 7. On

---

https://abcnews.go.com/Politics/whats-break-doge-staffers-scorching-earth-reshape-federal/story?id=118536035.

[42] Peter Suciu, *DOGE Employees Identified On X – Doxing Or Case Of Free Speech?*, Forbes (Feb. 4, 2025), https://www.forbes.com/sites/petersuciu/2025/02/04/doge-employees-identified-on-x--doxing-or-case-of-free-speech/.

[43] Makena Kelly, *USDS Engineering Director Resigns: 'This is Not the Mission I Came to Serve,'* Wired (Feb. 19, 2025), https://www.wired.com/story/doge-engineering-director-resign/.

[44] *President Trump Remarks at the FII Priority Summit*, C-SPAN (Feb. 19, 2025), https://www.c-span.org/program/white-house-event/president-trump-remarks-at-fii-priority-summit/655974. *See infra* Argument Part I.A.i for further discussions of Mr. Musk's role with respect to the USDS.

December 20, 2024, OMB acknowledged receipt of the First OMB Request and assigned it

tracking number 2025-373. Decl. ¶ 8. On January 28, 2025, CREW submitted a request for

expedited processing of the First OMB Request, citing the "urgency to inform the public about

an actual or alleged Federal Government activity" and the fact that "[t]here are possible

questions, in a matter of widespread and exceptional public interest, about the Government's

integrity which affect public confidence." Ex. G (citing 5 C.F.R. § 1303.40(e)(1)(ii), (iv)); Decl.

¶ 12.

 Separately, on January 24, 2025, CREW submitted a separate expedited FOIA request to

OMB ("Second OMB Request") and an expedited FOIA request to USDS ("USDS Request")

seeking records related to changes to the operations of the U.S. Digital Service, organizational

charts, financial disclosures, and other information relevant to the newly-formed USDS. The

USDS Request also sought "All communications between USDS personnel and personnel of any

federal agency outside of the Executive Office of the President." At the direction of OMB's

FOIA Office, CREW submitted the USDS Request through OMB's FOIA office. Decl. ¶¶ 9-10.

The same day, OMB acknowledged receipt of both the Second OMB Request, assigned number

2025-574, and the USDS Request, assigned number 2025-573. Decl. ¶ 11. On January 29, 2025,

OMB granted expedited treatment for both the Second OMB Request and the USDS Request but

did not commit to producing the documents by a date certain. Decl. ¶ 13.

 On February 7, 2025, CREW sent a letter to OMB and USDS, through the OMB FOIA

office, requesting the production of the records requested in the Second OMB Request (2025-

574) and the USDS Request (2025-573) sufficiently in advance of the March 14, 2025 expiration

of the current continuing resolution fund the federal government, but no later than March 1,

2025. Decl. ¶ 14. CREW notified OMB and USDS in its February 7 letter that the records sought

in the Second OMB Request and USDS Request, which are related to the structure and operations of USDS, are "critical for the American public to have an informed engagement about the appropriations process" that had already begun to unfold prior to the expiration of the government's funding, and that members of Congress had already publicly indicated that OMB's role in efforts to curtail government spending in tandem with USDS would be an important part of the public and congressional debate about how the government would continue to be funded. Ex. J. CREW further noted that USDS's widely-reported conduct in controlling and disrupting the functions of the federal government increases, both in the appropriations process and generally, the need for the records sought by CREW immediately and certainly in time for the public to have them during the appropriations process. *Id.* To date, OMB has not responded to CREW's February 7 letter. Decl. ¶ 15.

On February 11, 2025, CREW sent a letter to OMB requesting the production of the records requested in the First OMB Request on the same grounds described in its February 7 letter because they, too, "are critical for the American public to have an informed engagement with the appropriations process." Ex. K; Decl. ¶ 16. On February 14, 2025, OMB granted expedited treatment for the First OMB request and acknowledged CREW's letter of February 11 requesting that OMB produce the responsive records by March 1, but did not commit to producing the records by any date certain. Decl. ¶ 17.

In addition, in a January 15, 2025 letter, CREW requested that the Archivist and acting Director of OMB promptly comply with their statutory duties to investigate the potential unauthorized destruction of federal records of DOGE's Signal communications and initiate a DOJ enforcement to recover any records that might have been destroyed. Decl. ¶ 21. In a January 27, 2025 letter, CREW again requested that the Archivist, the acting Director of OMB, and the

14

Administrator of USDS promptly comply with their statutory duties to investigate the potential

unauthorized destruction of federal records of DOGE's Signal communications and initiate a

DOJ enforcement to recover any records that might have been destroyed. Decl. ¶ 23. To date,

NARA, OMB, and USDS have not responded to either letter. Decl. ¶¶ 22, 24.


## JURISDICTION

Under FOIA, this Court "has jurisdiction to enjoin [an] agency from withholding agency

records and to order the production of any agency records improperly withheld from the

complainant," 5 U.S.C. § 552(a)(4)(B), which includes granting preliminary injunctions related

to expedited processing. *Wash. Post v. U.S. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 66

(D.D.C. 2006) (so holding and citing cases); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 416 F.

Supp. 2d 30, 35 (D.D.C. 2006) (same); *see also Al-Fayed v. C.I.A.*, 254 F.3d 300, 308 (D.C. Cir.

2001) (addressing preliminary injunction ruling without questioning jurisdiction).[45]

---

[45] *See also, e.g.*, *Brennan Ctr. for Just. at NYU Sch. of Law v. U.S. Dep't of Com.*, 498 F. Supp.
3d 87 (D.D.C. 2020) (granting preliminary injunction due to Congress' imminent certification of
the Census numbers); *Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d
132 (D.D.C. 2020) (granted preliminary injunction for documents ahead of the imminent 2020
Presidential election); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32
(D.D.C. 2020) (granting preliminary injunction to expedite production of records "likely
influence public discourse around ICE's handling" of the global pandemic); *Am. Oversight v.
U.S. Dep't of State*, 414 F. Supp. 3d 182 (D.D.C. 2019) (granting preliminary injunction for
documents relevant to the ongoing impeachment inquiry); *Ctr. for Pub. Integrity v. U.S. Dep't of
Def.*, 411 F. Supp. 3d 5 (D.D.C. 2019) (granting preliminary injunction for "subject of imminent
congressional hearings and action"); *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 263
F. Supp. 3d 293 (D.D.C. 2017) (granting preliminary injunction for records related to the strike
against Syria); *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 416 F. Supp. 2d 30 (D.D.C. 2006)
(granting preliminary injunction for records in light of related ongoing congressional hearings);
*Wash. Post v. U.S. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61 (D.D.C. 2006) (granting
preliminary injunction for White House visitor logs based on the upcoming midterm elections);
*Leadership Conf. on C.R. v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005) (granting preliminary
injunction for documents concerning federal elections based on the imminent expiration of the

