UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CITIZENS FOR RESPONSIBILITY AND
ETHICS IN WASHINGTON,
              Plaintiff,

        v.

U.S. DOGE SERVICE, *et al.*,
              Defendants.

Case No. 1:25-cv-00511 (CRC)

**MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 4

    I.      Freedom of Information Act .................................................................... 4

    II.    The United States DOGE Service............................................................ 5

    III.   Procedural Background ........................................................................... 6

ARGUMENT ....................................................................................................................... 10

    I.      Legal Standard ...................................................................................... 10

    II.    CREW Has Failed To Carry Its Heavy Burden To Show Entitlement to
           Preliminary Injunction Requiring Processing By A Date Certain ...................... 11

          A.    CREW Has Not Demonstrated That It Will Suffer Irreparable Harm ......11

          B.    CREW Has Not Demonstrated Likelihood of Success on the Merits .... 18

          C.    The Public Interest and Balance of Equities Weigh Against a Preliminary
                Injunction…………………………………………………………..…… 20

    III.   CREW Is Not Entitled To A Preservation Order From This Court ...................... 21

CONCLUSION…………………………………………………………………….. ……...26

# TABLE OF AUTHORITIES

## Cases

*Aguilera v. FBI*,
    941 F. Supp. 144 (D.D.C. 1996) ........................................................................... 13

*Alcresta Therapeutics, Inc. v. Azar*,
    318 F. Supp. 3d 321 (D.D.C. 2018) ...................................................................... 11

*Al-Fayed v. CIA*,
    254 F.3d 300 (D.C. Cir. 2001) ............................................................................. 20

*America First Legal Foundation v. Becerra*,
    No. 24-cv-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024) ......................... 25

*Armstrong v. EOP*,
    1 F.3d 1274 (D.C. Cir. 1993) ............................................................................... 25

*Aviles-Wynkoop v. Neal*,
    978 F. Supp. 2d 15 (D.D.C. 2013) ....................................................................... 11

*\*Brennan Center for Justice v. Department of Commerce*,
    498 F. Supp. 3d 87 (D.D.C. 2020) ........................................................... 12, 13, 14

*\*Center for Public Integrity v. U.S. Department of Defense*,
    411 F. Supp. 3d 5 (D.D.C. 2019) .............................................................. 13, 14, 15

*CityFed Financial Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995) ............................................................................... 11

*Columbia Hospital for Women Foundation, Inc. v. Bank of Tokyo–Mitsubishi Ltd.*,
    15 F. Supp. 2d 1 (D.D.C. 1997) ........................................................................... 11

*Competitive Enterprise Institute v. Office of Science and Technology Policy*,
    No. 14-cv-765, 2016 WL 10676292 (D.D.C. Dec. 12, 2016) ............................... 25

*Cornish v. Dudas*,
    540 F. Supp. 2d 61 (D.D.C. 2008) ....................................................................... 11

*\*Democracy Forward Foundation v. U.S. General Services Administration*,
    393 F. Supp. 3d 45 (D.D.C. 2019) ....................................................................... 23

*Electronic Privacy Information Center v. Department of Defense*,
    355 F. Supp. 2d 98 (D.D.C. 2004) ......................................................................... 5

*Electronic Privacy Information Center v. Department of Justice*,
    15 F. Supp. 3d 32 (D.D.C. 2014) ......................................................................... 11

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
    920 F.3d 1 (D.C. Cir. 2019) .................................................................................. 10

*\*Heritage Foundation v. DOJ*,
    No. 23-cv-1854-DLF, 2023 WL 4678763 (D.D.C. July 19, 2023) ..................................... 12, 19

*\*Heritage Foundation v. EPA*,
    No. 23-cv-748 (JEB), 2023 WL 2954418 (D.D.C. Apr. 14, 2023) .............................. 3, 12, 14

*\*Heritage Foundation v. U.S. Department of State*,
    No. 24-cv-2862 (TJK), 2024 WL 4607501 (D.D.C. Oct. 29, 2024)......................................... 14

*Leadership Conference on Civil Rights v. Gonzales*,
    404 F. Supp. 2d 246 (D.D.C. 2005)......................................................................... 13

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................................................. 11

*Munaf v. Geren*,
    553 U.S. 674 (2008) .......................................................................................... 10

*N.Y. Times Co. v. Defense Health Agency*,
    No. 21-cv-566-BAH, 2021 WL 1614817 (D.D.C. Apr. 25, 2021).................................... 12, 18

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
    48 F. Supp. 3d 87 (D.D.C. 2014) ............................................................................ 10

*Payne Enterprises, Inc. v. United States*,
    837 F.2d 486 (D.C. Cir. 1988) ............................................................................... 3

*Protect Democracy Project, Inc. v. United States Department of Justice*,
    498 F. Supp. 3d 132 (D.D.C. 2020) ......................................................................... 16

*Public Citizen Health Research Group v. Acosta*,
    363 F. Supp. 3d 1 (D.D.C. 2018)............................................................................. 10

*Sampson v. Murray*,
    415 U.S. 61 (1974)............................................................................................ 11

*Wadelton v. Department of State*,
    941 F. Supp 2d 120 (D.D.C. 2013).......................................................................... 21

*Washington Post v. U.S. Department of Homeland Security*,
    459 F. Supp. 2d 61 (D.D.C. 2006) .......................................................................... 13

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).............................................................................................. 10

*Wolfe v. Department of Health & Human Services*,
  711 F.2d 1077 (D.C. Cir. 1983) ............................................................................. 23

## Statutes

5 U.S.C. § 552(a)(6)(E) ......................................................................................... 5, 19

5 U.S.C. § 552(a)(6)(E)(i)(I) ...................................................................................... 5

5 U.S.C. § 552(a) (6)(E)(i)(II) .................................................................................... 5

5 U.S.C. § 552(a)(6)(E)(iii) ........................................................................................ 5

5 U.S.C. § 706(1) ....................................................................................................... 9

5 U.S.C. § 3161 .......................................................................................................... 6

28 U.S.C. § 1361 ...................................................................................................... 10

44 U.S.C. § 3106(a) ................................................................................................. 22

## Executive Orders and Regulations

Exec. Order No. 14158,
  90 Fed. Reg. 8441 (Jan. 29, 2025) ...................................................................... 8, 17

Exec. Order No. 14170,
  90 Fed. Reg. 8621 (Jan. 30, 2025) ........................................................................ 17

