**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DOGE SERVICE, *et al.*,<br><br>Defendants. | Case No. 1:25-cv-00511-CRC<br><br>**HEARING SCHEDULED FOR MARCH 7, 2025** |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................................... iii

**INTRODUCTION**................................................................................................................... 1

**SUPPLEMENTAL FACTS** ................................................................................................... 2

**ARGUMENT** ......................................................................................................................... 3

    I.      CREW is likely to succeed on the merits.................................................................. 3

        A.   USDS is subject to FOIA and the FRA. ............................................................. 3

        B.   CREW is entitled to FOIA production sufficiently in advance of March 14, 2025, and preservation of records pending litigation.................................................... 5

    II.     CREW will suffer irreparable injury absent a preliminary injunction........................ 6

        A.   CREW has already suffered and will continue to suffer irreparable injury absent expedited processing and production of responsive records.............................. 6

            i.     USDS's operations and secrecy continue to dominate public debate and disrupt the appropriations process.................................................................. 6

            ii.    The requested records are central to the public debate on whether and how the government will be funded. ...................................................................... 11

            iii.   The requested records are crucial to an ongoing and time-sensitive public debate. ....................................................................................................... 16

        B.   CREW will suffer irreparable injury if records are not preserved............................ 18

    III.    The balance of equities and public interest favor granting a preliminary injunction.  20

**CONCLUSION** ...................................................................................................................... 25

**ATTACHMENT A**................................................................................................................. 1

# TABLE OF AUTHORITIES

**Cases**

*Al-Fayed v. CIA,*
    254 F.3d 300 (D.C. Cir. 2001) ............................................................ 22

*All. for Retired Ams. v. Bessent,*
    No. 25-313 (D.D.C. Feb. 28, 2025) ..................................................... 10

*Am. Fed'n of Lab. & Congr. of Indus. Orgs. v. U.S. Dep't of Lab.,*
    No. 25-0339 (D.D.C. Feb. 27, 2025) ................................................... 10

*Am. Immigr. Council v. Dep't of Homeland Sec.,*
    470 F. Supp. 3d 32 (D.D.C. 2020) ...................................................... 23

*Am. Oversight v. U.S. Dep't of State,*
    414 F. Supp. 3d 182 (D.D.C. 2019) ................................... 17, 18, 22, 23

*Am. Oversight v. U.S. Dep't of Gov't Efficiency,*
    1:25-cv-00409-BAH (D.D.C. Feb. 11, 2025) ......................................... 3

*Armstrong v. Bush,*
    807 F. Supp. 816 (D.D.C. 1992) ......................................................... 19

*Armstrong v. Exec. Off. of the President,*
    1 F.3d 1274 (D.C. Cir. 1993) ............................................................. 19

*Armstrong v. Exec. Off. of the President,*
    90 F.3d 553 (D.C. Cir. 1996) .......................................................... 4, 19

*Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.,*
    498 F. Supp. 3d 87 (D.D.C. 2020) .................................. 5, 12, 16, 18, 22, 24

*Competitive Enter. Inst. v. Off. of Sci. and Tech. Policy,*
    No. 14-cv-765, 2016 WL 10676292 (D.D.C. Dec. 12, 2016) ................ 20

*CREW v. Off. of Admin.,*
    565 F. Supp. 2d 23 (D.D.C. 2008) ....................................................... 5

*CREW v. Off. of Admin.,*
    566 F.3d 219 (D.C. Cir. 2009) ............................................................. 4

*CREW v. Off. of Admin.,*
    593 F. Supp. 2d 156 (D.D.C. 2009) .................................................... 20

*Ctr. for Pub. Integrity v. U.S. Dep't of Def.*,
   411 F. Supp. 3d 5 (D.D.C. 2019) ....................................................................... 12, 17, 18, 22

*CTS Corp. v. EPA*,
   759 F.3d 52 (D.C. Cir. 2014) ........................................................................................ 4

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
   Civ. No. 05–845 (D.D.C. Nov. 16, 2005) ................................................................. 24

*Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*,
   416 F. Supp. 2d 30 (D.D.C. 2025) ............................................................. 16, 18, 20, 21

*Khine v. DHS*,
   943 F.3d 959 (D.C. Cir. 2019) ...................................................................................... 5

*Kissinger v. Reps. Comm. for Freedom of the Press*,
   445 U.S. 136 (1980) ...................................................................................................... 4

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................................ 25

*Nat'l Council of Nonprofits v. OMB*,
   2025 WL 597959 (D.D.C. Feb. 25, 2025) ................................................................. 20

*N.Y. Rehab. Care Mgmt., LLC v. NLRB*,
   506 F.3d 1070 (D.C. Cir. 2007) .................................................................................... 4

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................................... 20

*Open Soc'y Just. Initiative v. Cent. Intel. Agency*,
   399 F. Supp. 3d 161 (S.D.N.Y. Aug. 6, 2019) .......................................................... 24

*Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*,
   247 F. Supp. 3d 76 (D.D.C. 2017) ................................................................................ 4

*Protect Democracy Project, Inc. v. U.S. Dep't of Just.*,
   498 F. Supp. 3d 132 (D.D.C. 2020) ................................................................... 9, 18, 20

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) .................................................................................... 20

*U.S. ex rel. Staggers v. Medtronic, Inc.*,
   2022 WL 4078969 (D.D.C. Sept. 6, 2022) .................................................................. 5

*United States ex rel. Staggers v. Medtronic, Inc.*,
    2022 WL 4078969 (D.D.C. Sept. 6, 2022) ...................................................... 20

*Wadelton v. U.S. Dep't of State*,
    941 F. Supp. 2d 120 (D.D.C. 2013) ................................................................ 24

*Wash. Post v. U.S. Dep't of Homeland Sec.*,
    459 F. Supp. 2d 61 (D.D.C. 2006) ........................................................... 18, 22

*Zhi Chen v. District of Columbia*,
    839 F. Supp. 2d 7 (D.D.C. 2011) .................................................................... 5

**Statutes**

5 U.S.C. § 552 .................................................................................................... 4

5 U.S.C. § 3161 ................................................................................................. 16

31 U.S.C. § 1512 ............................................................................................... 14

31 U.S.C. § 1513 ............................................................................................... 14

**Other Authorities**

Avi Asher-Schapiro et al., *DOGE's Millions: As Musk and Trump Gut Government, Their Ax-Cutting Agency Gets Cash Infusion*, ProPublica (Feb. 20, 2025),
    https://www.propublica.org/article/doge-trump-musk-funding-foia-congress-transparency .. 9

Chris Megerian, *Elon Musk dodges DOGE scrutiny while expanding his power in Washington*,
    AP News (Feb. 9, 2025),
    https://apnews.com/article/elon-musk-donald-trump-doge-secrecy-68a66370cbc67c457e0a1c6edb08c5ef .................................................................... 9

Dan Cooney, *WATCH: White House refuses to 'reveal' DOGE administrator during briefing*,
    PBS News (Feb. 25, 2025),
    https://www.pbs.org/newshour/politics/watch-white-house-refuses-to-reveal-doge-administrator-during-briefing .................................................................... 10

Department of Government Efficiency Home Page,
    https://doge.gov/ [https://perma.cc/2PQY-YU6S] .............................................. 21

Jeff Stein et al., *Musk's blitzkrieg is unnerving many of Trump's senior advisers*, Wash. Post
    (Feb. 21, 2025),
    https://www.washingtonpost.com/business/2025/02/21/doge-cuts-frustration-musk-trump/ 11

Joe Perticone & Lauren Egan, *House Dems Wonder: Should We Burn It All Down?*,
  The Bulwark (Feb. 27, 2025), https://perma.cc/AGG7-N9RT ............................................... 6

Justin Baragona, *Karoline Leavitt lashes out at press for being 'obsessed' with identity of new
  DOGE head: 'You are hounds!'*, The Independent (Feb. 26, 2025),
  https://perma.cc/WLR4-A4VN ............................................................................................. 10

Ken Thomas et al., *The Musk Deputy Running DOGE's Huge Cost-Cutting Drive*,
  Wall St. J. (Feb. 10, 2025),
  https://www.wsj.com/politics/policy/steve-davis-elon-musk-cost-cutting-cc1dc7c9 ............ 13

Laura Strickler & Courtney Kube, *Secrecy is becoming a defining trait of Elon Musk's DOGE*,
  NBC News (Feb. 7, 2025), https://perma.cc/7NLM-HGK2 ..................................................... 9

