**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON**, |
| Plaintiff, |
| v. |
| **U.S. DOGE SERVICE,** et al., |
| Defendants. |

Case No. 25-cv-511 (CRC)

<u>**MEMORANDUM OPINION**</u>

Government watchdog Citizens for Responsibility and Ethics in Washington ("CREW") lodged two Freedom of Information Requests with the Office of Management and Budget ("OMB") and one with the United States DOGE Service ("USDS") seeking to learn more about USDS's role in spearheading the mass firings and dramatic disruptions to federal programs that have punctuated the opening weeks of President Trump's second term. OMB accepted CREW's requests and agreed to process them on an expedited basis given the public importance of the records sought. USDS, on the other hand, refuses to process CREW's request to it on the ground that USDS is not an "agency" subject to FOIA. CREW sued and simultaneously sought a preliminary injunction ordering USDS to take up its request and requiring both entities to produce responsive documents by today's date in order to inform public debate on appropriations legislation now being considered by Congress.

Finding that USDS is likely covered by FOIA and that the public would be irreparably harmed by an indefinite delay in unearthing the records CREW seeks, the Court will order USDS to process CREW's request on an expedited timetable and, after receiving proposals on a production schedule, to begin producing documents on a rolling basis as soon as practicable.

CREW has not established that it is entitled to disclosure by a date certain, however. The Court will therefore deny CREW's request for an order directing OMB and USDS to produce records by today. Finally, the Court will also order both entities to preserve all records that may be responsive to CREW's FOIA requests.

## I.    Background

### A.    Establishment of USDS During Presidential Transition

On November 13, 2024, President-elect Donald Trump announced the formation of the "Department of Government Efficiency," or "DOGE," "to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." Colleen Long & Jill Colvin, *Trump says Musk, Ramaswamy will form outside group to advise White House on government efficiency*, AP News (Nov. 12, 2024), https://apnews.com/article/donald-trump-president-elon-musk-vivek-ramaswamy-2f0f76bb6440231f2504b77cb117d988. In the same X post, Trump identified technology billionaires Elon Musk and Vivek Ramaswamy as the incoming leaders of the new department. Id. Shortly thereafter, Musk and Ramaswamy published an opinion piece in the *Wall Street Journal*, in which they declared their intent to "advise DOGE at every step to pursue three major kinds of reform: regulatory rescissions, administrative reductions and cost savings." Elon Musk & Vivek Ramaswamy: *The DOGE Plan to Reform Government*, Wall St. J. (Nov. 20, 2024), https://www.wsj.com/opinion/musk-and-ramaswamy-the-doge-plan-to-reform-government-supreme-court-guidance-end-executive-power-grab-fa51c020. Musk and Ramaswamy further pledged that DOGE would operate through "embedded appointees" at federal agencies and would identify "thousands" of unlawful regulations for repeal by the President. Id. And its proposed leaders revealed that, from its inception, a major objective of the new department would be "mass head-count reductions across

the federal bureaucracy." Id. Musk later explained that using DOGE to cut $2 trillion dollars from the federal budget would be the "best-case scenario." Alex Gangitano, *Musk: Cutting $2T through DOGE 'best-case outcome'*, The Hill (Jan. 9, 2025), https://thehill.com/homenews/ administration /5076095-elon-musk-doge-2t-spending-cut-goal/.

USDS commenced operations prior to President Trump's second inauguration on January 20, 2025. During the transition period, USDS employees reportedly communicated via the encrypted messaging application Signal, which is "is widely used for its auto-delete functionality." Mot. for PI at 5. Through this function, users can set Signal to automatically and permanently delete text messages. Set and manage disappearing messages, Signal Support, https://support.signal.org/hc/en-us/articles/360007320771-Set-and-manage-disappearing-messages. (last visited Mar. 10, 2025). USDS employees reported being added to Signal groups after joining the organization, and on the eve of President Trump's inauguration, "[p]eople involved in the operation [said] that secrecy and avoiding leaks is paramount, and much of its communication is conducted on Signal[.]" Theodore Schleifer & Madeleine Ngo, *Inside Elon Musk's Plan for DOGE to Slash Government Costs*, NY Times, https://www.nytimes.com /2025/01/12/us/politics/elon-musk-doge-government-trump.html (Jan. 23, 2025); Vinay Hiremath Blog, *I am rich and have no idea what to do with my life* (last accessed Mar. 10, 2025), https://vinay.sh/i-am-rich-and-have-no-idea-what-to-do-with-my-life/ [https://perma.cc/BNR5-VT4G].

B. USDS Executive Orders

On January 20, 2025, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency." Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025). The Order "establishe[d] the Department of Government

Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."  90 Fed. Reg. at 8441.  It renamed the United States Digital Service as the United States Doge Service and reorganized it within the Executive Office of the President ("EOP").  Id.  The order also established a "temporary organization" under 5 U.S.C. § 3161 entitled "the U.S. DOGE Service Temporary Organization," which is set to last for 18 months.  Id.  A USDS Administrator established in the Executive Office of the President, who reports to the White House Chief of Staff, was charged with heading this temporary organization.  Id.  Although the new administration did not reveal the name of the USDS Administrator for several weeks into its term, the White House ultimately identified Amy Gleason as occupying that role on February 25.  See Ryan J. Foley, *Who is Amy Gleason, the person named DOGE's acting administrator by the White House?*, AP News (Feb. 25, 2025), https://apnews.com/article/doge-actingadministrator-amy-gleason-65af638e646fdd5dd6d5fcc5cc04a2e7.  The government has provided no information about the identity of the Administrator before Gleason.

The first USDS EO also directs agency heads to, in consultation with the USDS Administrator, "establish within their respective Agencies a DOGE Team of at least four employees."  90 Fed. Reg. at 8441.  Each team "will typically include one DOGE Team Lead, one engineer, one human resources specialist, and one attorney."  Id.  These DOGE Teams must "coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda."  Agency heads were also ordered to "ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems."  Id.

A separate presidential memorandum instituting a hiring freeze on all federal civilian employees issued on January 20, 2025, also referenced USDS.  Hiring Freeze, Presidential Mem.

(Jan. 20, 2025), available at https://www.whitehouse.gov/presidential -actions/2025/01/hiring-freeze/.  This memorandum directed the OMB Director, "in consultation with the Director of OPM and the Administrator of the United States DOGE Service to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition." Id. Upon submission of this plan, the hiring freeze would lift except as to the Internal Revenue Service, as separate procedures governed that agency's hiring freeze.  Id.

On February 11, 2025, President Trump issued a second executive order related to USDS, titled "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative."  Exec. Order No. 14210, 90 Fed. Reg. 9669 (Feb. 11, 2025).  The order requires that "[e]ach Agency Head shall develop a data-driven plan, in consultation with its DOGE Team Lead, to ensure new career appointment hires are in highest-need areas." 90 Fed. Reg. at 9670.  It also instructed that "new career appointment hiring decisions" under these plans "shall be made in consultation with the agency's DOGE Team Lead, consistent with applicable law."  Id.  And agencies were directed not to "fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled."  Id.  Neither of the USDS EOs delegates any statutory authority to the department, however.

C.  USDS Operations to Date

To date, USDS has reportedly taken widescale action in service of its stated goals to reduce government spending and shrink the federal workforce.  For instance, Mr. Musk claimed credit for placing large numbers of USAID employees on administrative leave in February, revelling that "We spent the weekend feeding USAID into the wood chipper."  Elon Musk (@elonmusk), X (Feb. 3, 2025, 1:54 AM), https://x.com /elonmusk/status/18863073168042

63979?s=46.  Musk's tweet came contemporaneously with severe cuts at USAID, which placed 2,140 employees on administrative leave by February 7 and planned to place another approximately 2,014 employees on leave shortly thereafter, "ultimately determine[ing] that approximately 611 staff were essential to carry out its statutory functions." <u>Am. Foreign Serv. Ass'n v. Trump</u>, No. 1:25-cv-352 (CJN), 2025 WL 573762, at *2 (D.D.C. Feb. 21, 2025).