This Court also has jurisdiction to enter a records preservation injunction pending litigation of CREW's FOIA and FRA claims. *See, e.g.*, *CREW v. Office of Admin.*, 565 F. Supp. 2d 23, 24-25 (D.D.C. 2008) [hereinafter *CREW I*] (preservation order in FOIA case); *Armstrong v. Bush*, 807 F. Supp. 816, 820-23 (D.D.C. 1992) (preservation order in FOIA and FRA case); *Am. First Legal Found. v. Becerra*, No. CV 24-1092 (RC), 2024 WL 3741402, at *14 (D.D.C. Aug. 9, 2024) (preservation order in FRA case); *see also CREW v. Cheney*, 577 F. Supp. 2d 328, 341-42 (D.D.C. 2008) [hereinafter *CREW II*] (preservation order in Presidential Records Act case).

## LEGAL STANDARD

To "warrant preliminary injunctive relief, the moving party must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (citations omitted). "When the movant seeks to enjoin the government, the final two . . . factors—balancing the equities and the public interest—merge." *D.A.M. v. Barr*, 474 F. Supp. 3d 45, 67 (D.D.C. 2020) (citing *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)).

Courts in this Circuit continue to apply a "sliding scale" approach to requests for preliminary injunctive relief, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C.

---

Voting Rights Act); *Aguilera v. F.B.I.*, 941 F. Supp. 144 (D.D.C. 1996) (granting preliminary injunction for records related to requester's role as an FBI informant ahead of evidentiary hearing).

Cir. 2022) (cleaned up) (noting potential tension in case law but reserving the question of "whether the sliding-scale approach remains valid"); *Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, No. 22-1043, 2024 WL 3443596, at *1-2 (D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding-scale precedent). But because Plaintiff satisfies "each of the four preliminary injunction factors, this case presents no occasion for the court to decide whether the 'sliding scale' approach remains valid." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).

## ARGUMENT

CREW is entitled to a preliminary injunction because it is likely to succeed on its claims that Defendants have violated FOIA, there is an urgent need to inform the public about the matters that are the subject of CREW's requests and to prevent irreparable harm if the records are not promptly processed and preserved, and the balance of equities and public interest favor the requested relief.

### I.    CREW is likely to succeed on the merits.

#### A.    CREW is entitled to complete production of responsive records before government funding expires on March 14, 2025.

CREW is entitled to expedited production ahead of the looming congressional appropriations process. FOIA provides that "[a]n agency shall process *as soon as practicable* any request for records to which the agency has granted expedited processing." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added). Where expediting processing has been granted by an agency or compelled by a court, "courts in this District have required the government to process FOIA requests by a date certain . . . to avoid the records requested becoming stale after that date, and thus being 'of little value' to 'inform the public of ongoing proceedings of national importance.'

17

Thus, under those circumstances, a plaintiff may demonstrate a likelihood that it is entitled to have processing completed quickly enough so that "the value of the information would not be lessened or lost." *Brennan Ctr. for Just. at NYU Sch. of Law v. Dep't of Com.*, 498 F. Supp. 3d 87, 99 (D.D.C. 2020) (citing *Ctr. for Pub. Integrity v. U.S. Dep't of Defense*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019); *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 185 (D.D.C. 2019); *Wash. Post*, 459 F. Supp. 2d at 76).

FOIA Request No. 2025-373 seeks records reflecting communications between employees of OMB and various persons purporting to have an affiliation with DOGE (and later USDS), between employees of OMB and individuals purporting to have an affiliation with the "Delivering Outstanding Government Efficiency Caucus," communications within those agencies about "DOGE" and related terms, and other DOGE-related communications and records. Ex. A. FOIA request Nos. 2025-573 and 2025-574 seek records related to USDS and its predecessor's organization and structure, operations, financial disclosures, communications with other agencies, budget and expenditures, and purported legal authorities. Ex. C & D. OMB and USDS having granted expedited processing for all three FOIA requests, such processing and production of records must be completed sufficiently in advance of the expiration of the continuing resolution on March 14, 2025, since "the value of the information would be lessened or lost" after that. *Brennan Ctr.*, 498 F. Supp. 3d at 99.

### i. OMB and USDS are subject to FOIA and the FRA.

As a threshold matter, both OMB and USDS are subject to FOIA and, in turn, the FRA. *See Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996) ("[T]he coverage of the FRA is coextensive with the definition of 'agency' in the FOIA."). That OMB is subject to FOIA is settled law. *See Cause of Action Inst. v. Off. of Mgmt. & Budget,* 10 F.4th 849, 855-58

18

(D.C. Cir. 2021); 5 C.F.R. § 1303.1 (OMB FOIA regulations). While USDS is a newly-formed entity within the Executive Office of the President ("EOP"), it too is a FOIA-covered agency under controlling precedent.

"By its terms, FOIA applies only to an 'agency.'" *CREW v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) [hereinafter *CREW III*]. FOIA defines agency to "include[] any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency." 5 U.S.C. § 552(f)(1) (emphasis added). USDS fits this definition exactly because it was created by Executive Order as an "establish[ment] in the Executive Office of the President."[46] USDS also satisfies the D.C. Circuit's requirement that an "EOP unit" otherwise within that statutory definition is only "subject to FOIA" if it "wield[s] substantial authority independently of the President." *CREW III*, 566 F.3d at 222. In evaluating whether an EOP component wields "substantial independent authority," the Court must consider both the functions the EOP component "performs *or* is authorized to perform." *Id.* at 224 (emphasis added); *see also id.* at 225 (court must consider both unit's "authority *and* operations") (emphasis added).