Exec. Order No. 14210,
  90 Fed. Reg. 9669 (Feb. 11, 2025) ........................................................................ 17

5 C.F.R. § 1303.40(e)(1)(i)-(iv) ............................................................................ 5, 7

28 C.F.R. § 16.5(e)(1)(ii) ........................................................................................... 7

## Other Authorities

Andrew Lautz and Arianna Fano, Bipartisan Policy Center, *What You Need to Know About Continuing Resolutions*,
  https://bipartisanpolicy.org/explainer/what-to-know-about-continuing-resolutions/ ............... 15

Theodore Schleifer & Madeleine Ngo, *Inside Elon Musk's Plan for DOGE to Slash Government Costs*, N.Y. Times, Jan. 12, 2023 (updated Jan. 23, 2023)
  https://www.nytimes.com/2025/01/12/us/politics/elon-musk-doge-government-trump.html  22, 24

## INTRODUCTION

The Freedom of Information Act (FOIA) provides simple and clear procedures for requesters to seek agency records. In the ordinary course, agencies will provide documents in a roughly first-in, first-out basis. In extraordinary situations, an agency will grant expedited processing and produce information "as soon as practicable." If a requester is aggrieved by a denial or delay in responding to its request, Congress has authorized rapid suit in federal court to litigate the controversy. Indeed, an agency is permitted just 10 calendar days to adjudicate a proper request for expedition, after which the requester may litigate the propriety of the expedition request. And just 30, rather than the standard 60, days after that, the government must provide its responsive filing in court. Congress has thus balanced the public's right to information against the agencies' limited resources and competing responsibilities. Plaintiff Citizens for Responsibility and Ethics in Washington (CREW) seeks to bypass statute, regulation, and all other requesters by rushing to court for a preliminary injunction that would require Defendants to complete the processing of all three of its expansive FOIA requests no later than eleven days from today—even though its two recent FOIA requests to OMB are *currently receiving* the highly favored expedited treatment reserved for only a small percentage of FOIA requests. Because CREW satisfies none of the requirements for this extraordinary relief, the court should deny the motion.

On January 24, 2025, CREW sent separate expedited FOIA requests to the Office of Management and Budget (OMB) and the United States DOGE Service (USDS)—following an earlier December 19, 2024 FOIA request to OMB as to which CREW did not initially request expedition. Collectively, CREW's requests are broad, seeking—among many other categories of records—beginning November 6, 2024, all communications between OMB and USDS personnel, all communications between OMB and the Trump/Vance transition team regarding USDS, all

1

communications between the USDS Administrator and USDS staff, and all communications between USDS personnel and personnel of any federal agency outside the Executive Office of the President regardless of subject matter. The requests also contain requests for extensive documents from January 1, 2014 to the present from the previously established United States Digital Service.[1]

OMB granted expedited processing of CREW's two January requests (as discussed below, OMB has since determined and informed CREW that the USDS Request was misdirected to OMB and has forwarded that request to USDS). And when CREW sought expedited treatment for its December request on February 11, 2024, OMB swiftly granted that request as well. As to each request, however, OMB noted "that the granting of expedited processing does not guarantee that your request will be completed by a date certain," because "OMB has a significant backlog of FOIA requests and we are doing our best to respond to each request as quickly as possible."

Notwithstanding the breadth of its requests and OMB's grant of expedited processing for the two OMB requests, CREW filed this lawsuit on February 20, 2025, and that same day sought a preliminary injunction requiring complete processing of all three of its requests no later than March 10, 2025. CREW also seeks a preservation order based on what CREW describes as "the apparent use of" the messaging service Signal by unspecified individuals allegedly planning to be associated with USDS prior to President Trump's 2025 inauguration.

CREW's request for a preliminary injunction should be denied. As this Court has repeatedly made clear, such relief—particularly preliminary injunctive relief directing processing by a date certain, which CREW seeks here—is highly disfavored in FOIA cases, and is ordinarily reserved for situations when information will become "stale" after an imminent date or completion

---

[1] CREW's January requests use "USDS" to refer both to the United States Digital Service and to the United States DOGE Service.

of an imminent event. *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988). As one court in this district has noted, courts "have generally found irreparable harm in FOIA preliminary-injunction cases only where the requested documents are time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost." *Heritage Foundation v. EPA*, No. 23-cv-748 (JEB), 2023 WL 2954418, at *4 (D.D.C. Apr. 14, 2023) (quotation marks omitted).

CREW cannot demonstrate that requisite irreparable harm here. CREW's attenuated and speculative theory of irreparable harm—that the requested documents must be released by March 10 because they are supposedly necessary to inform debates about a new government-funding bill—bears no resemblance to the rare scenarios in which this court has granted similar relief. Those cases have generally involved requests for discrete documents, that are directly tied to an imminent and time-limited public controversy. CREW's "irreparable harm" theory is almost the exact opposite in every relevant respect: CREW cannot credibly contend (and barely attempts to contend) that the records it seeks concerning USDS will become "stale" or otherwise no longer a subject of public interest after March 14, 2025, when the current legislation funding the government expires; CREW seeks broad categories of documents going back more than a decade, not specific records directly tied to a specific controversy; and the appropriations process is a continuing and frequently repeating Congressional process, not a one-time or infrequent event.

And putting all those fundamental defects aside, CREW fails to specifically explain—even as a general matter—why the broad categories of documents it seeks are important to the current appropriations process. Particularly given the substantial public and Congressional attention to USDS's activities, CREW's theory that the documents that are the subject of its FOIA requests— consisting largely of internal correspondence between and among governmental components, as

well as records long predating the current administration—are essential to imminent debates on government funding is wholly speculative and does not come close to meeting the demanding standard for the highly disfavored preliminary injunctive relief they seek.

CREW also has not shown likelihood of success on the merits. CREW has already received expedited processing for the two OMB requests, no statute or regulation entitles it to anything it has not already received, and the specific deadline it demands for completion of processing is unreasonable on its face. Relatedly, the public interest and balance of equities weigh against granting CREW's motion, which would disadvantage other FOIA requesters who submitted requests prior to CREW and who would be bumped further back in line.