Makena Kelly, *Not Even DOGE Employees Know Who's Legally Running DOGE*, Wired
  (Feb. 18, 2025), https://www.wired.com/story/doge-elon-musk-leadership-administrator/ .. 10

Matt Bai, *The blinding contempt of the DOGE bros*, Wash. Post (Feb. 24, 2025),
  https://www.washingtonpost.com/opinions/2025/02/24/musk-doge-usaid-cuts-dc/ ............ 11

Mike Masnick, *Musk Promised Government Transparency, DOGE Delivers Maximum Secrecy*,
  Techdirt (Feb. 11, 2025), https://perma.cc/ZJ63-TV7R ......................................................... 9

*Monday, March 3, 2025*, U.S. House of Rep. (Mar. 3, 2025),
  https://live.house.gov/?date=2025-03-03 ............................................................................... 7

Rachel Leingang, *Elon Musk showcases grip on Washington by impeding spending bill*,
  The Guardian (Dec. 19, 2024), https://www.theguardian.com/technology/2024/dec/19/elon-
  musk-trump-government-shutdown ....................................................................................... 13

Rosa DeLauro, *My Fellow Members of Congress: This Is a Naked Power Grab*,
  N.Y. Times (Feb. 12, 2025),
  https://www.nytimes.com/2025/02/12/opinion/musk-trump-spending-congress.html ........... 6

Ryan J. Foley, *Who is Amy Gleason, the person named DOGE's acting administrator by the
  White House?*, AP News (Feb. 25, 2025),
  https://apnews.com/article/doge-acting-administrator-amy-gleason-
  65af638e646fdd5dd6d5fcc5cc04a2e7 ................................................................................... 10

Sahil Kapur et al., *Trump administration rescinds order attempting to freeze federal aid
  spending*, NBC News (Jan. 29, 2025), https://perma.cc/FZ8H-RZK3 ................................... 14

Sahil Kapur, *Trump and Musk's slash-and-burn tactics are a sticking point in talks to prevent a
  shutdown*, NBC News (Feb. 26, 2025),
  https://www.nbcnews.com/politics/congress/trump-musk-tactics-sticking-point-government-
  shutdown-rcna193639 ........................................................................................................... 6

Sarah Cahalan et al., *The People Carrying Out Musk's Plans at DOGE*,
N.Y. Times (Mar. 3, 2025), https://perma.cc/7SN9-8WK5 .................................................. 13

Scott Patterson, et al., *Inside DOGE's Clash With the Federal Workforce*,
Wall St. J. (Feb. 27, 2025), https://www.wsj.com/politics/policy/inside-doge-elon-musk-government-employees-b87fc17a ................................................................................. 13, 19

*Senate Session - March 4, 2025*, C-SPAN (Mar. 4, 2025),
https://www.c-span.org/congress/?chamber=senate .......................................................... 2, 7

Shannon Bond et al., *Who is part of Elon Musk's DOGE, and what are they doing?*,
NPR (Feb. 7, 2025), https://perma.cc/PT7X-YACW ............................................................. 9

Soo Rin Kim & Will Steakin, *DOGE says it's saved $105 billion, though it's backtracked on some of its earlier claims*, ABC News (Mar. 3, 2025), https://perma.cc/VU87-4TFR .......... 13

Soo Rin Kim, *New details on Musk's DOGE agency raise questions about its scope, transparency*, ABC News (Jan. 23, 2025), https://perma.cc/WB95-XGF8 ............................ 9

Statement, Appropriations Committee Democrats, In Jetport Press Conference, Pingree Rails Against Unelected Billionaire Elon Musk, Illegal Actions by Trump Admin (Feb. 4, 2025), https://perma.cc/XN66-FVYP ................................................................................................ 6

Zoe Tillman, *Judge Calls DOJ Answers About Musk DOGE Role 'Highly Suspicious'*,
Bloomberg Law (Feb. 28, 2025), https://news.bloomberglaw.com/litigation/judge-calls-doj-answers-about-musk-doge-role-highly-suspicious ................................................................ 10

**Treatises**

Exec. Order No. 6166 (June 10, 1933) .................................................................................. 14

Exec. Order No. 14222, 90 Fed. Reg. 11095 (Mar. 3, 2025) ............................................... 11

Exec. Order No. 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ................................................ 14

Exec. Order No. 12608, § 2, 52 Fed. Reg. 34617 (Sept. 9, 1987) ....................................... 14

Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025) ......................................... 4, 11, 15, 21

Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 14, 2025) ............................................... 11

Presidential Mem., 90 Fed. Reg. 8247 (Jan. 20, 2025) ....................................................... 23

**INTRODUCTION**

Defendants' opposition is more notable for its omissions than its arguments. Defendants do not meaningfully argue that the United States DOGE Service ("USDS") is exempt from FOIA. They do not dispute that USDS is in fact wielding substantial independent authority across the executive branch. They do not engage with the enormous public record of unanswered questions about USDS's secretive operations—operations infused by more than $39,000,000 in taxpayer dollars that Congress did not appropriate for USDS. They do not dispute that USDS is at the heart of the ongoing congressional appropriations debate. They articulate no burden whatsoever *to USDS* in processing and producing records by March 10 (nor could they, since USDS is not processing *any* FOIA requests). And they continue to refuse to offer any assurances they will preserve records pending litigation.

The few arguments Defendants do offer are wholly unpersuasive. The public record that USDS's operations are central to the ongoing appropriations debate grows by the day, made all the more important by the government's flailing attempts to keep the details of USDS's operations secret as it ravages core federal functions. Those activities, and fresh reports that USDS personnel continue to use Signal to conduct their business, call out for a records preservation order before it is too late and the documents at issue are beyond the Court's reach. And any claims of overbreadth or burden of producing records to inform this crucial public debate are addressed by CREW's substantial narrowing of the FOIA requests for which it seeks preliminary injunctive relief, submitted here as Attachment A. The requested preliminary injunction is the only hope to inform the public about USDS's clandestine operations before Congress has to decide whether, and how, to fund the government and USDS itself. As a member of the U.S. Senate Appropriations Committee stated on the Senate floor earlier today:

1

Every single day that passes without transparency and congressional access to information about DOGE's funding, staffing, and scope of work is a moment too long. With the current continuing resolution due to expire on March 14, we have big decisions to make . . . [W]e cannot responsibly fund the government if we do not understand how DOGE has infiltrated it, made it less efficient, and less responsive to taxpayers, and essentially has circumvented the constitutional responsibilities of the United States Congress.[1]

## SUPPLEMENTAL FACTS

CREW submitted its January 24, 2025 FOIA request to USDS (the "USDS Request") via ombfoia@omb.eop.gov. It did so at the direction of OMB after asking OMB's FOIA personnel how to submit a FOIA to the U.S. DOGE Service and being told to do so through OMB because there was no other procedure in place to submit a FOIA to USDS at the time. Suppl. Maier Decl. ¶¶ 2-4, ECF No. 2-2. CREW's transmittal email and the USDS Request itself made clear that the request was to the "U.S. DOGE Service" and not OMB, a fact made clearer by CREW's submission of a separate request to OMB on the same day (the "First OMB Request"). Prelim. Inj. Ex. C–F, ECF Nos. 2-5–2-8. CREW received acknowledgments that the USDS Request was received on January 24 and that expedited processing of the USDS Request was granted on January 29. Prelim. Inj. Ex. F, I, ECF No. 2-1. On February 7, CREW submitted a letter to USDS and OMB through OMB requesting that each agency produce documents responsive to their respective FOIA requests by a date certain and received no reply. Prelim. Inj. Ex. J, ECF No. 2-12. CREW also attached its FOIA requests and the related correspondence to an email to Defendants' counsel on February 19 and sought their position on CREW's complaint and motion for preliminary injunction prior to their filing, but received no substantive response before February 25, 2025. Suppl. Maier Decl. ¶ 6, ECF No. 2-2.

---

[1] *Senate Session - March 4, 2025*, C-SPAN (Mar. 4, 2025), https://www.c-span.org/congress/?chamber=senate (Statement of Sen. Jack Reed, 2:24 to 2:26).

On February 25, 2025, OMB sent CREW a letter that claimed that OMB FOIA professionals "do not recall agreeing to accept FOIA requests specifically on behalf of DOGE" and that they may have been confused about the USDS Request. *Id.* ¶ 7; Defs.' Opp'n Ex. 1.1, ECF No. 10-2. OMB administratively closed the USDS Request and said that it was forwarding the request to USDS "due to the extenuating circumstances described above." *Id.* OMB's letter was the first time that Defendants raised any issue with the USDS request or the Executive Office of the President's handling of it. Suppl. Maier Decl. ¶ 8, ECF No. 2-2.