USDS, again through Musk, is also the reported architect of the "Fork in the Road" deferred resignation program intended to induce federal workers to quit.  OPM sent this deferred resignation offer to all federal employees on January 28.  <u>Nat'l Treasury Emps. Union v. Trump</u>, No. 25-CV-420 (CRC), 2025 WL 561080, at *2 (D.D.C. Feb. 20, 2025).  Under the terms of the offer, employees who chose to resign would retain all pay and benefits, regardless of their daily workload, until September 30, 2025.  <u>Id.</u>  According to the White House, approximately 75,000 employees—roughly 3% of the federal civilian workforce—resigned.  <u>Id.</u>  News sources characterized the Fork in the Road program as "part of DOGE head Elon Musk's effort to trim the size of government," noting that the subject line "Fork in the Road" is "the same language Musk used when he slashed jobs at Twitter after taking over that company in 2022."  Will Steakin & Laura Romero, *OPM, implementing Musk's DOGE plans, sends federal workers 2nd 'Fork in the Road' email*, ABC News (Feb. 3, 2025), https://abcnews.go.com/US/opm-implementing-musks-doge-plans-sends-federalworkers/story?id=118401375.
USDS has likewise claimed credit for other cuts across the federal government since President Trump's inauguration.  For instance, the agency announced that "taxpayers will see just over a $1 billion savings through the elimination of 104 diversity, equity and inclusion-related (DEI) contracts" with the government.  Charles Creitz, *DOGE announces more than $1B in savings after canceling 104 federal DEI contracts*, FOX News (Jan. 31, 2025), https://www.foxnews.

com /politics/doge-announces-more-than-1b-savings-after-canceling-104-federal-dei-contracts.
USDS also announced the termination of 89 Department of Education contracts related to the
Institute of Education Sciences, totaling over $900 million in cuts.  Zach Montague & Dana
Goldstein, *Musk Team Announces Millions in Cuts to Education Dept. Amid Legal Pushback*,
N.Y. Times (Feb. 11, 2025),  https://www.nytimes.com/2025/02/11/us/politics/musk-doge-
education-data.html#:~:text=Elon%20Musk's%20cost%2Dcutting%20effort,the%20Institute
%20of%20Education%20Sciences.

 And in a move viewed by some as pernicious, USDS has obtained unprecedented access
to sensitive personal and classified data and payment systems across federal agencies.  For
instance, USDS teams reportedly received access to "a massive trove of personal information for
millions of federal employees" maintained by OPM and "sensitive Treasury data including
Social Security and Medicare customer payment systems."    https://apnews.com/article/donald-
trump-elon-musk-doge-treasury-5e26cc80fcb766981cea56afd57ae759; Isaac Stanley-Becker et
al., *Musk's DOGE agents access sensitive personnel data, alarming security officials*, Wash.
Post (Feb. 6, 2025),  https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-
doge-access-personnel-data-opm-security/; Fatima Hussein, *Elon Musk's DOGE commission
gains access to sensitive Treasury payment systems: AP sources*, AP News (Feb. 1, 2025).
USDS personnel have also gained access to "information on all Americans who rely on Medicare
and Medicaid, as well as countless consumers" from the Consumer Financial Protection Bureau,
Department of Health and Human Services, and Department of Labor, among other agencies.
Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Dep't of Lab., No. CV 25-0339 (JDB),
2025 WL 542825, at *1 (D.D.C. Feb. 14, 2025); Aileen Graef & Veronica Stracqualursi,
*Homeland Security Secretary Noem says DOGE team has access to agency data*, CNN (Feb. 9,

2025), https://www.cnn.com/2025/02/09/politics/noem-homeland-security-doge-muskcnnntv/index.html; Jennifer Jacobs, *DOGE gets access into Consumer Financial Protection Bureau as OMB's Russell Vought takes over as acting head of federal consumer watchdog agency*, CBS News (Feb. 8, 2025), https://www.cbsnews.com/news/doge-access-consumer financial-protection-bureau-omb-russel-vough-acting-head/.  And, over protests from a USAID security director who was later removed, USDS employees allegedly accessed classified information without the appropriate clearances.  Abigail Williams et al., *USAID security leaders removed after refusing Elon Musk's DOGE employees access to secure systems*, NBC News (Feb. 2, 2025), https://www.nbcnews.com /politics/national-security/usaid-security-leaders-removed-refusingelon-musks-doge-employees-acce-rcna190357.

News reports also suggest that USDS has continued to conduct at least some operations outside official government systems.  For instance, USDS and agency personnel reportedly communicated "primarily on the encrypted Signal app" as recently as February 27.  Scott Patterson, et al., *Inside DOGE's Clash With the Federal Workforce*, Wall St. J. (Feb. 27, 2025), https://www.wsj.com/politics/policy/ inside-doge-elon-musk-government-employees-b87fc17a. Musk has also used the social media platform X, which he owns, to solicit job applications for positions at USDS and seek public input on proposed government actions.  Department of Government Efficiency (@DOGE), X (Nov. 14, 2024, 10:03 AM), https://x.com/DOGE /status/1857076831104434289; Kate Conger, *Elon Musk's X Becomes Weapon in Government Cost Cutting*, https://www.nytimes.com/2025/02/04/technology/elon-musk-x-doge.html (Feb. 4, 2025).

USDS's operations thus far have been marked by unusual secrecy in other ways, too.  For instance, USDS reportedly installed an outside server at OPM to store government staffers'

personal information, including their names and email accounts.  Dell Cameron, *Federal Workers Sue to Disconnect DOGE Server*, WIRED (Feb. 4, 2025), https://www.wired .com/story/federal-workers-sue-over-doge-server/.  USDS employees have also reportedly declined to identify themselves to career officials on request.  Benjamin Siegel et al., *'What's going to break?' DOGE staffers 'scorching the earth' as they reshape federal government*, ABC News (Feb. 6, 2025), https://abcnews.go.com/Politics/whats-break-doge-staffers-scorching-earth-reshapefederal/story?id=118536035.  Indeed, Musk has said that posters who released the names of USDS employees online "committed a crime."  Peter Suciu, *DOGE Employees Identified On X – Doxing Or Case Of Free Speech?*, Forbes (Feb. 4, 2025), https://www.forbes. com/sites/petersuciu/2025/02/04/doge-employees-identified-on-x--doxing-or-case-of-free-speech/.

D.  <u>CREW's Three FOIA Requests</u>

Concerned by the reports just discussed, CREW filed three FOIA requests seeking further information on USDS's operations.  CREW is a non-profit "committed to protecting the public's right to be aware of the activities of government officials, to ensuring the integrity of those officials, and to highlighting and working to reduce the influence of money on politics."  Mot. for PI, Ex. D (copy of USDS Request) at 8.  The organization is primarily engaged in educating the public on issues related to the government and "routinely disseminates information obtained through FOIA to the public," including on its website.  <u>Id.</u> at 3.

On December 19, 2024, CREW submitted a FOIA request to OMB ("First OMB Request") seeking (1) communications between "employees of OMB and various officials purporting to have an affiliation with DOGE;" (2) communications between employees of agencies and individuals affiliated with the "Delivering Outstanding Government Efficiency

Caucus;" (3) "communications within those agencies about 'DOGE' and related terms;" and (4)"other DOGE-related communications."  Compl. ¶ 88; Mot. for PI, Ex. A (copy of First OMB Request).  CREW sought information dating back to November 5, 2024.  Id.  OMB acknowledged receipt of the First OMB Request and assigned it a tracking number on December 20.  Compl. ¶ 89.