Here, USDS is wielding substantial—and indeed unprecedented—independent authority that goes far beyond advising the President. Executive Orders purport to vest USDS and its Administrator with decisionmaking authority over whether to fill career vacancies at *every federal agency*; discretion over the appointment of USDS personnel embedded at each agency and direction of their work; unfettered access to highly sensitive agency data; and shared

---

[46] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).

authority (in consultation with agency officials) to determine whether it is in the national interest

to lift the hiring freeze at IRS. *See supra* Background Part II. USDS also has a defined structure

with its own staff, including the USDS Administrator, DOGE Teams at every executive branch

agency who report to the USDS Administrator, and a temporary organization operating within

USDS that reports to the USDS Administrator. *See supra* Background Part I. USDS's "definite

structure" and "separate staff" are hallmarks of FOIA-covered EOP components. *Meyer v. Bush*,

981 F.2d 1288, 1296 (D.C. Cir. 1993).

   In practice, USDS personnel have reportedly played a leading role in unlawfully

"deleting" independent agencies created by Congress, including the CFPB, USAID, and the

Department of Education, and functionally taken control of other agencies; they have claimed

credit for cancelling billions of dollars in federal contracts; they have gained potentially illegal

access to systems containing highly restricted and confidential data, including classified material

and millions of Americans' personal data, across more than a dozen agencies; they have gained

potentially illegal access to a highly sensitive payment system used by the Treasury Department

to disburse trillions of tax dollars every year; and they have published classified information. *See*

*supra* Background Part II. USDS's authority and operations are more substantial and

independent than other EOP components the Circuit has held are covered by FOIA. *See, e.g.*,

*Pac. Legal Found. v. Council on Env't. Quality*, 636 F.2d 1259, 1262 (D.C. Cir. 1980) (holding

that the Council on Environmental Quality is subject to FOIA because it "coordinate[s] federal

programs related to environmental quality[,] . . . issue[s] guidelines to federal agencies for the

preparation of environmental impact statements," and "issue[s] regulations to federal agencies

for implementing all of the procedural provisions of [the National Environmental Policy Act.");

*Soucie v. David*, 448 F.2d 1067, 1073–75 (D.C. Cir. 1971) (holding that the Office of Science

and Technology is covered by FOIA because it has independent authority to evaluate federal scientific research programs, initiate and fund research projects, and award scholarships).[47]

For precisely these reasons, another judge in this District recently indicated that USDS is a FOIA-covered agency. *See AFL-CIO v. Dep't of Labor*, No. 25-cv-339-JDB, ECF No. 34 (D.D.C. Feb. 14, 2025). As the court explained, "USDS appears to do much more than advise and assist the President. USDS's mission, per the Executive Order, is to 'implement' the President's modernization agenda, not simply to help him form it. . . . [I]t is apparent that USDS is coordinating teams across multiple agencies with the goal of reworking and reconfiguring agency data, technology, and spending. That is not the stuff of mere advice and assistance." *Id.* at 6-7 (cleaned up).

Records created, used, or obtained by Mr. Musk in the course of his work with USDS are subject to FOIA and the FRA to the same extent as all other USDS records. "[I]n FOIA cases, 'the burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not agency records.'" *Cause of Action Inst.*, 10 F.4th at 854 (quoting *DOJ v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989) (cleaned up)). Although the Trump administration has not publicly identified the USDS Administrator and has claimed that Mr. Musk is not an "employee"

---

[47] Indeed, USDS is effectively operating as a new federal department, housed within EOP, superintending all manner of major Executive Branch functions. Given its lack of statutory authorization, USDS's operations may well be unconstitutional since "[a]dministrative agencies are creatures of statute," not executive action alone, and "possess only the authority that Congress has provided." *Nat'l Fed. of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). Yet for purposes of determining whether USDS is subject to FOIA, the question is not whether its operations are *lawful* but rather whether they are "substantial" and "independent." That they are.

of USDS,[48] a vast record of public statements by President Trump, his representatives, and Mr. Musk demonstrate that he is the leader and de facto administrator of USDS.

Prior to his inauguration, President Trump announced that Mr. Musk would be the head of what was then called the Department of Government Efficiency, and would become the USDS, on November 12, 2024, said that he would "create the new Department of Government Efficiency, headed by Elon Musk" on December 22, 2024, and said "We will create the new Department of Government Efficiency, headed by a gentleman named Elon Musk" on January 19, 2025, the day before he created the USDS.[49]

President Trump and his representatives have continued to affirm Mr. Musk's status as the de facto administrator of USDS since its creation. On February 9, 2025, President Trump indicated that Mr. Musk personally hired his USDS personnel when he said Mr. Musk "comes in with a hundred very smart people."[50] On February 18, 2025, the day after the Administration claimed in litigation that Mr. Musk was not an employee of USDS, the President responded to the suggestion that Mr. Musk was his "tech support" by saying, "No, no . . . He is much more

---

[48] *See* Declaration of Joshua Fisher, *New Mexico v. Musk*, No. 25-cv-00429 (D.D.C. Feb. 17, 2025), ECF No. 24-1.

[49] Aaron Blake, *The White House's many contradictions on Musk running DOGE*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/politics/2025/02/18/trump-musk-doge-contradictions/. Mr. Ramaswamy ended his association with the Department of Government Efficiency and USDS on January 20, 2025, the day that USDS was created, after reportedly clashing with Mr. Musk. *See* Adam Gabbatt, *Vivek Ramaswamy quits 'Doge' cost-cutting program leaving Musk in charge*, The Guardian (Jan. 21, 2025), https://www.theguardian.com/us-news/2025/jan/21/vivek-ramaswamy-quits-doge-elon-musk. In an X post announcing his departure, he said "It was my honor to help support the creation of DOGE. I'm confident Elon & team will succeed in streamlining government." Vivek Ramaswamy (@VivekGRamaswamy), X (Jan. 20, 2025, 6:21 PM), https://x.com/VivekGRamaswamy/status/1881482161565618648.

[50] Blake, *supra* note 49.

than that . . . But he gets it done. He's a leader[.]"[51]  The White House Press Secretary has, since USDS's creation, stated that President Trump "directed Elon Musk and DOGE" to investigate government kickbacks,[52] "directed Mr. Musk and the DOGE team to identify fraud at the Social Security Administration,"[53] and "tasked Elon Musk with administering his America first agenda[.]"[54] Most recently, on February 19, 2025, President Trump said during a speech, "I signed an order creating the Department of Government Efficiency and put a man named Elon Musk in charge."[55]

For his part, since being named as the head of the Department of Government Efficiency, Mr. Musk has, among other things, published his plan for what would become the USDS in the Wall Street Journal;[56] publicly accepted receipt via his personal X account correspondence from an interim United States Attorney that was addressed to "Elon Musk[,] DOGE[,] United States Government;"[57] and announced on his personal X account, after USDS representatives forced the effective closure of the United States Agency for International Development, that "*We* spent the weekend feeding USAID into the wood chipper."[58] During a February 11, 2025 event in the

---

[51] *Interview of President Trump and Elon Musk By Sean Hannity, "The Sean Hannity Show,"* The White House (Feb. 18, 2025), https://www.whitehouse.gov/remarks/2025/02/interview-of-president-trump-and-elon-musk-by-sean-hannity-the-sean-hannity-show/.
[52] Blake, *supra* note 49.
[53] *Id.*
[54] *Karoline Leavitt: Musk is best to 'shake up' Washington swamp*, Fox News (Feb. 17, 2025), https://www.foxnews.com/video/6368980371112.
[55] *See supra* note 44.
[56] Elon Musk & Vivek Ramaswamy, *Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government*, Wall. St. J. (Nov. 20, 2024), https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020?mod=hp_opin_pos_0.
[57] Elon Musk (@elonmusk), X (Feb. 3, 2025, 11:49 AM), https://x.com/elonmusk/status/1886457064438030687.
[58] Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM), https://x.com/elonmusk/status/1886307316804263979 (emphasis added).