Finally, there is no basis for CREW's request that this court enter an order requiring Defendants to preserve potentially responsive records. CREW points to a single news article suggesting without significant elaboration that individuals who expected to be associated with USDS communicated via Signal on unspecified topics. CREW provides no evidence of improper conduct, and even CREW's vague allegations entirely concern alleged communications that occurred before President Trump took office in 2025—and it is well established that neither FOIA nor the Federal Records Act applies to such documents. CREW thus provides no evidence that Defendants are violating, or will violate, any preservation-related obligation to which they are subject.

Accordingly, CREW's motion for preliminary injunction should be denied.

## BACKGROUND

### I.    Freedom of Information Act

Agencies ordinarily process FOIA requests on a first-in, first-out basis. In 1996, Congress amended FOIA to provide for "expedited processing" of certain categories of requests. *See*

Electronic Freedom of Information Amendments of 1996 (EFOIA), Pub. L. No. 104-231, § 8, 110 Stat. 3048, 3051-52 (codified at 5 U.S.C. § 552(a)(6)(E)). Expedition, when granted, entitles requesters to move ahead of requests filed previously by other persons but behind other requests previously granted expedited processing. *See Electronic Privacy Information Center v. Department of Defense*, 355 F. Supp. 2d 98, 104 (D.D.C. 2004).

As part of EFOIA, Congress directed agencies to promulgate regulations providing for expedited processing of requests for records (i) "in cases in which the person requesting the records demonstrates a compelling need," 5 U.S.C. § 552(a)(6)(E)(i)(I); and (ii) "in other cases determined by the agency." *Id.* § 552(a)(6)(E)(i)(II). OMB regulations provide for expedited processing of FOIA requests where, "(i) [t]he lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; (ii) [t]here is an urgency to inform the public about an actual or alleged Federal Government activity; (iii) [f]ailure to respond to the request expeditiously would result in the loss of due process rights in other proceedings; or (iv) [t]here are possible questions, in a matter of widespread and exceptional public interest, about the Government's integrity which affect public confidence." 5 C.F.R. § 1303.40(e)(1)(i)-(iv). FOIA provides that "[a]n agency shall process as soon as practicable any request for records to which the agency has granted expedition," 5 U.S.C. § 552(a)(6)(E)(iii), but sets forth no specific timetables for processing any particular request as to which expedition is granted.

## II.    The United States DOGE Service

On January 20, 2025, President Trump signed Executive Order 14,158, which directs changes to the previously established United States Digital Service in order to implement the President's agenda of "improv[ing] the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." 90 Fed. Reg. 8441, § 4 (USDS

E.O.). The USDS E.O. redesignated the United States Digital Service as the Department of Governmental Efficiency Service, or U.S. DOGE Service, and moved it out of OMB and made it a free-standing component of the Executive Office of the President (EOP). *Id.* § 3(a). Similarly, it established a "U.S. DOGE Service Temporary Organization" within USDS pursuant to 5 U.S.C. § 3161, which will terminate on July 4, 2026. USDS E.O. § 3(b). Agency heads are required under the USDS E.O. to establish within their respective agencies a USDS Team of at least four employees, which may include Special Government Employees. *Id.* § 3(c).

### III.    Procedural Background

On December 19, 2024, CREW submitted a FOIA request to OMB (First OMB Request) for records, from November 5, 2024 to the date the request is processed, of eight categories of documents that can be generally summarized in three parts: (1) communications between OMB personnel and Elon Musk, Vivek Ramaswamy, Antonio Gracias, William (Bill) McGinley, or Steve Davis, or any other individuals who are associated with the Department of Government Efficiency (DOGE) (or purport that they will be associated with DOGE in the future); (2) communications between OMB employees and Senator Joni Ernst, Congresswoman Marjorie Taylor Greene, or their offices "regarding DOGE, OMB's organizational structure, staffing, or expenditures or the efficiency of any of its programs, functions, or operations"; and (3) "[a]ny and all records within OMB regarding 'Department of Government Efficiency,' 'DOGE,' 'Government Efficiency Commission,' 'Delivering Outstanding Government Efficiency Caucus,' or 'DOGE Caucus.'" *See* ECF No. 2-2 (Maier Decl.) Ex. A at 2. The next day, OMB acknowledged receipt of the First OMB Request and assigned it tracking number 2025-373. Maier Decl. Ex. B. CREW did not request expedited processing of the First OMB Request at that time.

On January 24, 2025, CREW submitted another FOIA request to OMB (Second OMB

Request), Maier Decl. Ex. C, and a request to USDS (USDS Request), Maier Decl. Ex. D. The Second OMB Request seeks, from November 6, 2024 to the date the request is processed, broad categories of documents, including all communications of any kind between OMB and USDS personnel, all communications between OMB personnel and the Trump-Vance transition team regarding USDS, all memoranda, directives, or policies regarding performance evaluations of employees of USDS, and all ethics pledges, waivers, or financial disclosures executed by USDS personnel. Maier Decl. Ex. C at 2. The USDS Request seeks similar categories of information, as well as "[a]ll communications" of any kind between the USDS Administrator and USDS staff and "[a]ll communications" of any kind "between USDS personnel and personnel of any federal agency outside of the Executive Office of the President." Maier Decl. Ex. D at 2.

Both the Second OMB Request and the USDS Request also cover additional categories of documents spanning more than eleven years (from January 1, 2014 to January 19, 2025), including memoranda, directives, and policies regarding the scope of USDS's legal authority and the scope of its work with federal agencies, documents regarding USDS's total budget and expenditures for each fiscal year from 2014 to 2025, "[a]ll documents regarding funding requests or justifications that related to or included USDS operations," as well as all financial disclosures, ethics pledges, and waivers executed by USDS personnel. Maier Decl. Ex. C at 2-3; Maier Decl. Ex. D at 2-3.

CREW requested (at the time of each request, on January 24) expedited processing for both the Second OMB Request and the USDS Request, contending that "CREW is entitled to expedited processing because (1) '[t]here is an urgency to inform the public about an actual or alleged Federal Government activity,' 5 C.F.R. § 1303.40(e)(1)(ii) and CREW 'is primarily engaged in disseminating information,' 28 C.F.R. § 16.5(e)(1)(ii); and (2) [t]here are possible questions, in a matter of widespread and exceptional public interest, about the Government's integrity which

affect public confidence,'" *id.* § 1303.40(e)(1)(iv)." Maier Decl. Ex. C at 3 (alterations in original); Maier Decl. Ex. D at 3 (alterations in original). OMB granted both expedition requests on January 29. Maier Decl. Ex. H at 2; Maier Decl. Ex. I at 2. In each instance, OMB explained:

> Please understand, however, that the granting of expedited processing does not guarantee that your request will be completed by a date certain. OMB has a significant backlog of FOIA requests and we are doing our best to respond to each request as quickly as possible.