OMB has directed at least one other requester to submit FOIA requests to USDS through ombfoia@omb.eop.gov. On February 13, in response to an email inquiry asking explicitly where to send FOIA requests to DOGE, USDS, and U.S. DOGE Service Temporary Organization, OMB directed the Sierra Club to submit such requests through ombfoia@omb.eop.gov. Suppl. Maier Decl. ¶ 5, ECF No. 2-2. And on February 11, 2025, USDS was sued by another FOIA requester who submitted its FOIA request through ombfoia@omb.eop.gov. *See* Exhibit A to Declaration, *American Oversight v. U.S. Department of Government Efficiency*, 1:25-cv-00409-BAH (D.D.C. Feb. 11, 2025). CREW is not aware that OMB has sent a letter of correction to any other USDS FOIA requester who has submitted a request through OMB. Suppl. Maier Decl. ¶ 9, ECF No. 2-2.

## ARGUMENT

### I.   CREW is likely to succeed on the merits.

#### A.  USDS is subject to FOIA and the FRA.

Defendants acknowledged that "CREW devotes significant space to arguing that USDS is an agency subject to FOIA," but chose not to address the substance of that threshold merits question. Defs.' Opp'n 20 n.4, ECF No. 10 (citing Prelim. Inj. Mem. 18–25, ECF No. 2-1). Instead, Defendants argue summarily in a footnote that USDS is exempt from FOIA because on

January 20, 2025 "USDS moved out of OMB and became a free-standing component of [the Executive Office of the President ("EOP")] that reports to the White House Chief of Staff." Defs.' Opp'n 8 n.2, ECF No. 10 (citing Exec. Order No. 14158 § 3(a), 90 Fed. Reg. 8441 (Jan. 29, 2025)); Defs.' Opp'n 20 n.4, ECF No. 10. But as CREW previously explained, *see* Prelim. Inj. Mem. 18–25, ECF No. 2-1, an entity is not exempt from FOIA merely because it is a "free-standing component of EOP."[2] *See CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) [hereinafter *CREW III*] (citing *Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980)). To the contrary, FOIA's definition of "agency" expressly covers "establishment[s] in the executive branch of the Government (including the Executive Office of the President)," 5 U.S.C. § 552(f)(1), and controlling precedent makes clear that FOIA applies to EOP units that "wield substantial authority independently of the President," *CREW III*, 566 F.3d at 222. By failing to respond to these points, Defendants have forfeited any argument that CREW is unlikely to succeed on the merits of its claim that USDS is subject to FOIA and the FRA.[3] *See CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("[H]iding an argument [in a footnote] and then articulating it only in a conclusory fashion results in forfeiture."); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 247 F. Supp. 3d 76 (D.D.C. 2017) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work.") (quoting *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007)).[4]

---

[2] The same rule applies to the FRA. *See Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996) ("[T]he coverage of the FRA is coextensive with the definition of 'agency' in the FOIA.")

[3] Defendants also fail to address CREW's arguments that Mr. Musk is operating as USDS's de facto Administrator. *See* Prelim. Inj. Mem. 21–25, ECF No. 2-1.

[4] Defendants also suggest that CREW used the wrong process to submit the USDS Request. *See* Defs.' Opp'n 8–9 n.2, ECF No. 10. But, as explained above, CREW simply followed the

### B. CREW is entitled to FOIA production sufficiently in advance of March 14, 2025, and preservation of records pending litigation.

Defendants' assertion that there is no provision in FOIA "requiring production of all non-exempt responsive records on a particular date of CREW's choosing" misses the point and ignores the law. Defs.' Opp'n at 19, ECF No. 10. Even they concede "this court has previously ordered [production by] a date certain in exceptional cases." This is one of those cases. *See infra* Part II.A; Prelim. Inj. Mem. 25–29, ECF No. 2-1; *Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com.*, 498 F. Supp. 3d 87, 99 (D.D.C. 2020).

In addition, this Court has jurisdiction to enter a records preservation order, *see* Prelim. Inj. Mem. 15–16, ECF No. 2-1, and the irreparable harm to CREW and balance of equities relating to potential document destruction justifies such an order here, *see* Prelim. Inj. Mem. Part I.B, II.B, III, ECF No. 2-1; *infra* Part II.B, III. While disputing CREW's entitlement to such an order, Defendants fail to offer any assurance that they will actually preserve records pending litigation—despite repeated requests for such assurances. This Court can and should enter a preservation order pursuant to its inherent power, *see U.S. ex rel. Staggers v. Medtronic, Inc.*, 2022 WL 4078969 (D.D.C. Sept. 6, 2022); *Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 12 (D.D.C. 2011), and longstanding case law in this District, *see, e.g.*, *CREW v. Off. of Admin.*, 565 F. Supp. 2d 23, 24–25 (D.D.C. 2008) [hereinafter *CREW I*] (entering preservation order to maintain the status quo during the litigation, despite rejecting what it considered "unfounded

---

instructions OMB gave CREW and other requesters on submitting requests to the newly-created U.S. DOGE Service. *See* Suppl. Maier Decl. ¶ 2, ECF No. 2-2. The point is also immaterial to any legal question before the Court. Defendants do not claim that CREW failed to exhaust administrative remedies as to the USDS Request (and thus have forfeited any such argument). *See Khine v. DHS*, 943 F.3d 959, 964 (D.C. Cir. 2019) (exhaustion is non-jurisdictional). And any exhaustion defense would be meritless: it would have been both futile and impossible for CREW to exhaust with USDS since USDS claims it is not subject to FOIA and has no formal process for accepting FOIA requests. *See id.* (exhaustion doctrine only "precludes judicial review if the purposes of exhaustion and the particular administrative scheme support such a bar").

speculation" that "documents responsive to its FOIA request have been destroyed."); Prelim. Inj.

Mem. 29–32, ECF No. 2-1 (citing cases); *infra* Part II.B.

## II.    CREW will suffer irreparable injury absent a preliminary injunction.

### A.    CREW has already suffered and will continue to suffer irreparable injury absent expedited processing and production of responsive records.

#### i.    USDS's operations and secrecy continue to dominate public debate and disrupt the appropriations process.

Defendants' refusal to release responsive records shedding light on USDS's structure and

operations has already irreparably harmed CREW, and that harm grows by the day. USDS's

rapid and reckless disruption of congressionally funded government operations has become the

focal point of the appropriations debate. For example, on February 26, Rep. Rosa DeLauro,

Ranking Member on the House Appropriations Committee, voiced that precise concern: "If you

appropriate the money . . . how can you then decide that that's not what it's going to be? Now

there are some in the administration that would like to do that, and we just want to be sure that

what we're doing, make sure that the dollars . . . are going for the purposes intended."[5] On

February 27, Rep. Brendan Boyle, the Ranking Member on the House Budget Committee

similarly said, "I don't know how in the world I could possibly make an agreement with this

White House to fund anything if then, the very next day after my vote, Elon Musk can just show

up and close the agency."[6] As recently as yesterday and today, Rep. Norma Torres, Sens. Patty

---

[5] Sahil Kapur, *Trump and Musk's slash-and-burn tactics are a sticking point in talks to prevent a shutdown*, NBC News (Feb. 26, 2025), https://www.nbcnews.com/politics/congress/trump-musk-tactics-sticking-point-government-shutdown-rcna193639.

[6] Joe Perticone & Lauren Egan, *House Dems Wonder: Should We Burn It All Down?*, The Bulwark (Feb. 27, 2025), https://perma.cc/AGG7-N9RT; *see also* Statement, Appropriations Committee Democrats, In Jetport Press Conference, Pingree Rails Against Unelected Billionaire Elon Musk, Illegal Actions by Trump Admin (Feb. 4, 2025), https://perma.cc/XN66-FVYP; Rosa DeLauro, *My Fellow Members of Congress: This Is a Naked Power Grab*, N.Y. Times (Feb. 12, 2025), https://www.nytimes.com/2025/02/12/opinion/musk-trump-spending-congress.html.