Next, on January 24, 2025, CREW submitted an expedited FOIA request to OMB ("Second OMB Request") "seeking records related to changes to the operations of the U.S. Digital Service, organizational charts, financial disclosures, and other information relevant to the newly-formed USDS."  Id. ¶ 90; Mot. for PI, Ex. C (copy of Second OMB Request).  The second request similarly focused on the time period beginning November 6, 2024, but also requested some records dating back until January 2014.  Id.  On the same day, CREW contacted the OMB FOIA Requester Service Center to ask how to submit a FOIA request directly to USDS and was directed to submit that request through OMB, too.  Mot. for PI, Ex. D at 1 n.1.  Accordingly, CREW also submitted an expedited FOIA request directly to USDS ("USDS Request"), which, along with the just-listed information, sought "[a]ll communications between USDS personnel and personnel of any federal agency outside of the Executive Office of the President."  Compl. ¶ 90; Mot. for PI, Ex. D.  On January 24, OMB acknowledged receipt of both requests.  Id. ¶ 92.

A few days later, on January 28, CREW sought expedited processing of the First OMB Request, citing the "urgency to inform the public about an actual or alleged Federal Government activity" and the fact that "[t]here are possible questions, in a matter of widespread and exceptional public interest, about the Government's integrity which affect public confidence."  Id. ¶ 93; see 5 C.F.R. 1303.40(e) (1)(ii), (iv).  The next day, OMB granted expedited treatment for the Second OMB Request and the USDS request but did not commit to producing any

documents by a date certain.  Id. ¶ 94.  CREW sent follow-up letters to OMB on February 7 and February 11, requesting the records by March 1 in advance of the March 14 expiration of the current continuing resolution to fund the federal government.  Id. ¶¶ 95, 99, 100.  Then, on February 14, OMB granted expedited treatment for the First OMB Request as well.  Id. ¶ 100.

Although OMB initially agreed to process the USDS request and granted it expedited treatment, it has since done an about face.  After CREW sued, the government suggested that OMB had inadvertently accepted the USDS request.  See Opp'n at 8–9 n.2.  It further indicated that USDS had been reorganized as a "free-standing component of EOP that reports to the White House Chief of Staff."  Id.  "As a result," the government posits, "USDS is not subject to FOIA."  Id.  The government confirmed at oral argument on CREW's motion that neither OMB nor USDS itself intend to process the USDS request on that ground.  Rough Tr. 3:23–4:4.

E.  Procedural History

On February 20, CREW filed suit against Defendants USDS; John Doe, in his official capacity as Administrator of the U.S. DOGE Service; Elon Musk, in his official capacity; the Office of Management and Budget ("OMB"); Russell Vought, in his official capacity as Director of OMB; and the National Archives and Records Administration ("NARA").  CREW's complaint includes three counts.  Count One contends that Defendants violated FOIA by failing to expeditiously process CREW's requests and timely release all requested records.  Compl. ¶¶ 107–113.  Count Two alleges that USDS has "unlawfully deleted or failed to preserve federal records" and that Defendants' failure to initiate an enforcement action under the Federal Records Act ("FRA") as a result violates the Administrative Procedure Act.  Compl. ¶¶ 114–122.  Count Three seeks a writ of mandamus based on substantially the same allegations.  Compl. ¶¶ 123–28.

On the same day, CREW filed a motion for preliminary injunction seeking an Order requiring OMB and USDS to fully process and produce, by March 10, 2025, all non-exempt records as to all three of its requests. CREW seeks preliminary relief because it asserts that the public and Congress need the requested information in time to inform public debate over appropriations legislation after the current continuing resolution to fund the government expires on March 14. Mot. for PI at 1. The government filed an opposition on an expedited briefing schedule. Along with its reply, CREW submitted narrowed versions of its FOIA requests that purportedly "focus on the subsets of requested records most crucial to informing the public about USDS's operations before March 14." Reply at 12.

The narrowed OMB requests seek: "any and all communications between employees of OMB" and "Elon Musk or Steve Davis"  or "any other individual purporting to represent, work for, or communicate on behalf of Elon Musk or Steve Davis" from November 6, 2024, to the present; "all memoranda, directives, or policies regarding changes to the operations of the former U.S. Digital Service, now renamed the U.S. DOGE Service" from January 20, 2025, to the present; "all communications with the office of the Administrator of USDS regarding actual or potential changes to USDS operations after President Trump assumed office on January 20, 2025[,]" from January 20, 2025, to the present; and all ethics pledges, waivers, and financial disclosures of USDS personnel employed by USDS on January 19, 2025. Reply, Attachment A at 1.

The narrowed USDS request seeks, in each case from January 20, 2025, to the present: "all memoranda, directives, or policies regarding changes to the operations of USDS"; organizational charts for USDS; ethics pledges, waivers and financial disclosures of USDS personnel; "all communications with the office of the Administrator of the USDS regarding

actual or potential changes to USDS operations"; and "all communications between USDS personnel and personnel of any federal agency outside of the Executive Office of the President regarding that agency's staffing levels (including any effort to reduce staffing), treatment of probationary employees, contract and grant administration, access to agency information technology systems, or the authority of USDS in relation to that agency." Id. at 2.

On March 7, 2025, the Court held a hearing on CREW's motion. The Court will now deny the motion for a preliminary injunction directing OMB and USDS to process the three requests at issue by March 10, 2025. The Court will, however, grant CREW's request for a preliminary injunction requiring expedited processing of the USDS request. And it will direct OMB and USDS to provide an estimate of the volume of responsive records within ten days and thereafter entertain proposals from the parties for an expedited rolling production schedule. Finally, the Court will grant CREW's request for an Order requiring the Defendants to preserve all records that may be relevant to CREW's FOIA requests.

## II.    Legal Standards

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alterations in original) (quoting Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011)). "[I]t is especially important for the movant to demonstrate a likelihood of success on the merits." Nat'l Head Start Ass'n v. U.S. Dep't of Health & Hum. Servs., 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (citing Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360, 366 (D.C. Cir. 1999)). A preliminary injunction is an "extraordinary" remedy and so "should not be granted unless the movant, by a

clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972

(1997) (per curiam) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and

Procedure § 2948 (2d ed. 1995)).

### III. Analysis

CREW's preliminary-injunction motion, which was filed just over two weeks ago, seeks

an Order requiring OMB and USDS to fully process and produce, by today, March 10, 2025, all

non-exempt records as to all three of its requests. As noted, although OMB initially agreed to

process the USDS Request, the government informed the Court at oral argument that neither

OMB nor USDS intends to process the USDS Request on the ground that USDS is not an

"agency" under FOIA. Given these late-breaking developments, the Court inquired at the

hearing whether CREW's requested relief encompasses a preliminary order directing USDS (or

OMB) to process the USDS request on an expedited basis as OMB originally agreed—but

perhaps not by a date certain tied to Congress's ongoing appropriations debate. Rough Tr. 12:5–

14. CREW indicated that such an order would be within scope of the relief it seeks. Id. at

12:15–17. The Court agrees. Accordingly, the Court construes CREW's request as seeking (1)

processing and production by March 10, 2025, for all three requests; and (2) expedited

processing of the USDS Request in the event the Court declines to order a date certain for

completing that request.

The Court will deny the motion for a preliminary injunction directing OMB and USDS to

process the three requests at issue by March 10, 2025. However, finding that CREW has

established a likelihood of success on the merits of its argument that USDS is subject to FOIA

and that indefinite delay in the release of the requested USDS records would cause CREW and

the public irreparable harm, the Court will grant CREW's request for expedited processing of the USDS request, consistent with how OMB is presently treating the other two requests.