Oval Office in which President Trump signed an executive order expanding USDS's operations, Mr. Musk made plain that he and USDS are one and the same, stating in response to a question about his conflicts: "Well, *we* actually are trying to be as transparent as possible. In fact, *we* post *our* actions to the DOGE handle on X [USDS's official X account] and to the DOGE website [USDS's official website]. So all of *our* actions are maximally transparent. In fact . . . I don't know of a case where an organization has been more transparent than the DOGE organization."[59] Mr. Musk was also asked "Can you talk a little bit about how closely you're working with agency heads as you're directing these cuts?" Mr. Musk not only failed to deny that he was directing the cuts, but replied "Yeah, *we* work closely with agency heads . . . It's not just *us* going in and doing things willy-nilly."[60]

Mr. Musk's personal management of USDS is reflected in its conduct, as well. For example, USDS was also responsible for sending out "fork in the road" emails offering buyouts (or "deferred resignation") to virtually every federal civilian employee.[61] "Fork in the Road," which then also became the title of the OPM page describing the buyout program to federal employees,[62] was also the subject line of a 2022 company-wide email that Mr. Musk sent to his employees at Twitter that gave them an ultimatum to commit to being "extremely hardcore" or accept a three-month's of severance pay, shortly after he purchased the company.[63] These facts reflect the simple reality that, however the Administration might label personnel to avoid

---

[59] Chris Megerian, *WATCH: Trump makes appearance with Musk, signs executive order downsizing federal workforce*, PBS News (Feb. 11, 2025), https://www.pbs.org/newshour/politics/watch-trump-makes-appearance-with-musk-signs-executive-order-downsizing-federal-workforce (emphasis added).
[60] *Id.*
[61] Danner, *supra* note 27.
[62] *See* Fork in the Road, OPM, https://www.opm.gov/fork (last visited Feb. 19, 2025).
[63] *See* Ordonez, *supra* note 29.

scrutiny, the records associated with Mr. Musk's work with USDS are USDS's agency records under FOIA, and therefore subject to both FOIA and the preservation requirements of the FRA.

To be sure, discovery will shed light on the full scope of USDS's operations. *See CREW III*, 566 F.3d at 225 (noting district court permitted targeted discovery on the White House Office of Administration's "authority and operations, an understanding of which is critical for determining whether OA is subject to FOIA"). But the existing record demonstrates that CREW is substantially likely to succeed in establishing that USDS is subject to FOIA and the FRA and all of the records it has requested are agency records that must be processed and preserved.

> ### ii. CREW is entitled to production before the congressional appropriations process concludes.

CREW is entitled to processing and production by the time that Congress is back in session on March 10, 2025, mere days before the expiration of the continuing resolution on March 14, 2025, because public disclosure of the requested documents is necessary to inform the debate about the federal government's funding and operations. *See, e.g.*, *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 12; *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 260 (D.D.C. 2005); *Am. Immigr. Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32 (D.D.C. 2020); *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d 30. "An informed public is 'a structural necessity in a real democracy." *Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 12 (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)). But an informed public can only serve its proper function when its members have timely information because "the primary value of the information lies in its ability to inform the public of ongoing proceedings of national importance[.]" *Id.* at 12 (quoting *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988)). Courts recognize the imperative of getting information into public hands

before it goes stale, understanding that "'stale information is of little value.'" *Id.* at 12-14. Here, harm to the public "occur[s] each day the [congressional] proceedings move forward without an informed public able to access relevant information." *Id.* at 13.

Courts frequently order expedited disclosure in similar circumstances. In *Center for Public Integrity*, the court addressed requests by a plaintiff that had requested information "in order to inform the public about matters relating to [a presidential] impeachment proceeding." *Id*. at 12. The court recognized that dissemination of that information "contributes to an informed electorate capable of developing knowledgeable opinions and sharing those knowledgeable opinions with their elected leaders. *Id*. at 12. The Court held that the information would become stale, and therefore of little value, after the conclusion of the impeachment proceedings and on that basis granted injunctive relief. *Id.* at 12-14. Similarly, *Brennan Center* addressed a request for records relating to "methodology used to calculate and report state-population totals" prior to an impending conclusion of the apportionment process. *Brennan Ctr.*, 498 F. Supp. 3d at 92. The court likewise recognized that "the value of the information sought by the Brennan Center to inform the public about these matters would be materially lessened or lost," because "the 2020 census and the reapportionment process will be complete" on January 25, 2021, and ordered defendants to "produce *Vaughn* indices to it on a rolling basis by January 11, 2021, in time for the Brennan Center to make use of the records by January 25, 2021." *Id.* at 100, 103; *see also Wash. Post*, 459 F. Supp. 2d at 75-76 (ordering production within 10 days considering "the impending election"); *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d at 41, 43 ("produce or identify all responsive records within 20 days of the date of this order" in light of "current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program").