Maier Decl. Ex. H at 2; Maier Decl. Ex. I at 2. CREW then sent a follow-up letter on February 7, 2025, requesting that OMB finish processing both requests by March 1, 2025, noting that the continuing resolution currently funding the government expires on March 14, 2025 and contending that "[t]he records requested by CREW—OMB and USDS records related to the structure and operations of USDS—are critical for the American public to have an informed engagement with the appropriations process." Maier Decl. Ex. J at 3.

On February 11, 2025, CREW requested expedited processing of the First OMB Request, submitted on December 19, 2024, and further requested that OMB complete processing that request by March 1, 2025. Maier Decl. Ex. K at 2. On February 14, 2025, OMB granted that expedition request as well but did not promise to complete processing by March 1 as CREW requested, instead including the same language quoted above (i.e., noting, inter alia, that expedition does not guarantee completion of processing by a date certain). Maier Decl. Ex. L.

OMB subsequently determined that the USDS Request was misdirected to OMB. In a February 25 letter to CREW, OMB explained that, because the U.S. DOGE Service is not housed within OMB, it was administratively closing the FOIA Request within OMB.[2] *See* Walsh Decl.

---

[2] CREW states in the USDS Request that a help desk attendant at OMB directed it to submit the USDS Request through OMB. Maier Decl. Ex. D at 2 n.1. That procedure was not correct. After January 20, 2025, USDS moved out of OMB and became a free-standing component of EOP that reports to the White House Chief of Staff, *see* Exec. Order No. 14158 § 3(a), 90 Fed. Reg. 8441

Exhibit 1. Although OMB is not required to forward misdirected requests outside OMB, it nonetheless forwarded the USDS Request to USDS given the extenuating circumstances. *Id.*

Separately, on January 15, 2025, CREW sent a letter to the National Archives and Records Administration (NARA) as well as OMB demanding that NARA and OMB "investigate the potential unauthorized destruction of federal or presidential records." Maier Decl. Ex. M at 2. On January 27, 2025—after the new Administration took office—CREW again sent a letter to NARA and OMB (as well as USDS). Maier Decl. Ex. N. We discuss those letters further below. *See infra* pp. 22-23.

CREW filed suit on February 20, 2025. ECF No. 1 (Compl. or Complaint). The Complaint contains three counts. Count One contends that Defendants violated FOIA by failing to timely release all requested records in full, and failing to process CREW's requests expeditiously. Compl. ¶¶ 107-113. Count Two contends that "[o]n information and belief, USDS has unlawfully deleted or failed to preserve federal records in violation of the [Federal Records Act] and NARA regulations, including but not limited to communications on Signal and emails from personal accounts," *id.* ¶ 117, contends on the basis of this allegation that USDS, OMB, and NARA have nondiscretionary obligations to initiate an FRA enforcement action through the Attorney General, and contends that Defendants' failure to initiate such an enforcement action constitutes unlawfully withheld agency action for purposes of the Administrative Procedure Act under 5 U.S.C. § 706(1) (in addition to being actionable under the APA's prohibition on arbitrary and capricious agency action, *see id.* § 706(2)(A)). Compl. ¶¶ 114-122. Count Three seeks a writ of mandamus against

(Jan. 29, 2025). As a result, USDS is not subject to FOIA. As the February 25 letter to CREW explains, OMB's FOIA Requester Service does not recall agreeing to accept FOIA requests specifically on behalf of DOGE, and it is possible that the Service misinterpreted CREW's request to refer to legacy-U.S. Digital Service records belonging to OMB. OMB regrets this misunderstanding.

all three Defendants, *see* 28 U.S.C. § 1361, based on substantially the same allegations, Compl. ¶¶ 123-128.

The same day CREW filed its Complaint, CREW filed a motion for a preliminary injunction. *See* ECF No. 2 (Motion); ECF No. 2-1 (PI Mem.) CREW requests that this Court enter a preliminary injunction directing Defendants to "fully process and produce all non-exempt records responsive to" all three FOIA requests no later than March 10, 2025, and to direct further Defendants to "preserve all potentially responsive and relevant records pending final resolution of the case, inclusive of appeals." ECF No. 2-17.

## ARGUMENT

### I.    **Legal Standard**

"A preliminary injunction is an extraordinary and drastic remedy" and "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A movant may be awarded such an "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To establish such entitlement, a movant must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20. The last two factors merge when the government is the opposing party. *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 789 2020); *accord Public Citizen Health Research Group v. Acosta*, 363 F. Supp. 3d 1, 20 (D.D.C. 2018).

"[P]laintiffs bear the burden of persuasion on all four preliminary injunction factors in order to secure such an 'extraordinary remedy.'" *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). Further, in the context of a mandatory injunction, like

the one sought here, CREW "must meet a higher standard than in the ordinary case by showing clearly that [the movant] is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." *Electronic Privacy Information Center v. Department of Justice*, 15 F. Supp. 3d 32, 39 (D.D.C. 2014) (quoting *Columbia Hospital for Women Foundation, Inc. v. Bank of Tokyo–Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997)).

## II.    CREW Has Failed To Carry Its Heavy Burden To Show Entitlement to a Preliminary Injunction Requiring Processing By A Date Certain.

### A.  CREW Has Not Demonstrated That It Will Suffer Irreparable Harm.

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). To constitute irreparable injury, the harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation and alteration omitted). Further, "irreparable harm" in the FOIA context must consist of informational harm to the *plaintiff*–plaintiffs cannot satisfy the "irreparable harm" element of the preliminary injunction standard by pointing to alleged harms faced by third parties. *See, e.g.*, *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) (noting that "injuries to third parties are not a basis to find irreparable harm"). CREW has the burden to put forth sufficient evidence to satisfy this high standard. "The movant cannot simply make 'broad conclusory statements' about the existence of harm. Rather, [the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm . . . .'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)). Accordingly, district courts have routinely rejected motions seeking an expedition order,

or date certain, through the preliminary injunction vehicle. *See, e.g.*, *N.Y. Times Co. v. Defense Health Agency*, No. 21-cv-566-BAH, 2021 WL 1614817, at *1 (D.D.C. Apr. 25, 2021) (denying preliminary injunction); *Heritage Foundation v. EPA*, No. 23-748-JEB, 2023 WL 2954418, at *6 (D.D.C. Apr. 14, 2023) (same), *appeal dismissed*, 2023 WL 8116008 (D.C. Cir. Nov. 17, 2023); *Heritage Foundation v. DOJ*, No. 23-cv-1854-DLF, 2023 WL 4678763, at *5 (D.D.C. July 19, 2023) (same), *appeal dismissed as moot*, 2023 WL 6884264 (D.C. Cir. Oct. 16, 2023).