Murray and Jack Reed have commented on the floors of the House and Senate that they cannot responsibly fund the federal government without transparency from USDS.[7]

These statements add to numerous congressional requests to the White House for information on USDS's composition and operations—including the information CREW's FOIA request seeks—and numerous requests for information to federal agencies about USDS's work.[8] On February 20, 2025, for example, the Ranking Member of the House Committee on Oversight and Government Reform sent the President a letter asking, among other things, for the identity of the USDS Administrator, details on Mr. Musk's role, authority, and directives, and an

---

[7] *Monday, March 3, 2025*, U.S. House of Rep. (Mar. 3, 2025), https://live.house.gov/?date=2025-03-03 (Statement of Rep. Torres, 7:15:29 to 7:17:03); *Senate Session - March 4, 2025*, C-SPAN (Mar. 4, 2025), https://www.c-span.org/congress/?chamber=senate (Statement of Sen. Patty Murray, 2:44:37 to 2:59:14); *supra* note 1.

[8] Letter from Rep. Rosa L. DeLauro, Ranking Member, Committee on Appropriations, to Russell T. Vought, Director, Office of Mgmt & Budget (Mar. 4, 2025), https://perma.cc/XX72-2AYE; Letter from Senator Jon Ossoff, U.S. Senate, et al., to Douglas Collins, Secretary, U.S. Dept. of Veterans Affairs (Feb. 13, 2025), https://perma.cc/2M8Y-65Z3; Letter from Senator Mark R. Warner, U.S. Senate, et al., to Susie Wiles, White House Chief of Staff Exec., Office of the President (Feb. 5, 2025), https://perma.cc/M2CL-Y29L; Letter from Rep. Gerald E. Connolly, Ranking Member, Comm. on Oversight and Gov't Reform, to Donald J. Trump, President of the U.S. (Feb. 20, 2025), https://perma.cc/MX5F-VUPW; Letter from Senator Gary C. Peters, Ranking Member, Senate Comm. on Homeland Sec. and Gov't Affairs, et al., to Susie Wiles, White House Chief of Staff, Exec. Office of the President & David Warrington, Assistant to the President and Counsel to the President, White House Counsel Office (Feb. 7, 2025), https://perma.cc/BS7W-AHP5; Letter from Rep. James A. Himes, Ranking Member, House Permanent Select Comm. on Intelligence, et al., to Donald J. Trump, President of the U.S. (Feb. 4, 2025), https://perma.cc/5EPY-E7ZE; Letter from Rep. Gerald E. Connolly, Ranking Member, Comm. on Oversight and Gov't Reform, et al., to Donald J. Trump, President of the U.S. (Feb. 25, 2025), https://perma.cc/L4FQ-XN7B; Letter from Senator Ron Wyden, Ranking Member, Comm. on Finance, et al., to Leland Dudek, Acting Commissioner, Social Security Admin. (Feb. 19, 2025), https://perma.cc/M4GH-ALSL; Letter from Rep. Robert C. "Bobby" Scott, Ranking Member, Comm. on Education and Workforce, et al., to Denise Carter, Acting Secretary, U.S. Dep't of Education & Dr. Matthew Soldner, Acting Director, Inst. of Education Sciences (Feb. 21, 2025), https://perma.cc/K49Q-6DD7.

organizational chart for USDS.[9] That follows similar letters to the White House Chief of Staff,
one on February 7 from six members of the Senate Committee on Homeland Security and
Governmental Affairs seeking information about Mr. Musk's role, USDS staff, what agencies
USDS has accessed, and whether USDS has terminated or directed the termination of
government employees,[10] and one on February 5 from eight members of the Senate Select
Committee on Intelligence seeking information on USDS personnel, at which agencies it has
established DOGE Teams and who is overseeing them, the legal authorities it is relying on, its
oversight structure, and from which agencies it has sought information.[11]

Serious questions have also arisen regarding USDS's use of funds that have not been
appropriated to it and the legality of USDS itself, both central issues to how Congress will
account for USDS in the appropriations process. Despite the absence of any appropriation to
USDS, which did not exist when Congress last appropriated funds for the EOP, OMB has
nevertheless apportioned a total of $39,121,156 to a "DOGE" account, largely in the form of
"anticipated reimbursements from agencies in support of Software Modernization."[12] Prelim. Inj.
Mem. 2, ECF No. 2-1. Whether those apportionments were legally authorized and authority
exists for similar apportionments in the future turns on whether USDS's operations align with the

---

[9] Letter from Rep. Gerald E. Connolly, Ranking Member, Comm. on Oversight and Gov't
Reform, to Donald J. Trump, President of the U.S. (Feb. 20, 2025), https://perma.cc/2LFB-
N6PH.
[10] Letter from Senator Gary C. Peters, Ranking Member, Senate Comm. on Homeland Sec. and
Gov't Affs., et al., to Susie Wiles, White House Chief of Staff, Exec. Off. of the President, &
David Warrington, Assistant to the President and Couns. to the President, White House Couns.
Off. (Feb. 7, 2025), https://perma.cc/89N6-G6GZ.
[11] Letter from Senator Mark R. Warner, U.S. Senate, et al., to Susie Wiles, White House Chief of
Staff, Exec. Off. of the President (Feb. 5, 2025), https://perma.cc/CJ5Z-EMMC.
[12] *See, e.g.*, Off. of Mgmt. & Budget, January 27, 2025 Apportionment, Iteration No. 1 for TAFS
011-X-0041 (approved Jan. 27, 2025, 08:29 PM), https://openomb.org/file/11409026.

March 2024 legislation that appropriated funds to EOP.[13] Members of Congress have already

raised these concerns,[14] and the appropriations process is Congress's best opportunity to address

these issues, provided it has sufficient information regarding USDS's operations.[15]

Defendants' claim that there is already sufficient public information about USDS's

operations, Defs.' Opp'n at 17, ECF No. 10, is both irrelevant and wrong. News reports are no

substitute for the official, authentic, and verified government records agencies must produce in

response to FOIA requests. *See Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F.

Supp. 3d 132 (D.D.C. 2020) [hereinafter *Protect Democracy I*] (rejecting argument that partial,

publicly available information is sufficient). Indeed, the lack of reliable public information about

how USDS works has itself been the subject of extensive press coverage.[16]

---

[13] *See, e.g.*, Avi Asher-Schapiro et al., *DOGE's Millions: As Musk and Trump Gut Government, Their Ax-Cutting Agency Gets Cash Infusion*, ProPublica (Feb. 20, 2025), https://www.propublica.org/article/doge-trump-musk-funding-foia-congress-transparency ("If DOGE uses funds that are available only for IT-related purposes for initiatives that have nothing to do with IT, that use could violate federal law.").

[14] *See, e.g.*, *id.* ("The top Democrat on the House Appropriations Committee, Rep. Rosa DeLauro, D-Conn., told ProPublica she didn't believe DOGE had the legal authority for the actions it's taken. She called it a 'made-up federal department' that's wasting taxpayer dollars.").

[15] Off. of Mgmt. & Budget, January 27, 2025 Apportionment, Iteration No. 1 for TAFS 011-X-0041 (approved Jan. 27, 2025, 08:29 PM), https://openomb.org/file/11409026 (citing "Public Law 118-47"); Off. of Mgmt. & Budget, February 8, 2025 Apportionment, Iteration No. 1 for TAFS 011-2024-2028-0041 (approved Feb. 8, 2025, 11:33 AM), https://openomb.org/file/11410064 (citing "31 USC 1535 and 5 USC 3161").

[16] *See, e.g.*, Soo Rin Kim, *New details on Musk's DOGE agency raise questions about its scope, transparency*, ABC News (Jan. 23, 2025), https://perma.cc/WB95-XGF8; Shannon Bond et al., *Who is part of Elon Musk's DOGE, and what are they doing?*, NPR (Feb. 7, 2025), https://perma.cc/PT7X-YACW; Laura Strickler & Courtney Kube, *Secrecy is becoming a defining trait of Elon Musk's DOGE*, NBC News (Feb. 7, 2025), https://perma.cc/7NLM-HGK2; Chris Megerian, *Elon Musk dodges DOGE scrutiny while expanding his power in Washington*, AP News (Feb. 9, 2025), https://apnews.com/article/elon-musk-donald-trump-doge-secrecy-68a66370cbc67c457e0a1c6edb08c5ef; Mike Masnick, *Musk Promised Government Transparency, DOGE Delivers Maximum Secrecy*, Techdirt (Feb. 11, 2025), https://perma.cc/ZJ63-TV7R.