A.  OMB Requests

The government has already granted expedited processing of both of CREW's requests directed to OMB.  Compl. ¶¶ 94, 100.  Thus, as to those requests, CREW seeks only production by a date certain—March 10, 2025.  CREW seeks the same as to the USDS Request as well as expedited processing.  Unfortunately for CREW, it satisfies none of the factors entitling it to preliminary relief ordering production of its OMB requests by today's date.

### 1.  Likelihood of Success on the Merits/Irreparable Harm

An agency may grant expedited processing of FOIA requests "in cases in which the person requesting the records demonstrates a compelling need."  5 U.S.C. § 552(a)(6)(E)(i)(I).  When an agency grants such a request, it "shall process as soon as practicable any request for records to which the agency has granted expedited processing."  Id. § 552(a)(6)(E)(iii).  When, as here, a requester seeks not just expedited processing but production of its requests by a date certain, it "must do more than just show a likelihood of success that it is entitled to the expedited processing of its requests."  Brennan Ctr. for Just. at N.Y.U. Sch. of L. v. Dep't of Com., 498 F. Supp. 3d 87, 99 (D.D.C. 2020).  The requester must demonstrate, instead, "a likelihood that it is entitled to have processing finished" by the requested date certain.  Id.  "In other words, it must show that under the circumstances, 'as soon as practicable,' means by that date."  Id. (citation omitted).

The Court's analysis of likelihood of success in such circumstances "tracks closely with its evaluation of irreparable harm."  Id.  That is so because the question boils down to whether "the records requested" will "becom[e] stale after" the requested date and thus be "of little value

to inform the public of ongoing proceedings of national importance." Id. (quotation marks omitted) (citation omitted). The Court will therefore consider these factors together in evaluating CREW's request for processing of the OMB requests by March 10. The Court concludes, for the same reasons, that CREW has established neither a likelihood of success on the merits that the requested information will go stale after March 10 nor irreparable harm from failing to receive the documents until after the impending appropriations process has concluded.

CREW argues that the requested records are necessary "to inform the debate about the federal government's funding and operations" that will take place after the current continuing resolution expires on March 14, 2025, because "USDS is at the heart of a larger debate about the Trump administration's efforts to cut federal spending." Mot. for PI at 25, 27. Although CREW's argument mostly sounds in generalities, CREW contends that the narrowed subset of requested records reflects on whether, for instance, "OMB will use the apportionment process or any other authorities to withhold funding to implement DOGE's prerogatives." Reply at 14. CREW cites statements from legislators expressing interest in this question; for instance, Representative Brendan Boyle reportedly stated: "I don't know how in the world I could possibly make an agreement with this White House to fund anything if then, the very next day after my vote, Elon Musk can just show up and close the agency." Id. at 6 (citing Joe Perticone & Lauren Egan, *House Dems Wonder: Should We Burn It All Down?*, The Bulwark (Feb. 27, 2025), https://perma.cc/AGG7-N9RT). At oral argument, counsel for CREW attempted to put a finer point on its argument, explaining that legislators, although aware of USDS's effects on the federal government thus far, need to "understand more about how DOGE is working, how it's deciding to make the cuts it's making, how very crucially it's exercising influence and directing the actions of agencies." Rough Tr. 22:12–15.

The Court takes the general point that members of Congress, in exercising their responsibilities as appropriators, should know what USDS is up to.  And while the Court agrees that the requested records are important, it disagrees that they are so central to the impending appropriations process as to require their production by March 10, 2025.  CREW acknowledges that the most likely outcome following the expiration of funding on March 14 is the passage of another continuing resolution to fund the government or a government shutdown, not individual appropriations bills covering each agency.  Rough Tr. 25:7–10.  The Court highly doubts that the specifics of how USDS has interacted thus far with OMB is crucial to the determination whether to continue funding the entire federal government.  As CREW concedes, legislators already have sufficient information to conclude that USDS will likely influence OMB's distribution of appropriated funds.  Rough Tr. 21:8–13.  Indeed, from the President's Executive Orders, news reports, and USDS actions thus far already detailed by the Court, any rational legislator could conclude that USDS's priorities include reducing the size of the federal workforce and that it will likely take further action to carry out those objectives.

Beyond this, the Court doubts that legislators urgently require, for example, communications between OMB employees and Musk, Steve Davis, and their representatives, or other communications or memoranda concerning "changes to the operations of" USDS to decide whether to continue funding the government.  Reply, Attachment A at 1.  To the extent legislators are concerned enough about USDS influence to shut down the government, they may already do that, and CREW provides few examples of specific information included in the requested records that might be relevant to that broad decision.  And given that Congress is not considering whether to fund USDS itself, CREW's request for ethics pledges or waivers and financial disclosure forms of USDS personnel seems particularly far afield.  See id.

When pressed at oral argument, CREW indicated that legislators most pressingly want to know which programs or agencies have been prioritized for further cuts. Rough Tr. 30:14–25. Such information, in CREW's view, may lead a legislator who disapproves "not to vote for a" continuing resolution to keep funding the government. Id. at 30:1–2. But the Court discerns no limiting principle preventing this argument from requiring the production of all documents relevant to the executive branch's priorities ahead of every single congressional appropriations vote. To be sure, the structure and influence of USDS appear to unprecedented, and those factors, along with USDS's outsized influence on the federal government, support expedited processing of these requests, as OMB has already acknowledged. Congress should certainly receive information about the structure of USDS in time to meaningfully respond to it, but CREW has provided little connective tissue between the requested records and the specific decision whether to continue funding the government after March 14. Congress's appropriations power is continuous—as CREW acknowledges, Rough Tr. 18:9–11—and it may respond to information received about USDS's operations through the passage of appropriations legislation after March 10.

Although some funding decisions may not be easily wound back, the appropriations process is much more fluid than one-off events that have very occasionally given rise to "date certain" preliminary injunctions in FOIA cases—such as a decennial census, see Brennan Ctr., 498 F. Supp. 3d at 100; a congressional election, Wash. Post v. Dep't of Homeland Sec., 459 F. Supp. 2d 61, 75 (D.D.C. 2006); and a presidential impeachment proceeding, Ctr. for Pub. Integrity v. U.S. Dep't of Def., 411 F. Supp. 3d 5, 12 (D.D.C. 2019). Moreover, Congress's appropriations power is not the only tool available to it to exert control over USDS. Although Congress as a whole has thus far shown no inclination to do so, it may pass other types of

legislation, for instance, or hold hearings and issue subpoenas to learn more about the
department's structure and operations.  The Court agrees that Congress and the public must
receive the requested information "in a timely fashion" such that they can participate in these
"ongoing public and congressional debates about issues of vital national importance," including
so that Congress may exert its means of influence over USDS if it so chooses.  Protect
Democracy Project, Inc. v. U.S. Dep't of Def., 263 F. Supp. 3d 293, 301 (D.D.C. 2017) (citations
omitted).  But nothing about the impending opportunity to act on March 14 makes it so
exceptional as to warrant the rare relief of immediate processing of the OMB Requests.

And the handful of cases in which courts in this district have ordered production by a date
certain do not support CREW's position.  In Brennan Center v. Department of Commerce, for
instance, the requesters sought information related to the use of citizenship data to calculate the
2020 state-population totals used to apportion the United States House of Representatives.  498
F. Supp. 3d at 94.  The court ordered production of the records by January 11, 2021, in time to
use them by January 25, 2021—the date on which the 2020 census and reapportionment process
would conclude.  Id. at 100, 103.  The court explained that after completion of the
reapportionment process, "the value of the information sought by the Brennan Center to inform
the public about these matters would be materially lessened or lost."  Id. at 100.