26

The same circumstances exist here. CREW is seeking information from OMB and USDS that could have a direct impact on an impending matter of great public interest and has "identif[ied] a specific end point at which the information's value drops off altogether—*i.e.*, the conclusion of a process such as a legislative vote, impeachment proceeding, national census, court case, or the like." *Heritage Found. v. U.S. Env't Prot. Agency*, No. 23-cv-748, 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023), *appeal dismissed*, 2023 WL 8116008 (D.C. Cir. Nov. 17, 2023). There also is no realistic chance that requested information will otherwise come to light before the Congress acts to fund the government because USDS's website contains none of the request information and Republicans in Congress have blocked a subpoena to Mr. Musk so that the public can find out more about USDS operations.[64] *See Amer. Oversight*, 414 F. Supp. at 187 (stating that irreparable harm "stems from the fact that, if non-exempt responsive records exist, the public may not otherwise have access to them" after State Department refused to comply with Congressional subpoena in connection with impeachment inquiry); *see also Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 13 (compelling expedited processing in part on the same grounds). Only by producing the requested records "sufficiently in advance of the expiration of the continuing resolution on March 14, 2025," Ex. J & K, as CREW urged OMB and USDS to do, can the American public be armed with all of the facts for "an informed engagement with the appropriations process." *Id.*

As described above, USDS is at the heart of a larger debate about the Trump administration's efforts to cut federal spending, with Senate Minority Leader Schumer describing USDS as "using a meat axe" on the federal government and demanding that spending cuts

---

[64] *See* Pereira & O'Brien, *supra* note 6.

should occur "through a debate in Congress, not lawlessly by just implementing it,"[65] while

Senator Paul has noted the primacy of the appropriations process because USDS cannot "just not

spend."[66] The Senate Appropriations Committee Chair has commented on USDS or DOGE's

impact on the federal government's fiscal policies and Congress's involvement therein.[67] *See*

*also* Ex. J & K (quoting House Minority Leader Hakeem Jeffries' statement about OMB actions

in the appropriations process). These statements make clear not only that the debate about

appropriations is already underway, but that the operations of USDS, which are the subject of

CREW's FOIA requests, will be central to them.

In other words, public harm is occurring "each day the [congressional] proceedings move

forward without an informed public able to access relevant information." *Ctr. for Pub. Integrity*,

411 F. Supp. 3d at 13. The public needs the information requested by CREW to form

knowledgeable opinions on the composition and operations of USDS, how it has and might

continue to exert outsized control over Executive Branch operations that Congress is going to

fund, whether conflicts of interest in USDS leadership are impacting its work, and the propriety

and wisdom of federal funding for USDS.

The appropriations process is complicated and requires the reconciliation of the full

spectrum of competing interests and priorities. Decisions by the people and their representatives

in the appropriations process have real-world consequences and mistakes born of a lack of

government transparency cannot be discerned or simply undone. The American people have an

urgent need and fundamental right to understand, *while* their representatives in Congress are

---

[65] *See* Bolton, *supra* note 2.
[66] *See* Bobic, *supra* note 3.
[67] *See* Walsh, *supra* note 4.

deciding how the government will be funded and operated, what USDS is and how it is exerting its authority on the government. Only then can the public know, before it is too late, not just the extent to which the appropriations process should be used to fund or curtail USDS's activities, but also whether USDS is poised to attack and disrupt the operations that Congress sees fit to fund and authorize, as it has done since USDS was reorganized. The value of those requested records will be materially lessened if they are not disclosed in time for them to inform the public debate about how the government will be funded, which has already begun but must be resolved by March 14, 2025 at the latest, on which date the current continuing resolution that is funding the government will expire. Members of Congress are communicating to the public about their positions on USDS and the need to address its operations in the appropriations process, but without the public having the benefit of even basic information about USDS's operations, staffing, or perception of its own authority. The harm caused by that knowledge gap only grows more acute as Congress approaches the expiration of the government's funding.

CREW is therefore entitled to production of records sufficiently before the expiration of the continuing resolution on March 14 to ensure it has "time to use them." *Brennan Ctr.*, 498 F. Supp. 3d at 100; *see also id.* at 103 (setting the production deadline two weeks before records would lose value).

### B.  CREW is entitled to preservation of relevant records pending litigation.

As described *supra*, this Court has jurisdiction to enter preservation orders pending litigation of CREW's FOIA and FRA claims. In *CREW I*, CREW filed a FOIA request for records that the district court ultimately concluded, in a "close" decision, were not subject to FOIA. 565 F. Supp. 2d at 24-25. Despite the fact that the district court had ruled against CREW on the merits, the court ordered the defendants to preserve records responsive to CREW's FOIA

request pending appeal. *Id.* at 25 (granting a stay pending appeal). Without such a preservation

order, the court reasoned, it was possible that the defendant could dispose of records responsive

to CREW's FOIA requests, leaving it with "absolutely no recourse in the event that [responsive

records] were destroyed." *Id.* at 29-30; *see also Competitive Enter. Inst. v. Off. of Sci. and Tech.*

*Policy*, No. 14-cv-765, 2016 WL 10676292, at *2 (D.D.C. Dec. 12, 2016) (finding likelihood of

success for a preservation order because "this [FOIA] case presents 'serious legal questions' for

the Court to address in future merits briefing").

Here, there are indications that USDS is seeking to avoid transparency and cut corners in

various aspects of its operations, with no assurances it is properly preserving records pursuant to

the FRA. Those indications include: the apparent use of Signal, which is widely used for its auto-

delete functionality, while USDS (then called the Department of Government Efficiency) was

ramping up and began contacting agency personnel during President Trump's pre-inauguration

and the failure of USDS to confirm that its use of Signal has ceased;[68] USDS's failure to disclose

its personnel, their positions, their roles, or their employment status vis-a-vis the federal

government, including their civil service classifications or security clearances; Mr. Musk's

related suggestion that disclosing the names of its personnel is a crime;[69] USDS representatives'

refusals to identify themselves when they have demanded information from civil servants and

access to government systems;[70] USDS's apparent installation and use at OPM of a server from

---

[68] Schleifer & Ngo, *supra* note 14; *Set and manage disappearing messages*, *supra* note 15.
[69] Peter Suciu, *DOGE Employees Identified On X – Doxing Or Case Of Free Speech?*, Forbes (Feb. 4, 2025), https://www.forbes.com/sites/petersuciu/2025/02/04/doge-employees-identified-on-x--doxing-or-case-of-free-speech/.
[70] Quilty-Harper, *supra* note 41; Benjamin Siegel et al., *'What's going to break?' DOGE staffers 'scorching the earth' as they reshape federal government*, ABC News (Feb. 6, 2025), https://abcnews.go.com/Politics/whats-break-doge-staffers-scorching-earth-reshape-federal/story?id=118536035.

outside the agency;[71] and USDS's and Mr. Musk's apparent use of X accounts to conduct official business.[72] Such indications that requested records have or will be lost or destroyed justify the relief sought by CREW here. *See Landmark Legal Found. v. Env't Prot. Agency*, 910 F. Supp. 2d 270, 279 (D.D.C. 2012).