This is a difficult showing to make, particularly in FOIA cases. Indeed, "[i]t is rare that *any* preliminary relief is appropriate in a FOIA case." *Brennan Center for Justice v. Department of Commerce*, 498 F. Supp. 3d 87, 92 (D.D.C. 2020) (emphasis in original). To be sure, in rare cases, even when an agency has granted expedited processing, "courts in this District have required the government to process FOIA requests by a date certain to avoid the records requested becoming stale after that date, and thus being of little value to inform the public of ongoing proceedings of national importance." *Id.* at 99. But the facts of those unusual cases underscore the difficulty of establishing irreparable harm warranting this type of relief.

In *Brennan Center for Justice*, for example, the plaintiff sought documents directly tied to the 2020 census, including information concerning how the Executive Branch collected certain citizenship data and used that data to calculate state-population totals for purposes of apportioning the United States House of Representatives, as well as records pertaining to the process by which the Secretary of Commerce and President would report the state-population totals to Congress. *Id.* at 95. Because the request concerned collection of information for the specific purpose of the 2020 census process (and for no other purpose), the court concluded that "this is the rare case where after a date certain, the value of the information sought by the Brennan Center to inform the public about these matters would be materially lessened or lost." *Id.* at 100. Still, the court did not

rubberstamp the plaintiff's request. Although the plaintiff requested an injunction requiring completion of processing by November 2, 2020, the court only required processing to be completed by January 25, 2021, the date by which the apportionment process would be complete. *Id.*

Similarly, in *Center for Public Integrity v. U.S. Department of Defense*, 411 F. Supp. 3d 5 (D.D.C. 2019)—on which CREW also relies, *see* PI Mem. at 26—the plaintiff sought information directly and highly probative to an imminent public debate. Specifically, the plaintiff sought communications between the Department of Defense (DOD) and OMB with DOD's comptroller concerning DOD's "Ukraine Security Assistance Initiative." *Id.* at 7. The information requested by plaintiff was "directly tied" to then-ongoing impeachment proceedings against the President of the United States, proceedings that were "of the highest national concern." *Id.* at 12. And for plaintiff, "the primary value of the information lies in its ability to inform the public of ongoing proceedings of national importance." *Id.* at 12. On these unique facts, the court ordered processing of discrete identified records on a rolling basis between December 12, 2019 and December 20, 2019. *Id.* at 8; *see also Washington Post v. U.S. Department of Homeland Security*, 459 F. Supp. 2d 61 (D.D.C. 2006) (granting a preliminary injunction where the records concerned White House visitor logs and where midterm elections were occurring shortly); *Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005) (granting expedited processing of records where the records concerned the monitoring of federal elections and certain provisions of the Voting Rights Act were set to expire); *Aguilera v. FBI*, 941 F. Supp. 144, 151 (D.D.C. 1996) (granting preliminary injunction concerning documents related to a requester's role as a confidential FBI informant ahead of an imminent evidentiary hearing).

Thus, the rare cases finding irreparable harm justifying an order to complete processing by

a date certain share several common features. First and most obviously, the information in those cases risked becoming "stale" following a specified imminent event. To be sure, if the records concerning the Ukraine Security Assistance initiative were released following the 2019 impeachment proceedings, that information would perhaps "still be of historical value," 411 F. Supp. 3d at 12, but the public interest in this information would be *substantially* reduced. So too with the citizenship data and records concerning calculation of state-population totals in *Brennan Center for Justice*, which were directly tied to the 2020 census which made use of that information. Second and relatedly, the event to which the information was uniquely relevant was a distinct and non-frequently-recurring event. Third, such injunctions have generally been limited to either identified responsive documents or discrete and narrow categories of documents. *See Center for Public Integrity*, 411 F. Supp. 3d at 7-8 (noting that Defendants identified only 120 unique records, totaling approximately 211 pages, that were responsive to the request); *Brennan Center for Justice*, 498 F. Supp. 3d at 95, 100 (in the course of granting preliminary injunction in part, *denying* an injunction as applied to a broader set of records— records "relating to the 2020 census" to the extent certain individuals and organizations were involved). And fourth, "it is not enough that the requested documents have some connection to an important event." *Heritage Foundation v. U.S. Department of State*, No. 24-cv-2862 (TJK), 2024 WL 4607501, at *5 (D.D.C. Oct. 29, 2024). Rather, "the requested records must generally be 'time-sensitive and highly probative, or even essential to the integrity, of [that] imminent event.'" *Id.* (quoting *Heritage Foundation*, 2023 WL 2954418, at *4).

That framework makes this an easy motion to resolve. CREW's irreparable-harm theory— that it "is entitled to processing and production by the time that Congress is back in session on March 10, 2025 . . . because public disclosure of the requested documents is necessary to inform

the debate about the federal government's funding and operations," PI Mem. at 25—flunks all of these benchmarks and obviously so.

For starters, CREW does not appear to seriously contend that the information it seeks concerning USDS will become stale or no longer of public interest once the current governing funding bill expires. The "U.S. DOGE Service Temporary Organization" Executive Order 14,158 creates will not terminate until July 4, 2026, more than 16 months from now. *See supra* p. 6. And as illustrated by the numerous news articles and statements from political leaders concerning USDS that CREW itself references—the vast majority of which are not specifically tied to the current Congressional appropriations process, *see* PI Mem. at 2-12 & nn. 2-44—significant public and Congressional interest in USDS's work will continue long after March 14. This is thus hardly a case where the records CREW seeks will be of mere "historical value" following that date. *Center for Public Integrity*, 411 F. Supp. 3d at 12.