What scant information the Administration has released has been unreliable and grudgingly disclosed. For example, the White House only identified Amy Gleason as USDS Administrator on February 25,[17] after weeks of refusals to do so in response to inquiries by members of Congress,[18] the press,[19] USDS's own employees,[20] and the judges of this Court.[21] Hours earlier, the White House Press Secretary responded to the question of who the USDS Administrator was by replying "Elon Musk is overseeing DOGE," only to mock the press the next day by stating that "everybody knew" that Ms. Gleason was the Administrator and that the Administration only confirmed it because the media is "so obsessed with this for some reason."[22] Meaningful information about USDS is so difficult to pry from the government that Judge Bates has ordered depositions in another matter to discern USDS's structure,[23] and on February 28, during a hearing regarding an Appointments Clause case against Mr. Musk, Judge Chuang called the government's inability to identify the USDS Administrator before Ms. Gleason "highly suspicious."[24]

---

[17] *See* Ryan J. Foley, *Who is Amy Gleason, the person named DOGE's acting administrator by the White House?*, AP News (Feb. 25, 2025), https://apnews.com/article/doge-acting-administrator-amy-gleason-65af638e646fdd5dd6d5fcc5cc04a2e7.

[18] *See supra* note 8.

[19] *See also* Dan Cooney, *WATCH: White House refuses to 'reveal' DOGE administrator during briefing*, PBS News (Feb. 25, 2025), https://www.pbs.org/newshour/politics/watch-white-house-refuses-to-reveal-doge-administrator-during-briefing.

[20] *See* Makena Kelly, *Not Even DOGE Employees Know Who's Legally Running DOGE*, Wired (Feb. 18, 2025), https://www.wired.com/story/doge-elon-musk-leadership-administrator/.

[21] *See* Transcript of Preliminary Injunction at 65:8–65:16, *Alliance for Retired Americans v. Bessent*, No. 25-313 (D.D.C. Feb. 28, 2025).

[22] Cooney, *supra* note 19 (Leavitt response that Musk was running DOGE); Justin Baragona, *Karoline Leavitt lashes out at press for being 'obsessed' with identity of new DOGE head: 'You are hounds!'*, The Independent (Feb. 26, 2025), https://perma.cc/WLR4-A4VN.

[23] Order, *American Federation of Labor and Congress of Industrial Organizations v. Department of Labor*, No. 25-0339 (D.D.C. Feb. 27, 2025), ECF No. 48.

[24] Zoe Tillman, *Judge Calls DOJ Answers About Musk DOGE Role 'Highly Suspicious'*, Bloomberg Law (Feb. 28, 2025), https://news.bloomberglaw.com/litigation/judge-calls-doj-answers-about-musk-doge-role-highly-suspicious.

While the Administration has stonewalled, USDS's influence has grown, increasing the public interest in information about its operations. On February 26, the President issued an executive order that required agency heads to consult with the DOGE Teams, already chosen in consultation with USDS and required by executive order to "coordinate their work with USDS," at their agencies on contract and grant justification systems, process reviews, terminations and modifications, approvals, non-essential travel justifications, and real property leases.[25] That is in addition to the DOGE Teams' previously granted authority to influence each agency's hiring approval plans and individual hiring decisions—including the power to prevent agencies from filling career vacancies unless overruled by the agency head.[26] And USDS has used its authority aggressively, taking action without knowledge of those running the agencies and, in some cases, against directives from cabinet members and the White House.[27]

### ii. The requested records are central to the public debate on whether and how the government will be funded.

Defendants nevertheless dismiss the information sought by CREW as insufficiently central to the debate about appropriations. Defs.' Opp'n 21, ECF No. 10. They are wrong. For one, Defendants' argument relies on the faulty premise that the requested information about USDS's structure and operations—pursued by Congress, the courts, the press, and CREW—is somehow not integral to an appropriations process that, according to members of Congress themselves, will turn on USDS's impact on federal spending.[28] It is nonsensical to suggest that

---

[25] Exec. Order 14222, 90 Fed. Reg. 11095 (Mar. 3, 2025); Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).
[26] Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 14, 2025).
[27] Jeff Stein et al., *Musk's blitzkrieg is unnerving many of Trump's senior advisers*, Wash. Post (Feb. 21, 2025), https://www.washingtonpost.com/business/2025/02/21/doge-cuts-frustration-musk-trump/; Matt Bai, *The blinding contempt of the DOGE bros*, Wash. Post (Feb. 24, 2025), https://www.washingtonpost.com/opinions/2025/02/24/musk-doge-usaid-cuts-dc/.
[28] *See supra* Part II.A.i.

how USDS is structured and operates outside of public view is not integral to scrutiny of the enormous effects of its work on the federal government. Further, "no court has required a plaintiff to show that public debate and discussion, or the outcome of a proceeding, would likely be changed or influenced" to demonstrate irreparable harm. *Brennan Ctr.*, 498 F. Supp. 3d at 102. As in *Brennan* and *Public Integrity*, "the primary value of the information" that CREW seeks, is "not the likelihood that it would influence the outcome" of proceedings, "but rather, 'its ability to inform the public of ongoing proceedings.'" *Id.* at 101–02 (quoting *Ctr. for Pub. Integrity v. U.S. Dep't of Def.*, 411 F. Supp. 3d 5, 12 (D.D.C. 2019)). Thus, even if Members of Congress were not chasing information about USDS to make an informed decision about how to fund the government—and they are—the mere fact that USDS is at the center of whether the government will be funded makes information sought by CREW crucial to informing the public on an ongoing debate that affects virtually every American.

While full compliance with CREW's FOIA requests is the best way to ensure the public has the information it needs, CREW recognizes that some of the records it seeks are more germane than others to the appropriations process. Accordingly, CREW submits as Attachment A narrowed versions of its FOIA requests to OMB and USDS that focus on the subsets of requested records most crucial to informing the public about USDS's operations before March 14. As explained below, each category of high-priority records bear directly on the ongoing appropriations debate.[29]

---

[29] Defendants' Opposition is the first word that CREW has heard from OMB, USDS, or their counsel regarding the scope of CREW's requests or whether either Defendant has made any effort to identify documents responsive to them, despite CREW's offer to confer on its Motion prior to filing and subsequent emails keeping Defendants' counsel apprised of its progress. The only substantive responses that CREW has received to any of its requests have been the grants of expedited processing. Consistent with its normal practice, CREW would have gladly worked with Defendants to narrow the scope of its requests had Defendants asked.

*High-Priority OMB Records*. First, OMB's communications with Mr. Musk, Steve Davis, and their representatives are crucial to understanding the relationship between Mr. Musk (who President Trump has repeatedly touted as the leader of the Department of Government Efficiency,[30] is the de-facto administrator of USDS,[31] is the subject of numerous Congressional inquiries,[32] has claimed credit for many of the most extreme efforts to reduce the size and scope of the government,[33] and who has been identified by name as a stumbling block in the current appropriations process[34] after reportedly thwarting a congressional spending bill in December 2024),[35] and OMB, the agency that will be responsible for apportioning the funds appropriated by Congress.[36] To date, USDS has claimed that it has prevented agencies from spending billions of dollars in funds already apportioned by OMB,[37] and may well influence OMB to use the apportionment process to withhold funds altogether. Equally important are the communications of Mr. Davis, a business associate of Mr. Musk who has been publicly identified as a day-to-day leader of USDS.[38]

---

[30] Prelim. Inj. Mem. 22–23, ECF No. 2-1.

[31] *Id.* at 21-25.

[32] *See supra* note 8.

[33] Prelim. Inj. Mem. 23–25, ECF No. 2-1.

[34] *See* Kapur, *supra* note 5.

[35] Rachel Leingang, *Elon Musk showcases grip on Washington by impeding spending bill*, The Guardian (Dec. 19, 2024), https://www.theguardian.com/technology/2024/dec/19/elon-musk-trump-government-shutdown.

[36] *See generally* Cong. Rsch. Serv., RS21665, *Office of Management and Budget (OMB): An Overview* (June 22, 2023), https://crsreports.congress.gov/product/pdf/RS/RS21665.

[37] *See* Soo Rin Kim & Will Steakin, *DOGE says it's saved $105 billion, though it's backtracked on some of its earlier claims*, ABC News (Mar. 3, 2025), https://perma.cc/VU87-4TFR.