In American Oversight v. United States Department of State, 414 F. Supp. 3d 182
(D.D.C. 2019) (Cooper, J.), the requester sought communications between (1) senior State
Department officials and Rudolph W. Giuliani, President Trump's personal lawyer, and (2) State
Department officials and the White House regarding the May 2019 recall of the former U.S.
Ambassador to Ukraine.  Id. at 183.  This Court ordered production by a date certain because the
requested records "potentially go to the heart of one of the issues that the Congress is

considering" in an ongoing impeachment inquiry: "Mr. Giuliani's alleged efforts to enlist

Ukraine's assistance in furthering the President's reelection prospects." Id. at 186.  Thus, the

Court ordered the records to be produced in time for them to be used "while the impeachment

process is ongoing."  Id. at 187.

Similarly, in Center for Public Integrity v. United States Department of Defense, 411 F.

Supp. 3d 5 (D.D.C. 2019), a fellow court in this district ordered production of communications

between DOD and OMB concerning DOD's Ukraine Security Assistance Initiative that were

closely related to the same ongoing impeachment inquiry.  Id. at 7..  The court reasoned that "the

primary value of the information lies in its ability to inform the public of ongoing proceedings of

national importance"—the impeachment proceedings—and anything received after those

proceedings concluded would be "stale information . . . of little value." Id. at 12.  Employing

similar reasoning, another court in this district ordered production of relevant records by a date

certain ahead of an upcoming congressional election.  Wash. Post, 459 F. Supp. 2d at 75.

None of these cases supports production of the requested records here by March 10, even

if that were possible.[1]  Each case involved a singular event—a census, congressional election, or

impeachment process—with an end date, after which the requested records would no longer have

anything but "historical value." Brennan Ctr., 498 F. Supp. 3d at 101.  Here, on the other hand,

as just explained, Congress's ability to pass appropriations legislation and otherwise act in

---

[1] True, one court in this district ordered production of records relating to the Bush
administration's policy of conducting surveillance of domestic communications without prior
authorization by a date certain for use in congressional debates "surrounding the legality of the
Administration's warrantless surveillance program." Elec. Priv. Info. Ctr. v. Dep't of Just., 416
F. Supp. 2d 30, 41 (D.D.C. 2006).  But that case largely relied on a "presumption of agency
delay raised by failing to respond to an expedited request within twenty days," id. at 39, which
the D.C. Circuit has since called into question in Citizens for Responsibility and Ethics in
Washington v. Federal Election Commission, 711 F.3d 180, 189 (D.C. Cir. 2013).

response to USDS's activities will not evaporate on March 14.  Any information received about USDS will remain valuable and informative to congressional leaders, and the public in conversation with their representatives, as long as USDS exists—which it will, as it stands, for at least 18 months.  90 Fed. Reg. at 8441.  Moreover, in each case, the link between the requested records—e.g., the government's use of citizenship data and the reapportionment process—was much closer than the tenuous connection between the records requested and the appropriations process here.

CREW counters that "continued value of the information for other purposes [does] not diminish its value for the movant's purposes."  Reply at 17.  True.  In Brennan Center, for instance, the court rejected the argument that the requested records could continue to inform public debate leading up to the 2030 census because "the debate the Brennan Center, and the public, are focused on concerns *this* census and *this* reapportionment process."  498 F. Supp. 3d at 102.  But the debate surrounding USDS is not so limited.  CREW seeks the information so that the public and Congress may respond to USDS's activities in a timely and ongoing manner, not so that they may do so only during the appropriations process taking place this week and thereafter wash their hands of USDS.  CREW seeks the requested records so that Congress, with public input, may consider information about USDS's structure and influence over OMB when making funding decisions.  The information will not go "stale" for CREW's own asserted purpose after March 10—to the contrary, it will likely remain valuable and relevant to all congressional funding decisions in the near future.  This is a far cry from the circumstances at issue in Brennan Center and other cases where FOIA plaintiffs have obtained "date certain" preliminary injunctions, where information relevant to a particular event will have only "historical value" to future events.  Id. at 101.

For these reasons, the Court concludes that CREW has not established a likelihood of success on the merits that it is entitled to processing of the OMB Requests by March 10. The Court's conclusion in this regard also disposes of CREW's claim of irreparable harm, as its two arguments largely overlap. See Mot. for PI at 25–29.

### 2. The Balance of the Equities and the Public Interest

These two factors "merge when the Government is the opposing party." FBME Bank Ltd. v. Lew, 125 F. Supp. 3d 109, 127 (D.D.C. 2015) (quoting Nken v. Holder, 556 U.S. 418, 435 (2009)). Here, the balance of the equities and the public interest favor the government at least as to the request for production by March 10. It would be practically impossible for the government to process the requests by the date of this opinion, especially given that there are 35 expedited requests at OMB in the queue ahead of CREW's. See Opp'n, Decl. of Heather V. Walsh, ¶ 17. And since the Court has already concluded that CREW is not entitled to production by the requested date certain, no interest outweighs the insurmountable hardship to Defendants and other requesters.

### B. USDS Request

The Court next turns to the USDS Request, which is differently situated from the OMB Requests because the government has declined to process this request at all. The Court concludes that CREW has established a likelihood of success on the merits that: (1) USDS is an agency subject to FOIA; and (2) its request is entitled to expedited processing consistent with the treatment provided to the two OMB requests. CREW has also shown that indefinite delay in the release of the requested USDS records would cause CREW irreparable harm. It is therefore entitled to preliminary relief ordering USDS to process the request on an expedited basis. For

the reasons already discussed, however, the Court will not order processing of the USDS request by March 10.

    1.   *Likelihood of Success on the Merits*

        (1)  USDS is Likely Subject to FOIA

The parties dispute whether USDS is an agency subject to FOIA. Mot. for PI at 21–25; Opp'n at 8–9 n.2. FOIA defines "agency" as "includ[ing] any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President)." 5 U.S.C. § 552(f)(1). Recall that USDS was "established in the Executive Office of the President." 90 Fed. Reg. at 8441. To conclude that "an EOP unit is subject to FOIA," there must be "a finding that the entity in question 'wielded substantial authority independently of the President.'" Citizens for Resp. & Ethics in Wash. v. Off. of Admin., 566 F.3d 219, 222 (D.C. Cir. 2009) (citation omitted). If instead the unit's "sole function is to advise and assist the President," it is not an agency. Alexander v. FBI, 456 F. App'x 1, 1–2 (D.C. Cir. 2011) (quoting Kissinger v. Reps. Comm., 445 U.S. 136, 156 (1980)). The Court concludes that, on this preliminary record, CREW will likely succeed in demonstrating that USDS wields the requisite substantial independent authority.

Three sources of information point in this direction. First, the relevant executive orders appear to endow USDS with substantial authority independent of the President. The initial executive order "establishes the Department of Government Efficiency *to implement the President's DOGE Agenda*, by modernizing Federal technology and software to maximize governmental efficiency and productivity." 90 Fed. Reg. at 8441 (emphasis added). That order appears to give USDS the authority to implement the DOGE Agenda, not just to advise the

President in doing so.  See Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. Dep't of Lab., No. CV

25-0339 (JDB), 2025 WL 542825, at *3 (D.D.C. Feb. 14, 2025) (noting that USDS's mission as

set forth in the Executive Order "is to 'implement' the President's modernization agenda, not

simply to help him form it").  Moreover, President Trump's subsequent executive order directs

that agencies "shall not fill any vacancies for career appointments that the DOGE Team Lead

assesses should not be filled, unless the Agency Head determines the positions should be filled."

90 Fed. Reg. at 9669.  This order grants the USDS Team Lead the power to keep vacant career

positions open unless an agency overrides their decision.  And the order appears to contemplate

that this authority will be exercised independent of the President.