Courts have also routinely granted preliminary injunctive relief in FRA cases to ensure the preservation of relevant records pending resolution of litigation about the FRA's applicability. *See*, *e.g.*, *Am. First Legal Found.*, No. 24-cv-1092-RC, 2024 WL 3741402 at *14, *16 (granting preliminary injunction barring the Centers for Disease Control from destroying records) (citing cases); *see also CREW II*, 577 F. Supp. 2d at 339, 341-42 (granting preliminary injunction requiring the Vice President and other defendants "to preserve throughout the pendency of this litigation all documentary material" at issue and noting that "once documentary material is gone, it cannot be retrieved"). CREW has asserted FRA claims here based on Defendants' failure to comply with their non-discretionary duties to initiate an enforcement action to recover USDS records that may have been unlawfully deleted. *See* Compl. ¶¶ 115-29.

Here, as in *CREW I* and *CREW II*, there is no doubt that destruction of documents regarding the organization and communications of USDS will frustrate this Court's jurisdiction and ability to grant meaningful relief as to CREW's FOIA and FRA claims. To prevent

---

[71] Beitsch,*supra*, note 38.

[72] Department of Government Efficiency (@DOGE), X (Nov. 14, 2024, 10:03 AM), https://x.com/DOGE/status/1857076831104434289 (soliciting employment applications via direct message); Department of Government Efficiency (@DOGE), X (Feb. 16, 2025, 7:49 PM), https://x.com/doge/status/1891288881674240070?s=46&t=-tkA4Plhw0ldXWGtY5kv1A (coordinating submissions of public comments via direct message to USDS affiliates at other agencies); Elon Musk (@elonmusk), X (Feb. 3, 2025, 11:49 AM), https://x.com/elonmusk/status/1886457064438030687 (acknowledging receipt via X of a letter sent to him in his capacity as a member of USDS by a United States Attorney).

irreparable harm described *infra* Part II.B, this Court should order Defendants to preserve relevant records pending litigation.

## II.    CREW will suffer irreparable injury absent the preliminary injunction.

CREW will suffer irreparable injury absent a preliminary injunction ordering expedited production and preservation of records sufficiently in advance of March 14, 2025. USDS is currently operating without any meaningful oversight, transparency, or accountability. Each day, the agency continues its onslaught against the federal government and the rule of law. USDS has attempted to unlawfully shut down entire agencies, access Americans' personal and sensitive information, strip government workers of employment rights without due process, and has posted classified information on its website. These efforts affect not only the day-to-day lives of the American public, but also directly implicate the ongoing debate over government funding. The continuing resolution that is currently funding the government will expire on March 14, 2025, creating an urgent need for a new funding measure by that date to avert a government shutdown. As described above, the requested records are critical to help the American public make informed engagement with the appropriations process.

### A.    CREW will suffer irreparable injury absent expedited processing and production of responsive records.

"The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm." *Newby*, 838 F.3d at 7. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* at 7-8 (quoting *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006)). "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy,* 454 F.3d at 297). "[C]ourts in this District 'have generally found irreparable harm in FOIA preliminary-injunction cases only where the requested documents are

time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost.'" *Heritage Found. v. U.S. Dep't of State*, 2024 WL 4607501, at *4 (quoting *Heritage Found. v. U.S. Env't Prot. Agency*, 2023 WL 2954418, at *4 (citing cases)). This is precisely such a case.

First, CREW and the American public have already suffered actual and great harm by Defendants' violations of FOIA, and will continue to suffer such harm if OMB and USDS further delay disclosure of the requested information. CREW is primarily engaged in disseminating information to the public. CREW "is committed to protecting the rights of citizens to be informed about the activities of government officials and agencies, ensuring the integrity of government officials and agencies, and empowering citizens to have an influential voice in government decisions and in the government decision-making process through the dissemination of information about public officials and their actions." Decl. ¶ 2. As noted in the expedited processing request, "CREW's website receives hundreds of thousands of page views every month. The website includes blogposts that report on and analyze newsworthy developments regarding government ethics, corruption, and money in politics, as well as numerous reports CREW has published to educate the public about these issues. These reports frequently rely on government records obtained through FOIA." Ex. C & D. Recipients of CREW's information and analysis include the House and Senate Appropriations Committees.[73]

---

[73] *See, e.g.*, Testimony by Debra Perlin, Policy Director, & Gabriella Cantor, Senior Policy Associate, CREW, at Senate Appropriations Commerce, Justice, Science Subcommittee (May 23, 2024), https://www.citizensforethics.org/wp-content/uploads/2024/05/FY-2025-OLC-testimony-Senate-CJS.pdf; Testimony by Nikhel Sus, Senior Counsel, Complaints And Litigation, CREW, at House Appropriations Committee, Subcommittee On Commerce, Justice, Science, And Related Agencies (May 13, 2022), https://www.citizensforethics.org/wp-content/uploads/2022/05/N.Sus_CJS_Testimony.docx-1.pdf.

This case goes to the heart of CREW's mission. The information CREW seeks concerns a matter of great public importance—the organization and communications of the novel and powerful USDS. CREW seeks to increase public knowledge of USDS's activities because a public informed about its government's actions is "a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). By disseminating this information to the public, the public can use this information to participate in debate about priorities in the upcoming government funding legislation. Furthermore, for members of Congress, who will draft, debate, and ultimately vote on the funding bill, this information is necessary to have an informed debate over the appropriations process. Members of the public will not be able to meaningfully engage with their elected representatives about the appropriations process while questions about USDS's mandate, structure, and legal authority are unresolved before the expiration of the current continuing resolution.

Second, CREW's and the American public's injuries will be beyond remediation without injunctive relief from this court. Given Congress's imminent action on government funding in response to the expiration of the continuing resolution on March 14, and the deliberation and debate that is *already* underway, there is an urgent need to inform the public about USDS's operations *right now*. *See Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 12 (finding delay in processing a FOIA request involving "ongoing proceedings of national importance" would cause irreparable harm); *id*. at 13 (irreparable harm to the public "occur[s] each day the [congressional] proceedings move forward without an informed public able to access relevant information"). Both members of Congress who are critical of what they consider USDS's "lawless" use of a "meat axe" on the federal government and those who support what they consider the "good stuff" it has been doing have already made clear that their decisionmaking in the appropriations

34

process is impacted by USDS's ongoing work.[74] Americans deserve the information necessary to assess the situation for themselves and express their position to their elected representatives during the public debate and not after the course of the federal government is already set.