In addition, to the extent the information CREW seeks is even particularly relevant to the appropriations process (and as discussed below, that is questionable), the appropriations process is of course a continuous Congressional power, and is thus nothing like the one-time events in which similar preliminary injunctions have been granted. A range of outcomes on or before March 14 is possible: (1) A short-term funding bill like the current continuing resolution that President Biden signed on December 21, 2024 that runs through March 14, 2025; (2) An even shorter term funding bill[3]; (3) A longer term funding bill; or (4) A failure to enact new government funding legislation by the deadline (in which case there would be a lapse in appropriations). But under any scenario, there will be numerous additional appropriations processes after March 14 and before

---

[3]  *See, e.g.*,  https://bipartisanpolicy.org/explainer/what-to-know-about-continuing-resolutions/ (noting that, "[f]rom 2010 to 2022, policymakers passed 47 continuing resolutions ranging in duration from one to 176 days").

July 4, 2026—to say nothing of Congress's legislative and oversight tools. This case is thus nothing like the unique and non-recurring events at issue in the cases in which similar preliminary injunctions have been granted, such as the decennial census in *Brennan Center for Justice*, the unique impeachment proceedings in which the Ukraine Security Assistance initiative was directly at issue in *Center for Public Integrity*, or a specific imminent election coupled with information directly relevant to an important public controversy concerning that election, *see Protect Democracy Project, Inc. v. United States Department of Justice*, 498 F. Supp. 3d 132 (D.D.C. 2020).

Third, unlike the narrow categories of records in the cases CREW characterizes as analogous to this one, CREW's requests are quite broad. *See supra* pp. 6-7; *infra* p. 19. These requests certainly are not reasonably targeted to documents that bear directly on an imminent and important public debate.

Fourth, the records CREW seeks are not "highly probative" let alone "essential to the integrity" of public debates about how the Government will be funded after March 14. Although USDS's work is obviously important, CREW's sweeping requests for information about a single component on their face do not go to the core of Congress's debate about how to fund the *entire* government. But even putting that aside, the link between the information CREW seeks and any imminent public funding debate is, to put it charitably, highly attenuated. This is most obvious with respect to those aspects of the Second OMB Request and the USDS Request seeking records going back as far as January 1, 2014. *See* Maier Decl. Ex. C at 2; Maier Decl. Ex. D at 3. This court should reject out of hand the notion that records predating the current Administration (and as to some requested records, predating the *first* Trump Administration) are somehow essential to the integrity of funding debates in 2025 concerning USDS.

As to the portion of CREW's requests that are limited to more recent records, CREW fails to explain how this information is even likely to be particularly relevant to any imminent funding debate (putting aside that "relevance" is not sufficient, *see supra* p. 14). For starters, the putative importance of the information CREW seeks must be judged by reference to the (significant) information about USDS's activities that is *already* available. As CREW's Complaint and preliminary-injunction motion themselves make clear, USDS's activities (and associated public debates and controversies) since President Trump took office on January 20, 2025, have been *exhaustively* covered by the media, *see* PI Mem. at 2-12 & nn. 2-5, 6, 9, 13-14, 27-38, 41-44, have been the subject of multiple Executive Orders setting forth USDS's mission, its organization, and relationship to federal agencies, *see* Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025), Exec. Order No. 14170, 90 Fed. Reg. 8621, 8621 (Jan. 30, 2025), Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025), and has drawn the interest of prominent members of Congress in both parties, *see* PI Mem. at 2-3. As CREW also describes it, "Messrs. Musk and Ramaswamy described DOGE's strategic plan in the Wall Street Journal." *Id.* at 4; *see also id.* at 12 (characterizing Mr. Musk as "publicly plotting USDS's course"). CREW's contention that the public has been "kept in the dark" regarding USDS's work, PI Mem. at 1, is thus simply not credible.

And given all of this, CREW fails to explain how the additional information it seeks would be likely to significantly inform any imminent funding debate. As noted above, CREW's requests are quite broad but, to simplify just a bit, essentially encompass: (1) communications between OMB personnel and identified individuals (as well as any others associated or expected to be associated with USDS); (2) communications between OMB and USDS personnel; (3) communications between OMB and the Trump-Vance Transition Team; (4) certain internal USDS correspondence; and (5) communications between USDS personnel and personnel from federal

agencies. *See supra* pp. 6-7. Although these materials—to the extent such materials are not exempt from disclosure as deliberative or on other grounds—might be of interest to CREW or the public, it is not clear how they are probative (let alone "highly probative") to any imminent funding debate, particularly given significant publicly available information about USDS's activities. Indeed, to the extent CREW even attempts to address this question, it relies entirely on vague generalities. *See* PI Mem. at 27 (contending that "USDS is at the heart of a larger debate about the Trump administration's efforts to cut federal spending"); *id.* at 28 (contending without elaboration that "[t]he public needs the information requested by CREW to form knowledgeable opinions on the composition and operations of USDS, how it has and might continue to exert outsized control over Executive Branch operations"). This does not come close to meeting CREW's burden to show that the requested information is *essential* to the integrity of an imminent funding debate. Rather, "any link between the requested data sets" and upcoming funding debates "is, at best, speculative." *New York Times Co.*, 2021 WL 1614817, at *9.

The bottom line is straightforward. CREW wants a preliminary injunction that would provide it with all the relief it has sought in this action, and it wants an injunction that would require Defendants to provide broad categories of documents spanning back more than 11 years, and to do so 11 days from now. But CREW has not come close to establishing that its request falls within the narrow circumstances in which this court has found the requisite irreparable harm justifying such an extraordinary order. For this reason alone, the court should deny the motion.

### B.  CREW Has Not Demonstrated Likelihood of Success on the Merits

Although CREW's manifest failure to demonstrate irreparable harm by itself compels denial of its motion, CREW also has no realistic possibility—let alone a likelihood—of success on the merits. Since Defendants *granted* CREW's request for expedited processing as to the two

OMB requests, the relevant question for likelihood-of-success purposes at least for those two requests is whether CREW would be likely to succeed on its claim that it is entitled to complete processing of its FOIA requests by March 10, 2025, if that question could be fully litigated and decided before that date.