[38] *See* Scott Patterson, et al., *Inside DOGE's Clash With the Federal Workforce*, Wall St. J. (Feb. 27, 2025), https://www.wsj.com/politics/policy/inside-doge-elon-musk-government-employees-b87fc17a (describing Davis as "a top DOGE official" and "a leader of Musk's Boring Co."); Ken Thomas et al., *The Musk Deputy Running DOGE's Huge Cost-Cutting Drive*, Wall St. J. (Feb. 10, 2025), https://www.wsj.com/politics/policy/steve-davis-elon-musk-cost-cutting-cc1dc7c9; Sarah Cahalan et al., *The People Carrying Out Musk's Plans at DOGE*, N.Y. Times (Mar. 3, 2025), https://perma.cc/7SN9-8WK5.

Second, OMB's memoranda, directives, and policies regarding changes to the operations of USDS and the USDS Administrators' communications regarding the same are crucial for similar reasons. OMB is in a unique position with respect to funding for executive branch agencies. As described above, OMB is the agency responsible for apportioning to executive branch agencies funds appropriated by Congress.[39] Through this process, OMB controls agency spending by setting the rate at which agencies can obligate or expend funds.[40] The President has already directed OMB to use the apportionment process to withhold certain funding,[41] and, as of February 8, 2025, OMB has also used this authority to apportion over $39 million to a new U.S. DOGE Service account. *See* Prelim. Inj. Mem. at 2. Given OMB's significant role in budget execution, OMB's understanding of USDS's mandate and operations, and OMB's relationship to USDS, are vitally important to the public's understanding of if OMB will use the apportionment process or any other authorities to withhold funding to implement DOGE's prerogatives.[42]

Finally, the requests for ethics pledges and waivers and financial disclosures of legacy U.S. Digital Service personnel employed as of January 19, 2025—the last day that the U.S. Digital Service was a component of OMB—are crucial to understand what guardrails, if any,

---

[39] 31 U.S.C. § 1513(b); Exec. Order No. 6166, § 16 (June 10, 1933), *as amended by* Exec. Order No. 12608, § 2, 52 Fed. Reg. 34617 (Sept. 9, 1987), 3 C.F.R. 245 (1987 comp.) (delegating apportionment authority to OMB).

[40] 31 U.S.C. §§ 1512(b)(1)(A) (apportionment by time), 1512(b)(1)(B) (apportionment by activity, function, project, or object), 1512(b)(1)(C) (apportionment by a combination of both time and activity, function, project, or object).

[41] *See Reevaluating and Realigning United States Foreign Aid*, Exec. Order 14169, 90 Fed. Reg. 8619 (Jan. 20, 2025) ("[OMB] shall enforce this pause through its apportionment authority.").

[42] The Administration already attempted to use OMB to stop payments under thousands of federal contracts and grants, reversing course when OMB's directive became public and caused public backlash. Memorandum from Matthew J. Vaeth, Acting Dir., Off. of Mgmt. & Budget, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs (Jan. 27, 2025), https://static01.nyt.com/newsgraphics/documenttools/da3a3829590efbb7/b0c025ff-full.pdf; Sahil Kapur et al., *Trump administration rescinds order attempting to freeze federal aid spending*, NBC News (Jan. 29, 2025), https://perma.cc/FZ8H-RZK3.

apply to those employees and their financial conflicts of interest as the newly-formed USDS has transitioned into a role to influence (and control) every executive branch agency and disrupted federal spending through its slash-and-burn approach to contracts, grants, leasing and personnel decisions, and will continue to do so when funds are newly appropriated.

**High-Priority USDS Records**. The narrowed requests to USDS seek equally crucial information since USDS was reorganized on January 20, 2025. *See* Attachment A. First, USDS memoranda, directives, and policies regarding changes to the operations of USDS have obvious import. USDS is a reorganized entity that has undergone a drastic change in its authority, purpose, and operations.[43] These requested documents will provide insight into how USDS is actually operating and has developed since its abrupt reorganization on January 20, which is critical for the public to understand its likely impact on the federal spending that Congress is considering. The narrowed request for communications with the Office of the Administrator about the same topics will capture more informal communications that, while having the practical effect of orders, have not been formalized. Similarly, the organizational charts sought in the narrowed requests will provide clarity on areas of focus within USDS, reporting lines and chain-of-command, and how USDS conceives of itself as it influences (or dictates) spending.

The ethics pledges and waivers and financial disclosures of USDS personnel since January 20 will inform the public whether USDS personnel and volunteers who have been hired to pursue USDS's new mandate are or are not expected to comply with federal ethics rules or have conflicts of interest. This is particularly important because members of the temporary organization within USDS can be appointed by the USDS Administrator with virtually no

---

[43] *See* Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).

oversight.[44] *See* 5 U.S.C. § 3161 (empowering the head of a temporary organization under the statute to hire employees and accept volunteer services without complying with other civil service laws). Finally, the narrowed request for communications between USDS and executive branch agencies outside of the EOP regarding staffing levels, treatment of probationary employees, contract and grant administration, and the authority of USDS in relation to those agencies will, by capturing communications between USDS and agency staff, including the DOGE Teams at each agency, inform the public about precisely what multiple members of Congress are concerned about: USDS's level of influence over federal spending and its actual or de facto authority over executive branch agencies.

### iii. The requested records are crucial to an ongoing and time-sensitive public debate.

Defendants wrongly argue that irreparable harm requires a showing that the requested information will lose *all* value after March 14. *See* Defs.' Opp'n 12-15, ECF No. 10. Not so. To establish irreparable harm, CREW need only show that the requested information will lose its *specific* value as it relates to an imminent event of public concern. *See, e.g.*, *Brennan Ctr.*, 498 F. Supp. at 99 (stating that continued relevance of documents regarding census reapportionment does not neutralize irreparable harm because "the debate the Brennan Center, and the public, are focused on concerns *this* census and *this* reapportionment process, which ends" on a date certain) (emphasis in original).

For example, in *Electronic Privacy Information Center v. Department of Justice*, 416 F. Supp. 2d 30, 40-41 (D.D.C. 2025), the court found that irreparable harm would befall a FOIA requester seeking records relating to the governments' ongoing warrantless surveillance of Americans based purely on the need for the information to come to light during the course of a

---

[44] *Id.*

public debate on the practice. The court did so even though the requested documents (audits of surveillance activities, checklists that the government used to determine if it would warrantlessly surveil someone, communications concerning the use of warrantless surveillance, and documents reflecting their legal basis) were undoubtedly valuable in untold numbers of legal and political contexts beyond the undefined public debate about the program that led to the granted relief. *Id.* Similarly, the documents related to potentially corrupt conduct of America's foreign affairs in Ukraine that were ordered produced in *American Oversight v. Department of State*, 414 F. Supp. 3d 182 (D.D.C. 2019) (Cooper, J.) (granting preliminary injunction for communications between the State Department and the President's personal lawyer and the recall of the U.S. Ambassador to Ukraine); *Ctr. for Pub. Integrity*, 411 F. Supp. 3d 5 (granting preliminary injunction for documents related to Ukraine Security Assistance Initiative), while stale for the requester's purposes of informing an ongoing impeachment inquiry once that inquiry concluded, retained significant value for uses other than in the impeachment proceedings, including future debates about the United States' role in supporting Ukraine, the first Trump administration's posture toward it, and even President Trump's re-election prospects. The continued value of the information for *other purposes* did not diminish its value for the *movant's purposes*.

Accepting the Defendants' argument would lead to the absurd result of creating a class of records that are so perennially important an agency could never be enjoined to expeditiously produce them, no matter how pressing they are to a particular event. Regardless of whether the records sought here are valuable to *later* public debates, they also go to the heart of the *current* debate about whether and how the government—including USDS itself—will continue to be funded.[45] To enable their participation in that ongoing debate, the American people need

---

[45] *See supra* Part II.A.ii.

information *now* about the basic operations of a government entity recklessly slashing federal programs and spending taxpayer funds with no oversight or accountability.

But Defendants also cannot say what is going to happen after March 14. All that is certain is that (1) by that date the government will either shut down for an indefinite period or Congress will continue to fund it at unknown levels, for an unknown duration, and with unknown priorities and conditions, and (2) that the outcome will impact virtually every American. That no one knows how the appropriations debate will end only highlights the mounting irreparable harm to the public as it is kept in the dark about USDS as Congress's deadline to act approaches. *See Ctr. for Pub. Integ.*, 411 F. Supp. at 13 ("[I]rreparable harm is already occurring each day the impeachment proceedings move forward without an informed public able to access relevant information."). And it makes it clear that the magnitude of the situation easily matches the national importance of the public debates that have led to preliminary injunctions in other FOIA cases. *See Brennan Ctr.*, 498 F. Supp. 3d 87 (census reapportionment); *Am. Oversight*, 414 F. Supp. 3d 182 (impeachment inquiry); *Ctr. for Pub. Integrity*, 411 F. Supp. 3d 5 (impeachment inquiry); *Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d 30 (ongoing debate about warrantless surveillance); *Wash. Post v. U.S. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61 (D.D.C. 2006) (midterm elections); *Protect Democracy I*, 498 F. Supp. 3d 132 (prospective challenges to election results).