Second, Musk and the President's public statements indicate that USDS is in fact

exercising substantial independent authority.  At its inception, President Trump trumpeted that

USDS would have the power to "to dismantle Government Bureaucracy, slash excess

regulations, cut wasteful expenditures, and restructure Federal Agencies."  Donald J. Trump

(@realDonaldTrump), X (Nov. 13, 2024, 6:21 AM), https://x.com/realDonaldTrump/status/18

56658569124262092.  Musk, too, indicated that USDS would take aggressive action to pursue its

agenda, explaining that USDS was focused on three areas of reform: "regulatory rescissions,

administrative reductions and cost savings."  Musk & Ramaswamy, supra.  In the same article,

Musk and Ramaswamy also suggested that USDS would have the power to identify regulations

due for the chopping block.  Id.  More recently, Musk noted publicly that he plans to use USDS

to reduce the federal budget by $2 trillion.  Gangitano, supra.  Presumably, such a staggering

result would require more than mere advice.  Musk also took credit for the cuts at USAID,

boasting: "We spent the weekend feeding USAID into the wood chipper."  Elon Musk

(@elonmusk), X (Feb. 3, 2025, 1:54 AM), https://x.com/elonmusk /status/18863073168042639

79.  And in recent weeks, President Trump has praised Musk and DOGE for their efforts, noting that Musk "found hundreds of billions of dollars worth of fake contracts" and gave orders to "[c]ut 50%, 60%, 70%."  Taylor Penly, *Trump praises 'real patriot' Elon Musk for 'opening a lot of eyes' with DOGE*, Fox Business, https://www.foxbusiness.com /media/trump-praises-real-patriot-elon-musk-opening-lot-eyes-doge (Mar. 9, 2025).  The President also reportedly "ordered cabinet secretaries to cooperate with DOGE on staffing."  Id.  These statements and reports suggest that the President and USDS leadership view the department as wielding decision-making authority to make cuts across the federal government.

Third, USDS's actions to date demonstrate its substantial authority over vast swathes of the federal government.  Musk's just-noted statement attributing the decimation of USAID to USDS was contemporaneous with the placement of nearly all USAID employees on administrative leave.  See Am. Foreign Serv. Ass'n, 2025 WL 573762, at *2.  The Court need not stretch to conclude that USDS likely drove the charge to shutter USAID, and conducting such mass firings evidently requires substantial authority.  USDS also claimed to have eliminated 104 DEI-related contracts with the federal government, saving $1 billion, and saving another $900 million through the termination of 89 of the Department of Education's contracts.  Creitz, supra; Montague & Goldstein, supra.  Canceling any government contract would seem to require substantial authority—and canceling them on this scale certainly does.  Again, USDS reportedly is leading the charge on these actions, not merely advising others to carry them out.  From these reports, the Court can conclude that USDS likely has at least some independent authority to identify and terminate federal employees, federal programs, and federal contracts.  Doing any of those three things would appear to require substantial independent authority; to do all three surely does.

USDS has also gained access to sensitive data and payment systems across federal agencies, and potentially to classified information, even over the objection of officials within those agencies.  Ellen Knickmeyer & Matthew Lee, *USAID Security Chiefs Put on Leave After Trying to Stop Musk's Team From Accessing Classified Info, Officials Say*, PBS News (Feb. 2, 2025), https://www.pbs.org/newshour/politics/usaid-security-chiefs-put-on-leave-after-trying-to-stop-musks-team-from-accessing-classified-info-officials-say.  And USDS appears likely to have been responsible for the Fork in the Road deferred resignation offer sent to all federal employees, which mirrors Musk's prior actions at Twitter.  Steakin & Romero, *supra*.  Musk also directed the sending of emails to federal employees requiring them to respond with weekly lists of five bullet points summarizing their accomplishments.  Alex Horton & Warren P. Strobel, *Musk's '5 Things' Email Mandate A 'Nightmare' Risk, Cyber Officials Say*, https://www.washingtonpost.com/national-security/2025/03/07/doge-emails-cyber-command-intel/ (Mar. 7, 2025).  USDS's power to override agency officials, swiftly gain access to agency systems, and impose job requirements on federal employees all further suggest substantial independent authority.

To determine whether an agency is subject to FOIA, courts also consider "whether it has a self-contained structure."  Meyer v. Bush, 981 F.2d 1288, 1293 (D.C. Cir. 1993).  Per its establishing order, USDS has a defined staff: the USDS Administrator, a temporary organization operating within USDS, and DOGE teams that are embedded outside USDS within each executive branch agency.  90 Fed. Reg. at 8441.  USDS also retains the authority to consult with agency heads regarding the selection of the outside USDS teams, thereby exerting influence over employees across federal agencies.

From all this, the Court concludes that in practice, USDS is likely exercising substantial

independent authority much greater than other EOP components held to be covered by FOIA.[2]

For instance, the Circuit held that the Office of Science and Technology exercised substantial

independent authority because of its role evaluating federal research programs and advising the

President on scientific policy.  Soucie v. David, 448 F.2d 1067, 1073–75 (D.C. Cir. 1971).

Similarly, the Circuit recognized that the Council on Environmental Quality, a three-member

unit within EOP, was an agency subject to FOIA because it too was "independently authorized to

evaluate federal programs," by coordinating federal programs related to environmental quality,

issuing guidelines to federal agencies on environmental impact statements, and issuing

regulations for implementation of NEPA's procedural provisions.  Pac. Legal Found. v. Council

on Env't Quality, 636 F.2d 1259, 1262–63 (D.C. Cir. 1980).  Based on its actions so far, USDS

appears to have the power not just to evaluate federal programs, but to drastically reshape and

even eliminate them wholesale.

The Court recognizes that much, though by no means all, of the evidence supporting its

preliminary conclusion that USDS is wielding substantial independent authority derives from

media reports.  Yet, the Court finds it meaningful that in its briefing and at oral argument, USDS

has not contested any of the factual allegations suggesting its substantial independent authority.

To be sure, USDS claims it declined to make this argument because CREW's "motion fails for

multiple independent reasons."  Opp'n at 20 n.4.  But, as the Court's granting of partial

---

[2] Although President Trump recently told Cabinet secretaries that "that they — not
billionaire adviser Elon Musk and his team — had control over which workers their agencies
fire," that statement standing alone cannot overcome all the other evidence of USDS's
substantial independent authority just discussed.  Jeff Stein & Dan Diamond, *Trump Touted
Sweeping Tariff, DOGE Plans — Then Adjusted as Backlash Grew*, Wash. Post,
https://www.washingtonpost.com/business/2025/03/09/trump-tariffs-doge-politics/ (Mar. 9,
2025).

preliminary relief indicates, USDS did not have a slam-dunk argument after all.  And USDS

cannot escape the consequences of refusing its opportunity to refute any of CREW's allegations

suggesting that USDS is acting with substantial independent authority.[3]  The Court's conclusion

accords with the observations made by its colleague in another case in this district, who opined

that USDS's work in "coordinating teams across multiple agencies with the goal of reworking

and reconfiguring agency data, technology, and spending" "is not the stuff of mere advice and

assistance."  Am. Fed'n of Lab. & Cong. of Indus. Orgs., 2025 WL 542825, at *3.  For all these

reasons, the Court concludes that USDS likely qualifies as an agency for the purposes of FOIA.

> (2) CREW is Entitled to Expedited Processing of the USDS
>        Request

The Court next turns to whether CREW has established a likelihood of success on the

merits on whether it is entitled to expedited processing of the USDS Request.  Here too, CREW

comes out ahead.

"A party seeking expedited FOIA processing must establish a compelling need or show

that he qualifies under another ground set out by the relevant agency for such treatment."

Brennan Ctr., 498 F. Supp. 3d at 97 (quotation marks omitted); 5 U.S.C. § 552(a)(6)(E)(i)(I)–(II).