"District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017). The need to protect against such irreparable harm drives courts in this District to regularly grant preliminary injunctions in FOIA cases where the information would affect a developing situation of national significance. *See, e.g.*, *Wash. Post*, 459 F. Supp. 2d at 75 (in case involving disclosure of visitor logs to the Vice President's office and residence preceding the 2004 election, holding that "[b]ecause the urgency with which the plaintiff makes its FOIA request is predicated on a matter of current national debate, due to the impending election, a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."); *Leadership Conf.*, 404 F. Supp. 2d at 260 (finding urgency requirement for expedition satisfied based on "upcoming expiration of the special provisions of the Voting Rights Act in 2007"); *Brennan Ctr.*, 498 F. Supp. 3d 87 (Congress' imminent certification of the Census numbers); *Protect Democracy Project, Inc. v. United States Dep't of Just.*, 498 F. Supp. 3d 132 (D.D.C. 2020) (2020 Presidential election); *Am. Immigr. Council*, 470 F. Supp. 3d at 37 ("'public discourse around ICE's handling' of the global pandemic"); *Am. Oversight*, 414 F. Supp. 3d 182 (ongoing impeachment inquiry); *Ctr. for Pub. Integrity*, 411 F. Supp. 3d 5 (ongoing impeachment inquiry); *Protect Democracy Project, Inc. v.*

---

[74] *See* Bolton, *supra* note 2; Bobic, *supra* note 3; Walsh, *supra* note 4.

*U.S. Dep't of Def.*, 263 F. Supp. 3d 293 (D.D.C. 2017) (strike against Syria); *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d 30 (ongoing debate about the Bush administration's warrantless surveillance program).

The records that CREW has requested are highly relevant to at least two related key issues at the heart of the appropriations debate: (1) to what extent and to what level appropriations should be used to facilitate USDS's operations and (2) to what extent USDS is planning or poised to continue to influence the operations of the government for which appropriations are made. As described, *supra* Background Part I & II, USDS has had an immediate and outsized impact on the basic functions of the federal government, from the employment status of hundreds of thousands of federal workers, to the operations of entire agencies, to maintenance and access to sensitive data systems, to the disbursement of billions of dollars in taxpayer money across multiple agencies. And while its work certainly intersects with the appropriations process due to its already massive impact on spending of already appropriated funds and the fact that its own operations need to be funded,[75] USDS's operations are also inextricably linked with the appropriations process because it is, in its inception and execution, an agency designed to make extreme and immediate cuts to government spending.[76] The American public has a right to know, and CREW has a legal right to inform the public about the composition, operations, and guardrails of the agency dedicated to that mission before the appropriations process runs its course, especially when USDS has so energetically attacked

---

[75] As noted earlier, OMB has already approved a series of apportionments totaling $39,121,156 to USDS. *See supra* note 1.
[76] *See supra* Background Part II.

government functions and programs for which Congress had already appropriated funds when USDS was created.

CREW's FOIA requests target such information. The records sought by the First OMB Request would provide critical information regarding whether and to what extent the Department of Government Efficiency and its self-proclaimed allies in Congress communicated with OMB personnel, what issues they prioritized or foresaw, and how OMB prepared itself, or didn't, after Mr. Musk and Mr. Ramaswamy announced in the Wall Street Journal that they expected to work closely with OMB to cut hundreds of billions of dollars in federal spending. Ex. A.[77] The Second OMB Request would provide crucial information on the inception of USDS and how responsibly it was transformed from the United States Digital Service into an agency that directs federal employment practices, contract administration, maintenance of sensitive data, and the operations of entire agencies. Ex. C. The Second OMB Request would also provide crucial information regarding OMB's understanding or lack thereof of USDS's legal authority, operations, organization, and funding. *Id.* Finally, the USDS Request would provide the same crucial information regarding USDS's transformation, understanding of its own legal authority, operations, organization, funding, and ethical commitments, as well as information regarding how, both with respect to substance and chain-of-command, USDS communicates with other agencies. Ex. D. All of this information is highly relevant to the fundamental question of whether USDS is constituted and operated in such a way that it and its mission should be facilitated,

---

[77] Elon Musk & Vivek Ramaswamy, *Elon Musk and Vivek Ramaswamy: The DOGE Plan to Reform Government*, Wall St. J. (Nov. 20, 2024), https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020?mod=hp_opin_pos_0.

curtailed, or guarded against in the appropriations process and whether USDS is poised to thwart the spending of funds that Congress decides to appropriate.

Given USDS's relationship to congressional appropriations and the information that CREW's requests seek, CREW's right to meaningful access to public records and its ability to inform the public about USDS's ongoing operations will be irreparably harmed if defendants do not promptly process CREW's requests and produce all non-exempt records along with *Vaughn* index on an expedited schedule.

### B.  CREW will suffer irreparable injury if records are not preserved.

The potential destruction of records related to USDS operations will also irreparably harm CREW. Both FOIA and the FRA impose mandatory requirements on defendants to preserve federal records. FOIA requires federal agencies to release requested records to the public unless one or more specific statutory exemptions apply. 5 U.S.C. § 552.  The FRA requires federal agencies to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101.

DOGE's reported use of Signal in the run-up to President Trump's inauguration,[78] USDS representatives' reported refusal to identify themselves when requesting information from government employees,[79] USDS's use of an apparently private server in OPM's offices,[80] and its

---

[78] Schleifer & Ngo, *supra* note 14.
[79] Quilty-Harper, *supra* note 41.
[80] Beitsch,*supra*, note 38.

apparent conduct of official business on the social media platform X[81] all indicate that USDS personnel are not operating transparently and well may be ignoring their preservation obligations under the FRA. And Defendants' failure to respond to CREW's letters demanding assurances of FRA compliance heightens these concerns. Decl. ¶¶ 22, 24. The threat of unlawful record deletion could irreparably deprive Plaintiffs of their right to inspect USDS's records. *Cf. Armstrong*, 807 F. Supp. at 820-21 ("While the defendants contend they are not currently planning any wholesale purge of their electronic records, they are unwilling to guarantee that such a purge will not take place. In fact, history is full of instances where the outgoing President has decided to erase, burn or destroy all or substantially all [relevant] records before the end of his term.").

Courts have repeatedly held that parties entitled to government records are irreparably harmed by their premature destruction. In *Armstrong*, the court issued a temporary restraining order directing the President and the White House to preserve material stored on an electronic communications system that was at risk of destruction. 807 F. Supp. at 819, 823. Importantly, the court did so even though it was not yet in a position to conclusively rule whether the records in question were actually subject to the requirements of the FRA, instead choosing to "preserve the status quo" and ensure that the records were "saved until the Court examines these issues further or decides the case on the merits." *Id.* at 821-23. Similarly, the court in *CREW I* found that the plaintiff "would suffer irreparable harm if it were to prevail on appeal but could not ultimately access the documents responsive to its FOIA request because they had not been preserved." 565

---

[81] Kate Conger, *Elon Musk's X Becomes Weapon in Government Cost Cutting*, N.Y. Times (Feb. 4, 2025), https://www.nytimes.com/2025/02/04/technology/elon-musk-x-doge.html.