The answer to that question is plainly no. There is no provision in FOIA or any other source of law requiring production of all non-exempt responsive records on a particular date of CREW's choosing. "All the statute requires is that, once a request is expedited, the agency process it as soon as practicable." *Heritage Foundation*, 2023 WL 4678763, at *5. Indeed, there is "no authority for the proposition that *within* the category of expedited requests, [an agency] has an obligation to prioritize productions based on their 'gravity and urgency.'" *Id.* Instead, "an agency faces the same obligation for 'any' expedited request: namely, to process it 'as soon as practicable.'" *Id.* (quoting 5 U.S.C. § 552(a)(6)(E)(iii)) (emphasis omitted). And although this court has previously ordered a date certain in exceptional cases, for the reasons previously discussed, there is no basis for doing so here. *See supra* pp. 14-18.

But in addition, CREW has not demonstrated likelihood of success because the date certain it has proposed is manifestly unreasonable given the breadth of its requests. As noted, CREW seeks broad categories of records from OMB and USDS going back more than a decade. *See supra* pp. 6-7. And with respect to the more time-limited aspects of its request, CREW seeks, among other documents, all communications of any kind between the USDS Administrator and USDS staff, and all communications between any USDS personnel and any personnel from federal agencies. There is no likelihood that CREW would succeed on the merits of its argument that it is entitled to full processing of these and other expansive categories of potentially responsive records

requests by March 10.[4]

## C. The Public Interest and Balance of Equities Weigh Against a Preliminary Injunction.

Along with alleged harm to CREW, the Court must consider whether a preliminary injunction of the sort CREW demands would be in the public interest or harm nonlitigants. *See Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001). Here a preliminary injunction would not be in the public interest and would harm nonlitigants.

The primary effect of granting a preliminary injunction would be to disadvantage other requesters who would be pushed further back in the FOIA processing queue. And here that displacement would be particularly acute because CREW seeks a preliminary injunction compelling Defendants to produce all non-exempt responsive records by March 10, 2025, which is, as noted, a wholly unreasonable deadline given the breadth of the requests. *See supra* p. 19. As noted in the Declaration of Heather Walsh (Walsh Decl.) accompanying this opposition, responding to CREW's two requests to OMB will "be a massive undertaking," Walsh Decl. ¶ 34, that will be impossible to complete by March 10, *id.* ¶ 31, and that would interfere significantly with OMB's existing FOIA workload, *id.* ¶ 17-27; *see also id.* ¶ 34 (explaining that, even potentially meeting CREW's requested deadline "would bring all other OMB FOIA operations, and some non-FOIA operations, to a standstill").

CREW points to no facts that would counterbalance this harm. CREW argues that the injunction it seeks is in the public interest because "[i]t is essential that the public has as much

---

[4] CREW devotes significant space to arguing that USDS is an agency subject to FOIA. PI Mem. at 18-25. Defendants disagree. This is a question for the merits, however, once Defendants have had an opportunity to answer the complaint in the ordinary course. It should not be decided in the context of a preliminary-injunction motion seeking accelerated processing, particularly when CREW's motion fails for multiple independent reasons.

relevant information as possible about USDS's secretive and highly consequential operations" and because "[t]he public needs information that can inform how it engages its elected representatives before the funding bill is drafted and voted on." PI Mem. at 43. That logic, however, "does nothing to distinguish plaintiffs' FOIA request from any other FOIA request." *Wadelton v. Department of State*, 941 F. Supp 2d 120, 124 (D.D.C. 2013) (rejecting plaintiffs' argument that the public interest element weighed in their favor where it was "based on little more than the core purpose of FOIA being to allow the public to be informed about what their government is up to" (citations and quotation marks omitted)). Moreover, the argument fails for all the reasons previously expressed: USDS's operations have not been "secretive" and the additional information CREW seeks would have at most, a tangential and speculative effect on a frequently recurring process.

Nor is there any basis for CREW's attempt to leverage OMB's grant of expedited processing for the two OMB requests in support of their public-interest arguments. *See* PI Mem. at 42. As noted, those grants of expedited processing entitle CREW to have the OMB requests processed as soon as practicable. They do not entitle CREW to a date certain—let alone a date certain eleven days from now—and also do not entitle CREW to have those two requests prioritized over other expedited requests that Defendants received before CREW's requests. *See supra* pp. 14-18, 20. Granting CREW the relief it seeks would be contrary to the public interest, and contrary to the principles on which FOIA requests are generally processed. Accordingly, the motion should be denied.

### III.    CREW Is Not Entitled To A Preservation Order From This Court

Finally, there is no legal or factual basis for CREW's request that the Court enter an order requiring preservation of all potentially responsive and relevant records. Initially, to the extent this request is tied to CREW's claims seeking *initiation of a record recovery action* (Counts Two and

Three of its Complaint), Compl. ¶¶ 114-128, CREW has no realistic possibility—let alone a substantial likelihood—of success on those claims. The substantive base of these claims are two provisions of the Federal Records Act (FRA). The first such provision provides that:

> The head of each Federal agency shall notify the Archivist of any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records *in the custody of the agency*, and with the assistance of the Archivist shall initiate action through the Attorney General for the recovery of records the head of the Federal agency knows or has reason to believe have been unlawfully removed *from that agency*.

44 U.S.C. § 3106(a) (emphases added). The second imposes substantially the same obligation on the Archivist to notify agency heads. *See id.* § 2905(a). Thus, as CREW itself acknowledges, the obligations triggered by these provisions apply only insofar as an agency knows or has reason to know of the unlawful removal or other destruction of *federal records*. *See, e.g.*, Compl. ¶ 116.

CREW has not adequately pled a claim triggering these mandatory obligations. In support of these Counts, CREW's Complaint relies entirely on a New York Times article from January 12, 2025, alluding to communications among individuals who then expected to be associated with USDS using Signal. *See* Compl. ¶ 18 (citing Theodore Schleifer & Madeleine Ngo, Inside Elon Musk's Plan for DOGE to Slash Government Costs, N.Y. Times, https://www.nytimes.com/2025/01/12/us/politics/elon-musk-doge-government-trump.html). In its preliminary-injunction motion, CREW also cites statements of an individual CREW describes as an "insider who briefly worked with DOGE" (statements that were also included in the same New York Times article). PI Mem. at 4. CREW in turn cites to a personal blog post from this individual—which is undated but which predates President Trump's 2025 inauguration[5]—and which states that "I was added to a number of Signal groups and immediately put to work" and "I

---

[5] Maier Decl. Ex. M at 2 n.10 (noting that CREW last accessed this page on January 15, 2025, the same day it sent the letter).

was in multiple Signal groups" without providing further elaboration. *See* Vinay Hiremath Blog, *I am rich and have no idea what to do with my life*, https://vinay.sh/i-am-rich-and-have-no-idea-what-to-do-with-my-life/ [https://perma.cc/BNR5-VT4G].