### B. CREW will suffer irreparable injury if records are not preserved.

Defendants mischaracterize CREW's argument with respect to the recordkeeping practices of USDS. CREW does not "rel[y] entirely" on the fact that DOGE personnel used Signal before inauguration. Defs.' Opp'n at 22-23. USDS's use of Signal, which was reportedly

continuing as recently as February 27, 2025,[46] constitutes just one part of a pattern of secrecy about USDS's operations, further described *supra*, that raises serious concerns about its recordkeeping practices. Defendants meagerly claim "USDS's operations have not been 'secretive,'" Defs.' Opp'n at 21, while failing to refute reports of USDS personnel's "refusal to identify themselves when requesting information from government employees, USDS's use of an apparently private server in OPM's offices, and its apparent conduct of official business on the social media platform X." Prelim. Inj. Mem. 38–39, ECF No. 2-1.

These concerns are heightened by Defendants' continued refusal to agree to preserve records pending litigation—despite CREW's repeated demands. That omission alone ups the stakes. *See Armstrong v. Bush*, 807 F. Supp. 816, 820 (D.D.C. 1992) (issuing preservation order when defendants "contend they are not currently planning any wholesale purge of their electronic records," but were "unwilling to guarantee that such a purge will not take place."). And Defendants' conclusory assertion that USDS is not subject to FOIA (and thus the FRA) because of its placement in the EOP calls into question whether USDS's records will be lost based on a mistaken understanding of USDS's legal duties. *See Armstrong v. Exec. Off. of the President*, 90 F.3d 553, 556 (D.C. Cir. 1996); *see also* Prelim. Inj. Mem., ECF No. 2-1 at 29-32 (citing cases).

Defendants argue that this Court must "presume that executive officials will act in good faith." Defs.' Opp'n at 25 (quoting *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1293 (D.C. Cir. 1993)). But courts finding irreparable harm relating to threatened records destruction have granted temporary injunctive relief *despite* presuming good faith. *See, e.g.*, *CREW v. Off. of*

---

[46] *See* Patterson et al., *supra* note 38 ("Some have taken to calling DOGE members 'muskrats' and 'muskovites.' Many on both sides communicate primarily on the encrypted Signal app.").

*Admin.*, 593 F. Supp. 2d 156, 162 (D.D.C. 2009) [hereinafter *CREW IV*] ("[A]bsent a court order

punishable by contempt requiring the maintenance and preservation of the records here at

issue… [Plaintiff] would have no recourse if the documents were not so maintained and

preserved."); *Competitive Enter. Inst. v. Off. of Sci. and Tech. Policy*, No. 14-cv-765, 2016 WL

10676292, at *2 (D.D.C. Dec. 12, 2016) ("[A] Preservation Order will provide prudent

assurances against the risk that the emails could be destroyed, whether unintentionally or not");

*see also Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *11 (D.D.C. Feb. 25, 2025)

("[T]he court will not confer th[e] presumption [of good faith] when the government says one

thing while expressly doing another."). Even if this Court deems the public reports of USDS's

recordkeeping practices insufficient to justify a preliminary injunction, it may nonetheless issue a

preservation order pursuant to its inherent powers. *See, e.g.*, *United States ex rel. Staggers v.

Medtronic, Inc.*, 2022 WL 4078969 (D.D.C. Sept. 6, 2022).

**III.    The balance of equities and public interest favor granting a preliminary injunction.**

Balancing the equities and public interest "merge when the Government is the opposing

party." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016)

(quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Both weigh strongly in favor of issuing a

preliminary injunction here. CREW's requested relief serves the public interest because it would

vindicate "FOIA's core purpose of 'shedding light on an agency's performance of its statutory

duties.'" *Protect Democracy I*, 498 F. Supp. 3d at 144 (quoting *Elec. Privacy Info. Ctr.*, 416 F.

Supp. 2d at 42) (cleaned up). Defendants offer nothing to override that powerful public interest.

*USDS.* Defendants fail to make any case whatsoever that USDS will be burdened by

CREW's FOIA request. They thus concede the point. *See Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d

at 41 (where agency "fail[ed] to make any case whatsoever that it will be burdened by granting a

preliminary injunction," it "conced[ed] that this factor … weighs in [the plaintiff's] favor"). Any

burden argument by USDS would fail in any event, especially given CREW's narrowed FOIA request. *See supra* Part II.A; Attachment A. First, USDS claims it is not subject to FOIA and thus does not appear to be processing requests at all. *See* Defs.' Opp'n at 8-9 n.2; 20 n.4. Processing CREW's single request, as narrowed, should pose little difficulty. *See Elec. Priv. Info. Ctr.*, 416 F. Supp. 2d at 41 (agency components' "relatively small FOIA caseloads" weighed in favor of injunction). Second, USDS has demonstrated its capacity and willingness to locate, process, and publish copious amounts of information from dozens of government agencies.[47] Surely it has the capacity to identify a comparatively small number of government records of its own. Third, USDS purportedly specializes in using data and technology to promote efficiency in government.[48] Its personnel thus should have the unique technological ability to identify and process records within USDS itself. (And infused with over $39,000,000 in taxpayer dollars, USDS certainly has the funding to do so.) Fourth, USDS has only existed for six weeks, so the universe of potentially responsive records is smaller than it would be for virtually any other government entity. And finally, prompt disclosure furthers USDS's own stated objectives. De facto USDS Administrator Elon Musk has said that USDS is "trying to be as transparent as possible"[49] and declared: "All aspects of the government must be fully transparent and accountable to the people. No exceptions."[50] CREW agrees.

---

[47] Department of Government Efficiency Home Page, https://doge.gov/ [https://perma.cc/2PQY-YU6S] (last visited Mar. 4, 2025); Department of Government Efficiency (@DOGE), X (last visited Mar. 2, 2025).

[48] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).

[49] Chris Megerian, *WATCH: Trump makes appearance with Musk, signs executive order downsizing federal workforce*, PBS News (Feb. 11, 2025), https://perma.cc/K2D7-VYQV.

[50] Elon Musk (@elonmusk), X (Feb. 9, 2025, 8:39 AM), https://x.com/elonmusk/status/1888583443962814811.

*OMB.* With respect to the OMB requests, Defendants' assertion that departing from its typical first-in, first-out processing unduly harms other FOIA requestors and thus the public interest is immediately undercut by its determination that CREW's FOIA requests concern matters of current exigency and must receive expedited processing. Prelim. Inj. Ex. H, L, ECF Nos. 2-10, 2-14; *see Al-Fayed v. CIA*, 254 F.3d 300, 310 (D.C. Cir. 2001) ("[T]he consequences of delaying a response to a FOIA request would compromise a significant recognized interest."). As such, OMB has already conceded that processing CREW's requests requires imposing a "disadvantage [on] other requesters who would be pushed further back in the FOIA processing queue," Defs.' Opp'n at 20. Given the circumstances, that includes other requestors who have been granted expedited processing. *See Wash. Post*, 459 F. Supp. 2d at 76 (noting that granting expedition concedes that public interest does not require first-in-first-out processing).

Further, because injunctions always require agencies to change how they prioritize processing requests, courts in this Circuit have found that "hardship on other FOIA requesters is not a bar to relief" when a Plaintiff can show irreparable harm, which justifies processing a "request ahead of others in Defendants' FOIA queues." *Brennan Ctr.*, 498 F. Supp. 3d at 103 (quoting *Ctr. for Public Integrity*, 411 F. Supp. 3d at 14). As it should. Given FOIA's purpose of providing timely information about the activities of the government to inform democratic decisionmaking, the public will at times be irreparably harmed if an agency's processing of a specific request does not account for unfolding events. *See Ctr. for Pub. Integrity*, 411 F. Supp. 3d 5. Such is the case here, *see supra* Part II.A, where the need to process CREW's requests "outweighs any harm to other FOIA requesters that might result from a temporary diversion of the [agency's] FOIA resources to accelerate processing of this request." *Am. Oversight*, 414 F. Supp. 3d at 187.