Under the relevant provision, a "compelling need" means "with respect to a request made by a

person primarily engaged in disseminating information, urgency to inform the public concerning

actual or alleged Federal Government activity."  5 U.S.C. § 552(a)(6)(E)(v)(II); see 5 C.F.R.

---

[3] Indeed, the Court wonders whether this decision was strategic.  In other briefing before courts in this district, USDS has argued that it qualifies as an agency—for instance, for purposes of the Economy Act—when it suits it.  See Am. Fed'n of Lab. & Cong. of Indus. Organizations, 2025 WL 542825, at *3.  Thus "USDS becomes, on defendants' view, a Goldilocks entity: not an agency when it is burdensome but an agency when it is convenient."  Id.

§ 1303.40(e)(1)(ii) (same).  The applicable regulations further provide that requests will be expedited where OMB determines that "[t]here are possible questions, in a matter of widespread and exceptional public interest, about the Government's integrity which affect public confidence."  5 C.F.R. § 1303.40 (e)(1)(iv).

CREW sought expedited processing of the USDS request—which, recall, OMB initially granted—on the grounds of both urgency and widespread public interest.  USDS Request at 2.  The USDS Request easily qualifies for expedited treatment under either test.  As to the first, CREW is primarily engaged in disseminating information to the public and "routinely disseminates information obtained through FOIA to the public," including on its website.  Id. at 2, 9.  Next, in considering whether "urgency to inform the public concerning actual or alleged federal government activity" exists, courts consider three factors:  "(1) whether the request concerns a matter of current exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity."  Protect Democracy Proj. v. United States Dep't of Just., 498 F. Supp. 3d 132, 139 (D.D.C. 2020).

Here, USDS's structure and operations doubtless "concern a matter of current exigency" to the public.  As just explained, USDS has been the subject of numerous news articles cited in this opinion and in the parties' briefing—at least fifty, by the Court's count.  This "widespread media attention" suggests a matter of urgency.  Protect Democracy Proj., 498 F. Supp. 3d at 140; see 28 C.F.R. § 16.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful in establishing the requirement that there be an 'urgency to inform' the public on the topic.").  Second, a delay would "compromise a significant recognized interest," as discussed further below.  If production of the USDS records is substantially delayed, the public and

Congress will be "precluded . . . from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of" a high-profile government action. Protect Democracy Proj. v. U.S. Dep't of Def., 263 F. Supp. 3d 293, 299 (D.D.C. 2017) (ellipsis in original). That conclusion is further bolstered by the Court's irreparable harm analysis, see infra at 31–34. Third, there is no doubt that CREW's request concerns federal government activity.

For essentially the same reasons, USDS's activities qualify as "a matter of widespread and exceptional public interest." Again, the many news articles on the subject indicate that USDS's operations represent "a matter of immediate concern to the American public, given extensive media interest[.]" Ctr. for Pub. Integrity v. United States Dep't of Def., 411 F. Supp. 3d 5, 11 (D.D.C. 2019). And the "more than fifty recent articles" cited by the parties is "considerably more than has sufficed in other cases[.]" Brennan Ctr., 498 F. Supp. 3d at 97. Moreover, reports that USDS personnel have gained access to sensitive data and payment systems, classified information without the appropriate clearances, and operate in secrecy using auto-deleting messaging apps like Signal, each call into question "the Government's integrity, which need not suggest any dishonesty or intentional wrongdoing on Defendants' part." Id. at 97 (quotation marks omitted); see Schleifer & Ngo, supra (noting USDS staffers' Signal use); Knickmeyer & Lee, supra (describing USAID officials' objections to permitting USDS staff without the appropriate clearance to access classified information and their subsequent termination).

Accordingly, CREW is likely to succeed on the merits of its request for expedited processing of the USDS Request. Indeed, the agency's prior decision to grant expedited treatment of this request only confirms the Court's conclusion. See Compl. ¶ 94.

### 2. *Irreparable Harm*

Although the Court has concluded that CREW is entitled to expedited processing of the USDS Request, it cannot stop there.  Because CREW seeks preliminary relief, the Court must also consider whether delay in processing its request on an expedited basis would cause irreparable harm.  CREW has made that showing.

"The Supreme Court has observed that a public informed about its government's actions is 'a structural necessity in a real democracy.'"  Brennan Ctr., 498 F. Supp. 3d at 101 (quoting Nat'l Archives & Recs. Admin. v. Favish, 541 U.S. 157, 172 (2004)).  *Timely* awareness is equally necessary because "stale information is of little value."  Payne Enters. v. United States, 837 F.2d 486, 494 (D.C. Cir. 1988).  Thus, "in a few rare FOIA cases" involving "ongoing proceedings of national importance," courts in this district "have concluded that a delay in processing of a FOIA request would cause irreparable harm."  Brennan Ctr., 498 F. Supp. 3d at 101 (D.D.C. 2020) (citing Ctr. for Public Integrity, 411 F. Supp. 3d at 11–13 (collecting cases)).

If the Court does not grant preliminary relief to CREW, records responsive to the USDS request will not be released anytime soon, if ever.  As the government stated at oral argument, USDS is not currently processing CREW's request because it does not believe itself to be an agency.  Rough Tr. 4:1–4.  The time it would take to litigate that question on the merits and thereafter begin processing would likely result in a substantial delay of years, for all practical purposes imposing an indefinite delay.  By that time, the Court suspects that the information may indeed be "stale," or at least, significantly less useful than it once was.  Accordingly, "the potential for irreparable harm under these circumstances exists because ongoing public and congressional debates about issues of vital national importance cannot be restarted or wound back."  Protect Democracy Proj., 263 F. Supp. 3d at 301 (quotation marks omitted).

Many of the facts establishing CREW's entitlement to expedited processing, as just discussed, likewise indicate that an indefinite delay would result in irreparable harm. The USDS records sought are "directly tied to [] current, ongoing" actions by USDS, which "are of the highest national concern." Ctr. for Pub. Integrity, 411 F. Supp. 3d at 12. The narrowed requests seek, for instance, "communications between USDS personnel and personnel of any federal agency outside of the Executive Office of the President regarding that agency's staffing levels (including any effort to reduce staffing)." Reply, Attachment A at 1. Congressional leaders have repeatedly expressed interest in similar questions, sending letters to the White House Chief of Staff "seeking information about Mr. Musk's role, USDS staff, what agencies USDS has accessed, and whether USDS has terminated or directed the termination of government employees[.]" Reply at 8. And USDS is reportedly considering further large-scale layoffs across federal agencies. Stein & Diamond, *supra*. The information sought in the USDS request is thus urgently needed to inform "debates about issues of vital national importance." Protect Democracy Proj., 263 F. Supp. 3d at 300.

To be sure, the Court previously concluded that more information on USDS was not crucial to the specific upcoming appropriations process following the expiration of the continuing resolution on March 14. But that is so because, although irreparable harm will not result if the requested records are not *immediately* released, there is a point in the not-too-distant future when continued delay will indeed impose such harm. And taking a broader view of the tools available to it, Congress needs the requested information in a timely fashion to use it effectively.

The electorate also requires the expeditious production and publication of this information. Voters may seek to influence congressional representatives to take action

responsive to USDS at any point along the road.  And "[t]he dissemination of information" sought by CREW would contribute "to an informed electorate capable of developing knowledgeable opinions and sharing those knowledgeable opinions with their elected leaders." Ctr. for Pub. Integrity, 411 F. Supp. 3d at 12.  But the information will only be useful to the electorate so long as USDS remains a topic of current national importance.  Information released years down the road would come too late.  At that point, further details about USDS's operations and communications with federal agencies likely would be only "of historical value."  Brennan Ctr., 498 F. Supp. 3d at 101.