F. Supp. 2d at 30; *see also*, *e.g.*, *Am. First Legal Found.*, 2024 WL 3741402, at \*14 (noting that "courts have recognized the irreparable nature of the government's failure to properly preserve records while litigation is pending.") (first citing *CREW I*, 565 F. Supp. 2d at 29-30; then citing *CREW v. Exec. Off. of President*, 587 F. Supp. 2d 48, 59-61 (D.D.C. 2008)); *CREW II*, 577 F. Supp. 2d at 339, 328, 341-42 (finding that "the damage [from wrongful document destruction] is inherently irreparable; once documentary material is gone, it cannot be retrieved.").

Courts have thus consistently held that the wrongful destruction of government records irreparably harms those with a right to access them and granted relief to prevent such harm, even before conclusively establishing plaintiffs' legal entitlement to access. In this case, indicia of USDS's efforts to avoid transparency and lack of diligence with regard to the maintenance of records create risks of irretrievable harm to Plaintiff and any other person seeking access to USDS's records. This Court should act to prevent the deletion of USDS records, and the resulting irreparable harm to Plaintiffs and the public, until it has had an opportunity to fully resolve Plaintiff's claims.

## III. The balance of equities and public interest favor granting a preliminary injunction.

The balance-of-equities and public-interest factors likewise weigh strongly in favor of issuing a preliminary injunction. These factors require courts to "balance the competing claims of injury and . . . consider the effect on each party with the granting or withholding of the requested relief," in addition to paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). When "the Government is the opposing party," the two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

With respect to CREW's records preservation requests, the immediate relief that CREW seeks will require nothing more of the Defendants than what the law already mandates: the preservation of agency records under agency custody pursuant to the FRA, 44 U.S.C. §§ 3101 *et seq*. Requiring Defendants to comply with the law cannot properly be characterized as a burden. As the D.C. Circuit has recognized, "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (cleaned up).

Indeed, courts have recognized in circumstances substantially similar to those present here that preliminary relief requiring document preservation is appropriate "where the parties dispute the adequacy of the government's record keeping procedure[s]." *Armstrong*, 807 F. Supp. at 823; *see also Am. Friends Serv. Comm. v. Webster*, 485 F. Supp. 222, 234-35 (D.D.C. 1980) ("the imposition of a judicially-imposed moratorium on the further destruction of FBI files under satisfactory record-retention standards and procedures are established would not impose an injury on defendants outweighing the harm done to plaintiffs from a failure to grant relief."). Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *accord R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).

Furthermore, CREW simply seeks to enforce preservation obligations to which Defendants already are subject as part of this litigation. A party to litigation has an obligation "to preserve potentially relevant evidence once that party anticipates litigation." *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011) (cleaned up). Consistent with that obligation,

41

CREW sought assurances that Defendants were complying with their preservation obligations—assurances made all the more necessary by the speed of USDS's work and its reported use of Signal. Requiring Defendants to comply with their preservation obligations during the pendency of this litigation simply reinforces an obligation they already bear.

With respect to CREW's FOIA processing claims, a preliminary injunction serves "the citizens' right to be informed about 'what their government is up to.'" *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989); *see also Ctr. to Prevent Handgun Violence v. U.S. Dep't of the Treasury*, 49 F. Supp. 2d 3, 5 (D.D.C. 1999) (describing the "public benefit in the release of information that adds to citizens' knowledge" of government activities). "[P]ursuant to the statutory provision mandating expedited treatment, the public's interest in expedited processing of the plaintiff's request outweighs any general interest that it has in first-in-first-out processing of FOIA requests." *Wash. Post*, 459 F. Supp. 2d at 76 (citing *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977)). Where, as here, "[t]he government concedes that the plaintiff here has a statutory right to expedited processing" with respect to CREW's three FOIA requests, "the public's interest in this case is best assessed through the statutory provisions passed by the public's elected representatives." *Wash. Post*, 459 F. Supp. 2d at 76; *see also Ctr. for Pub. Integrity*, 411 F. Supp. 3d at 14 (finding that in view of the ongoing impeachment proceedings, "extraordinary circumstances presented in this case warrant such line-cutting"); *Brennan Ctr.*, 498 F. Supp. 3d at 103 ("Although Defendants will have to process and produce these records quickly, and face substantial backlogs, their burden is outweighed by the Brennan Center's pressing need for the information and the public interest in being informed on a matter—the 2020 census and reapportionment of seats in the House of Representatives—that is of 'the highest national concern.'").

42

It is essential that the public has as much relevant information as possible about USDS's secretive and highly consequential operations. The public needs information that can inform how it engages its elected representatives before the funding bill is drafted and voted on. Moreover, the passage of time shrinks the window for the public to learn about USDS's impact on federal grants, contracts, hiring, and funding, as well as the window for members of the public to voice their opinions about these matters before the use of the federal government's funds in the coming months are fixed by a new appropriations bill. A preliminary injunction requiring timely processing and disclosure of records concerning USDS's formation, structure, and operations is decidedly in the public interest.

**CONCLUSION**

For the foregoing reasons, Plaintiff requests that this Court issue a preliminary injunction requiring Defendants to fully process and produce all non-exempt records along with *Vaughn* index sufficiently in advance of March 14, 2025, no later than March 10, 2025, and preserve all potentially relevant records pending final resolution of the case.


Dated: February 20, 2025                    Respectfully submitted,

                                            */s/ Nikhel S. Sus*_____

                                            Nikhel S. Sus (D.C. Bar No. 1017937)
                                            Jonathan E. Maier* (D.C. Bar No. 1013857)
                                            Donald K. Sherman* (D.C. Bar No.
                                            90031810)
                                            CITIZENS FOR RESPONSIBILITY AND
                                            ETHICS IN WASHINGTON
                                            P.O. Box 14596
                                            Washington, D.C. 20044
                                            Telephone: (202) 408-5565
                                            Fax: (202) 588-5020
                                            jmaier@citizensforethics.org
                                            nsus@citizensforethics.org
                                            dsherman@citizensforethics.org

                                            *Counsel for Plaintiff*

                                            **Pro hac vice* application forthcoming

44