The Complaint is thus clear that CREW's allegations concerning Signal use are limited to the period before President Trump's 2025 inauguration. Compl. ¶¶ 45-46. Indeed, that must be the case because both the New York Times article on which CREW relies (published January 12) and the initial letter CREW sent to NARA and OMB (on January 15) predated the current Administration. And although CREW sent a second letter purporting to recount developments since President Trump took office related to USDS, the letter did not purport to identify any evidence since President Trump took office (or since its January 15, 2025 letter) of communications on Signal or any other non-governmental communications service. Maier Decl. Ex. N at 2-4.

It is well-settled, however, that documents by transition teams or otherwise created by individuals before they join the Executive Branch are not subject to FOIA. *See, e.g.*, *Wolfe v. Department of Health & Human Services*, 711 F.2d 1077 (D.C. Cir. 1983); *Democracy Forward Foundation v. U.S. General Services Administration*, 393 F. Supp. 3d 45, 51 (D.D.C. 2019). To be sure, as the thorough discussion in *Democracy Forward Foundation* makes clear, the analysis can be complicated somewhat if such documents find their way into agency systems (though even in that case, the court held that transition-team documents were not subject to FOIA notwithstanding that they were hosted on General Services Administration systems). But there is no question that, when documents are created by individuals before they join the Executive Branch and those documents are *never* transferred to agency systems, they are not agency records subject to FOIA. Such documents are also not presidential or federal records. *See* Congressional Research Service,

Presidential and Federal Records: Transition Considerations (July 30, 2024), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12722#:~:text=NARA%20guidance%20further %20stipulates%20that,considered%20to%20be%20federal%20records.    Thus,    CREW's allegations on their face do not give rise to any obligation to initiate a recovery action.

      In addition, even putting aside those statutes' lack of coverage—which is of course itself dispositive—CREW provides no evidence of even arguably improper conduct. The New York Times article CREW cites contains only two references to Signal communications. The first quotes from the same personal blog that CREW cites in its preliminary-injunction memorandum, with the individual stating that "I was added to a number of Signal groups and immediately put to work"; the second reference simply notes that people allegedly expected to be involved in DOGE's operation    were    communicating    via    Signal.    *See* https://www.nytimes.com/2025/01/12/us/politics/elon-musk-doge-government-trump.html. There is no indication from these sources that any communications would constitute federal records if those individuals had been in the Executive Branch at the time these communications were made. But again, none of this matters because the individuals involved were not subject to obligations under the FRA to begin with.

      Finally, even if CREW's demand for a preservation order is viewed as a freestanding request *unconnected to* Claims Two and Three, it nonetheless fails. CREW asserts that it "simply seeks to enforce preservation obligations to which Defendants already are subject as part of this litigation." PI Mem. at 41; *see also id.* ("With respect to CREW's records preservation requests, the immediate relief that CREW seeks will require nothing more of the Defendants than what the law already mandates: the preservation of agency records under agency custody pursuant to the FRA."). But the relief CREW seeks is still *an injunction* that requires CREW to satisfy the four

preliminary injunction factors, including irreparable harm.

Courts "presume that executive officials will act in good faith." *Armstrong v. EOP*, 1 F.3d 1274, 1293 (D.C. Cir. 1993). Consistent with that principle, and as the cases CREW cites themselves makes clear, demonstrating irreparable harm warranting entry of such an order at least requires CREW to point to specific evidence that relevant records are at risk of being destroyed during the litigation absent such an order. For example, in *Competitive Enterprise Institute v. Office of Science and Technology Policy*, No. 14-cv-765, 2016 WL 10676292 (D.D.C. Dec. 12, 2016), the agency's director had allegedly used his personal email account to conduct agency-related business; and because the director was a political appointee scheduled to leave office in January 2017 (just over one month after the district court entered the order), it was uncertain whether the emails would at that point be subject to the agency's control. *Id.* at *3. Similarly, in *America First Legal Foundation v. Becerra*, No. 24-cv-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024), the plaintiff filed suit based on allegations that the CDC deletes the emails of its former employees after those employees leave the agency, and NARA concluded that the CDC's policies and practices were consistent with the FRA. Because, among other reasons, the very subject of the lawsuit was an alleged email-deletion practice that the plaintiff contended violated the FRA, and because the plaintiff had six pending FOIA requests seeking records from HHS, the CDC, and other HHS components, the court concluded that the plaintiff would likely suffer irreparable harm absent preliminary relief. *Id.* at *15-*16.

CREW offers no similar evidence here. CREW primarily relies on "the apparent use of Signal" during "President Trump's pre-inauguration" but, as discussed previously, this is not

evidence of a failure to preserve records subject to the FRA. *See supra* pp. 22-23.[6] CREW also provides a hodgepodge of additional allegations including, inter alia, USDS's alleged refusal to identify its personnel or their positions, and alleged social-media activity. PI Mem. at 31. Even assuming the truth of these characterizations—which Defendants do not concede—they do not suggest that Defendants are violating, or will imminently violate, any preservation-related obligations.

## CONCLUSION

For the foregoing reasons, the Court should deny the motion for preliminary injunction.

Dated: February 27, 2025          Respectfully submitted,

                                  YAAKOV M. ROTH
                                  Acting Assistant Attorney General

                                  */s/ Elizabeth J. Shapiro*
                                  Elizabeth J. Shapiro  (D.C. Bar # 418925)
                                  Deputy Director, Civil Division
                                  U.S. Department of Justice
                                  Federal Programs Branch
                                  1100 L Street, NW
                                  Washington, D.C. 20005
                                  (202) 514-3402
                                  Elizabeth.Shapiro@usdoj.gov

                                  Attorneys for Defendant

---

[6] CREW also highlights what it describes as "failure of USDS to confirm that its use of Signal has ceased." PI Mem. at 30; *see also id.* at 6 (contending that "neither DOGE nor those who publicly associated themselves with it disavowed its use of Signal in the course of conducting DOGE's business"). But as noted, CREW's letters did not provide or purport to provide evidence of improper Signal use by USDS personnel; CREW's letters thus provided nothing to "disavow."