The temporary burden imposed on OMB by CREW's narrowed requests also does not bar relief. OMB leans on claims of limited resources to comply with FOIA because of a "substantial reduction in OMB OGC's workforce dedicated to FOIA and FOIA litigation." Walsh Decl. ¶ 29, 30. But its declarant does not specify what role OMB or the Administration's wider policy and personnel changes may have had in those departures, whether other OMB staff are available to assist in the limited production sought by CREW, or if OMB is seeking to replace those employees, all of which are key questions in the face of the Administration's aggressive campaign to shrink the federal workforce.[51] Unlike defendants in *American Immigration Council v. Department of Homeland Security*, who were forced to contend with COVID-19 office closures beyond the government's control, staff turnover is entirely predictable and any exacerbation of it could well be a problem of the government's own making. 470 F. Supp. 3d 32 (D.D.C. 2020). OMB can, but apparently refuses to, devote appropriate resources to OGC's FOIA workforce, while citing additional FOIA litigation obligations which appear typical for an agency of OMB's size and scope.

Further, CREW has narrowed its specific requests to minimize the burden to Defendants while still informing the public about a current matter of national significance.[52] *See Am. Oversight*, 414 F. Supp. at 187 (granting preliminary injunction and ordering parties to meet and confer in an effort to narrow the specific requests). CREW's narrowing addresses the specific concerns raised by Ms. Walsh in her affidavit. *See* Walsh Decl. ¶ 32-34. Given CREW's narrowing, it is implausible that meeting the requested March 10 deadline "would bring all other OMB FOIA operations, and some non-FOIA operations, to a standstill." *Id.* ¶ 34.

---

[51] Presidential Mem., 90 Fed. Reg. 8247 (Jan. 20, 2025).
[52] *See supra* Part II.A.ii.

Here, a temporary diversion of OMB's FOIA resources is appropriate to accommodate the extraordinary public interest in USDS's rapidly-unfolding operations before Congress decides how and whether to fund the government.[53] *See, e.g.*, *Open Soc'y Just. Initiative v. Cent. Intel. Agency*, 399 F. Supp. 3d 161, 169 (S.D.N.Y. Aug. 6, 2019) ("a 5,000-page-per-month processing rate remains 'practicable' for FOIA purposes, even if meeting this demand calls upon DOD to augment, temporarily or permanently, its review resources, human and/or technological."). OMB is not the sole arbiter of the practicability of compliance. Courts have repeatedly directed agencies to restructure response systems to further the public interest. *See, e.g.*, *Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, Civ. No. 05–845, slip op. at *4–5 (D.D.C. Nov. 16, 2005) (noting that the agency's processing of the plaintiff's expedited request was "unnecessarily slow and inefficient" and ordering the agency to process 1,500 pages every 15 calendar days until processing is complete); *Brennan Ctr.*, 498 F. Supp. 3d at 103 (agency burden outweighed by pressing need for the information and the public interest in being informed, despite "substantial backlogs").

Citing dicta, Defendants argue that CREW's motion should be denied because the public interest in prompt disclosure is indistinguishable from "any other FOIA request." Defs.' Opp'n at 21 (citing *Wadelton v. Department of State*, 941 F. Supp. 2d 120, 124 (D.D.C. 2013) (noting, after holding that there was "no need to consider" the public interest, that plaintiffs were unlikely to succeed on merits due to lack of "widespread public concern" about subject matter of requests)). That claim is divorced from reality. The requested information is central to a crucial public debate of national interest, clearly separating it from other FOIA requests and the sole case cited by Defendants.

---

[53] *Id.*

Finally, Defendants do not dispute that the public interest and balance of the equities weigh in CREW's favor regarding its records preservation requests. Nor could they, since requiring Defendants to comply with the law cannot properly be characterized as a burden. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). A preliminary injunction will require nothing more of Defendants than what the law already mandates. *See* Prelim. Inj. Mem. 41, ECF No. 2-1.

## CONCLUSION

For the foregoing reasons, CREW respectfully requests that this Court issue a preliminary injunction requiring Defendants to (1) process CREW's FOIA requests as narrowed in Attachment A and to produce all non-exempt records and a *Vaughn* index by March 10, 2025 and (2) preserve all potentially relevant records pending final resolution of the case, inclusive of appeals.

Dated: March 4, 2025                    Respectfully submitted,

                                        */s/ Nikhel S. Sus*

                                        Nikhel S. Sus (D.C. Bar No. 1017937)
                                        Jonathan E. Maier* (D.C. Bar No. 1013857)
                                        Donald K. Sherman* (D.C. Bar No. 90031810)
                                        CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
                                        P.O. Box 14596
                                        Washington, D.C. 20044
                                        Telephone: (202) 408-5565
                                        Fax: (202) 588-5020
                                        nsus@citizensforethics.org
                                        jmaier@citizensforethics.org
                                        dsherman@citizensforethics.org

                                        *Counsel for Plaintiff*

                                        **Pro hac vice* application pending

25

**ATTACHMENT A**
**High-Priority OMB & USDS Records**

This table represents narrowed FOIA requests No. 2025-373, 2025-573, 2025-574, for purposes of CREW's motion for preliminary injunction. Original requests are found at PI Ex. A, C, D. Items in the original requests not included below are not part of the narrowed requests.

| To Office of Management and Budget | |
|---|---|
| Modified Request | Original Request |
| From November 6, 2024 to the present, any and all communications between employees of OMB and Elon Musk or Steve Davis. | From November 6, 2024 to the present, any and all communications between employees of OMB and Elon Musk, Vivek Ramaswamy, Antonio Gracias, William (Bill) McGinley, or Steve Davis. |
| From November 6, 2024 to the present, any and all communications between employees of OMB and any other individual purporting to represent, work for, or communicate on behalf of Elon Musk or Steve Davis | From November 6, 2024 to the present, any and all communications between employees of OMB and any other individual purporting to represent, work for, or communicate on behalf of Elon Musk, Vivek Ramaswamy, Antonio Gracias, William (Bill) McGinley, or Steve Davis. |
| From January 20, 2025 to the present, all memoranda, directives, or policies regarding changes to the operations of the former U.S. Digital Service, now renamed the U.S. DOGE Service | From November 6, 2024 to the present, all memoranda, directives, or policies regarding changes to the operations of the former U.S. Digital Service, now renamed the U.S. DOGE Service |
| From January 20, 2025 to the present, all communications with the office of the Administrator of USDS regarding actual or potential changes to USDS operations after President Trump assumed office on January 20, 2025 | From November 6, 2024 to the present, all communications with the office of the Administrator of the USDS regarding actual or potential changes to USDS operations after President Trump assumed office on January 20, 2025 |
| All ethics pledges or waivers executed by USDS personnel employed by USDS on January 19, 2025 | All ethics pledges or waivers executed by USDS personnel |
| All financial disclosures of USDS personnel employed by USDS on January 19, 2025 | All financial disclosures of USDS personnel |

| To United States DOGE Service | |
|---|---|
| Modified Request | Original Request |
| From January 20, 2025 to the present, all memoranda, directives, or policies regarding changes to the operations of USDS | From November 6, 2024 to the present, all memoranda, directives, or policies regarding changes to the operations of USDS |
| From January 20, 2025 to the present, organizational charts for USDS | From November 6, 2024 to the present, organizational charts for USDS |
| From January 20, 2025 to the present, all ethics pledges or waivers executed by USDS personnel | From November 6, 2024 to the present, all ethics pledges or waivers executed by USDS personnel |
| From January 20, 2025 to the present, all financial disclosures of USDS personnel | From November 6, 2024 to the present, all financial disclosures of USDS personnel |
| From January 20, 2025 to the present, all communications with the office of the Administrator of the USDS regarding actual or potential changes to USDS operations | From November 6, 2024 to the present, all communications with the office of the Administrator of the USDS regarding actual or potential changes to USDS operations |
| From January 20, 2025 to the present, all communications between USDS personnel and personnel of any federal agency outside of the Executive Office of the President regarding that agency's staffing levels (including any effort to reduce staffing), treatment of probationary employees, contract and grant administration, access to agency information technology systems, or the authority of USDS in relation to that agency | From November 6, 2024 to the present, all communications between USDS personnel and personnel of any federal agency outside of the Executive Office of the President |