"Moreover, absent an expedited response to Plaintiff's FOIA request, it is not clear to the Court that the public" or Congress "would otherwise have access to this relevant information." Ctr. for Pub. Integrity, 411 F. Supp. 3d at 13.  Congressional subpoenas for Musk to testify about USDS's work have already been blocked, and the Court sees no reason to think they will ever succeed.  Ivan Pereira & Jay O'Brien, *Republicans Block Musk from Congressional Subpoena as DOGE Continues to Access Government Data*, ABC News (Feb. 5, 2025), https://abcnews. go.com/Politics/republicans-block-musk-congressional-subpoena-doge-continues-access-story?id=118487749.  To be sure, this indicates that not all Members of Congress, nor even a majority, desire access to the requested documents.  But that does not change CREW's and the public's important interest in obtaining these records and discussing them with the Members that do.

A few final points bear mentioning.  To begin, USDS's actions to date have proceeded remarkably swiftly.  In the less than two months since President Trump's inauguration, USDS has reportedly caused 3% of the federal civilian workforce to resign, shuttered an entire agency, cut billions of dollars from the federal budget, canceled hundreds of government contracts,

terminated thousands of federal employees, and obtained access to vast troves of sensitive

personal and financial data.  USDS appears able to do this in part because of its access to many

agency's IT systems, which help the department carry out its objectives at warp speed.  Anna

Maria Barry-Jester & Brett Murphy, *In Breaking USAID, the Trump Administration May Have*

*Broken the Law*, ProPublica (Feb. 9, 2025), https://www.propublica.org/article/usaid-trump-

musk-destruction-may-have-broken-law.  But the rapid pace of USDS's actions, in turn, requires

the quick release of information about its structure and activities.  That is especially so given the

secrecy with which USDS has operated.  For instance, the name of the USDS Administrator was

not even released until February 25, more than month into the new administration.  Ryan J.

Foley, *Who Is Amy Gleason, The Person Named DOGE's Acting Administrator By The White*

*House?*, AP News (Feb. 25, 2025), https://apnews.com/article/doge-acting-administrator-amy-

gleason-65af638e646fdd5dd6d5fcc5cc04a2e7.  Nor does USDS appear to have released much

public information about its other personnel.[4]  See Yeganeh Torbati, et al., *Who's working for*

*Elon Musk's DOGE?*, Wash. Post (Mar. 5, 2025), https://www.washingtonpost.com/business/

2025/02/14/doge-employees-list-staff-elon-musk/ (noting that exact titles, precise roles, and even

which agencies some USDS personnel work for remains unknown).  Moreover, the authority

exercised by USDS across the federal government and the dramatic cuts it has apparently made

with no congressional input appear to be unprecedented.  All these factors together bolster the

Court's conclusion that a years-long delay in processing the USDS Request would cause

irreparable harm.

---

[4] OPM regulations require that information like name and position title of most federal
employees be available to the public.  5 C.F.R. § 293.311(a).

3.   *The Balance of the Equities and the Public Interest*

The last two preliminary-injunction factors also weigh in CREW's favor.  These considerations need not detain the Court for long.  Not only would the public benefit from participation in the "ongoing debate" discussed above, but an agency's compliance with a mandatory statutory regime is presumably always in the public interest.  Protect Democracy Proj., 263 F. Supp. 3d at 301.  And given that USDS is apparently not processing any other requests, the Court doubts it would impose much of a burden on the department to expediently process CREW's request.

CREW is therefore entitled to a preliminary injunction directing the expedited processing of the USDS Request.  The Court will not order USDS to process the request by March 10, however, for the same reasons it declined to order production by the same date certain for the OMB Requests.  See supra at 15–22.

C.   Preservation Order

Finally, CREW seeks a records preservation order pending litigation.  Mot. for PI at 38–40.  "Federal courts have the inherent power to issue orders preserving information relevant to the claims and defenses brought before them." United States ex rel. Staggers v. Medtronic, Inc., No. 1:15-CV-392-TSC-RMM, 2022 WL 4078969, at *2 (D.D.C. Sept. 6, 2022).  CREW asks the Court to either exercise its inherent authority to enter a preservation order, or to enter such an order as a form of preliminary relief.

According to CREW, such an order is necessary because—despite Mr. Musk's insistence that all USDS's actions are "maximally transparent" and that he doesn't "know of a case where an organization has been more transparent than the Doge organization," *Elon Musk Appears With Trump And Tries to Claim 'Doge' Team Is Transparent*, Guardian (Feb. 11, 2025), https://www.

35

the guardian. com/us-news/2025/feb/11/elon-musk-trump-doge—USDS personnel "are not operating transparently and may well be ignoring their preservation obligations under the FRA." Mot. for PI at 39.  CREW points first to USDS's use of non-governmental systems to conduct official business.  For instance, USDS employees acknowledged using Signal, an encrypted messaging app with an auto-delete function, during the presidential transition period and into the new administration, as recently as February 27.  Schleifer & Ngo, *supra*; Patterson, *supra*.  Musk has also used the social media platform X to solicit job applications for USDS and to poll the public about courses of action that USDS is considering.  Kate Conger, *Elon Musk's X Becomes Weapon in Government Cost Cutting*, N.Y. Times (Feb. 4, 2025), https://www.nytimes.com /2025/02/04/technology/elon-musk-x-doge.html.

CREW also notes reports that USDS employees have refused to identify themselves when requested to do so by career officials, further suggesting that the agency is operating with unusual secrecy.  Sarah Cahalan et al., *The People Carrying Out Musk's Plans at DOGE*, N.Y. Times (Mar. 6, 2025), https://www.nytimes.com/interactive/2025/02/27/us/politics/doge-staff-list.html.  Indeed, Musk tweeted that a poster who published the names of USDS employees "committed a crime."  Peter Suciu, *supra*.  USDS also allegedly installed an "illegally connected server" at the U.S. Office of Personnel Management's headquarters to store personally identifiable information about executive branch employees.  Dell Cameron, *Federal Workers Sue to Disconnect DOGE Server*, WIRED (Feb. 4, 2025), https://www.wired.com/story/federal-workers-sue-over-doge-server/.

And although CREW requested "assurances of FRA compliance" from USDS, Defendants apparently did not respond.  Mot. for PI.  At oral argument, counsel for the government likewise was unable to provide such assurances to the Court.  Rough Tr. 76:7–16.

This evidence gives rise to the possibility that representatives of the Defendant entities may not fully appreciate their obligations to preserve federal records. This is especially true for USDS, many of whose staffers are reported to have joined the federal government only recently and, to put it charitably, may not be steeped in its document retention policies. That being said, the Court need not make a finding of bad faith in order to enter a document preservation order. See CREW v. Off. of Admin., 593 F. Supp. 2d 156, 165 (D.D.C. 2009) (issuing preservation order without finding of bad faith). Accordingly, the Court will enter a preservation order as to all documents responsive to CREW's three FOIA requests pursuant to its inherent authority. Medtronic, 2022 WL 4078969, at *2.

## IV. Conclusion

For these reasons, the Court will grant in part and deny in part CREW's motion for a preliminary injunction. As set forth in the accompanying Order, the Court will direct USDS to process CREW's request on an expedited basis but will stop short of ordering production of either the USDS or OMB Requests by March 10, 2025.

In accordance with its supervisory role, however, the Court will direct the government to file a status report by March 20, 2025, including the estimated number of documents responsive to CREW's three requests. The Court will further order the parties to meet and confer regarding a proposed processing and production timeline and to file by March 27 a joint status report proposing a schedule for expedited processing and rolling production of responsive records.

CHRISTOPHER R. COOPER
United States District Judge

Date: March 10, 2025

37