```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2                             ---

 3   CITIZENS FOR RESPONSIBILITY   )
     AND ETHICS IN WASHINGTON,     )
 4                                 )
                                   )  CIVIL NO. 25-511
 5             Plaintiff,          )
                                   )
 6   v.                            )  Friday, March 7, 2025
                                   )
 7   U.S. DOGE SERVICE, et al.,    )  2:08 p.m. - 3:50 p.m.
                                   )
 8                                 )
               Defendant.          )
 9   _____)

10              TRANSCRIPT OF MOTION HEARING

11         BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                  UNITED STATES DISTRICT JUDGE
12                             ---

13   APPEARANCES:      CITIZENS FOR RESPONSIBILITY AND ETHICS
                          IN WASHINGTON
14                     BY:  JONATHAN MAIER
                            NIKHEL SUS
15                     1331 F Street NW
                       Washington, DC 20004
16                     202-408-5565
                       Email: Jmaier@citizensforethics.org
17
                       For the Plaintiff
18
                       DOJ-Enrd
19                     Civil Division, Federal Programs
                        Branch
20                     1100 L Street NW
                       Washington, DC 20005
21                     202-353-7203
                       Email: Andrew.m.bernie@usdoj.gov
22
                       For the Government
23                             ---

24   COURT REPORTER:   CHANDRA R. KEAN, RMR
                       Official Court Reporter
25                     333 Constitution Avenue, NW
                       Washington, DC 20001
```

| | |
|---|---|
| 1 | **PROCEEDINGS** |
| 2 | (Court called to order at 2:08 p.m.) |
| 3 | DEPUTY COURTROOM CLERK:  This is Civil Matter |
| 4 | 25-511, *Citizens for Responsibility and Ethics in* |
| 5 | *Washington v. U.S. DOGE Services, et al.* |
| 6 | Would counsel please approach and identify |
| 7 | yourselves for the record. |
| 8 | MR. MAIER:  Jonathan Maier for CREW, plaintiff, |
| 9 | with Nikhel Sus. |
| 10 | THE COURT:  Okay.  Mr. Maier, good to see you. |
| 11 | MR. MAIER:  Good to see you. |
| 12 | MR. BERNIE:  Good afternoon, Your Honor. |
| 13 | Andrew Bernie on behalf of all defendants. |
| 14 | THE COURT:  Good afternoon, Mr. Bernie.  Good |
| 15 | to see you. |
| 16 | All right.  So we're here on a -- for hearing on |
| 17 | the plaintiff's motion for a preliminary injunction, |
| 18 | which was subject to expedited briefing. |
| 19 | I would have gotten to you a little earlier with |
| 20 | the hearing but I was out of town until yesterday, so my |
| 21 | apologies for that. |
| 22 | I know that we have a public line set up.  I would |
| 23 | just remind anyone joining in that recording or |
| 24 | broadcasting are strictly prohibited. |
| 25 | So with that, it's your motion, Mr. Maier, but I |

1    think before we start with you, I think it would make

2    more sense for me to get a bit more information from the

3    government about the DOGE request.

4        I know we flagged a couple of issues in our minute

5    order, just to put you on notice that we were interested

6    in that, and that might affect the scope of the issues

7    being discussed.

8            MR. BERNIE:  Certainly, Your Honor, and thanks

9    for -- thanks for giving us notice of those -- of those

10   questions the Court had in advance.

11           THE COURT:  Sure.  And I will refer to it as

12   DOGE as opposed to the other acronym, which sounds --

13   sounds a lot more like other agencies.

14           MR. BERNIE:  I'm used to saying USDS but

15   I'll --

16           THE COURT:  You call it what you will.

17           MR. BERNIE:  But just to address the Court's

18   question as to --

19       (Reporter request for clarification.)

20           MR. BERNIE:  Can you hear me better now?

21       So just to address the USDS or DOGE request, I

22   mean, there has been a relevant development.

23       Last night the Court -- the DOGE made a

24   determination on that request.  DOGE sent an email to

25   plaintiff saying that the request was denied on the

1    grounds that USDS is not an agency subject to FOIA.

2         So from our perspective, USDS will not be

3    processing that request on an expedited basis or

4    otherwise.

5         Those are the facts.  I mean, I'm happy to get into

6    the implications.

7         I mean, we still think the PI should be denied on

8    other grounds, as we said in our motion -- our

9    opposition, independent of that, and that that legal

10   issue should be briefed and decided before any potential

11   processing of documents on USDS' behalf.

12            THE COURT:  Okay.  Well, thank you for that

13   clarification.

14        I mean, so I guess that raises the question as to

15   procedurally speaking how do we -- or how should we tee

16   up that issue.

17        I take it that if I don't grant the PI and we were

18   just to proceed on an expedited processing basis and I

19   ordered DOGE to, you know, process -- you know, based on

20   a conclusion that DOGE was in fact an agency and subject

21   to FOIA, I ordered DOGE to process, you know, X-hundred

22   of records a week or a month as I would in any FOIA

23   request, I take it your response would be that DOGE

24   would not -- would not do that absent some sort of court

25   order on the merits.

1              MR. BERNIE:  Right.  I mean, we would -- we

2    would ask the Court to decide the legal issue first.  I

3    mean, obviously if the Court were to issue a processing

4    order without deciding the legal issue, we obviously

5    recognize that we have to comply with court orders of

6    course.  But we would urge that issue to be decided

7    first.

8         As to the vehicle as to which it decided, I mean,

9    our answer, our response to the complaint, is due

10   March 26th.  Courts have -- courts in this district have

11   sometimes resolved such issues on Rule 12 motions.  We

12   haven't decided yet whether we would make that argument

13   as a basis for a partial motion to dismiss, but it could

14   be teed up in that context.  Depending on how the Court

15   resolves any such motion, it could also be teed up in a

16   motion -- you know, in a motion for summary judgment.

17        I guess our top line --

18             THE COURT:  I guess -- so there are three

19   options, right?  I could, I suppose, grant a PI with a

20   declaration contained in it saying that the Court finds

21   that DOGE is an agency subject to FOIA.

22        That would be appealable.

23             MR. BERNIE:  Correct.

24             THE COURT:  Or we could do it on a 12(b) motion

25   on an expedited basis or a motion for summary judgment

1      on an expedited basis.

2            Are there any other choices?

3            MR. BERNIE:  No.  I mean, I think -- I think

4      that those are the general buckets of choices.

5            I mean, the one thing I'll say is that from our

6      perspective, whatever --

7            THE COURT:  But then if we did it on a summary

8      judgment motion, there would need to be some sort of,

9      you know, certification of interlocutory appeal.

10           I'm thinking out loud a little bit here.

11           MR. BERNIE:  I think that's probably right.  It

12     wouldn't be -- if it was just as to DOGE, it wouldn't

13     be -- a final judgment.

14           THE COURT:  It wouldn't be.

15           MR. BERNIE:  So I guess that's right.  I don't

16     want to get too far ahead of myself, but I think that's

17     probably right.

18           I mean, I guess -- I guess what we would say about

19     the -- obviously, we prefer the latter two options to

20     the first one.  I guess what we would say about the --

21     about why we don't think it's appropriate to address

22     that motion in the context of the preliminary

23     injunction -- and first of all, this is obviously a very

24     important legal question.  We briefed this on an

25     expedited basis, and we think the PI should be denied on

1     other grounds.

2          But the other thing I would say about that is

3     before CREW filed their -- before CREW filed their

4     reply, the -- and purported to narrow the FOIA request,

5     their FOIA request, I mean, we would say were just

6     plainly overbroad given the deadlines they sought.

7          I mean, they sought essentially every communication

8     among USDS employees over a three-month period.  All

9     communications --

10          THE COURT:  Okay.  We'll get there later.

11          I mean, what I'm hearing from you is if from your

12     perspective the DOGE request is off the table because

13     there's been a determination that DOGE is not subject to

14     FOIA, that leaves the other two OMB requests.

15          Prior to narrowing, you told me that it would take

16     you at minimum three years to process that request, even

17     on an expedited basis.  Now that the request has been

18     narrowed, has there been any undertaking by DOGE to

19     estimate when it would be practicable or as soon as

20     practicable under the expedited standard to process

21     those two requests?

22          MR. BERNIE:  Right.  So just to wrap up my

23     answer to the first part of your question first.

24          THE COURT:  Okay.

25          MR. BERNIE:  So I think as Your Honor's

1    question anticipates, we did envision that these two --

2    that the two sets of requests sort of proceeding on

3    somewhat separate tracks with briefing on the legal

4    issues for the USDS request and then, you know, a

5    processing schedule or something like that for the OMB

6    request.

7        But let me address the Court's question about --

8    about potential timing for OMB.

9        So I'll just be perfectly honest with you.  We -- I

10   mean, I'm always honest, but to be perfectly candid,

11   we -- these requests were narrowed, you know, on Tuesday

12   night.  We sort of found out about this when we reviewed

13   the reply on Wednesday evening.

14       Since the Court issued its minute order yesterday

15   afternoon, we have tried as hard as we can to get the

16   Court an estimate, even if -- a very provisional

17   estimate.  And I just -- as I stand here at the lectern

18   right now, we just haven't been able to do that.

19           THE COURT:  Okay.

20           MR. BERNIE:  We just don't have a good sense of

21   the volume.  I think if we have a week or two to run

22   sort of keyword searches and sort of figure out the

23   number of documents we're talking about, the

24   sensitivities associated with the other documents,

25   whether there are equities with other agencies that

1    require consultation, I just don't think, you know --

2    sort of overnight from Thursday to Friday, we sort of

3    tried as hard as we can, and I think we could confer

4    with CREW and come up with a reasonable timeline, you

5    know, in the next -- you know, if we have a couple -- a

6    week or a couple of weeks to do some keyword searches

7    and figuring out the universe of response of documents.

8         But absent a great idea of the volume, it's just --

9    I just don't have a great sort of estimate right now.

10         THE COURT:  Okay.  All right.  Let me hear from

11    the plaintiffs.

12         MR. MAIER:  Thank you, Your Honor --

13         THE COURT:  So that clears at least some of the

14    underbrush away, right?

15         MR. MAIER:  It does.  Would it be helpful for

16    us to discuss --

17         THE COURT:  Why don't we start there and then

18    you can go on with your --

19         MR. MAIER:  Sure, sure.  Well, I think, Your

20    Honor, with respect to the three options you're talking

21    about, I think the issue is that only the first one

22    actually gets at the problem that we have here, which is

23    that --

24         THE COURT:  And that would be a --

25         MR. MAIER:  That being the timeline on which

1     these documents need to make it into the public for

2     FOIA's purposes to be met.

3          The entire shift of our motion, as you know, Your

4     Honor, is the expiration of the continuing resolution

5     next week on March 14th.

6          You know, right now we have a situation in which --

7     I understand that defendants are in a position now where

8     for the first time they are grappling with the way that

9     these productions might be made and what these documents

10    actually mean.  But as you're well aware, they were

11    statutorily bound to do it earlier, and they didn't.

12         And quite frankly, the 12(b) motion, expedited

13    summary judgment, a week to meet and confer, time to run

14    searches, is work that should have been done before and

15    hasn't.

16         And specifically with USDS, I think that that

17    argument is problematic because, you know, as they note

18    in their motion, they don't believe themselves to be

19    subject to FOIA, but that's simply because it's a

20    standalone component of the EOP.

21         They don't cite any support for that.  We're kind

22    of grasping at straws here without information.  We

23    have -- you know, DOGE in its conception is a

24    fast-moving essentially agent of chaos that's affecting

25    government functions throughout -- throughout the

1    executive branch, shuttering agencies, dismissing

2    employees, suspending billions of dollars of

3    appropriated funds, as we're moving through this rushed

4    appropriations process.

5        So I think my response to this notion that --

6            THE COURT:  Okay.  Well, let's -- let's put

7    aside the date that you've asked for, which is Monday,

8    okay?

9            MR. MAIER:  Sure.

10           THE COURT:  And let's assume that I agree with

11   the agency that the subject matter is -- you know,

12   merits expedited processing under the statute for all

13   three requests.

14           MR. MAIER:  Sure.

15           THE COURT:  How would it be best to go about

16   determining -- or under what standard should I determine

17   at this early stage that DOGE is or is not subject to

18   FOIA?  I mean, there's no record other than press

19   reports and your allegations.

20       There's a Judge Bates' opinion in the data case

21   involving HHS and CFPB, you know, containing some dicta

22   indicating that it appears that DOGE is an agency

23   subject to FOIA because it would appear to exercise some

24   independent authority apart -- you know, authority

25   independent of the President and is not just an advisory

1    organization.

2        But as you say, you know, that changes by the day,

3    it seems -- you know, at least the explanation reported

4    in the press changes by the day, it seems.

5        So, you know, how should we skin this cat?  Is the

6    question, whether you have sufficiently alleged at this

7    point, you know, sufficiently to show likelihood of

8    success on the merits of at least expedition, and if I

9    were to agree with you on that, that would be the basis

10   for a PI not with a date certain perhaps, but with, you

11   know, an order to process the DOGE request.

12       Is that -- it's not quite what you've asked for,

13   but is that within the scope at least of the emergency

14   relief that you've sought?

15           MR. MAIER:  I think it's within the scope of

16   the emergency relief that we seek.  I think there are

17   two questions kind of bound up in there that I would

18   like to address.

19           THE COURT:  Okay.

20           MR. MAIER:  The first is essentially because

21   USDS never responded to the FOIA request because they

22   don't have any process for doing so, the question of

23   whether expedited processing should be granted, I don't

24   see any reason that the cat needs to be skinned in any

25   other way than to look at our allegations and what's in

1    the public record for two reasons.

2        Number one is that USDS has had an opportunity to

3    refute all of it.  It's refuted none of it.  The simple

4    statement in one footnote is -- I'll say DOGE, I'm also

5    in the habit of USDS but -- that DOGE is a standalone

6    entity in the EOP, and therefore it's not subject to

7    FOIA.

8        Full stop.

9        They haven't done anything in this court, and I

10   don't think they did anything in Judge Bates' court

11   either, to indicate that DOGE is not exercising

12   substantial independent authority.

13       So at the question of whether expedited processing

14   is appropriate, under FOIA, there's certainly an urgency

15   to alert the public to an ongoing government action.

16       I'm not aware of anything in those expedition

17   requests that would require, you know, essentially the

18   question of first impression about whether USDS is

19   subject to FOIA not to be decided in a preliminary

20   injunction setting.

21       I understand that that's uncomfortable for some

22   people, but that -- but DOGE has had an opportunity to

23   refute this and hasn't.

24       So I think that it's perfectly appropriate for the

25   Court to hold that expedition would be granted under

1    FOIA under the statute.  Obviously, DOGE has no regs

2    that would -- that would help answer this question.

3         THE COURT:  Okay.  So if what you end up

4    getting is a PI with a declaration from the Court that

5    you have sufficiently alleged facts that would show that

6    DOGE is subject to FOIA, therefore you're likely to

7    succeed on the merits, and as the government has already

8    acknowledged in the context of the OMB request, the

9    request is -- warrants expedited processing, so the

10   Court will order DOGE to expedite the processing of that

11   request.

12        If that comes in a PI, the government is going to

13   appeal that, and you're not going to get any documents

14   next week certainly, right?

15        Is there any other mechanism?  And as your

16   colleague said, the other requests can proceed along

17   their track.

18        MR. MAIER:  Sure.  I don't see -- I'm hesitant

19   to -- to grant the premise that because DOGE apparently

20   plans to appeal that ruling that it shouldn't be issued.

21        I think there's fundamental --

22        THE COURT:  But as a practical matter.

23        MR. MAIER:  As a practical matter, I don't see

24   how track two or track three solves the problem in any

25   event.  I would much rather --

```
 1              THE COURT:  Okay.

 2              MR. MAIER:  -- that the Court apply the

 3    preliminary injunction analysis as it should, both with

 4    respect to expedition and with respect to how quickly

 5    these documents need to be produced.

 6              THE COURT:  Right.  Even though your

 7    application does not quite ask for what we've been

 8    discussing?

 9              MR. MAIER:  It doesn't, Your Honor, because

10    it's not clear to me on this record if you're saying

11    that it doesn't seek this preliminary ruling with

12    respect to expedition.  I think --

13              THE COURT:  All you've asked me for is a ruling

14    that says produce by Monday and a retention order.

15              MR. MAIER:  Sure.  So I think part and parcel

16    with that would have to be an order that we are likely

17    to succeed on the merits both with respect to coverage

18    of DOGE by FOIA and -- on expedited processing, and

19    obviously, on the need under the PI factors.

20              THE COURT:  Okay.

21              MR. MAIER:  So I think that first finding,

22    though they'll surely appeal it, I think is one that

23    needs to be made.

24              THE COURT:  Okay.  And I'll give you an

25    opportunity to respond after the bulk of plaintiff's
```

1    argument.

2             MR. MAIER:  Sure.  Are there any other

3    questions on that front at this point?  Because I think

4    that narrows some of what I was going to talk about

5    here.

6             THE COURT:  Yeah.  Hold on.

7        Okay.  Why don't you proceed to your irreparable

8    harm argument.

9             MR. MAIER:  Sure, Your Honor.  Our irreparable

10   harm argument here is based on the extraordinary

11   circumstances in which we find ourselves where the newly

12   formed U.S. DOGE Service, a black box agency, designed

13   and dedicated to drastically cutting federal spending at

14   virtually any cost, ravages government functions and

15   services for which Congress has already appropriated

16   funds, shuttering agencies, terminating billions of

17   dollars in contracts and grants, and summarily

18   dismissing thousands of federal employees.

19       (Reporter request for clarification.)

20            THE COURT:  Okay.  Just slow down, Counsel.  We

21   have plenty of time.

22            MR. MAIER:  Okay.  Simultaneously, we're

23   barrelling toward either a government shutdown or a

24   last-minute spending bill by March 14th.

25       The viability in terms of that bill, from the

```
1    mouths of the appropriators themselves, turns on

2    Congress' abilities to get details on how the new USDS

3    operates and whether it's poised to prevent, at its

4    option, appropriated funds from being spent.

5         The only --

6            THE COURT:  Okay.  Tell me this.

7         First of all, I think you would agree that the

8    cases in this district where courts have granted

9    preliminary injunctions arise in pretty different fact

10   patterns where there's clearly a one-off event that the

11   requested records will inform a discussion of, and after

12   that event ends, the records then becomes stale.

13        I issued one in the -- in one of the impeachment

14   cases, in the American Oversight cases.  The factual

15   contexts have been the census count, Presidential

16   elections that will obviously be over on a certain date,

17   the impeachment inquiry.

18        How is this like that?  I mean, your colleague

19   makes the point that, you know, Congress is always

20   exercising its appropriations responsibilities.  There

21   will be appropriates debate going forward.  It looks

22   like we're headed for a CR or a shutdown, perhaps.  That

23   certainly won't be the end of the appropriations debate.

24        You know, this information, while, you know,

25   vitally important, will not simply become stale once
```

1    whatever happens next week happens.

2        Respond to that.

3        MR. MAIER:  Sure, Your Honor.  And I think

4    that -- I'll respond with a few points.  But I think the

5    overarching point of this is that this is a different

6    situation because of the nexus of different things

7    occurring at once and how the information that CREW is

8    seeking factors into that -- into that mix.

9        So as you noted, we have the continuing resolution

10   that's set to expire on March 14th.  That certainly is

11   something that's repeatable, but as the Court noted in

12   *Brennan* -- granted that census reapportionment is a

13   little bit different because it happens only so often,

14   but the Court in *Brennan* made very clear in response to

15   arguments from the DOJ that the information that was

16   being sought would be valuable and useful for, in the

17   DOJ's estimation, ten years.

18       To highlight, and we made this point in our reply

19   brief, that the analysis for staleness and value of the

20   information turns on its use for the present purposes of

21   the movant.

22       Here -- I will absolutely grant that appropriations

23   is something that's repeatable, Your Honor, but it

24   doesn't change the fact that whether the government's

25   funded, whether it's not, is something that is of

1    national importance, will affect many, if not all

2    Americans.  And we simply don't know how this is going

3    to turn out.

4        The CR could fund for a week; it could be two

5    years.  This could set the course for federal funding

6    for quite a while.

7                THE COURT:  Okay.

8                MR. MAIER:  But I think the thing that

9    separates it from just the typical appropriations

10    process is the presence of DOGE and very specifically

11    the role of DOGE in all of this.

12                THE COURT:  Okay.

13                MR. MAIER:  DOGE itself is a new and

14    unscrutinized entity.  No one really knows anything

15    about it, despite weeks -- as we've outlined in our

16    reply and in our motion -- weeks of requests from the

17    public, weeks of request from members of Congress, from

18    the appropriators themselves who say we need to know

19    more about this entity as it's taking this toll on the

20    federal government.

21        Because, Your Honor, I think it changes and has the

22    potential to change the entire nature of the

23    appropriations process.  The messages that we're getting

24    from the appropriators is that they don't know what

25    they're voting for, they don't know how to vote, they

1   don't know what contours it should take because DOGE is

2   sitting there, as they understand it, with the authority

3   and essentially poised to undo this federal spending.

4           THE COURT:  Okay.  As I read your papers, the

5   argument is not that the appropriators are going to be

6   debating whether to fund DOGE next week.

7           MR. MAIER:  That's exactly correct.

8           THE COURT:  Okay.  But the problem you've

9   identified is that in order to responsibly appropriate

10  monies to other components of the government,

11  legislatures -- legislators would like to know whether

12  DOGE may, you know, impound the funds that they

13  appropriate or, you know, terminate the programs or the

14  personnel that Congress intends to implement their

15  appropriations through.

16      Is that fair?

17          MR. MAIER:  Yeah, yeah.  I think that's

18  accurate.

19          THE COURT:  Okay.  And so the question then

20  becomes, what additional information -- I mean, doesn't

21  Congress -- or does Congress already have sufficient

22  information from the President's statement, from

23  Mr. Musk's statements to, you know, eyewitness reports

24  and reporting every day as to what is going on in the

25  agencies with respect to these DOGE teams, et cetera,

1    with respect to, you know, data access to at least know

2    that that's an issue and that there may not be a

3    guarantee that those appropriated funds will ultimately

4    be used for appropriated purposes given DOGE's reported

5    influence?

6        What more does it need to know to inform that

7    process at this point?

8            MR. MAIER:  I think the answer to that comes

9    from the appropriators themselves.  The appropriators

10    themselves are saying -- they do understand, Your Honor,

11    I think very clearly, and I think the public

12    understands, that DOGE is going to influence the way

13    appropriations happen, right?

14        But what they don't know, and the information that

15    we're seeking is the information that they are seeking,

16    which is, realistically, if they want to account for

17    DOGE as they're going through the appropriations

18    process, How does it work?  How is it organized?  What

19    is it poised to do?

20        Is it following -- for instance, one major thrust

21    with the criticism that Congress members have about DOGE

22    is how they're handling, for instance, Mr. Musk's

23    conflicts of interest.  They can't understand -- and the

24    public I think is the larger point -- the public can't

25    understand any of this with the coverage with respect to

1   what you're talking about of DOGE's conduct is

2   results-based.

3        There's certainly, and the government points out, a

4   copious amount of information about the effect of DOGE

5   on the government.  There are reports of people after

6   issues happen about what's going on.

7        Certainly we're all aware of what DOGE is doing at

8   the effects end.  But the question that Congress is

9   asking, explicitly the appropriators are asking, is,

10  okay, if we're going to be able to deal with this, if

11  I'm going to understand what I'm voting for, I need to

12  understand more about how DOGE is working, how it's

13  deciding to make the cuts it's making, how very

14  crucially it's exercising influence and directing the

15  actions of agencies.

16       Because not all agencies are created equal.  And at

17  this point, the public and Congress is basically in a

18  posture of waiting to see where DOGE is going to go

19  next.

20       And the information that we're seeking --

21  organizational information, conflicts of interest and

22  ethics waivers, documents that would reflect

23  communications from DOGE to the agencies -- will inform

24  that.

25            THE COURT:  Congress could get that information

1    directly if it wanted to, couldn't it?

2            MR. MAIER:  It's tried and it hasn't been able

3    to.

4            THE COURT:  Well, the --

5            MR. MAIER:  We note in our papers that --

6            THE COURT:  I mean, the Appropriations

7    Committee could call Mr. Musk or --

8            MR. MAIER:  Ms. Gleason.

9            THE COURT:  -- Ms. Gleason to a hearing

10   tomorrow, couldn't they, and ask her all those

11   questions?

12           MR. MAIER:  I think in theory they could, but I

13   think --

14           THE COURT:  This is really a minority/majority

15   issue.

16           MR. MAIER:  Not sure that it's necessarily a

17   majority or minority issue, I think, for a couple of

18   reasons, Your Honor.

19       The first is that even if we are going to grant the

20   minority/majority paradigm, the realistic situation here

21   is that Congress is very closely balanced.  Single votes

22   matter here.

23           THE COURT:  Right.

24           MR. MAIER:  The second thing I would say --

25           THE COURT:  And there could be folks in the

1    majority who for whatever reason don't want to --

2    wouldn't want to recommend such a path for whatever

3    reason.

4            MR. MAIER:  And that's true, but we're not

5    talking about providing information here solely so that

6    members of Congress can act on it.

7        Our emphasis on the congressional debate about this

8    is to make it really clear that the structure of DOGE,

9    the operations of DOGE, are what's animating a public

10   debate about whether the government will even be funded.

11       And the public, as it's been recognized in all of

12   the cases in this circuit where PIs have been issued in

13   FOIA cases, the purpose of FOIA and the purpose of this

14   PI analysis is not -- it is expressly not to influence

15   government action.  It's to make sure that the public

16   understands what that action is.

17       And with respect to your point about kind of the

18   different sides of the aisle --

19            THE COURT:  Right.  But it's the influence on

20   the appropriations policy that's your hook to a PI.

21       I mean, ordinarily, you know, you have to show that

22   the data that you're -- the records that you're seeking

23   will inform a particular event that is discrete and not

24   repeatable.

25            MR. MAIER:  And here, that's what this is.

```
1              THE COURT:  Okay.
2              MR. MAIER:  The information that we're seeking
3    will address how DOGE, a new federal agency designed to
4    disrupt the spending of appropriated funds, is handled
5    in the appropriations process.
6         That's exactly correct, Your Honor.  I think that
7    is what separates this from typical appropriations
8    processes.  This is not a debate about the size of a
9    budget for a particular agency or the size of the
10   spending.
11        It is a very, very specific unique circumstance
12   where we have an agency set on disrupting the funding of
13   appropriated funds, for the first time doing so in the
14   course of Congress trying to figure out how this is
15   going to work and what that effect is going to be.
16        So with respect, Your Honor, certainly it will
17   affect this appropriations bill.  To your point, there
18   is a way for this appropriations bill to pass with
19   answers unknown, but the public shouldn't have to --
20             THE COURT:  But Congress isn't going to pass
21   however many appropriations bills are required to fund
22   the entire government next week, is it?
23             MR. MAIER:  I mean, it will have to pass a
24   piece of legislation to fund the government.  The last
25   CR essentially just maintained funding --
```

1          THE COURT:  Okay.  Right.

2          MR. MAIER:  -- with a certain -- with a certain

3     limit but --

4          THE COURT:  And that is, by far, the most the

5     likely outcome -- I'm not an appropriations expert, but

6     that's by far the most likely outcome, sitting here

7     today, is another CR for however many months.  Or if

8     they can't negotiate one, a shutdown.  It is not the

9     passing of each of the, you know, individual

10    appropriations bills.

11         MR. MAIER:  And that's correct, Your Honor.

12    And I think that's the key distinction is we're not --

13         THE COURT:  Okay.  So all those individual

14    appropriations bills are going to have to get passed at

15    some point, and at that point if -- you know, if you

16    have your documents, those documents could inform that

17    process down the line, right?

18         MR. MAIER:  Sure.  It certainly can inform

19    information down the line, but we are concerned and the

20    public is concerned with this process now.

21         And, again, I go back to -- the *Brennan* case I

22    think is the most explicit on that point; that the

23    potential for information to be used later doesn't

24    reduce its value for the movant's purposes.

25         And I think there are other cases that support that

1    principle very explicitly both in practice and --

2            THE COURT:  So you're -- just to, like, pin

3    this down --

4            MR. MAIER:  Sure.

5            THE COURT:  -- your point is that, you know,

6    the records that you've -- the narrowed records that

7    you're seeking, including correspondence between DOGE

8    and OMB, or at least Mr. Musk and Mr. Davis and OMB, are

9    necessary so that the public will know what DOGE is

10   doing and can weigh in with their representatives who

11   are considering whether to pass another CR or not and

12   therefore shut down the government, and that those

13   specific records are necessary to that vote.

14           MR. MAIER:  They're necessary for the public's

15   understanding of that vote.

16           THE COURT:  Of that vote.

17           MR. MAIER:  Yes.  Because -- oh, go ahead,

18   sorry.

19           THE COURT:  So tell me, hypothetically, what

20   correspondence between Mr. Musk or Mr. Davis and OMB

21   would influence whether a particular member of Congress

22   votes up or down on a proposed CR?

23           MR. MAIER:  Sure.  I think that's a fair

24   question.

25       And with respect to our request for communications

1    with Mr. Musk and OMB, Mr. Musk is undisputedly --

2    unrefutedly, at least, the head of DOGE.  He is the one

3    that is exerting the most influence over it and is

4    administering it.

5        Members of Congress have made repeated requests to

6    the government for information about Mr. Musk and his

7    role in this organization.  He specifically identified

8    OMB as the agency that DOGE would work most closely

9    with.

10        And OMB is a unique -- is a unique animal here,

11    obviously, because it controls how appropriated funds

12    are actually apportioned.  It dictates the financial

13    relationship between the agencies and the federal

14    government.

15        We've already seen the administration once try to

16    essentially suspend funding of billions of dollars on

17    thousands of grants through OMB.  OMB is essentially

18    one-stop shopping for much of what DOGE wants to do and

19    is the place where, if DOGE wants to most efficiently

20    prevent appropriated funds from being apportioned, it

21    will go.

22        Specifically to your question, with respect to what

23    we might find out, Mr. Musk's communications with OMB

24    would reflect whether he is giving directives to OMB --

25    this is just an example -- whether he is giving

1    direction -- directives to OMB on how to handle

2    apportionments for particular -- for particular

3    agencies, whether he is directing OMB to contact certain

4    members of DOGE, whether he's telling them what the

5    priorities will be, whether he is, you know, advising

6    them to take or not take actions.

7        I think that question, which has been very

8    explicitly asked by Congress and that members of

9    Congress have been seeking, is a perfect example of why

10   these documents are so important and that they will

11   inform public understanding of this debate.

12       It just -- it makes logical sense that if -- what's

13   at the fulcrum of the appropriations debate is DOGE and

14   what DOGE is capable of, what it is poised to do, and

15   how it's structured, that for the public to understand

16   that debate, for it to participate in that debate in any

17   meaningful way, it needs the information that Congress

18   says will sway the debate.

19       I think that kind of document is exactly what we're

20   talking about.

21            THE COURT:  Okay.  So hypothetically --

22            MR. MAIER:  Sure.

23            THE COURT:  -- okay, who knows what's in these

24   documents to the extent they exist, but if, you know,

25   Mr. Musk is directing or recommending to someone at OMB

1    that a certain program in a particular agency should not

2    be appropriated funds, then a Congress person might

3    choose not to vote for a CR and instead decide we're

4    shutting this down because I don't like that.

5           MR. MAIER:  There are any number of ways that

6    could play out.

7           THE COURT:  Okay.  Again, I'm not an expert.

8    I'm just --

9           MR. MAIER:  And I'm --

10           THE COURT:  -- you know, if you're telling me

11    you're being harmed, I'd like to know specifically how

12    you're being harmed.

13           MR. MAIER:  Sure, absolutely.  And let's say --

14    and I don't want to put names to agencies or anything

15    like that.  But let's say that Mr. Musk through one of

16    those communications or one of our other requests, for

17    instance, if there was a communication from the USDS

18    administrator to OMB about the scope of DOGE's work,

19    right, let's say that they said, Here is the agency that

20    we are going to target next.  You are directed, when

21    appropriated funds come, to contact us before any

22    apportionments are made.

23     That is certainly information that would be very

24    important, I think, to any consideration in Congress

25    about whether funds should be appropriated, right, to

1   that agency.

2       But to a more fundamental question that is at the

3   heart of all of this, which is, if Congress understands

4   that is the message that's going from USDS/DOGE, to OMB,

5   what can it do -- this is very specifically what

6   Congresswoman DeLauro was talking about in one of the --

7   one of the statements that we put in our reply.

8       What can happen?  What can be done in the

9   appropriations debate to prevent inappropriate influence

10  from USDS to OMB?

11      The budget is finite.  It is a zero sum -- zero sum

12  proposition once the top line has been decided.  So if

13  Congress is going to decide how to -- not only the top

14  line number, but how it's actually going to apportion

15  funds and appropriate funds throughout Congress, this

16  information would provide very helpful information to

17  that.  It would also be very helpful if --

18          THE COURT:  Okay.  So let me cut you off.

19          MR. MAIER:  Sure.

20          THE COURT:  OMB maintains that discretion in

21  all cases or generally.

22      And so, you know, wouldn't that argument --

23  couldn't you make that argument with respect to any

24  appropriations process where the government is facing a

25  shutdown and someone says, I need to know what OMB's

1    priorities are, I need to know what funding they're

2    going to actually, you know, get out the door, and I

3    want to know the timing of that funding because that

4    will affect my vote.

5         How is this any different?

6         MR. MAIER:  This is very different because of

7    the nature of the influence that we're seeing DOGE

8    applying to federal agencies.  That's in our record that

9    has gone unrefuted.

10        THE COURT:  Okay.

11        MR. MAIER:  If this were a situation where DOGE

12   was kind of publicly following the rules -- we'll call

13   it that.  We'll call it that -- publicly following the

14   rules, publicly following the typical processing

15   guidance for apportionment, you're right, this would be

16   like any other appropriations bill.

17        The problem, and exactly what Congress is trying to

18   understand here, that the public needs to understand, is

19   that this isn't a normal situation.  This is a situation

20   where USDS, this newly formed unscrutinized black box,

21   is apparently very clearly directing agencies to do

22   things, not to do things, shutting down agencies,

23   shutting down programs.

24        So that's why this situation --

25             THE COURT:  But don't we -- just putting DOGE

1    aside for a minute --

2              MR. MAIER:  Sure.

3              THE COURT:  -- I mean, aren't there claims all

4    of the time that industry or the advocacy community or

5    certain constituencies are perhaps improperly attempting

6    to influence the White House through OMB to prioritize

7    certain programs over others?

8        It can't be that anytime there's an allegation like

9    that, a FOIA requester is entitled to a PI saying

10    produce the documents by next week.

11              MR. MAIER:  Sure.  And I don't take any issue

12    with that because it's about, again, the nature of the

13    USDS.

14        For instance, those outside influences don't have

15    the weight of the federal government and the White House

16    behind them.  They don't have the ability to actually

17    direct, which is what appears to be happening, action by

18    the agencies the way that USDS does.

19        And let's not forget that USDS/DOGE is not --

20    there's nothing in the record to refute the idea of all

21    of these public reports.

22        DOGE isn't asking for anything.  It is instructing

23    agencies on what to do, and it's not doing it here and

24    there, it's not doing it around the edges.  It's doing

25    it to the tune of the cancellation of hundreds of

1        billions of dollars in contracts and the summary

2        dismissal of thousands of federal workers.

3            So while I agree with you that there's always --

4        there are always influences on the government, I would

5        say that in the future, a PI would be appropriate if

6        there was some similarly situated ultra -- I have no

7        other way to put this -- super powerful entity, right,

8        that is in a position to prevent the apportionment of

9        appropriated funds.

10           That is, I think, the distinction between this and

11       every other case that we've seen like this, and it's

12       truly unprecedented.

13               THE COURT:  Right, right.  Well, again, I'm not

14       quarreling with you, and the government doesn't seem to

15       be quarreling with you as to the importance of the

16       records.  You know, we're only here on when you're going

17       to get them.

18               MR. MAIER:  Yeah.

19               THE COURT:  And what -- and how do we get from

20       A to B and how long that's going to take, right?

21               MR. MAIER:  Yeah, and I -- if that's the case,

22       then I think the answer to that very specific

23       question --

24               THE COURT:  Yes.

25               MR. MAIER:  -- has to be driven by the

```
1       expiration of the continuing resolution.
2                THE COURT:  Okay.
3                MR. MAIER:  Because as I said, it has the
4       ability to fundamentally alter, essentially, Congress'
5       power of the purse and what the appropriations process,
6       how it unfolds and what it means.  And that is before we
7       get to the question of for however long the next
8       continuing resolution goes, what's going to happen to
9       the American public and to the people that are
10      influenced by the way this appropriations bill shakes
11      out?
12          And I think it's very troublesome that this could
13      all go on -- Congress could say to the public, here is
14      what the issue is, here is what we need to understand.
15      We're going to pass a CR anyway or we're not.  The
16      government's not going to -- the government won't be
17      funded is the other option -- and you, the public, will
18      have no meaningful information about how this debate
19      might unfold, and actually even what it means.
20               THE COURT:  Okay.
21               MR. MAIER:  Because at this point we also have
22      competing legislative proposals.  Over just the last two
23      days, there have been Republican proposals to rescind
24      funding, $500 billion in funding, to correlate with DOGE
25      cuts so far that have been made without any information
```

1    for the public about how it's actually operating, how it

2    selected the cuts, whether there are conflicts of

3    interest protections, whether there are ethical

4    protections, or whether those cuts were achieved by USDS

5    improperly ordering agencies to do things.

6        The competing legislation that's out there is of

7    riders that have been offered by -- on the democratic

8    side that will make contingent any continuing resolution

9    on legal limitations to how DOGE can influence the

10   government.

11       So we have the appropriations debate, we have the

12   permanent cuts debate, we have the rider debate, all

13   focused on the question of what DOGE is doing and all

14   revolving around essentially a blind debate, because

15   there's no information for the public or for Congress to

16   understand anything but the outcome of DOGE's frantic

17   work as it jumps from agency to agency wreaking havoc.

18           THE COURT:  Okay.  You want to touch on your

19   request for the preservation order briefly?

20           MR. MAIER:  Sure, Your Honor.  I think that --

21           THE COURT:  I'm sorry.  Are you done with harm?

22           MR. MAIER:  I don't think there's anything else

23   I would say on irreparable harm, Your Honor.  I would

24   just highlight, and we're happy to provide them to the

25   Court, that this debate is intensifying.  This isn't

1    something where, you know, there are the random

2    statements made and the questions about how USDS/DOGE is

3    operating are fading away.

4         There have been multiple new statements this week

5    from the appropriators themselves about how they need

6    the specific information that our FOIA is seeking.

7         With respect to the preservation order, Your Honor,

8    I think that a lot can be clarified by highlighting the

9    fact -- two things.

10         Number one, that none of the defendants have

11    identified any burden associated with having to preserve

12    these records.

13         Second of all, none of these defendants have agreed

14    to preserve the records, even though apparently there is

15    no burden in maintaining them.

16         And with respect to the resistance to this

17    preservation order, I think that the defendant's

18    opposition to our position is based on a

19    misunderstanding of why we're asking for it.  I think

20    there are two bases on which a preservation order can

21    and should be issued here.

22         The first is our likelihood of success on the

23    merits of the application of the FRA to USDS and the

24    likelihood of -- on the merits of our success in

25    compelling the defendants to initiate a recovery action

1    through the DOJ.

2        We think that our papers make a clear case for

3    that --

4            THE COURT:  Do I have to even get to the FRA?

5    Do I not have sort of inherent authority to manage my

6    FOIA cases by --

7            MR. MAIER:  Exactly, Your Honor.  And that's

8    exactly what I was saying.  And that is the crux of our

9    position, is that there's nothing controversial, there's

10   nothing unusual about the Court exercising its inherent

11   authority over litigation generally and also FOIA cases

12   here.

13       And I think that as a matter of course, that is a

14   good idea as maintaining the status quo so that -- go

15   ahead.

16           THE COURT:  And correct me if I'm wrong, but,

17   you know, do I have to deviate from the presumption of

18   good faith and the presumption that the government is

19   going to violate the law?  I don't have to -- or, you

20   know, not violate the law but fail to maintain

21   responsive records?

22       Do I even need to get to that presumption?  Can I

23   assume that that will happen yet still enter a

24   preservation order?

25           MR. MAIER:  Yes, that's exactly correct, Your

1    Honor.  Because under the -- for example, *CREW v.*

2    *Office of Administration*, which we cite in our brief,

3    that exact point is made; is that even though the Court

4    recognized that there wasn't evidence -- credible

5    evidence of the document destruction, preservation needs

6    to occur to prevent accidental destruction and to

7    maintain the status quo.

8         THE COURT:  Okay.  So I don't have to make any

9    findings of bad faith or prior destruction or intent to

10   withhold or destroy documents?

11        MR. MAIER:  I don't think you have to, but in

12   the event that I think defendants would argue that you

13   do need to, I would just note that there are explicit

14   cases in this circuit that we cite in our reply where

15   that -- the presumption of good faith was maintained,

16   and preservation orders were entered.

17        However, I think there are substantial grounds for

18   concern about whether these documents are going to be

19   maintained here.  And I think we lay them out in our

20   reply, but I think they're worth repeating here.

21        I think -- as we noted in our initial complaint and

22   motion and again in our reply, there are reports of

23   Signal use.  They are not stale; they are from last

24   week, the most recent one, of USDS using Signal, an

25   ephemeral messaging app that deletes automatically to

1    conduct USDS business.

2        We have public use of X by DOGE, a nongovernmental

3    platform.  And we have a -- unrefuted reports of the use

4    of standalone servers by DOGE staff.

5        And as we outlined kind of at length in our reply,

6    a long record of obfuscation by DOGE and by the

7    administration when pressed by the courts in this

8    building, Congress, and the press about the basic

9    details about DOGE's operations.

10       Multiple courts, who as you've noted, taken up

11   questions about DOGE have had to order discovery in

12   order to find out the basic information that our FOIA

13   request seeks.

14       You know, federal judges have referred to DOGE's

15   answers about its leadership, another fundamental

16   structural question, calling them highly suspicious.

17   This presumption of regularity has been denied as it

18   relates to issues relating to DOGE.

19       And again, here, defendants aren't acknowledging an

20   obligation or agreeing to preserve the documents, which

21   under *Armstrong* is a factor tending towards the need for

22   preservation.

23       And for the first time last night, we found out

24   that USDS/DOGE considers itself bound by the

25   Presidential Records Act, not the Federal Records Act.

```
 1          They're different regimes; they have different

 2     requirements.  The archivist makes the decisions about

 3     the circumstances of destroying documents under the FRA;

 4     the White House has that ability under the PRA.  FRA

 5     compliance is subject to judicial review.  PRA

 6     compliance mostly isn't.

 7          These aren't on the same level.  And there's really

 8     no argument put forth by the defendants about why

 9     preservation shouldn't be issued.

10          THE COURT:  Okay.  So tell me this:  If DOGE is

11     now within EOP, that's not dispositive as to whether

12     FOIA applies or not, right?

13          MR. MAIER:  Correct.

14          THE COURT:  Okay.  If there's an exercise of

15     substantial independent authority, then FOIA applies.

16     It's treated as an agency.  If it's simply advising, as

17     I understand the law, FOIA does not apply.

18          But what about the distinction between the Federal

19     Records Act and the Presidential Records Act?  If it's

20     in EOP, regardless of its role, does that put it in PRA

21     land or could an EOP agency, like OMB, be also subject

22     to the Federal Records Act?

23          And I don't know the answer to that question but --

24          MR. MAIER:  Your Honor, I think that the -- the

25     analysis has always been, and it applies to OMB, that
```

1    the FRA -- if your question is:  Can they be subject to

2    both or one not the other, I -- standing here today, I

3    can't answer that question with any surety to myself

4    that there are cases where that question itself has been

5    addressed.

6         OMB is the example, though.  OMB is subject to the

7    FRA; OMB is subject to FOIA.

8              THE COURT:  Okay.

9              MR. MAIER:  It is simply not the case that by

10   being an EOP, perhaps there are provisions of the PRA

11   that don't conflict with provisions of the FRA.

12             THE COURT:  Okay.  OMB is subject to the

13   Federal Records Act?

14             MR. MAIER:  Yes.

15             THE COURT:  Okay.

16             MR. MAIER:  Your Honor, I think we've covered

17   most of what I wanted to highlight.

18        I just want to highlight a few other things about

19   the balance of the equities here.

20        You know, obviously since this is a case where the

21   government is opposing our motion, the balance of the

22   equities and the public interest merge.

23        I know we started this conversation about what is

24   it that OMB can do?  What is it that USDS is capable of

25   doing?  What are they willing to do?  But we have to

1    proceed from the premise that FOIA and the public

2    interest are both served by the production of documents,

3    and it should take a lot for the burdens on our

4    defendants here to override that.  And they simply

5    haven't done that.

6        USDS, you know, make no argument in their reply

7    about the burden that it would undertake to have to

8    produce the documents here, and certainly no argument

9    that it overrides the public interest.

10       And this is in our reply, but I think --

11           THE COURT:  Well, they have made the argument

12   that there are -- your friend will correct me, but 34

13   expedited requests before OMB that are currently in the

14   hopper.  And so, you know, if I were to move yours to

15   the top of the queue, then by -- you know, necessarily,

16   that would harm, you know, those other 34 requesters; it

17   would harm the agency's ability to respond to those

18   other 34 requesters.

19       I'll ask your friend, but, you know, what do we

20   know about those other 34?  Are any of them related to

21   DOGE?  Does CREW have other DOGE-related requests either

22   to OMB or other executive branch agencies?  You know, is

23   -- whenever I get FOIA requests, be it the, you know,

24   Clinton emails or, you know, other matters of national

25   importance, there are always overlapping requests, and,

1    you know, if you're not careful, there can be a lot of

2    duplication of efforts.

3        Are you aware of other requests that could be

4    handled at the same time as this one or folded into this

5    one and not -- there are a lot of questions in there,

6    but you get the idea.

7            MR. MAIER:  Sure.  And I'm happy to answer all

8    of them, and I will.  But I want to make one thing

9    really clear, that I was speaking about USDS.

10       USDS has made no showing, no argument whatsoever,

11   that it would be burdened by any of this.

12           THE COURT:  Okay.  Well, I assume -- and again,

13   I'll ask your friend -- that if the USDS doesn't believe

14   it's covered by FOIA, it doesn't have a FOIA office, it

15   doesn't have a Privacy Act officer, it doesn't have the

16   infrastructure except what's currently at OMB to even

17   process the request.  I suspect that's the answer I'm

18   going to get.

19           MR. MAIER:  I suspect that's the answer that

20   you'll get as well, Your Honor, but I just want to

21   highlight why I don't think that should be given

22   particular weight here.

23       It is certainly true that USDS doesn't have -- I

24   can't really grant the premise that USDS doesn't have

25   any kind of information officer or FOIA capability

1    because we don't know anything about it.  We don't have

2    its organizational charts.  We don't have anything.

3    That's what we're trying to get to find out.

4         But that also means it doesn't have a FOIA burden.

5         If USDS is simply not accepting FOIA requests and

6    hasn't and we contacted other requesters that --

7              THE COURT:  Are you the first one?

8              MR. MAIER:  Are we the first?  I'm not -- I

9    don't think so, Your Honor.

10             THE COURT:  Okay.

11             MR. MAIER:  But there's no indication --

12    they've received no response from USDS.  So all of our

13    indications is that there is no FOIA burden.

14         But the bigger thing with respect to DOGE is that

15    DOGE has the capacity very publicly on its website to

16    scour daily the full breadth of the executive branch,

17    identify inefficiencies, publish information.  It has a

18    website dedicated to the public information that it is

19    selectively pulling out, aggregating, and getting out

20    there.

21         I don't fully understand how it could be that DOGE

22    has the capacity to do that on a daily basis, to tout

23    what's going on across the federal government but not to

24    turn that capacity within and just say, okay, we have

25    this finite number of documents; let's turn some of our

1    capacity from voluntarily publishing information to

2    doing it under a court order.

3        The same thing is true with respect to their

4    capabilities of -- their technical capabilities to do

5    this.  USDS by design is data-driven.  It is IT -- IT, I

6    don't want to say geniuses -- IT experts.  Again, there

7    is nothing in the record to indicate that they would

8    have a difficulty in actually pulling these documents

9    together.

10        With respect to an information officer or kind of

11    working through this, to your point, presumably they may

12    not have that.  Again, we don't know that.  We don't

13    know anything about the volume of documents that they

14    might need to produce or how they would go about doing

15    it.

16        And, you know, at the end of the day, Mr. Musk,

17    DOGE's leader, and DOGE itself have touted their

18    transparency.  They're claiming that they are

19    transparent at all terms -- at all times.

20        Mr. Musk has said transparency everywhere in the

21    government, no exceptions.

22        So I'm not really sure how USDS now is going to

23    claim that when there actually is transparency required

24    by Congress and the public, they're suddenly unable to

25    do it.

1          With respect to OMB, I want to talk about some of

2     the questions that you asked.  And with respect to

3     line-cutting, OMB's grant of our expedited request

4     entitles us to, for lack of a better term, cut the line

5     before other requesters who haven't been granted

6     expedition.

7          The question is amongst the other --

8          THE COURT:  To get another cut.

9          MR. MAIER:  Yeah, exactly.  We get another

10    cut.

11         And while there are indications of the numbers of

12    requests that are pending at OMB, we don't have any

13    information relating to their importance, their

14    timeliness, or what, you know, what public debates

15    they're going to.

16         What we do have here is an enormously important

17    public debate about DOGE and its effect on the

18    appropriations process.

19         And the merits and public interest -- excuse me,

20    irreparable harm analysis in the context of a PI is what

21    justifies the cut, the line-cutting, us moving to the

22    front of the line.  It's inherent in every PI case for

23    FOIA requests that there's going to be line-cutting, and

24    there's really nothing that's been pointed to to suggest

25    that other than that completely typical outcome, there's

1    an issue here.

2         The other thing I will say about the declarant and

3    the statements that they made about the staffing at OMB

4    is that there are precedented cases, *American*

5    *Immigration Council* being one of them, where

6    circumstances outside of an agency's control does

7    justify delay in producing documents.

8         Staff turnover is predictable; it is routine.  They

9    don't make any indication in their declaration about the

10   circumstances of the departures or the broader question

11   of whether the government's own policies are driving

12   them.  They also don't make any statements about, even

13   though they have a smaller number of dedicated FOIA

14   response staff than they used to, whether there are

15   other resources that could be brought to bear here in

16   order to make these narrowed requests -- to get them

17   processed and to get them produced.

18        And, you know, at the end of the day, one of the

19   major concerns here is that when we're in a context

20   where we have DOGE doing what it's doing to the federal

21   government, when it's at the center of all of this, it's

22   troubling in the extreme for the answer to request for

23   public information, for timely public information from

24   OMB, kind of the key agency in the apportionment

25   process, just to be, "We don't have the resources to do

1    this right now."

2         They need to put the resources where the resources

3    need to be put.

4              THE COURT:  Just to -- couple questions about

5    the relationship between the DOGE request and the OMB

6    requests.

7              MR. MAIER:  Sure.

8              THE COURT:  So I guess the first one is, and we

9    touched on it at the outset, if I were to issue a PI

10   order that would tee up the issue of "is DOGE subject to

11   FOIA," what would it say?

12             MR. MAIER:  I think that the --

13             THE COURT:  And just assume for the sake of

14   argument that it will not include an order to produce

15   documents by Monday.

16             MR. MAIER:  So -- I'm sorry.  I'm not sure I

17   understand the question, Your Honor.

18             THE COURT:  So if -- I mean, what do you want,

19   right?  And assume that I'm not going to order the

20   government to produce documents by Monday.  Is what you

21   want an order granting a preliminary injunction to

22   process the DOGE requests on an expedited basis,

23   implicit in that order would be a determination that you

24   were likely to succeed on the merits of the question,

25   "Is DOGE subject to FOIA?"

1          MR. MAIER:  Yes.

2          THE COURT:  Is that essentially what you're

3   asking me to issue?

4          MR. MAIER:  I think -- that is what we're

5   asking you to issue, but I don't think it's sufficient

6   for the purposes of FOIA and for the moment that we're

7   in just to grant that and say, okay, now for the first

8   time, USDS, you need to start processing these

9   documents.

10      If you're not going to require them to be produced

11   on Monday --

12          THE COURT:  Well, let's assume it will include

13   an order for processing, but they're going to appeal

14   that presumably, and -- so what should go up, assuming

15   they appeal -- they may not, I don't know -- but what

16   should then be in the order that goes up to the Circuit

17   to determine whether DOGE is subject to FOIA or not?

18      Is that just an order commanding expedited

19   processing of the DOGE requests?

20          MR. MAIER:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. MAIER:  And all I'm saying is that I think

23   for the purposes of our preliminary injunction and what

24   this needs to be, it can't simply be full stop.  There

25   is a substantial likelihood of success on the merits

1    that DOGE is subject to FOIA, and I am ordering DOGE to

2    process the documents.  It needs to be something more to

3    ensure that as many possible -- many documents as

4    possible are produced as early as possible so that the

5    public doesn't lose out on this information and have the

6    CR come and go without understanding what DOGE is.

7              THE COURT:  Okay.  And the second question is:

8    I didn't parse the different requests, but there seems

9    to be at least some overlap -- between the OMB requests

10   and the DOGE requests.

11        So, for instance, to the extent you're seeking

12   correspondence between the two entities, they're going

13   to be covered by both requests.  How much information is

14   there really in your DOGE request that you wouldn't be

15   getting if there's expedited processing or processing by

16   a date certain of the other two?

17             MR. MAIER:  Sure.  I think there's virtually

18   all of it, Your Honor.  I think there's a little bit of

19   overlap.  I think the only explicit overlap between the

20   two is that we're seeking both from OMB and from USDS.

21             THE COURT:  Correspondence.

22             MR. MAIER:  Correspondence --

23             THE COURT:  Correspondence between the two.

24             MR. MAIER:  Well --

25             THE COURT:  There's a recipient and a sender,

1    and you're going to have an email on both ends of that

2    chain, presuming that it's been retained.

3         MR. MAIER:  Sure, sure.  That is true with I

4    think only one subset of the documents, and that would

5    be communications between Mr. Musk, Mr. Davis, their

6    reps, and OMB, because Mr. Musk and Mr. Davis are part

7    of DOGE, right, so that one there certainly would be

8    overlap.

9         THE COURT:  Okay.

10        MR. MAIER:  The only other area of overlap that

11   I'm seeing, thinking about these again, is that we are

12   seeking both from OMB and USDS directives and

13   communications from the USDS administrator to OMB

14   regarding changes to the operations of USDS.

15        THE COURT:  And as of February 26 that was --

16   that is Ms. Gleason.  Before February 26th, we're not

17   sure who that is, is that --

18        MR. MAIER:  Precisely.

19        THE COURT:  Okay.

20        MR. MAIER:  And that's why -- one of the many

21   reasons those documents are important.

22       Where there wouldn't be overlap, and I want to make

23   sure that Your Honor understands this because there are

24   a lot of words in these, and they're not always easy to

25   follow is --

```
 1                    THE COURT:  You're telling me.
 2                    MR. MAIER:  -- is that the communications we're
 3          seeking between USDS and other agencies with respect
 4          to -- according to our narrowed request -- a subset of
 5          issues.  And that's contract administration, some
 6          employment matters, access to systems, and explicit
 7          discussion, I think is how we would fairly put it, about
 8          the authority that USDS has over these agencies.  That
 9          wouldn't include OMB because we are explicitly excluding
10          from that request components of the EOP.
11                    THE COURT:  Okay.  And I take it that apart
12          from the narrowing proposal that I think we received
13          Wednesday, there have been no discussions between the
14          two sides as to, look, you know, here's what we're most
15          interested in.  There's been no meet and confer process
16          thus far.
17                    MR. MAIER:  No.  We simply didn't receive any
18          response since we filed.
19                    THE COURT:  Okay.  Just so that I'm clear.
20                    MR. MAIER:  Yes, Your Honor.  And I'll be
21          perfectly frank.  You know, that's a conversation that I
22          think we would have been happy to have.  We're still
23          willing to discuss with the Court, obviously, you know,
24          what we really need to get here if the Court is not
25          inclined to grant our full relief.  But we haven't had
```

1    the opportunity to have that conversation with them

2    because it's been a black box.

3            THE COURT:  Understood.  Okay.

4            MR. MAIER:  All right, Your Honor.

5            THE COURT:  Thank you very much.

6            MR. MAIER:  Thank you.

7            THE COURT:  All right.  Mr. Bernie, sorry to

8    keep you waiting.

9            MR. BERNIE:  No problem, Your Honor.  So I have

10    a lot to say about the merits of the PI motion, but

11    before I do that, I just want to turn back briefly to

12    the sort of question about what we think the Court

13    should do more generally --

14            THE COURT:  Yeah.

15            MR. BERNIE:  -- regarding -- going forward

16    regarding the USDS request and potentially processing of

17    the OMB request.

18        And I guess the way I would answer that is this

19    Court obviously has a lot of FOIA cases, is very

20    familiar with FOIA.  If the Court is inclined to deny

21    the preliminary injunction motion, which we obviously

22    think you should, we just think the attempt to make out

23    irreparable harm by reference to the appropriations

24    process this week -- next week, doesn't work.

25        I think -- we think that the sort of baseline is

 1      the Court should just treat it like it would sort of an

 2      ordinary FOIA case, perhaps a case where we would have

 3      arguments about how quickly to -- with plaintiffs about

 4      how to expedite --

 5              THE COURT:  Well, if it's an ordinary FOIA

 6      case, there would be an answer, there would be a meet

 7      and confer.  You know, you've estimated 36 months to

 8      respond to the requests.  We'd get to summary judgment,

 9      you know, six months after that, and -- you know, there

10      would be no response by DOGE to its requests because its

11      position is we're not subject to FOIA, and we'd be

12      litigating that four years down the road.

13          What good would that do?

14              MR. BERNIE:  Well, so when we said the Court --

15      when we said the Court would treat it like an ordinary

16      FOIA request, I mean -- what I meant by that is, for

17      example, we could submit status reports, perhaps

18      competing status reports, and as -- and the Court

19      could -- could order processing on a schedule that --

20      based on discovery from the parties.

21          So we're not sort of presupposing the outcome of

22      that process.  Our point -- I guess our overarching

23      point is we don't think that they should gain any

24      litigation advantage or any advantage vis-a-vis other

25      requesters just from having filed a preliminary

1    injunction motion.

2         So that would be -- I mean, I think our baseline

3    request --

4              THE COURT:  But Counsel, you would agree that

5    whether this thing that we call DOGE is subject to FOIA

6    or not, which is the main way that the public gets

7    information about what its government is doing, is a

8    pretty important question --

9              MR. BERNIE:  Right, no --

10             THE COURT:  -- that should be resolved sooner

11   rather than later.

12        And that's what I'm trying to accomplish here.

13             MR. BERNIE:  Oh, sure.  And we -- and if the

14   Court -- if the Court wants to order certain, you know,

15   expedited briefing on that question, that's certainly

16   the Court's prerogative.

17        I guess our overarching point is if the Court -- if

18   the Court would be inclined to do that absent the

19   preliminary injunction motion, that's fine.  Our point

20   is --

21             THE COURT:  But then you don't have a final

22   order, right?  And if I issue an order and it's not

23   appealable until the end of the case, then, you know,

24   what -- I mean, I don't mean to put you on the spot, but

25   what would DOGE do?

1          Would they produce or not produce?

2               MR. BERNIE:  Well, I mean, any decision about

3     appeal obviously, as the Court knows, would be for the

4     solicitor general.

5               THE COURT:  Of course.

6               MR. BERNIE:  Way above my pay grade.

7          I mean, if the Court were to issue a ruling, I

8     mean, there would be -- there would be -- I'm just

9     speculating -- there would be the possibility of a

10    1292(b) appeal.  I mean, obviously this Court would

11    presumably have to certify that.

12         But we -- at the very least, I think we want that

13    legal -- legal question resolved.

14              THE COURT:  And is that -- tell me this:  Is

15    that question teed up in any of my colleague's courts or

16    elsewhere across the country?

17              MR. BERNIE:  I don't think so.  If I'm wrong

18    about this, I could certainly submit a letter, but I

19    don't think we've -- I don't think we've squarely

20    briefed that issue.  I mean, the case --

21              THE COURT:  And you really haven't briefed it

22    here; it's only in a footnote.

23              MR. BERNIE:  Right.  We briefed it only in a

24    footnote here -- we only made reference in a footnote

25    here because we certainly thought the PI should be

1    denied on other grounds, particularly the very broad PI

2    before it was narrowed by the reply.

3        I mean, it was addressed sort of briefly by Judge

4    Bates in the decision you referenced.  In that case he

5    just said it appears to be an agency subject to FOIA.

6            THE COURT:  Was he wrong?

7            MR. BERNIE:  We think -- we think -- we think

8    he was wrong.  I mean -- and that case wasn't a FOIA

9    case.  It involved the Economy Act, which uses broader

10   language, you know, "instrumentality, department, or

11   agency."

12       So we think our position that it was an

13   instrumentality in that case is consistent with our

14   position going forward that it's not an agency subject

15   to FOIA.  But we haven't briefed that in detail, the

16   preliminary injunction motion.

17       And I guess I can just turn to the merits of that

18   motion.

19            THE COURT:  Sure.

20            MR. BERNIE:  We just think that they clearly

21   have not shown the type of irreparable harm that this

22   Court has required in the few cases granting the

23   extraordinary relief of a preliminary injunction by a

24   date certain.

25       I think that's really for four reasons, some of

1    which are related, but the first is, as the Court

2    referenced, this Court has consistently required not

3    just a relationship to some imminent event but some

4    showing that the information will become stale or

5    substantially decreased relevance after that event

6    passes.

7         I don't read even *CREW* to be making that contention

8    here.  To the extent the documents they seek concerning

9    USDS are of public importance, that will certainly

10   remain the case after next week when the current bill

11   funding the government expires --

12        THE COURT:  Well, your friend made an argument

13   that, you know, next week there will be a vote as to

14   whether to fund the government through a supplemental

15   continuing resolution or to shut the government down.

16        I know that these government shutdown votes have a

17   sense of deja vu here in Washington, but that's a pretty

18   big deal, right?

19        And if there's a congressperson on record as saying

20   how I vote on that very important issue, which will

21   affect the lives of millions of our fellow citizens, I

22   want to know whether DOGE has in effect told OMB to zero

23   out a particular office or program or agency that I'm

24   interested in.

25        Why isn't that linking the harm to a particular

1    vote such that the information will be stale for that

2    purpose past next week?

3         MR. BERNIE:  Well, I guess -- well, I guess I

4    would say as a threshold is I certainly don't think

5    that -- and I want to be responsive to the Court's

6    question, but I certainly don't think the idea that --

7         THE COURT:  But just address the argument.  I

8    mean, you know, I get that the appropriations process is

9    ongoing.

10        MR. BERNIE:  Well, I -- I understood -- I

11   understood their argument to be that the information

12   concerning USDS generally is important to particular

13   legislators.  I don't think that -- I certainly don't

14   think that's sufficient to obtain a preliminary

15   injunction for several reasons.

16        First of all, the most fundamental reason is that

17   there's no showing that this information is going to be

18   stale after that.  But also, this is just fundamentally

19   unlike the types of processes in which preliminary

20   injunctions have been granted.  The decennial census in

21   *Brennan Center*, the Ukraine impeachment -- related

22   impeachment proceedings at Center For Public

23   Integrity -- a specific election to which a specific

24   controversy is relevant.

25        And, I mean, on the stale point, my friend on the

1    other side mentioned *Brennan Center for Justice*.  I

2    mean, in that case it really was the case that the

3    government's use of the citizenship-related

4    information -- perhaps it would still be of interest

5    after the census was over, but it was really just going

6    to be of historical interest.  And the same thing is

7    true of the Ukraine-related information in the

8    impeachment proceedings.

9         Here the generalized information they seek is

10   just -- it's just not of the same caliber.

11        The other thing is -- but even -- but even if the

12   question is whether this is relevant to the -- relevant

13   to the appropriations discussions next week.  As I said,

14   I don't think -- I don't think that that by itself is

15   enough.

16        We just think the relationship is too attenuated.

17   And just to be clear, the question for this purpose is

18   not whether the alleged activities of USDS are

19   important.  We would certainly concede that they are.

20   It's not even whether the documents they seek might be

21   of public interest.  They certainly could be.

22        The question is whether the documents they have

23   sought, financial disclosures, ethics disclosures,

24   certain communications -- internal communications from

25   the USDS administrator are so essential to the integrity

 1    of the decision, of the funding decision that Congress

 2    will be making next week, that it has to be disclosed on

 3    an emergency basis.

 4        And we just think the answer to that is clearly no

 5    and --

 6            THE COURT:  So is it -- so is the argument that

 7    they would have to -- among other things -- identify a

 8    specific document or a specific category of documents as

 9    opposed to all correspondence and, you know, there's a

10    possibility that there will be something within that set

11    of waters that might inform the process?

12            MR. BERNIE:  I don't think -- I think in terms

13    of specific documents.  I mean, I take the point that

14    they don't know -- they don't know what potential

15    documents there are.  I mean, I don't know what

16    potential documents there are --

17            THE COURT:  Or categories of documents.

18            MR. BERNIE:  Yeah.  The question is:  Do they

19    have to show, I think, some good reason to believe that

20    it will be essential to the integrity of the choice

21    Congress will make next week, and we just don't think

22    that's the case, particularly since much of the public

23    concern about USDS concerns not necessarily the

24    documents they're requesting but the things USDS is

25    doing.

1        And as the Court noted, what USDS is allegedly

2    doing is obviously the subject of significant media

3    attention, attention from other -- from members of

4    Congress, and I just think the question is whether the

5    marginal value to be potentially added by this

6    information is just so essential that it has to be an

7    emergency order to disclose now.  And it just doesn't

8    meet the standards of the cases.

9        And the one thing I want to address is the Court

10   asked -- the Court made the point that there's often

11   some sort of argument about, you know, the government

12   being captured by certain interest groups or something

13   like that.

14       I think there's always the possibility, and I think

15   Judge Kelly referenced this in one of the *Heritage*

16   *Foundation* cases cited in the brief, talking about --

17   talking about elections.  In that case, he denied a

18   request for a preliminary injunction releasing --

19   seeking to release documents related to a visit by the

20   president of Ukraine.

21       And his point is that it's always possible to --

22   when you have something like an election, for there to

23   be an argument that, you know, something is

24   concededly -- is arguably relevant to a choice that

25   voters might make.  But that can't be the standard

1    because then it's just going to be open season seeking

2    preliminary injunctions right before elections.

3        And I think that concern is even more acute for

4    something like this.  It doesn't happen every two to

5    four years, but happens more or less continually and

6    sometimes on a monthly basis.  And there just isn't

7    enough of a nexus between --

8        THE COURT:  Well, I think the point is that

9    while those are ordinary occurrences, these are no

10   ordinary times because of the role that DOGE, for all

11   the reasons counsel discussed, has an influence in

12   potentially, or allegedly, the appropriations process.

13       And why is -- why does this not -- this whole

14   scenario not move this into a justification for a PI?

15       MR. BERNIE:  Because I just don't -- because I

16   just don't -- in addition to our point about lack of

17   staleness and the appropriations process, I just think

18   if you look at the documents -- I mean, I understand

19   that they think that they're -- I understand that they

20   think these documents are important, and they can make

21   arguments when this goes to processing, that this Court

22   should order processing on an expedited basis.  I mean,

23   we recognize that we might oppose those arguments.

24       But I just think the idea that, for example, all

25   ethics pledges or waivers that were executed,

1    communications with the administrator of USDS.  Again, I

2    take the point that those might be important documents

3    to them, but I just do not think they come close to

4    meeting the standard of what this Court has required,

5    whether it's documents going to the heart of a pending

6    impeachment inquiry, documents about use of citizenship

7    data for a census that was soon to be completed.  I just

8    don't think it comes anywhere near the standards this

9    Court has required for irreparable harm in this case, in

10   those contexts.

11        And just the specific date they've chosen, which is

12   on Monday, I think is just -- first of all, it's

13   unreasonable and not doable but -- and so that's just

14   also -- that's just also part of the likelihood of

15   success analysis.

16        And I think that remains the case even though they

17   have attempted to narrow the request.  I mean, I guess

18   what I would say about that is they did this on, you

19   know, a Tuesday evening, and you know, we first learned

20   about it on Wednesday.

21        I don't think it's reasonable or doable to expect

22   us to process these records, you know, some of which do

23   request documents by reference to certain subject

24   matters and things that -- require things like searches,

25   you know, within one business day or over a couple of

1    business days.

2        I just --

3        THE COURT:  You've had the request, not in

4    narrowed form, obviously, but since mid-December or

5    mid-January, right?

6        MR. BERNIE:  We had the first request since

7    mid-December.  They didn't -- they didn't even request

8    expedition of that request -- of that first request

9    until February 7th.

10       We did have the other request starting January 4th,

11   and we granted expedition to those requests on

12   January 29th.  I mean, there's -- we've since -- that

13   includes the USDS request, which we've since transferred

14   to USDS, and they've denied the request.

15       But the point is that in granting expedition, we

16   did what we do with expedition cases generally, which

17   is, it jumps them to the front of the general queue,

18   which is no small thing.  It's -- you know, we have --

19   as we identified in the declaration, we have more than

20   1,200 FOIA requests at OMB.

21       It's better to be the 35th out of 35 expedited

22   requests than at the bottom of the general pile.

23       THE COURT:  Okay.  Can you tell me -- can you

24   answer -- or shed any light on the questions that I

25   asked your colleague about the nature of those 34?

```
 1          Are these -- are there any other DOGE requests that

 2    have been kicked back to OMB or DOGE requests -- related

 3    requests that were filed with OMB in the first instance?

 4          MR. BERNIE:  Sure.

 5          THE COURT:  You know, what's the universe?  Who

 6    would I be kicking to the back of the line?

 7          MR. BERNIE:  So the question the Court asked in

 8    the minute order yesterday but was another sort of

 9    related request before USDS -- before OMB and USDS, I

10    can -- I can answer that question, which I recognize is

11    a slightly different question.  There are about 170

12    requests at OMB right now that request information about

13    the U.S. DOGE Service, Elon Musk, or closely related

14    topics.

15       OMB has administratively closed a few of those just

16    on the basis that they're really seeking documents from

17    USDS that OMB doesn't have, but most of those are in the

18    early stages of processing.

19       As to USDS --

20          THE COURT:  Has processing begun or searching

21    begun and any documents produced to other requesters?  I

22    mean, you know, is there a duplication issue?  Can we

23    streamline this process to get DOGE-related documents

24    out of the agency on an organized -- in an organized

25    manner?
```

1          MR. BERNIE:  I'm not sure I can -- I think the

2      vast majority of those requests were received in

3      early -- were received in early February, and I -- since

4      there are only 35 expedited requests, I'm not sure how

5      many of those 35 are USDS requests.  I'm not sure if any

6      of those requests are expedited.

7          So I don't think any -- I don't think -- I can

8      correct the record if I turn out to be wrong, but I

9      don't think any of those have been -- have been --

10     resulted in production of documents.

11          THE COURT:  Okay.

12          MR. BERNIE:  Which I don't think --

13          THE COURT:  So no decisions about whether this

14     would be appropriate subject matter for a reading room

15     or publication, you know, sort of collectively?

16          MR. BERNIE:  Not that I know of, Your Honor.  I

17     don't know the answer -- to answer your question

18     directly, I don't know how many, if any, of the 35 other

19     expedited requests, what the subject matter of those

20     requests are, how many of them involve USDS-related

21     topics.

22          THE COURT:  Got it.  Okay.

23          MR. BERNIE:  Just so -- but for all those

24     reasons, we just don't think that it meets the standard

25     for irreparable harm here, and that it's just, in any

1    event, not practical or feasible for us to process the

2    requests, either the original requests or the requests

3    as revised by next week, and this is putting aside our

4    contention that the question of USDS' agency status for

5    FOIA purposes should be resolved as a legal matter

6    first.

7        I mean, on the question of balance of the equities

8    and harm to other requesters, I mean, we think that

9    is -- we think that that is important and that that's

10    clearly implicated here.

11        As mentioned, there are 35 other requests that

12    are --

13        THE COURT:  But as your colleague points out,

14    you haven't given me any information about what those

15    requests entail, you know, how many documents are

16    subject to those requests, to what extent OMB has

17    already begun producing documents with respect to those

18    35 requests.

19        I mean, how can I balance the equities without

20    knowing what your equities are?

21        MR. BERNIE:  No, I know, so I appreciate the

22    concern, Your Honor.  But, respectfully, I think the

23    reason we haven't is because they filed a preliminary

24    injunction motion.

25        I think in the ordinary course, this would happen

1   at the stage of joint status reports and processing

2   disputes where we would have more time to present that

3   information.

4        And -- but because they filed this motion, then our

5   view just was not -- is not meritorious.  We just

6   haven't had time to do that.

7        All of that --

8            THE COURT:  Right.  But that's often the case

9   in PIs.  And, you know, I have to balance based on the

10  record in front of me, and the record is what it is

11  based on the decisions that you folks make.

12           MR. BERNIE:  Right.  No, I understand that, but

13  it's their burden to show satisfaction of all the PI

14  factors.

15           THE COURT:  Yeah.

16           MR. BERNIE:  And I think, for present purposes,

17  we don't think the Court needs to reach this issue

18  because we think the irreparable harm they've alleged

19  just doesn't meet the standards of this Court's case

20  law.  But at the very least, there's 35 other requests.

21       As we noted in the declaration, there's 19 pending

22  litigations in which -- in which OMB is a named party,

23  including five cases in which we're making -- currently

24  making rolling FOIA productions.

25       All of that is -- I mean, to some extent it's a

1    zero-sum game.  If we prioritize their requests, it has

2    to -- necessarily comes out of other things.

3        I mean, on the staffing point, just to make clear,

4    this is not an essential part of our argument, but, I

5    mean, we do have reduced -- we do have reduced staff as

6    we note in our -- as we note in our brief.

7        Just to address -- just to address -- I mean, just

8    to -- I do want to note -- I don't think this -- I don't

9    think it was a material error.  There was one error in

10   our declaration, I just want to make sure I bring to the

11   Court's attention.

12       We said in the declaration that there are -- that

13   there were eight government information specialists and

14   now there are two.  It was actually nine and now there's

15   two.  But it's still -- the two remains accurate.  I

16   don't think that's material, but I just wanted to make

17   sure to correct the record on that point.

18       Again, we don't --

19           THE COURT:  It is somewhat inconsistent, is it

20   not, to tout that this will be done with the utmost

21   transparency and yet reduce the number of FOIA folks who

22   are processing requests, right?

23           MR. BERNIE:  Well, to be clear, Your Honor, we

24   didn't put this in the declaration.  None of the -- none

25   of the individuals who -- none of the individuals who

1    left were terminated.  I mean, two left voluntarily and

2    the remainder were contractors where the contract terms

3    expired, and we don't currently have funding to enter

4    into new contracts.

5        Like I said, I don't think that any of this is

6    essential for the Court to resolve the motion, but it

7    just, I think, further underscores that the request

8    is -- that the request that they've requested isn't

9    reasonable and not something that we could feasibly do.

10        THE COURT:  Okay.  Move on to the preservation

11    order, if you would.

12        MR. BERNIE:  Sure.  So, I mean, the first thing

13    I'd say about that is there's a presumption of

14    regularity.  I mean, first of all, as to OMB, we

15    acknowledge that OMB is an agency that is subject to

16    FOIA and the FRA.  As to USDS, they are still subject --

17    they are still subject to our view in the PRA, so it's

18    not -- we are not saying there are no preservation

19    obligations at all.

20        THE COURT:  But at the very least, it's subject

21    to dispute as to whether they are also subject to FOIA

22    and the Federal Records Act.

23        MR. BERNIE:  Certainly, Your Honor --

24        THE COURT:  We have one of my colleagues in

25    dicta suggesting that that is the case.

1           MR. BERNIE:  Oh, sure.  But I'm just saying for

2     purposes --

3           THE COURT:  So in the event that it is

4     ultimately decided on the merits that DOGE is subject to

5     FOIA, and perhaps now it's operating under the

6     presumption that it is not, what in the world would be

7     wrong with an order from the Court preserving documents

8     in the event that it is held by me or some other court

9     that it's subject to FOIA?

10          MR. BERNIE:  Sure.  So I understand that

11    there's a dispute on that issue.

12       My point was only that even on our view of the law,

13    which we, of course, think is correct, I mean, we are --

14    the USDS is still subject to the Presidential Records

15    Act, which carries with it its own preservation

16    obligations.

17          THE COURT:  Which is not exactly enforceable.

18          MR. BERNIE:  It may not -- it may not be --

19    perhaps not, but there are still obligations.

20       And this -- and take the cases they mentioned.

21    This isn't a case like the *CREW v. Office of

22    Administration* case, for example.  That case I think was

23    decided on January 15, 2009, which was right before our

24    change in administrations.  And there were specific

25    concerns in that case that documents would be

1    transferred, I think, to NARA, and that they would be

2    beyond -- beyond the process of the Court.

3        In another case they cited which is the *Competitive*

4    *Enterprise Institute* case involving the OSTP director,

5    which is a component of EOP that I believe is subject to

6    FOIA and the FRA.  The concern there was their email

7    stored on a personal server of that director, and the

8    concern that when he was scheduled to leave office with

9    the change of administration there would be no -- there

10   would be no process -- or there would arguably be no

11   process to require him to turn over records.

12       So I guess --

13       THE COURT:  Do you agree with your colleague

14   that the Court does not need to upset the standard

15   presumption of good faith and that government employees

16   comply with relevant laws and statutes in order to

17   remind folks to maintain documents in this case?

18       MR. BERNIE:  Yeah, so I agree with that.  I

19   agree with that.  And certainly if the Court is inclined

20   to enter a preservation order, we certainly don't

21   think -- we certainly don't think it should be on the

22   basis of any -- of any bad faith or any evidence of bad

23   faith or anything like that.

24       We still think -- we still think a preservation

25   order is inappropriate, though, because even though

1    there's no requirement of finding of bad faith -- like,

2    for example, in the case I mentioned, I think the Court

3    explicitly mentioned that it said it wasn't making a

4    finding of bad faith or questioning the good faith.  But

5    there were specific reasons in that case why a

6    preservation order was necessary in the view of the

7    Court related to --

8            THE COURT:  Well, your colleague just gave a

9    few reasons.  You want to address those?

10           MR. BERNIE:  Sure.  So I don't think -- I don't

11   think the Signal use -- the alleged Signal use before

12   the inauguration is the basis of a claim under the FRA

13   or any fear of spoliation at all.  Those documents

14   simply are not subject to FOIA and the FRA in the first

15   place because they were made outside the executive

16   branch.  The --

17           THE COURT:  But now we have allegations, at

18   least reported allegations, after the inauguration.

19           MR. BERNIE:  Yeah, I mean, they cited the news

20   article, but I don't think there's really any detail.

21   There's no way to tell if those documents -- if any

22   alleged communications on Signal involved -- involved

23   documents that would otherwise be federal records at

24   all.

25        I just don't think on this record there's any

1    reason to believe that -- that any individuals are not

2    abiding by their responsibilities to communicate on

3    government systems to preserve relevant records.

4            THE COURT:  Do you care to provide the Court

5    with any assurances that no DOGE staff is currently

6    using Signal or otherwise deleting potentially relevant

7    communications?

8            MR. BERNIE:  I mean, I can't represent what

9    other people are doing.  If the Court wants assurances,

10   I can certainly -- I can certainly talk to -- I can

11   certainly talk to my clients and see if there's any

12   assurances we can give the Court in another submission

13   very soon, you know, early next week or something like

14   that.

15       I can't personally vouch for sort of -- make

16   representations about people who I don't know and

17   haven't interacted with.  That's the most I can do.

18           THE COURT:  So your client has not made those

19   representations to you, then?

20           MR. BERNIE:  While we --

21           THE COURT:  I'll retract that.  I'll retract

22   that.

23       All right.  Anything else on the preservation

24   order?  We talked about their evidence.  I would not

25   have to upset any presumptions by issuing one.

```
 1            MR. BERNIE:  I think that's right, subject to
 2     the caveat I said before, that there should -- but we
 3     agree that no finding of bad faith is necessary to enter
 4     such an order.
 5            THE COURT:  Okay.  Anything else?
 6            MR. BERNIE:  If the Court has any questions,
 7     I'm happy to address them, but otherwise, I don't think
 8     so.  We would ask that the preliminary injunction motion
 9     be denied.
10            THE COURT:  Okay.  Mr. Maier, brief rebuttal.
11            MR. MAIER:  Thank you, Your Honor.  I'll go in
12     reverse order of the issues that were just discussed.
13         So with respect to the preservation order, we
14     certainly agree that you don't need to make a finding of
15     bad faith to enter it.
16         I think our reply in particular makes it very clear
17     that there's reason for concern about the government's
18     fidelity to public information and public transparency
19     with respect to DOGE.  I think that's in our reply.
20         As my colleague just said, there's no way to tell
21     whether Signal is being used except for public reports.
22     And I would note that in the course of the discussion
23     you both just had, my colleague did say that public
24     reporting is what we should be relying on; it's why we
25     don't need these documents.
```

1          So I don't think it's particularly consistent for

2     the government to say, You have enough information from

3     public reports.  The public reports of what DOGE is

4     doing are so unreliable that they shouldn't sway the

5     Court.

6          With respect to the burden associated with

7     producing documents, particularly with OMB, because we

8     don't know what it is with USDS, I'm aware of no case,

9     and the defendants haven't cited one, where the Court

10     found that irreparable harm would exist where a

11     substantial likelihood of the merits existed but fully

12     denied a preliminary injunction simply because of the

13     burden.

14          It's a question of how the preliminary injunction

15     is ordered and the pace at which documents are produced

16     that really factors in there.

17          To your point, and to my colleague's point, I

18     recognize that this hearing was scheduled for a Friday

19     when we are requesting relief on Monday.  I think at the

20     very least --

21               THE COURT:  Well, to be fair, you requested the

22     hearing earlier in the week, and the Court was not

23     available to hear it.

24               MR. MAIER:  Thank you, Your Honor.  I

25     appreciate that.

1          But, you know, March 14th --

2               THE COURT:  But that still wouldn't have given

3     a whole lot of time, but your point is taken.

4               MR. MAIER:  Fair enough.  But I recognize the

5     reality of that, and, again, the Court can craft relief

6     here that can maximize the amount of information out to

7     the public by March 14th.  There are ways to do that.

8          The third argument -- or the third point that was

9     discussed is one I just want to make sure we're not

10    losing track of.

11         That defendants at this point want for the first

12    time to explain the merits of the USDS not being subject

13    to a FOIA argument and some of their other ones that

14    they had the opportunity to make in their opposition,

15    and they simply didn't.

16         As a matter of equity, as the Court considers what

17    additional briefing may be permitted, what additional

18    actions that are -- or information the parties might

19    need to provide, that shouldn't be lost here; that under

20    kind, they waived those arguments by not making them, by

21    simply saying USDS is a component of EOP, therefore,

22    it's not subject to FOIA.

23              THE COURT:  Okay.  And on the other end of the

24    scale, what evidence has CREW put in the record that

25    would support a conclusion that DOGE wields substantial

1    authority independent of the President and is not just

2    advisory?

3         MR. MAIER:  Sure.  And there's two forms of

4    them, and they're both extensive.

5      The first are -- is the language of the actual

6    charter documents that established what DOGE is allowed

7    to do.

8      The primary one being the President's January 20th

9    order establishing DOGE which creates the USDS

10   administrator and requires other members of the -- other

11   heads of agencies to consult with that person,

12   empowering and in fact mandating DOGE to, quote,

13   "implement the President's DOGE agenda, creating the

14   Temporary Organization within DOGE"; saying that it's

15   solely "dedicated to advancing the agenda," "creating

16   DOGE Teams at every agency that are staffed by personnel

17   hired in consultation with DOGE, to coordinate with DOGE

18   as they're working at these agencies."

19        THE COURT:  Okay.  And is that in the form of a

20   declaration or press reporting or what's -- what's the

21   form of the evidence?

22        MR. MAIER:  Well, we cited directly to the

23   Executive Order.

24        THE COURT:  To the EO, okay.

25        MR. MAIER:  Yes.  And there have been -- I

1    won't belabor the point, but there have been two -- at

2    least two subsequent EOs that the President has ordered

3    that give these DOGE Teams and DOGE itself reach into

4    federal contracting, federal hiring, price

5    justifications.

6        THE COURT:  Okay.  And just thinking this

7    through, is that evidence after DOGE was placed into EOP

8    as a freestanding agency, if I accept --

9        MR. MAIER:  Yes --

10        THE COURT:  -- the government's representation

11    that on some date that happened, there was a nominal

12    change?  Or maybe not nominal --

13        MR. MAIER:  So the order that created DOGE

14    created DOGE by reorganizing the Digital Service moving

15    into the EOP and giving it these powers.

16        THE COURT:  I see.  Okay.

17        MR. MAIER:  The other EOs that I'm talking

18    about were issued on February 11th and 26th.

19        THE COURT:  Okay.

20        MR. MAIER:  So well after it was moved into

21    EOP.

22        And then with respect, Your Honor, to the second

23    half, there's the charter documents and the actual

24    delegation of authority, and there's just an enormous

25    public record, as Your Honor noted, from people who are

1   within agencies who have said, "Members of DOGE came to

2   my office and did this."

3       We had -- I believe it was yesterday -- the head of

4   the Social Security Administration, the acting head of

5   the Social Security Administration, saying DOGE is

6   making the decisions, me and my career staff are just

7   implementing them, and we have to find a way to deal

8   with it.

9       There are, I'm going to say, scores of public

10  reports in our briefing describing USDS's substantial

11  authority.  And, again, the defendants didn't refute any

12  of it.  In fact, they just want us to look at other

13  public reporting.  That might shed more light on it.

14      And then my last -- the last thing I want to note

15  is on the irreparable harm, I think there's a couple

16  things to keep in mind.

17      First is I think that my colleague is overstating

18  the extent to which these cases rely on essentially the

19  total loss of the value of information by a date certain

20  in order to justify a PI.

21      As you noted, there are -- as I noted, *Brennan* is

22  an example of kind of an explicit statement of that, but

23  *EPIC*, the *Electronic Privacy Information Center* case, is

24  another great example.  There, requesters were seeking

25  information about the government's warrantless

1    surveillance program, and they were seeking crucial

2    documents, audits, the basis on which the warrants were

3    issued, how they were used, and the legal authority.

4        That wasn't in connection with a date certain.

5    That was within connection to what the Court recognized

6    was a crucial ongoing public debate that was invited by

7    the President.

8        Those documents just --

9            THE COURT:  But wasn't there a -- wasn't there

10   a bill to define NSA's authority?

11           MR. MAIER:  There may have been, but the Court

12   was very specific that it was tying it to the public

13   debate.

14           THE COURT:  Right.

15           MR. MAIER:  And the Court said explicitly there

16   actually was no legislation that would make it stale.

17   It was the President invited this debate.

18       And I'm not just saying that to highlight the fact

19   that the public debate was what was important, but those

20   are documents that undoubtedly had value in all kinds of

21   other circumstances outside of this kind of undefined

22   public debate.  The Court issued the injunction.

23       With respect to kind of the other point I want to

24   make on that point that we made in our reply is

25   accepting as a concept that some information will be so

 1    perpetually important that it is essentially immune from

 2    a public -- excuse me, a preliminary injunction order,

 3    would create what I'll call a form of super information;

 4    that is so important in so many contexts that even if

 5    it's crucial, vital, to even the most significant issue

 6    of national concern, agencies couldn't be compelled to

 7    produce it in the course of a preliminary injunction,

 8    specifically because it's so important.

 9        I think that turns FOIA on its head and should

10    caution against an overreliance on saying, Okay, because

11    DOGE is going to continue to wreak havoc on the

12    government, I can't order this relief.

13        And this last thing I'll say, with respect to kind

14    of the centrality of this, is I just want to share a

15    quote from Senator Jack Reed.

16        "Every single day that passes without transparency

17    and congressional access to information about DOGE's

18    funding, staffing, and scope of work is a moment too

19    long.

20        "With the current continuing resolution due to

21    expire on March 14th, we have big decisions to make.  We

22    cannot responsibly fund the government if we do not

23    understand how DOGE has infiltrated it, made it less

24    efficient, and less responsive to taxpayers and

25    essentially has circumvented the constitutional

1    responsibilities of the United States."

2         There are additional statements like that that

3    we're happy to submit to the Court.

4              THE COURT:  I saw them in your briefs.

5              MR. MAIER:  Okay.  Thank you, sir.

6              THE COURT:  Thank you.  All right.  Mr. Bernie,

7    if you'd like to address the state of the record as to

8    DOGE's responsibilities and therefore it's -- whether

9    it's covered under FOIA, I'll give you an opportunity to

10   do that since that just came up in rebuttal, but it's up

11   to you.

12             MR. BERNIE:  Yeah, I mean, just procedurally.

13   I mean, we obviously did not -- we obviously did not

14   brief this in our opposition.

15             THE COURT:  Right.  Have you waived it then?

16             MR. BERNIE:  No, I don't think we waived it.

17             THE COURT:  Okay.

18             MR. BERNIE:  And I think it's important to

19   understand the circumstances that we were facing when we

20   were answering the PI, not just was it -- is this an

21   argument that hadn't been briefed before and it was an

22   emergency.  But we were also responding to a very

23   different set of requests than the ones that were --

24   have been refashioned in the reply.

25             THE COURT:  Right.  But you opposed the motion

1    for a preliminary injunction based in part on lack of --

2    unlikelihood of success on the merits --

3            MR. BERNIE:  Right.

4            THE COURT:  -- right?

5        And if it were the case that you knew when you

6    filed that opposition that DOGE was taking the position

7    that it was not subject to FOIA, wasn't it your

8    obligation to tell me that that's why they're not going

9    to succeed on the merits and brief it?

10            MR. BERNIE:  No -- well, we cited in the

11    opposition, and that remains -- and it remains our

12    position today, which is that we think that the Court

13    can deny the motion without even addressing that because

14    they just haven't shown the type of irreparable harm,

15    and none of the other requirements are met.

16        My point, though, in just -- my point, though, in

17    just explaining why I think that the different state of

18    the request was relevant to our decision when we were

19    briefing the case, is back when they were requesting

20    literally every document involving the U.S. DOGE Service

21    with any agency outside the Executive Office of the

22    President, every document from the U.S. Digital Service

23    for a two-and-a-half month period, other extremely broad

24    categories of documents, it was extremely reasonable, I

25    think, for us to conclude based on those requests that

1    it was so clear that they were not entitled to

2    preliminary injunction as to those requests that we

3    did -- that there was no need to separately address that

4    legal issue which we had never addressed before.

5        So they have now, through their reply, set forth

6    basically a completely different set of requests.

7                THE COURT:  Okay.

8                MR. BERNIE:  But just on the merits of it, our

9    position would be when the case is briefed that the

10   functions performed by the U.S. DOGE Service are

11   advisory; that they have no -- that they have no

12   authority independent of the President.  I don't think

13   there's anything in the Executive Order referenced to

14   Executive Order 14158 that formed the U.S. DOGE Service

15   that contradicts that.

16       But in any event, we don't think the Court needs to

17   address that issue to deny the motion.

18               THE COURT:  Okay.  The Court will take the

19   matter under advisement, and we will get something out

20   as soon as we can.

21       I will say that it is likely that the order will

22   include a preservation order, and so we can assume that

23   that order should run from now.  So if you could advise

24   your clients of that as soon as possible, I think that

25   would be helpful.  Okay.

1          MR. BERNIE:  Thank you, Your Honor.

2          THE COURT:  All right.  Anything else?

3          MR. MAIER:  No.  Thank you, Your Honor.

4          THE COURT:  Okay.  Well briefed and argued on

5   short notice, Counsel.  And we will take it under

6   advisement and get back to you sooner rather than

7   later.

8      Have a good weekend.

9      (Court adjourned, 3:50 p.m.)

10

11                         - - - -

12

13

14                      CERTIFICATE

15

16      I, Chandra Kean, RMR, certify that the foregoing is

17   a correct transcription from the record of proceedings

18   in the above-titled matter.

19

20   _____        March 12, 2025

        Chandra Kean, RMR              DATED
21

22

23

24

25

**$**

**$500** [1] - 35:24

**0**

**0MB** [1] - 8:5

**1**

**1,200** [1] - 66:20
**11th** [1] - 81:18
**12** [2] - 5:11, 88:20
**12(b** [2] - 5:24, 10:12
**1292(b** [1] - 57:10
**14158** [1] - 87:14
**14th** [6] - 10:5, 16:24, 18:10, 79:1, 79:7, 84:21
**15** [1] - 73:23
**170** [1] - 67:11
**19** [1] - 70:21

**2**

**2009** [1] - 73:23
**2025** [1] - 88:20
**20th** [1] - 80:8
**25-511** [1] - 2:4
**26** [1] - 52:15
**26th** [3] - 5:10, 52:16, 81:18
**29th** [1] - 66:12
**2:08** [1] - 2:2

**3**

**34** [5] - 43:12, 43:16, 43:18, 43:20, 66:25
**35** [7] - 66:21, 68:4, 68:5, 68:18, 69:11, 69:18, 70:20
**35th** [1] - 66:21
**36** [1] - 55:7
**3:50** [1] - 88:9

**4**

**4th** [1] - 66:10

**7**

**7th** [1] - 66:9

**A**

**abiding** [1] - 76:2
**abilities** [1] - 17:2
**ability** [4] - 33:16, 35:4, 41:4, 43:17
**able** [3] - 8:18, 22:10, 23:2
**above-titled** [1] -

88:18
**absent** [3] - 4:24, 9:8, 56:18
**absolutely** [2] - 18:22, 30:13
**accept** [1] - 81:8
**accepting** [2] - 45:5, 83:25
**access** [3] - 21:1, 53:6, 84:17
**accidental** [1] - 39:6
**accomplish** [1] - 56:12
**according** [1] - 53:4
**account** [1] - 21:16
**accurate** [2] - 20:18, 71:15
**achieved** [1] - 36:4
**acknowledge** [1] - 72:15
**acknowledged** [1] - 14:8
**acknowledging** [1] - 40:19
**acronym** [1] - 3:12
**act** [1] - 24:6
**Act** [10] - 40:25, 41:19, 41:22, 42:13, 44:15, 58:9, 72:22, 73:15
**acting** [1] - 82:4
**action** [5] - 13:15, 24:15, 24:16, 33:17, 37:25
**actions** [3] - 22:15, 29:6, 79:18
**activities** [1] - 61:18
**actual** [2] - 80:5, 81:23
**acute** [1] - 64:3
**added** [1] - 63:5
**addition** [1] - 64:16
**additional** [4] - 20:20, 79:17, 85:2
**address** [5] - 3:17, 3:21, 6:21, 8:7, 12:18, 25:3, 60:7, 63:9, 71:7, 75:9, 77:7, 85:7, 87:3, 87:17
**addressed** [3] - 42:5, 58:3, 87:4
**addressing** [1] - 86:13
**adjourned** [1] - 88:9
**administering** [1] - 28:4
**Administration** [4] - 39:2, 73:22, 82:4, 82:5
**administration** [4] - 28:15, 40:7, 53:5, 74:9

**administrations** [1] - 73:24
**administratively** [1] - 67:15
**administrator** [5] - 30:18, 52:13, 61:25, 65:1, 80:10
**advance** [1] - 3:10
**advancing** [1] - 80:15
**advantage** [2] - 55:24
**advise** [1] - 87:23
**advisement** [2] - 87:19, 88:6
**advising** [2] - 29:5, 41:16
**advisory** [3] - 11:25, 80:2, 87:11
**advocacy** [1] - 33:4
**affect** [5] - 3:6, 19:1, 25:17, 32:4, 59:21
**affecting** [1] - 10:24
**afternoon** [3] - 2:12, 2:14, 8:15
**agencies** [24] - 3:13, 8:25, 11:1, 16:16, 20:25, 22:15, 22:16, 22:23, 28:13, 29:3, 30:14, 32:8, 32:21, 32:22, 33:18, 33:23, 36:5, 43:22, 53:3, 53:8, 80:11, 80:18, 82:1, 84:6
**agency** [28] - 4:1, 4:20, 5:21, 11:11, 11:22, 16:12, 25:3, 25:9, 25:12, 28:8, 30:1, 30:19, 31:1, 36:17, 41:16, 41:21, 48:24, 58:5, 58:11, 58:14, 59:23, 67:24, 69:4, 72:15, 80:16, 81:8, 86:21
**agency's** [2] - 43:17, 48:6
**agenda** [2] - 80:13, 80:15
**agent** [1] - 10:24
**aggregating** [1] - 45:19
**agree** [10] - 11:10, 12:9, 17:7, 34:3, 56:4, 74:13, 74:18, 74:19, 77:3, 77:14
**agreed** [1] - 37:13
**agreeing** [1] - 40:20
**ahead** [3] - 6:16, 27:17, 38:15
**aisle** [1] - 24:18
**al** [1] - 2:5
**alert** [1] - 13:15

**allegation** [1] - 33:8
**allegations** [4] - 11:19, 12:25, 75:17, 75:18
**alleged** [6] - 12:6, 14:5, 61:18, 70:18, 75:11, 75:22
**allegedly** [2] - 63:1, 64:12
**allowed** [1] - 80:6
**alter** [1] - 35:4
**American** [3] - 17:14, 35:9, 48:4
**Americans** [1] - 19:2
**amount** [2] - 22:4, 79:6
**analysis** [6] - 15:3, 18:19, 24:14, 41:25, 47:20, 65:15
**Andrew** [1] - 2:13
**animal** [1] - 28:10
**animating** [1] - 24:9
**answer** [18] - 5:9, 7:23, 14:2, 21:8, 34:22, 41:23, 42:3, 44:7, 44:17, 44:19, 48:22, 54:18, 55:6, 62:4, 66:24, 67:10, 68:17
**answering** [1] - 85:20
**answers** [2] - 25:19, 40:15
**anticipates** [1] - 8:1
**anytime** [1] - 33:8
**anyway** [1] - 35:15
**apart** [2] - 11:24, 53:11
**apologies** [1] - 2:21
**app** [1] - 39:25
**appeal** [8] - 6:9, 14:13, 14:20, 15:22, 50:13, 50:15, 57:3, 57:10
**appealable** [2] - 5:22, 56:23
**appear** [1] - 11:23
**application** [2] - 15:7, 37:23
**applies** [4] - 41:12, 41:15, 41:25
**apply** [2] - 15:2, 41:17
**applying** [1] - 32:8
**apportion** [1] - 31:14
**apportioned** [2] - 28:12, 28:20
**apportionment** [3] - 32:15, 34:8, 48:24
**apportionments** [2] - 29:2, 30:22
**appreciate** [2] - 69:21, 78:25

**approach** [1] - 2:6
**appropriate** [8] - 6:21, 13:14, 13:24, 20:9, 20:13, 31:15, 34:5, 68:14
**appropriated** [13] - 11:3, 16:15, 17:4, 21:3, 21:4, 25:4, 25:13, 28:11, 28:20, 30:2, 30:21, 30:25, 34:9
**appropriates** [1] - 17:21
**Appropriations** [1] - 23:6
**appropriations** [31] - 11:4, 17:20, 17:23, 18:22, 19:9, 19:23, 20:15, 21:13, 21:17, 24:20, 25:5, 25:7, 25:17, 25:18, 25:21, 26:5, 26:10, 26:14, 29:13, 31:9, 31:24, 32:16, 35:5, 35:10, 36:11, 47:18, 54:23, 60:8, 61:13, 64:12, 64:17
**appropriators** [8] - 17:1, 19:18, 19:24, 20:5, 21:9, 22:9, 37:5
**archivist** [1] - 41:2
**area** [1] - 52:10
**arguably** [2] - 63:24, 74:10
**argue** [1] - 39:12
**argued** [1] - 88:4
**argument** [24] - 5:12, 10:17, 16:1, 16:8, 16:10, 20:5, 31:22, 31:23, 41:8, 43:6, 43:8, 43:11, 44:10, 49:14, 59:12, 60:7, 60:11, 62:6, 63:11, 63:23, 71:4, 79:8, 79:13, 85:21
**arguments** [5] - 18:15, 55:3, 64:21, 64:23, 79:20
**arise** [1] - 17:9
**Armstrong** [1] - 40:21
**article** [1] - 75:20
**aside** [3] - 11:7, 33:1, 69:3
**associated** [3] - 8:24, 37:11, 78:6
**assume** [7] - 11:10, 38:23, 44:12, 49:13, 49:19, 50:12, 87:22
**assuming** [1] - 50:14

**assurances** [3] - 76:5, 76:9, 76:12
**attempt** [1] - 54:22
**attempted** [1] - 65:17
**attempting** [1] - 33:5
**attention** [3] - 63:3, 71:11
**attenuated** [1] - 61:16
**audits** [1] - 83:2
**authority** [14] - 11:24, 13:12, 20:2, 38:5, 38:11, 41:15, 53:8, 80:1, 81:24, 82:11, 83:3, 83:10, 87:12
**automatically** [1] - 39:25
**available** [1] - 78:23
**aware** [5] - 10:10, 13:16, 22:7, 44:3, 78:8

## B

**bad** [7] - 39:9, 74:22, 75:1, 75:4, 77:3, 77:15
**balance** [5] - 42:19, 42:21, 69:7, 69:19, 70:9
**balanced** [1] - 23:21
**barrelling** [1] - 16:23
**based** [9] - 4:19, 16:10, 22:2, 37:18, 55:20, 70:9, 70:11, 86:1, 86:25
**baseline** [2] - 54:25, 56:2
**bases** [1] - 37:20
**basic** [2] - 40:8, 40:12
**basis** [7] - 4:3, 4:18, 5:13, 5:25, 6:1, 6:25, 7:17, 12:9, 45:22, 49:22, 62:3, 64:6, 64:22, 67:16, 74:22, 75:12, 83:2
**Bates** [1] - 58:4
**Bates'** [2] - 11:20, 13:10
**bear** [1] - 48:15
**become** [2] - 17:25, 59:4
**becomes** [2] - 17:12, 20:20
**begun** [3] - 67:20, 67:21, 69:17
**behalf** [2] - 2:13, 4:11
**behind** [1] - 33:16
**belabor** [1] - 81:1
**BERNIE** [59] - 2:12, 3:8, 3:14, 3:17, 3:20,

5:1, 5:23, 6:3, 6:11, 6:15, 7:22, 7:25, 8:20, 54:9, 54:15, 55:14, 56:9, 56:13, 57:2, 57:6, 57:17, 57:23, 58:7, 58:20, 60:3, 60:10, 62:12, 62:18, 64:15, 66:6, 67:4, 67:7, 68:1, 68:12, 68:16, 68:23, 69:21, 70:12, 70:16, 71:23, 72:12, 72:23, 73:1, 73:10, 73:18, 74:18, 75:10, 75:19, 76:8, 76:20, 77:1, 77:6, 85:12, 85:16, 85:18, 86:3, 86:10, 87:8, 88:1
**Bernie** [4] - 2:13, 2:14, 54:7, 85:6
**best** [1] - 11:15
**better** [3] - 3:20, 47:4, 66:21
**between** [14] - 27:7, 27:20, 28:13, 34:10, 41:18, 49:5, 51:9, 51:12, 51:19, 51:23, 52:5, 53:3, 53:13, 64:7
**beyond** [1] - 74:2
**big** [2] - 59:18, 84:21
**bigger** [1] - 45:14
**bill** [6] - 16:24, 16:25, 25:17, 25:18, 32:16, 35:10, 59:10, 83:10
**billion** [1] - 35:24
**billions** [4] - 11:2, 16:16, 28:16, 34:21
**bills** [3] - 25:21, 26:10, 26:14
**bit** [4] - 3:2, 6:10, 18:13, 51:18
**black** [3] - 16:12, 32:20, 54:2
**blind** [1] - 36:14
**bottom** [1] - 66:22
**bound** [3] - 10:11, 12:17, 40:24
**box** [3] - 16:12, 32:20, 54:2
**branch** [4] - 11:1, 43:22, 45:16, 75:16
**breadth** [1] - 45:16
**Brennan** [6] - 18:12, 18:14, 26:21, 60:21, 61:1, 82:21
**brief** [7] - 18:19, 39:2, 63:16, 71:6, 77:10, 85:14, 86:9
**briefed** [9] - 4:10,

6:24, 57:20, 57:21, 57:23, 58:15, 85:21, 87:9, 88:4
**briefing** [6] - 2:18, 8:3, 86:15, 79:17, 82:10, 86:19
**briefly** [3] - 36:19, 54:11, 58:3
**briefs** [1] - 85:4
**bring** [1] - 71:10
**broad** [2] - 58:1, 86:23
**broadcasting** [1] - 2:24
**broader** [2] - 48:10, 58:9
**brought** [1] - 48:15
**buckets** [1] - 6:4
**budget** [2] - 25:9, 31:11
**building** [1] - 40:8
**bulk** [1] - 15:25
**burden** [8] - 37:11, 37:15, 43:4, 45:4, 45:13, 70:13, 78:6, 78:13
**burdened** [1] - 44:11
**burdens** [1] - 43:3
**business** [2] - 40:1, 65:25, 66:1

## C

**caliber** [1] - 61:10
**cancellation** [1] - 33:25
**candid** [1] - 8:10
**cannot** [1] - 84:22
**capabilities** [1] - 46:4
**capability** [1] - 44:25
**capable** [2] - 29:14, 42:24
**capacity** [4] - 45:15, 45:22, 45:24, 46:1
**captured** [1] - 63:12
**care** [1] - 76:4
**career** [1] - 82:6
**careful** [1] - 44:1
**carries** [1] - 73:15
**case** [41] - 11:20, 26:21, 34:11, 34:21, 38:2, 42:9, 42:20, 47:22, 55:2, 55:6, 56:23, 57:20, 58:4, 58:8, 58:9, 58:13, 59:10, 61:2, 62:22, 63:17, 65:9, 65:16, 70:8, 70:19, 72:25, 73:21, 73:22, 73:25, 74:3, 74:4, 74:17, 75:2, 75:5, 78:8,

82:23, 86:5, 86:19, 87:9
**cases** [20] - 17:8, 17:14, 24:12, 24:13, 26:25, 31:21, 38:6, 38:11, 39:14, 42:4, 48:4, 54:19, 58:22, 63:8, 63:16, 66:16, 70:23, 73:20, 82:18
**cat** [2] - 12:5, 12:24
**categories** [2] - 62:17, 86:24
**category** [1] - 62:8
**caution** [1] - 84:10
**caveat** [1] - 77:2
**census** [5] - 17:15, 18:12, 60:20, 61:5, 65:7
**center** [1] - 48:21
**Center** [4] - 60:21, 60:22, 61:1, 84:12
**centrality** [1] - 84:14
**certain** [11] - 12:10, 17:16, 26:2, 29:3, 30:1, 33:5, 33:7, 51:16, 56:14, 58:24, 61:24, 63:12, 65:23, 82:19, 83:4
**certainly** [30] - 3:8, 13:14, 14:14, 17:23, 18:10, 22:3, 22:7, 25:16, 26:18, 30:23, 43:8, 44:23, 52:7, 56:15, 57:18, 57:25, 59:9, 60:4, 60:6, 60:13, 61:19, 61:21, 72:23, 74:19, 74:20, 74:21, 76:10, 76:11, 77:14
**CERTIFICATE** [1] - 88:14
**certification** [1] - 6:9
**certify** [2] - 57:11, 88:16
**cetera** [1] - 20:25
**CFPB** [1] - 11:21
**chain** [1] - 52:2
**Chandra** [2] - 88:16, 88:20
**change** [5] - 18:24, 19:22, 73:24, 74:9, 81:12
**changes** [4] - 12:2, 12:4, 19:21, 52:14
**chaos** [1] - 10:24
**charter** [2] - 80:6, 81:23
**charts** [1] - 45:2
**choice** [2] - 62:20, 63:24

**choices** [2] - 6:2, 6:4
**choose** [1] - 30:3
**chosen** [1] - 65:11
**circuit** [2] - 24:12, 39:14
**Circuit** [1] - 50:16
**circumstance** [1] - 25:11
**circumstances** [6] - 16:11, 41:3, 48:6, 48:10, 83:21, 85:19
**circumvented** [1] - 84:25
**cite** [3] - 10:21, 39:2, 39:14
**cited** [6] - 63:16, 74:3, 75:19, 78:9, 80:22, 86:10
**Citizens** [1] - 2:4
**citizens** [1] - 59:21
**citizenship** [2] - 61:3, 65:6
**citizenship-related** [1] - 61:3
**Civil** [1] - 2:3
**claim** [2] - 46:23, 75:12
**claiming** [1] - 46:18
**claims** [1] - 33:3
**clarification** [3] - 3:19, 4:13, 16:19
**clarified** [1] - 37:8
**clear** [11] - 15:10, 18:14, 24:8, 38:2, 44:9, 53:19, 61:17, 71:3, 71:23, 77:16, 87:1
**clearly** [6] - 17:10, 21:11, 32:21, 58:20, 62:4, 69:10
**clears** [1] - 9:13
**CLERK** [1] - 2:3
**client** [1] - 76:18
**clients** [2] - 76:11, 87:24
**Clinton** [1] - 43:24
**close** [1] - 65:3
**closed** [1] - 67:15
**closely** [3] - 23:21, 28:8, 67:13
**colleague** [9] - 14:16, 17:18, 66:25, 69:13, 74:13, 75:8, 77:20, 77:23, 82:17
**colleague's** [2] - 57:15, 78:17
**colleagues** [1] - 72:24
**collectively** [1] - 68:15
**commanding** [1] - 50:18

**Committee** [1] - 23:7
**communicate** [1] - 76:2
**communication** [2] - 7:7, 30:17
**communications** [13] - 7:9, 22:23, 27:25, 28:23, 30:16, 52:5, 52:13, 53:2, 61:24, 65:1, 75:22, 76:7
**community** [1] - 33:4
**compelled** [1] - 84:6
**compelling** [1] - 37:25
**competing** [3] - 35:22, 36:6, 55:18
**Competitive** [1] - 74:3
**complaint** [2] - 5:9, 39:21
**completed** [1] - 65:7
**completely** [2] - 47:25, 87:6
**compliance** [2] - 41:5, 41:6
**comply** [2] - 5:5, 74:16
**component** [3] - 10:20, 74:5, 79:21
**components** [2] - 20:10, 53:10
**concede** [1] - 61:19
**concededly** [1] - 63:24
**concept** [1] - 83:25
**conception** [1] - 10:23
**concern** [8] - 39:18, 62:23, 64:3, 69:22, 74:6, 74:8, 77:17, 84:6
**concerned** [2] - 26:19, 26:20
**concerning** [2] - 59:8, 60:12
**concerns** [3] - 48:19, 62:23, 73:25
**conclude** [1] - 86:25
**conclusion** [2] - 4:20, 79:25
**conduct** [2] - 22:1, 40:1
**confer** [4] - 9:3, 10:13, 53:15, 55:7
**conflict** [1] - 42:11
**conflicts** [3] - 21:23, 22:21, 36:2
**Congress** [32] - 16:15, 17:19, 19:17, 20:14, 20:21, 21:21, 22:8, 22:17, 22:25, 23:21, 24:6, 25:14, 25:20, 27:21, 28:5, 29:8, 29:9, 29:17, 30:2,

30:24, 31:3, 31:13, 31:15, 32:17, 35:13, 36:15, 40:8, 46:24, 62:1, 62:21, 63:4
**Congress'** [2] - 17:2, 35:4
**congressional** [2] - 24:7, 84:17
**congressperson** [1] - 59:19
**Congresswoman** [1] - 31:6
**connection** [2] - 83:4, 83:5
**consideration** [1] - 30:24
**considering** [1] - 27:11
**considers** [2] - 40:24, 79:16
**consistent** [2] - 58:13, 78:1
**consistently** [1] - 59:2
**constituencies** [1] - 33:5
**constitutional** [1] - 84:25
**consult** [1] - 80:11
**consultation** [2] - 9:1, 80:17
**contact** [2] - 29:3, 30:21
**contacted** [1] - 45:6
**contained** [1] - 5:20
**containing** [1] - 11:21
**contention** [2] - 59:7, 69:4
**context** [5] - 5:14, 6:22, 14:8, 47:20, 48:19
**contexts** [3] - 17:15, 65:10, 84:4
**contingent** [1] - 36:8
**continually** [1] - 64:5
**continue** [1] - 84:11
**continuing** [7] - 10:4, 18:9, 35:1, 35:8, 36:8, 59:15, 84:20
**contours** [1] - 20:1
**contract** [2] - 53:5, 72:2
**contracting** [1] - 81:4
**contractors** [1] - 72:2
**contracts** [3] - 16:17, 34:1, 72:4
**contradicts** [1] - 87:15
**control** [1] - 48:6
**controls** [1] - 28:11
**controversial** [1] - 38:9

**controversy** [1] - 60:24
**conversation** [3] - 42:23, 53:21, 54:1
**coordinate** [1] - 80:17
**copious** [1] - 22:4
**correct** [12] - 5:23, 20:7, 25:6, 26:11, 38:16, 38:25, 41:13, 43:12, 68:8, 71:17, 73:13, 88:17
**correlate** [1] - 35:24
**correspondence** [7] - 27:7, 27:20, 51:12, 51:21, 51:22, 51:23, 62:9
**cost** [1] - 16:14
**Council** [1] - 48:5
**counsel** [2] - 2:6, 64:11
**Counsel** [3] - 16:20, 56:4, 88:5
**count** [1] - 17:15
**country** [1] - 57:16
**couple** [7] - 3:4, 9:5, 9:6, 23:17, 49:4, 65:25, 82:15
**course** [9] - 5:6, 19:5, 25:14, 38:13, 57:5, 69:25, 73:13, 77:22, 84:7
**Court** [70] - 2:2, 3:10, 3:23, 5:2, 5:3, 5:14, 5:20, 8:14, 8:16, 13:25, 14:4, 14:10, 15:2, 18:11, 18:14, 36:25, 38:10, 39:3, 53:23, 53:24, 54:12, 54:19, 54:20, 55:1, 55:14, 55:15, 55:18, 56:14, 56:17, 56:18, 57:3, 57:7, 57:10, 58:22, 59:1, 59:2, 63:1, 63:9, 63:10, 64:21, 65:4, 65:9, 67:7, 70:17, 72:6, 73:7, 74:2, 74:14, 74:19, 75:2, 75:7, 76:4, 76:9, 76:12, 77:6, 78:5, 79:16, 78:22, 79:5, 79:16, 83:5, 83:11, 83:15, 83:22, 85:3, 86:12, 87:16, 87:18, 88:9
**court** [6] - 4:24, 5:5, 13:9, 13:10, 46:2, 73:8
**COURT** [161] - 2:10, 2:14, 3:11, 3:16, 4:12, 5:18, 5:24, 6:7,

6:14, 7:10, 7:24, 8:19, 9:10, 9:13, 9:17, 9:24, 11:6, 11:10, 11:15, 12:19, 14:3, 14:22, 15:1, 15:6, 15:13, 15:20, 15:24, 16:6, 16:20, 17:6, 19:7, 19:12, 20:4, 20:8, 20:19, 22:25, 23:4, 23:6, 23:9, 23:14, 23:23, 23:25, 24:19, 25:1, 25:20, 26:1, 26:4, 26:13, 27:2, 27:5, 27:16, 27:19, 29:21, 29:23, 30:7, 30:10, 31:18, 31:20, 32:10, 32:25, 33:3, 34:13, 34:19, 34:24, 35:2, 35:20, 36:18, 36:21, 38:4, 38:16, 39:8, 41:10, 41:14, 42:8, 42:12, 42:15, 43:11, 44:12, 45:7, 45:10, 47:8, 49:4, 49:8, 49:13, 49:18, 50:2, 50:12, 50:21, 51:7, 51:21, 51:23, 51:25, 52:9, 52:15, 52:19, 53:1, 53:11, 53:19, 54:3, 54:5, 54:7, 54:14, 55:5, 56:4, 56:10, 56:21, 57:5, 57:14, 57:21, 58:6, 58:19, 59:12, 60:7, 62:6, 62:17, 64:8, 66:3, 66:23, 67:5, 67:20, 68:11, 68:13, 68:22, 69:13, 70:8, 70:15, 71:19, 72:10, 72:20, 72:24, 73:3, 73:17, 74:13, 75:8, 75:17, 76:4, 76:18, 76:21, 77:5, 77:10, 78:21, 79:2, 79:23, 80:19, 80:24, 81:6, 81:10, 81:16, 81:19, 83:9, 83:14, 85:4, 85:6, 85:15, 85:17, 85:25, 86:4, 87:7, 87:18, 88:2, 88:4
**Court's** [6] - 3:17, 8:7, 56:16, 60:5, 70:19, 71:11
**COURTROOM** [1] - 2:3
**courts** [6] - 5:10, 17:8, 40:7, 40:10, 57:15
**coverage** [2] - 15:17, 21:25

**covered** [4] - 42:16, 44:14, 51:13, 85:9
**CR** [9] - 17:22, 19:4, 25:25, 26:7, 27:11, 27:22, 30:3, 35:15, 51:6
**craft** [1] - 79:5
**create** [1] - 84:3
**created** [3] - 22:16, 81:13, 81:14
**creates** [1] - 80:9
**creating** [2] - 80:13, 80:15
**credible** [1] - 39:4
**CREW** [10] - 2:8, 7:3, 9:4, 18:7, 39:1, 43:21, 59:7, 73:21, 79:24
**criticism** [1] - 21:21
**crucial** [1] - 83:1, 83:6, 84:5
**crucially** [1] - 22:14
**crux** [1] - 38:8
**current** [2] - 59:10, 84:20
**cut** [5] - 31:18, 47:4, 47:8, 47:10, 47:21
**cuts** [5] - 22:13, 35:25, 36:2, 36:4, 36:12
**cutting** [4] - 16:13, 47:3, 47:21, 47:23

## D

**daily** [2] - 45:16, 45:22
**data** [5] - 11:20, 21:1, 24:22, 46:5, 65:7
**data-driven** [1] - 46:5
**date** [9] - 11:7, 12:10, 17:16, 51:16, 58:24, 65:11, 81:11, 82:19, 83:4
**DATED** [1] - 88:20
**Davis** [4] - 27:8, 27:20, 52:5, 52:6
**days** [2] - 35:23, 66:1
**deadlines** [1] - 7:6
**deal** [3] - 22:10, 59:18, 82:7
**debate** [23] - 17:21, 17:23, 24:7, 24:10, 25:8, 29:11, 29:13, 29:16, 29:18, 31:9, 35:18, 36:11, 36:12, 36:14, 36:25, 47:17, 83:6, 83:13, 83:17, 83:19, 83:22
**debates** [1] - 47:14
**debating** [1] - 20:6
**December** [2] - 66:4,

66:7

**decennial** [1] - 60:20

**decide** [3] - 5:2, 30:3, 31:13

**decided** [8] - 4:10, 5:6, 5:8, 5:12, 13:19, 31:12, 73:4, 73:23

**deciding** [2] - 5:4, 22:13

**decision** [5] - 57:2, 58:4, 62:1, 86:18

**decisions** [5] - 41:2, 68:13, 70:11, 82:6, 84:21

**declarant** [1] - 48:2

**declaration** [9] - 5:20, 14:4, 48:9, 66:19, 70:21, 71:10, 71:12, 71:24, 80:20

**decreased** [1] - 59:5

**dedicated** [4] - 16:13, 45:18, 48:13, 80:15

**defendant's** [1] - 37:17

**defendants** [12] - 2:13, 10:7, 37:10, 37:13, 37:25, 39:12, 40:19, 41:8, 43:4, 78:9, 79:11, 82:11

**define** [1] - 83:10

**deja** [1] - 59:17

**DeLauro** [1] - 31:6

**delay** [1] - 48:7

**delegation** [1] - 81:24

**deletes** [1] - 39:25

**deleting** [1] - 76:6

**democratic** [1] - 36:7

**denied** [9] - 3:25, 4:7, 6:25, 40:17, 58:1, 63:17, 66:14, 77:9, 78:12

**deny** [3] - 54:20, 86:13, 87:17

**department** [1] - 58:10

**departures** [1] - 48:10

**DEPUTY** [1] - 2:3

**describing** [1] - 82:10

**design** [1] - 46:5

**designed** [2] - 16:12, 25:3

**despite** [1] - 19:15

**destroy** [1] - 39:10

**destroying** [1] - 41:3

**destruction** [3] - 39:5, 39:6, 39:9

**detail** [2] - 58:15, 75:20

**details** [2] - 17:2, 40:9

**determination** [3] - 3:24, 7:13, 49:23

**determine** [2] - 11:16, 50:17

**determining** [1] - 11:16

**development** [1] - 3:22

**deviate** [1] - 38:17

**dicta** [2] - 11:21, 72:25

**dictates** [1] - 28:12

**different** [14] - 17:9, 18:5, 18:16, 18:13, 24:18, 32:5, 32:6, 41:1, 51:8, 67:11, 85:23, 86:17, 87:6

**difficulty** [1] - 46:8

**Digital** [1] - 81:14, 86:22

**direct** [1] - 33:17

**directed** [1] - 30:20

**directing** [4] - 22:14, 29:3, 29:25, 32:21

**direction** [1] - 29:1

**directives** [3] - 28:24, 29:1, 52:12

**directly** [3] - 23:1, 68:18, 80:22

**director** [2] - 74:4, 74:7

**disclose** [1] - 63:7

**disclosed** [1] - 62:2

**disclosures** [2] - 61:23

**discovery** [2] - 40:11, 55:20

**discrete** [1] - 24:23

**discretion** [1] - 31:20

**discuss** [2] - 9:16, 53:23

**discussed** [4] - 3:7, 64:11, 77:12, 79:9

**discussing** [1] - 15:8

**discussion** [3] - 17:11, 53:7, 77:22

**discussions** [2] - 53:13, 61:13

**dismiss** [1] - 5:13

**dismissal** [1] - 34:2

**dismissing** [2] - 11:1, 16:18

**dispositive** [1] - 41:11

**dispute** [2] - 72:21, 73:11

**disputes** [1] - 70:2

**disrupt** [1] - 25:4

**disrupting** [1] - 25:12

**distinction** [2] - 26:12, 34:10, 41:18

**district** [2] - 5:10, 17:8

**doable** [2] - 65:13, 65:21

**document** [5] - 29:19, 39:5, 62:8, 86:20, 86:22

**documents** [68] - 4:11, 8:23, 8:24, 9:7, 10:1, 10:9, 14:13, 15:5, 22:22, 26:16, 29:10, 29:24, 33:10, 39:10, 39:18, 40:20, 41:3, 43:2, 43:8, 45:25, 46:8, 46:13, 48:7, 49:15, 49:20, 50:9, 51:2, 51:3, 52:4, 52:21, 59:8, 61:20, 61:22, 62:8, 62:13, 62:15, 62:16, 62:17, 62:24, 63:19, 64:18, 64:20, 65:2, 65:5, 65:6, 65:23, 67:16, 67:21, 67:23, 68:10, 69:15, 69:17, 73:7, 73:25, 74:17, 75:13, 75:21, 75:23, 77:25, 78:7, 78:15, 80:6, 81:23, 83:2, 83:8, 83:20, 86:24

**DOGE** [124] - 2:5, 3:3, 3:12, 3:21, 3:23, 3:24, 4:19, 4:20, 4:21, 4:23, 5:21, 6:12, 7:12, 7:13, 7:18, 10:23, 11:17, 11:22, 12:11, 13:4, 13:5, 13:11, 13:22, 14:1, 14:6, 14:10, 14:19, 15:18, 16:12, 19:10, 19:11, 19:13, 20:1, 20:6, 20:12, 20:25, 21:12, 21:17, 21:21, 22:4, 22:7, 22:12, 22:18, 22:23, 24:8, 24:9, 25:3, 27:7, 27:9, 28:2, 28:8, 28:18, 28:19, 29:4, 29:13, 29:14, 32:7, 32:11, 32:25, 33:22, 35:24, 36:9, 36:13, 40:2, 40:4, 40:6, 40:11, 40:18, 41:10, 43:21, 45:14, 45:15, 45:21, 46:17, 47:17, 48:20, 49:5, 49:10, 49:22, 49:25, 50:17, 50:19, 51:1, 51:6, 51:10, 51:14, 52:7, 55:10, 56:5, 56:25, 59:22, 64:10, 67:1, 67:2, 67:13, 67:23, 73:4, 76:5, 77:19, 78:3, 79:25, 80:6, 80:9, 80:12,

80:13, 80:14, 80:16, 80:17, 81:3, 81:7, 81:13, 81:14, 82:1, 82:5, 84:11, 84:23, 86:6, 86:20, 87:10, 87:14

**DOGE's** [9] - 21:4, 22:1, 30:18, 36:16, 40:9, 40:14, 46:17, 84:17, 85:8

**DOGE-related** [2] - 43:21, 67:23

**DOJ** [2] - 18:15, 38:1

**DOJ's** [1] - 18:17

**dollars** [4] - 11:2, 16:17, 28:16, 34:1

**done** [6] - 10:14, 13:9, 31:8, 36:21, 43:5, 71:20

**door** [1] - 32:2

**down** [11] - 26:10, 26:17, 26:19, 27:3, 27:12, 27:22, 30:4, 32:22, 32:23, 55:12, 59:15

**drastically** [1] - 16:13

**driven** [2] - 34:25, 46:5

**driving** [1] - 48:11

**due** [2] - 5:9, 84:20

**duplication** [2] - 44:2, 67:22

## E

**early** [6] - 11:17, 51:4, 67:18, 68:3, 76:13

**easy** [1] - 52:24

**Economy** [1] - 58:9

**edges** [1] - 33:24

**effect** [4] - 22:4, 25:15, 47:17, 59:22

**effects** [1] - 22:8

**efficient** [1] - 84:24

**efficiently** [1] - 28:19

**efforts** [1] - 44:2

**eight** [1] - 71:13

**either** [4] - 13:11, 16:23, 43:21, 69:2

**election** [2] - 60:23, 63:22

**elections** [2] - 17:16, 63:17, 64:2

**Electronic** [1] - 82:23

**Elon** [1] - 67:13

**elsewhere** [1] - 57:16

**email** [3] - 3:24, 52:1, 74:6

**emails** [1] - 43:24

**emergency** [5] -

12:13, 12:16, 62:3, 63:7, 85:22

**emphasis** [1] - 24:7

**employees** [4] - 7:8, 11:2, 16:18, 74:15

**employment** [1] - 53:6

**empowering** [1] - 80:12

**end** [7] - 14:3, 17:23, 22:8, 46:16, 48:18, 56:23, 79:23

**ends** [2] - 17:12, 52:1

**enforceable** [1] - 73:17

**enormous** [1] - 81:24

**enormously** [1] - 47:16

**ensure** [1] - 51:3

**entail** [1] - 69:15

**enter** [5] - 38:23, 72:3, 74:20, 77:3, 77:15

**entered** [1] - 39:16

**Enterprise** [1] - 74:4

**entire** [3] - 10:3, 19:22, 25:22

**entities** [1] - 51:12

**entitled** [2] - 33:9, 87:1

**entitles** [1] - 47:4

**entity** [4] - 13:6, 19:14, 19:19, 34:7

**envision** [1] - 8:1

**EO** [1] - 80:24

**EOP** [12] - 10:20, 13:6, 41:11, 41:20, 41:21, 42:10, 53:10, 74:5, 79:21, 81:7, 81:15, 81:21

**EOs** [2] - 81:2, 81:17

**ephemeral** [1] - 39:25

**EPIC** [1] - 82:23

**equal** [1] - 22:16

**equities** [6] - 8:25, 42:19, 42:22, 69:7, 69:19, 69:20

**equity** [1] - 79:16

**error** [2] - 71:9

**essential** [5] - 61:25, 62:20, 63:6, 71:4, 72:6

**essentially** [14] - 7:7, 10:24, 12:20, 13:17, 20:3, 25:25, 28:16, 28:17, 35:4, 36:14, 50:2, 82:18, 84:1, 84:25

**established** [1] - 80:6

**establishing** [1] - 80:9

**estimate** [4] - 7:19, 8:16, 8:17, 9:9

estimated [1] - 55:7
estimation [1] - 18:17
et [2] - 2:5, 20:25
ethical [1] - 36:3
ethics [3] - 22:22, 61:23, 64:25
Ethics [1] - 2:4
evening [2] - 8:13, 65:19
event [11] - 14:25, 17:10, 17:12, 24:23, 39:12, 59:3, 59:5, 69:1, 73:3, 73:8, 87:16
everywhere [1] - 46:20
evidence [7] - 39:4, 39:5, 74:22, 76:24, 79:24, 80:21, 81:7
exact [1] - 39:3
exactly [9] - 20:7, 25:6, 29:19, 32:17, 38:7, 38:8, 38:25, 47:9, 73:17
example [10] - 28:25, 29:9, 39:1, 42:6, 55:17, 64:24, 73:22, 75:2, 82:22, 82:24
except [2] - 44:16, 77:21
exceptions [1] - 46:21
excluding [1] - 53:9
excuse [2] - 47:19, 84:2
executed [1] - 64:25
executive [4] - 11:1, 43:22, 45:16, 75:15
Executive [4] - 80:23, 86:21, 87:13, 87:14
exercise [2] - 11:23, 41:14
exercising [4] - 13:11, 17:20, 22:14, 38:10
exerting [1] - 28:3
exist [2] - 29:24, 78:10
existed [1] - 78:11
expect [1] - 65:21
expedite [2] - 14:10, 55:4
expedited [25] - 2:18, 4:3, 4:18, 5:25, 6:1, 6:25, 7:17, 7:20, 10:12, 11:12, 12:23, 13:13, 14:9, 15:18, 43:13, 47:3, 49:22, 50:18, 51:15, 56:15, 64:22, 66:21, 68:4, 68:6, 68:19
expedition [10] - 12:8, 13:16, 13:25, 15:4,

15:12, 47:6, 66:8, 66:11, 66:15, 66:16
expert [2] - 26:5, 30:7
experts [1] - 46:6
expiration [2] - 10:4, 35:1
expire [2] - 18:10, 84:21
expired [1] - 72:3
expires [1] - 59:11
explain [1] - 79:12
explaining [1] - 86:17
explanation [1] - 12:3
explicit [5] - 26:22, 39:13, 51:19, 53:6, 82:22
explicitly [6] - 22:9, 27:1, 29:8, 53:9, 75:3, 83:15
expressly [1] - 24:14
extensive [1] - 80:4
extent [6] - 29:24, 51:11, 59:8, 69:16, 70:25, 82:18
extraordinary [2] - 16:10, 58:23
extreme [1] - 48:22
extremely [2] - 86:23, 86:24
eyewitness [1] - 20:23


F

facing [2] - 31:24, 85:19
fact [7] - 4:20, 17:9, 18:24, 37:9, 80:12, 82:12, 83:18
factor [1] - 40:21
factors [4] - 15:19, 18:8, 70:14, 78:16
facts [2] - 4:5, 14:5
factual [1] - 17:14
fading [1] - 37:3
fail [1] - 38:20
fair [4] - 20:16, 27:23, 78:21, 79:4
fairly [1] - 53:7
faith [11] - 38:18, 39:9, 39:15, 74:15, 74:22, 74:23, 75:1, 75:4, 77:3, 77:15
familiar [1] - 54:20
far [5] - 6:16, 26:4, 26:6, 35:25, 53:16
fast [1] - 10:24
fast-moving [1] - 10:24
fear [1] - 75:13
feasible [1] - 69:1

feasibly [1] - 72:9
February [5] - 52:15, 52:16, 66:9, 68:3, 81:18
federal [16] - 16:13, 16:18, 19:5, 19:20, 20:3, 25:3, 28:13, 32:8, 33:15, 34:2, 40:14, 45:23, 48:20, 75:23, 81:4
Federal [5] - 40:25, 41:18, 41:22, 42:13, 72:22
fellow [1] - 59:21
few [5] - 18:4, 42:18, 58:22, 67:15, 75:9
fidelity [1] - 77:18
figure [2] - 8:22, 25:14
figuring [1] - 9:7
filed [8] - 7:3, 53:18, 55:25, 67:3, 69:23, 70:4, 86:6
final [2] - 6:13, 56:21
financial [2] - 28:12, 61:23
findings [1] - 39:9
fine [1] - 56:19
finite [2] - 31:11, 45:25
first [34] - 5:2, 5:7, 6:20, 6:23, 7:23, 9:21, 10:8, 12:20, 13:18, 15:21, 17:7, 23:19, 25:13, 37:22, 40:23, 45:7, 45:8, 49:8, 50:7, 59:1, 60:16, 65:12, 65:19, 66:6, 66:8, 67:3, 69:6, 72:12, 72:14, 75:14, 79:11, 80:5, 82:17
five [1] - 70:23
flagged [1] - 3:4
focused [1] - 36:13
FOIA [68] - 4:1, 4:21, 4:22, 5:21, 7:4, 7:5, 7:14, 10:19, 11:18, 11:23, 12:21, 13:7, 13:14, 13:19, 14:1, 14:6, 15:18, 24:13, 33:9, 37:6, 38:6, 38:11, 40:12, 41:12, 41:15, 41:17, 42:7, 43:1, 43:23, 44:14, 44:25, 45:4, 45:5, 45:13, 47:23, 48:13, 49:11, 49:25, 50:6, 50:17, 51:1, 54:19, 54:20, 55:2, 55:5, 55:11, 55:16, 56:5,

58:5, 58:8, 58:15, 66:20, 69:5, 70:24, 71:21, 72:16, 72:21, 73:5, 73:9, 74:6, 75:14, 79:13, 79:22, 84:9, 85:9, 86:7
FOIA's [1] - 10:2
folded [1] - 44:4
folks [4] - 23:25, 70:11, 71:21, 74:17
follow [1] - 52:25
following [4] - 21:20, 32:12, 32:13, 32:14
footnote [4] - 13:4, 57:22, 57:24
foregoing [1] - 88:16
forget [1] - 33:19
form [4] - 66:4, 80:19, 80:21, 84:3
formed [3] - 16:12, 32:20, 87:14
forms [1] - 80:3
forth [2] - 41:8, 87:5
forward [3] - 17:21, 54:15, 58:14
Foundation [1] - 63:16
four [3] - 55:12, 58:25, 64:5
FRA [11] - 37:23, 38:4, 41:3, 41:4, 42:1, 42:7, 42:11, 72:16, 74:6, 75:12, 75:14
frank [1] - 53:21
frankly [1] - 10:12
frantic [1] - 36:16
freestanding [1] - 81:8
Friday [2] - 9:2, 78:18
friend [5] - 43:12, 43:19, 44:13, 59:12, 60:25
front [4] - 16:3, 47:22, 66:17, 70:10
fulcrum [1] - 29:13
full [4] - 13:8, 45:16, 50:24, 53:25
fully [2] - 45:21, 78:11
functions [3] - 10:25, 16:14, 87:10
fund [19] - 14:9, 20:6, 25:21, 25:24, 59:14, 84:22
fundamental [4] - 14:21, 31:2, 40:15, 60:16
fundamentally [2] - 35:4, 60:18
funded [3] - 18:25, 24:10, 35:17

funding [12] - 19:5, 25:12, 25:25, 28:16, 32:1, 32:3, 35:24, 59:11, 62:1, 72:3, 84:18
funds [15] - 11:3, 16:16, 17:4, 20:12, 21:3, 25:4, 25:13, 28:11, 28:20, 30:2, 30:21, 30:25, 31:15, 34:9
future [1] - 34:5


G

gain [1] - 55:23
game [1] - 71:1
general [24] - 6:4, 57:4, 66:17, 66:22
generalized [1] - 61:9
generally [5] - 31:21, 38:11, 54:13, 60:12, 66:16
geniuses [1] - 46:6
given [5] - 7:6, 21:4, 44:21, 69:14, 79:2
Gleason [3] - 23:8, 23:9, 52:16
government [42] - 3:3, 10:25, 13:15, 14:7, 14:12, 16:14, 16:23, 19:20, 20:10, 22:3, 22:5, 24:10, 24:15, 25:22, 25:24, 27:12, 28:6, 28:14, 31:24, 33:15, 34:4, 34:14, 35:16, 36:10, 38:18, 42:21, 45:23, 46:21, 48:21, 49:20, 56:7, 59:11, 59:14, 59:15, 59:16, 63:11, 71:13, 74:15, 76:3, 78:2, 84:12, 84:22
government's [7] - 18:24, 35:16, 48:11, 61:3, 77:17, 81:10, 82:25
grade [1] - 57:6
grant [9] - 4:17, 5:19, 14:19, 18:22, 23:19, 44:24, 47:3, 50:7, 53:25
granted [7] - 12:23, 13:25, 17:8, 18:12, 47:5, 60:20, 66:11
granting [3] - 49:21, 58:22, 66:15
grants [2] - 16:17, 28:17
grappling [1] - 10:8
grasping [1] - 10:22

great [3] - 9:8, 9:9,
82:24
grounds [5] - 4:1, 4:8,
7:1, 39:17, 58:1
groups [1] - 63:12
guarantee [1] - 21:3
guess [16] - 4:14,
5:17, 5:18, 6:15,
6:18, 6:20, 49:8,
54:18, 55:22, 56:17,
58:17, 60:3, 65:17,
74:12
guidance [1] - 32:15

**H**

habit [1] - 13:5
half [2] - 81:23, 86:23
handle [1] - 29:1
handled [2] - 25:4,
44:4
handling [1] - 21:22
happy [6] - 4:5, 36:24,
44:7, 53:22, 77:7,
85:3
hard [2] - 8:15, 9:3
harm [17] - 16:8,
16:10, 36:21, 36:23,
43:16, 43:17, 47:20,
54:23, 58:21, 59:25,
65:9, 68:25, 69:8,
70:18, 78:10, 82:15,
86:14
harmed [2] - 30:11,
30:12
havoc [2] - 36:17,
84:11
head [4] - 28:2, 82:3,
82:4, 84:9
headed [1] - 17:22
heads [1] - 80:11
hear [3] - 3:20, 9:10,
78:23
hearing [6] - 2:16,
2:20, 7:11, 23:9,
78:18, 78:22
heart [2] - 31:3, 65:5
held [1] - 73:8
help [1] - 14:2
helpful [4] - 9:15,
31:16, 31:17, 87:25
Heritage [1] - 63:15
hesitant [1] - 14:18
HHS [1] - 11:21
highlight [6] - 18:18,
36:24, 42:17, 42:18,
44:21, 83:18
highlighting [1] - 37:8
highly [1] - 40:16
hired [1] - 80:17

hiring [1] - 81:4
historical [1] - 61:6
hold [2] - 13:25, 16:6
honest [2] - 8:9, 8:10
Honor [41] - 2:12, 3:8,
9:12, 9:20, 10:4,
15:9, 16:9, 18:3,
18:23, 19:21, 21:10,
23:18, 25:6, 25:16,
26:11, 36:20, 36:23,
37:7, 38:7, 39:1,
41:24, 42:16, 44:20,
45:9, 49:17, 50:20,
51:18, 52:23, 53:20,
54:4, 54:9, 68:16,
69:22, 71:23, 72:23,
77:11, 78:24, 81:22,
81:25, 88:1, 88:3
Honor's [1] - 7:25
hook [1] - 24:20
hopper [1] - 43:14
House [3] - 33:6,
33:15, 41:4
hundred [1] - 4:21
hundreds [1] - 33:25
hypothetically [2] -
27:19, 29:21

**I**

idea [6] - 9:8, 33:20,
38:14, 44:6, 60:6,
64:24
identified [4] - 20:9,
28:7, 37:11, 66:19
identify [3] - 2:6,
45:17, 62:7
Immigration [1] - 48:5
imminent [1] - 59:3
immune [1] - 84:1
impeachment [6] -
17:13, 17:17, 60:21,
60:22, 61:8, 65:6
implement [2] - 20:14,
80:13
implementing [1] -
82:7
implicated [1] - 69:10
implications [1] - 4:6
implicit [1] - 49:23
importance [5] - 19:1,
34:15, 43:25, 47:13,
59:9
important [18] - 6:24,
17:25, 29:10, 30:24,
47:16, 52:21, 56:8,
59:20, 60:12, 61:19,
64:20, 65:2, 69:9,
83:19, 84:1, 84:4,
84:8, 85:18

impound [1] - 20:12
impression [1] - 13:18
improperly [2] - 33:5,
36:5
inappropriate [2] -
31:9, 74:25
inauguration [2] -
75:12, 75:18
inclined [4] - 53:25,
54:20, 56:18, 74:19
include [4] - 49:14,
50:12, 53:9, 87:22
includes [1] - 66:13
including [2] - 27:7,
70:23
inconsistent [1] -
71:19
independent [7] - 4:9,
11:24, 11:25, 13:12,
41:15, 80:1, 87:12
indicate [2] - 13:11,
46:7
indicating [1] - 11:22
indication [2] - 45:11,
48:9
indications [2] -
45:13, 47:11
individual [2] - 26:9,
26:13
individuals [3] -
71:25, 76:1
industry [1] - 33:4
inefficiencies [1] -
45:17
infiltrated [1] - 84:23
influence [12] - 21:5,
21:12, 22:14, 24:14,
24:19, 27:21, 28:3,
31:9, 32:7, 33:6,
36:9, 64:11
influenced [1] - 35:10
influences [2] - 33:14,
34:4
inform [8] - 17:11,
21:6, 22:23, 24:23,
26:16, 26:18, 29:11,
62:11
Information [1] -
82:23
information [60] - 3:2,
10:22, 17:24, 18:7,
18:15, 18:20, 20:20,
20:22, 21:14, 21:15,
22:4, 22:20, 22:21,
22:25, 24:5, 25:2,
26:19, 26:23, 28:6,
29:17, 30:23, 31:16,
35:18, 35:25, 36:5,
37:6, 40:12, 44:25,
45:17, 45:18, 46:1,

46:10, 47:13, 48:23,
51:5, 51:13, 56:7,
59:4, 60:1, 60:11,
60:17, 61:4, 61:7,
61:9, 63:6, 67:12,
69:14, 70:3, 71:13,
77:18, 78:2, 79:6,
79:18, 82:19, 82:25,
83:25, 84:3, 84:17
infrastructure [1] -
44:16
inherent [3] - 38:5,
38:10, 47:22
initial [1] - 39:21
initiate [1] - 37:25
injunction [22] - 2:17,
6:23, 13:20, 15:3,
49:21, 50:23, 54:21,
56:1, 56:19, 58:16,
58:23, 60:15, 63:18,
69:24, 77:8, 78:12,
78:14, 83:22, 84:2,
84:7, 86:1, 87:2
injunctions [1] - 17:9,
60:20, 64:2
inquiry [2] - 17:17,
65:6
instance [6] - 21:20,
21:22, 30:17, 33:14,
51:11, 67:3
instead [1] - 30:3
Institute [1] - 74:4
instructing [1] - 33:22
instrumentality [2] -
58:10, 58:13
Integrity [1] - 60:23
integrity [2] - 61:25,
62:20
intends [1] - 20:14
intensifying [1] -
36:25
intent [1] - 39:9
interacted [1] - 76:17
interest [11] - 21:23,
22:21, 36:3, 42:22,
43:2, 43:9, 47:19,
61:4, 61:6, 61:21,
63:12
interested [3] - 3:5,
53:15, 59:24
interlocutory [1] - 6:9
internal [1] - 61:24
invited [2] - 83:6,
83:17
involve [1] - 68:20
involved [3] - 58:9,
75:22
involving [3] - 11:21,
74:4, 86:20
irreparable [12] - 16:7,

16:9, 36:23, 47:20,
54:23, 58:21, 65:9,
68:25, 70:18, 78:10,
82:15, 86:14
issue [27] - 4:10, 4:16,
5:2, 5:3, 5:4, 5:6,
9:21, 21:2, 23:15,
23:17, 33:11, 35:14,
48:1, 49:9, 49:10,
50:3, 50:5, 56:22,
57:7, 57:20, 59:20,
67:22, 70:17, 73:11,
84:5, 87:4, 87:17
issued [9] - 8:14,
14:20, 17:13, 24:12,
37:21, 41:9, 81:18,
83:3, 83:22
issues [8] - 3:4, 3:6,
5:11, 8:4, 22:6,
40:18, 53:5, 77:12
issuing [1] - 76:25
IT [3] - 46:5, 46:6
itself [5] - 19:13,
40:24, 42:4, 46:17,
61:14, 81:3

**J**

Jack [1] - 84:15
January [5] - 66:5,
66:10, 66:12, 73:23,
80:8
joining [1] - 2:23
joint [1] - 70:1
Jonathan [1] - 2:8
Judge [4] - 11:20,
13:10, 58:3, 63:15
judges [1] - 40:14
judgment [6] - 5:16,
5:25, 6:8, 6:13,
10:13, 55:8
judicial [1] - 41:5
jumps [2] - 36:17,
66:17
Justice [1] - 61:1
justification [1] -
64:14
justifications [1] -
81:5
justifies [1] - 47:21
justify [2] - 48:7, 82:20

**K**

Kean [2] - 88:16,
88:20
keep [2] - 54:8, 82:16
Kelly [1] - 63:15
key [2] - 26:12, 48:24
keyword [2] - 8:22,
9:6

**kicked** [1] - 67:2
**kicking** [1] - 67:6
**kind** [14] - 10:21, 12:17, 24:17, 29:19, 32:12, 40:5, 44:25, 46:10, 48:24, 79:20, 82:22, 83:21, 83:23, 84:13
**kinds** [1] - 83:20
**knowing** [1] - 69:20
**knows** [3] - 19:14, 29:23, 57:3

**L**

**lack** [3] - 47:4, 64:16, 86:1
**land** [1] - 41:21
**language** [2] - 58:10, 80:5
**larger** [1] - 21:24
**last** [9] - 3:23, 16:24, 25:24, 35:22, 39:23, 40:23, 82:14, 84:13
**last-minute** [1] - 16:24
**latter** [1] - 6:19
**law** [5] - 38:19, 38:20, 41:17, 70:20, 73:12
**laws** [1] - 74:16
**lay** [1] - 39:19
**leader** [1] - 46:17
**leadership** [1] - 40:15
**learned** [1] - 65:19
**least** [14] - 9:13, 12:3, 12:8, 12:13, 21:1, 27:8, 28:2, 51:9, 57:12, 70:20, 72:20, 75:18, 78:20, 81:2
**leave** [1] - 74:8
**leaves** [1] - 7:14
**lectern** [1] - 8:17
**left** [2] - 72:1
**legal** [11] - 4:9, 5:2, 5:4, 6:24, 8:3, 36:9, 57:13, 69:5, 83:3, 87:4
**legislation** [3] - 25:24, 36:6, 83:16
**legislative** [1] - 35:22
**legislators** [2] - 20:11, 60:13
**legislatures** [1] - 20:11
**length** [1] - 40:5
**less** [3] - 64:5, 84:23, 84:24
**letter** [1] - 57:18
**level** [1] - 41:7
**light** [2] - 66:24, 82:13
**likelihood** [6] - 12:7,

37:22, 37:24, 50:25, 65:14, 78:11
**likely** [6] - 14:6, 15:16, 26:5, 26:6, 49:24, 87:21
**limit** [1] - 26:3
**limitations** [1] - 36:9
**line** [12] - 2:22, 5:17, 26:17, 26:19, 31:12, 31:14, 47:3, 47:4, 47:21, 47:22, 47:23, 67:6
**line-cutting** [1] - 47:3, 47:21, 47:23
**linking** [1] - 59:25
**literally** [1] - 86:20
**litigating** [1] - 55:12
**litigation** [2] - 38:11, 55:24
**litigations** [1] - 70:22
**lives** [1] - 59:21
**logical** [1] - 29:12
**look** [4] - 12:25, 53:14, 64:18, 82:12
**looks** [1] - 17:21
**lose** [1] - 51:5
**losing** [1] - 79:10
**loss** [1] - 82:19
**lost** [1] - 79:19
**loud** [1] - 6:10

**M**

**MAIER** [104] - 2:8, 2:11, 9:12, 9:15, 9:19, 9:25, 11:9, 11:14, 12:15, 12:20, 14:18, 14:23, 15:2, 15:9, 15:15, 15:21, 16:2, 16:9, 16:22, 18:3, 19:8, 19:13, 20:7, 20:17, 21:8, 23:2, 23:5, 23:8, 23:12, 23:16, 23:24, 24:4, 24:25, 25:2, 25:23, 26:2, 26:11, 26:18, 27:4, 27:14, 27:17, 27:23, 29:22, 30:5, 30:9, 30:13, 31:19, 32:6, 32:11, 33:2, 33:11, 34:18, 34:21, 34:25, 35:3, 35:21, 36:20, 36:22, 38:7, 38:25, 39:11, 41:13, 41:24, 42:9, 42:14, 42:16, 44:7, 44:19, 45:8, 45:11, 47:9, 49:7, 49:12, 49:16, 50:1, 50:4, 50:20, 50:22, 51:17, 51:22, 51:24, 52:3,

52:10, 52:18, 52:20, 53:2, 53:17, 53:20, 54:4, 54:6, 77:11, 78:24, 79:4, 80:3, 80:22, 80:25, 81:9, 81:13, 81:17, 81:20, 83:11, 83:15, 85:5, 88:3
**Maier** [4] - 2:8, 2:10, 2:25, 77:10
**main** [1] - 56:6
**maintain** [3] - 38:20, 39:7, 74:17
**maintained** [3] - 25:25, 39:15, 39:19
**maintaining** [2] - 37:15, 38:14
**maintains** [1] - 31:20
**major** [2] - 21:20, 48:19
**majority** [3] - 23:17, 24:1, 68:2
**manage** [1] - 38:5
**mandating** [1] - 80:12
**manner** [1] - 67:25
**March** [8] - 5:10, 10:5, 16:24, 18:10, 79:1, 79:7, 84:21, 88:20
**marginal** [1] - 63:5
**material** [2] - 71:9, 71:16
**Matter** [1] - 2:3
**matter** [11] - 11:11, 14:22, 14:23, 23:22, 38:13, 68:14, 68:19, 69:5, 79:16, 87:19, 88:18
**matters** [3] - 43:24, 53:6, 65:24
**maximize** [1] - 79:6
**mean** [59] - 3:22, 4:5, 4:7, 4:14, 5:1, 5:3, 5:8, 6:3, 6:5, 6:18, 7:5, 7:7, 7:11, 8:10, 10:10, 11:18, 17:18, 20:20, 23:6, 24:21, 25:23, 33:3, 49:18, 55:16, 56:2, 56:24, 57:2, 57:7, 57:8, 57:10, 57:20, 58:3, 58:8, 60:8, 60:25, 61:2, 62:13, 62:15, 64:18, 64:22, 65:17, 66:12, 67:22, 69:7, 69:8, 69:19, 70:25, 71:3, 71:5, 71:7, 72:1, 72:12, 72:14, 73:13, 75:19, 76:8, 85:12, 85:13
**meaningful** [2] -

29:17, 35:18
**means** [3] - 35:6, 35:19, 45:4
**meant** [1] - 55:16
**mechanism** [1] - 14:15
**media** [1] - 63:2
**meet** [5] - 10:13, 53:15, 55:6, 63:8, 70:19
**meeting** [1] - 65:4
**meets** [1] - 68:24
**member** [1] - 27:21
**members** [8] - 19:17, 21:21, 24:6, 28:5, 29:4, 29:8, 63:3, 80:10
**Members** [1] - 82:1
**mentioned** [5] - 61:1, 69:11, 73:20, 75:2, 75:3
**merge** [1] - 42:22
**meritorious** [1] - 70:5
**merits** [18] - 4:25, 11:12, 12:8, 14:7, 15:17, 37:23, 37:24, 47:19, 49:24, 50:25, 54:10, 58:17, 73:4, 78:11, 79:12, 86:2, 86:9, 87:8
**message** [1] - 31:4
**messages** [1] - 19:23
**messaging** [1] - 39:25
**met** [2] - 10:2, 86:15
**mid** [3] - 66:4, 66:5, 66:7
**mid-December** [2] - 66:4, 66:7
**mid-January** [1] - 66:5
**might** [13] - 3:6, 10:9, 28:23, 30:2, 35:19, 46:14, 61:20, 62:11, 63:25, 64:23, 65:2, 79:18, 82:13
**millions** [1] - 59:21
**mind** [1] - 82:16
**minimum** [1] - 7:16
**minority** [1] - 23:17
**minority/majority** [2] - 23:14, 23:20
**minute** [5] - 3:4, 8:14, 16:24, 33:1, 67:8
**misunderstanding** [1] - 37:19
**mix** [1] - 18:8
**moment** [2] - 50:6, 84:18
**Monday** [7] - 11:7, 15:14, 49:15, 49:20, 50:11, 65:12, 78:19

**monies** [1] - 20:10
**month** [3] - 4:22, 7:8, 86:23
**monthly** [1] - 64:6
**months** [3] - 26:7, 55:7, 55:9
**most** [13] - 26:4, 26:6, 26:22, 28:3, 28:8, 28:19, 39:24, 42:17, 53:14, 60:16, 67:17, 76:17, 84:5
**mostly** [1] - 41:6
**motion** [30] - 2:17, 2:25, 4:8, 5:13, 5:15, 5:16, 5:24, 5:25, 6:8, 6:22, 10:3, 10:12, 10:18, 19:16, 39:22, 42:21, 54:10, 54:21, 56:1, 56:19, 58:16, 58:18, 69:24, 70:4, 72:6, 77:8, 85:25, 86:13, 87:17
**motions** [1] - 5:11
**mouths** [1] - 17:1
**movant** [1] - 18:21
**movant's** [1] - 26:24
**move** [3] - 43:14, 64:14, 72:10
**moved** [1] - 81:20
**moving** [4] - 10:24, 11:3, 47:21, 81:14
**MR** [163] - 2:8, 2:11, 2:12, 3:8, 3:14, 3:17, 3:20, 5:1, 5:23, 6:3, 6:11, 6:15, 7:22, 7:25, 8:20, 9:12, 9:15, 9:19, 9:25, 11:9, 11:14, 12:15, 12:20, 14:18, 14:23, 15:2, 15:9, 15:15, 15:21, 16:2, 16:9, 16:22, 18:3, 19:8, 19:13, 20:7, 20:17, 21:8, 23:2, 23:5, 23:8, 23:12, 23:16, 23:24, 24:4, 24:25, 25:2, 25:23, 26:2, 26:11, 26:18, 27:4, 27:14, 27:17, 27:23, 29:22, 30:5, 30:9, 30:13, 31:19, 32:6, 32:11, 33:2, 33:11, 34:18, 34:21, 34:25, 35:3, 35:21, 36:20, 36:22, 38:7, 38:25, 39:11, 41:13, 41:24, 42:9, 42:14, 42:16, 44:7, 44:19, 45:8, 45:11, 47:9, 49:7, 49:12, 49:16, 50:1,

50:4, 50:20, 50:22,
51:17, 51:22, 51:24,
52:3, 52:10, 52:18,
52:20, 53:2, 53:17,
53:20, 54:4, 54:6,
54:9, 54:15, 55:14,
56:9, 56:13, 57:2,
57:6, 57:17, 57:23,
58:7, 58:20, 60:3,
60:10, 62:12, 62:18,
64:15, 66:6, 67:4,
67:7, 68:1, 68:12,
68:16, 68:23, 69:21,
70:12, 70:16, 71:23,
72:12, 72:23, 73:1,
73:10, 73:18, 74:18,
75:10, 75:19, 76:8,
76:20, 77:1, 77:6,
77:11, 78:24, 79:4,
80:3, 80:22, 80:25,
81:9, 81:13, 81:17,
81:20, 83:11, 83:15,
85:5, 85:12, 85:16,
85:18, 86:3, 86:10,
87:8, 88:1, 88:3
**multiple** [2] - 37:4,
40:10
**Musk** [13] - 23:7, 27:8,
27:20, 28:1, 28:6,
29:25, 30:15, 46:16,
46:20, 52:5, 52:6,
67:13
**Musk's** [3] - 20:23,
21:22, 28:23

## N

**named** [1] - 70:22
**names** [1] - 30:14
**NARA** [1] - 74:1
**narrow** [2] - 7:4, 65:17
**narrowed** [7] - 7:18,
8:11, 27:6, 48:16,
53:4, 58:2, 66:4
**narrowing** [2] - 17:25,
53:12
**narrows** [1] - 16:4
**national** [3] - 19:1,
43:24, 84:6
**nature** [4] - 19:22,
32:7, 33:12, 66:25
**near** [1] - 65:8
**necessarily** [4] -
23:16, 43:15, 62:23,
71:2
**necessary** [5] - 27:9,
27:13, 27:14, 75:6,
77:3
**need** [24] - 6:8, 10:1,
15:5, 15:19, 19:18,
21:6, 22:11, 31:25,

32:1, 35:14, 37:5,
38:22, 39:13, 40:21,
46:14, 49:2, 49:3,
50:8, 53:24, 74:14,
77:14, 77:25, 79:19,
87:3
**needs** [9] - 12:24,
15:23, 29:17, 32:18,
39:5, 50:24, 51:2,
70:17, 87:16
**negotiate** [1] - 26:8
**never** [2] - 12:21, 87:4
**new** [5] - 17:2, 19:13,
25:3, 37:4, 72:4
**newly** [2] - 16:11,
32:20
**news** [1] - 75:19
**next** [19] - 9:5, 10:5,
14:14, 18:1, 20:6,
22:19, 25:22, 30:20,
33:10, 35:7, 54:24,
59:10, 59:13, 60:2,
61:13, 62:2, 62:21,
69:3, 76:13
**nexus** [2] - 18:6, 64:7
**night** [3] - 3:23, 8:12,
40:23
**Nikhel** [1] - 2:9
**nine** [1] - 71:14
**nominal** [2] - 81:11,
81:12
**none** [7] - 13:3, 37:10,
37:13, 71:24, 71:25,
86:15
**nongovernmental** [1]
- 40:2
**normal** [1] - 32:19
**note** [8] - 10:17, 23:5,
39:13, 71:6, 71:8,
77:22, 82:14
**noted** [9] - 18:9,
18:11, 39:21, 40:10,
63:1, 70:21, 81:25,
82:21
**nothing** [5] - 33:20,
38:9, 38:10, 46:7,
47:24
**notice** [3] - 3:5, 3:9,
88:5
**notion** [1] - 11:5
**NSA's** [1] - 83:10
**number** [8] - 8:23,
13:2, 30:5, 31:14,
37:10, 45:25, 48:13,
71:21
**numbers** [1] - 47:11

## O

**obfuscation** [1] - 40:6

**obligation** [2] - 40:20,
86:8
**obligations** [3] -
72:19, 73:16, 73:19
**obtain** [1] - 60:14
**obviously** [18] - 5:3,
5:4, 6:19, 6:23, 14:1,
15:19, 17:16, 28:11,
42:20, 53:23, 54:19,
54:21, 57:3, 57:10,
63:2, 66:4, 85:9
**occur** [1] - 39:6
**occurrences** [1] - 64:9
**occurring** [1] - 18:7
**offered** [1] - 36:7
**office** [5] - 39:2,
44:14, 59:23, 74:8,
82:2
**Office** [2] - 73:21,
86:21
**officer** [3] - 44:15,
44:25, 46:10
**often** [3] - 18:13,
63:10, 70:8
**OMB** [56] - 7:14, 8:8,
14:8, 27:8, 27:20,
28:1, 28:8, 28:10,
28:17, 28:23, 28:24,
29:1, 29:3, 29:25,
30:18, 31:4, 31:10,
31:20, 33:6, 41:21,
41:25, 42:6, 42:7,
42:12, 42:24, 43:13,
43:22, 44:16, 47:1,
47:12, 48:3, 48:24,
49:5, 51:9, 51:20,
52:6, 52:12, 52:13,
53:9, 54:17, 59:22,
66:20, 67:2, 67:3,
67:9, 67:12, 67:15,
67:17, 69:16, 70:22,
72:14, 72:15, 78:7
**OMB's** [2] - 31:25,
47:3
**once** [4] - 17:25, 18:7,
28:15, 31:12
**one** [40] - 6:5, 6:20,
9:21, 13:2, 13:4,
15:22, 17:10, 17:13,
19:14, 21:20, 26:8,
28:2, 28:18, 30:15,
30:16, 31:6, 31:7,
37:10, 39:24, 42:2,
44:4, 44:5, 44:8,
45:7, 48:5, 48:18,
49:8, 52:4, 52:7,
52:20, 63:9, 63:15,
65:25, 71:9, 72:24,
76:25, 78:9, 79:9,
80:8

**one-off** [1] - 17:10
**one-stop** [1] - 28:18
**ones** [2] - 79:13, 85:23
**ongoing** [3] - 13:15,
60:9, 83:6
**open** [1] - 64:1
**operates** [1] - 17:3
**operating** [3] - 36:1,
37:3, 73:5
**operations** [3] - 24:9,
40:9, 52:14
**opinion** [1] - 11:20
**opportunity** [6] - 13:2,
13:22, 15:25, 54:1,
79:14, 85:9
**oppose** [1] - 64:23
**opposed** [3] - 3:12,
62:9, 85:25
**opposing** [1] - 42:21
**opposition** [6] - 4:9,
37:18, 79:14, 85:14,
86:6, 86:11
**option** [2] - 17:4,
35:17
**options** [3] - 5:19,
6:19, 9:20
**Order** [3] - 80:23,
87:13, 87:14
**order** [52] - 2:2, 3:5,
4:25, 5:4, 8:14,
12:11, 14:10, 15:14,
15:16, 20:9, 36:19,
37:7, 37:17, 37:20,
38:24, 40:11, 40:12,
46:2, 48:16, 49:10,
49:14, 49:19, 49:21,
49:23, 50:13, 50:16,
50:18, 55:19, 56:14,
56:22, 63:7, 64:22,
67:8, 72:11, 73:7,
74:16, 74:20, 74:25,
75:6, 76:24, 77:4,
77:12, 77:13, 80:9,
81:13, 82:20, 84:2,
84:12, 87:21, 87:22,
87:23
**ordered** [4] - 4:19,
4:21, 78:15, 81:2
**ordering** [2] - 36:5,
51:1
**orders** [2] - 5:5, 39:16
**ordinarily** [1] - 24:21
**ordinary** [6] - 55:2,
55:5, 55:15, 64:9,
64:10, 69:25
**organization** [2] -
12:1, 28:7
**Organization** [1] -
80:14
**organizational** [2] -

22:21, 45:2
**organized** [3] - 21:18,
67:24
**original** [1] - 69:2
**OSTP** [1] - 74:4
**otherwise** [4] - 4:4,
75:23, 76:6, 77:7
**ourselves** [1] - 16:11
**outcome** [5] - 26:5,
26:6, 36:16, 47:25,
55:21
**outlined** [2] - 19:15,
40:5
**outset** [1] - 49:9
**outside** [5] - 33:14,
48:6, 75:15, 83:21,
86:21
**overarching** [3] - 18:5,
55:22, 56:17
**overbroad** [1] - 7:6
**overlap** [6] - 51:9,
51:19, 52:8, 52:10,
52:22
**overlapping** [1] -
43:25
**overnight** [1] - 9:2
**overreliance** [1] -
84:10
**override** [1] - 43:4
**overrides** [1] - 43:9
**Oversight** [1] - 17:14
**overstating** [1] - 82:17
**own** [2] - 48:11, 73:15

## P

**p.m** [2] - 2:2, 88:9
**pace** [1] - 78:15
**papers** [3] - 20:4,
23:5, 38:2
**paradigm** [1] - 23:20
**parcel** [1] - 15:15
**parse** [1] - 51:8
**part** [6] - 7:23, 15:15,
52:6, 65:14, 71:4,
86:1
**partial** [1] - 5:13
**participate** [1] - 29:16
**particular** [11] - 24:23,
25:9, 27:21, 29:2,
30:1, 44:22, 59:23,
59:25, 60:12, 77:16
**particularly** [4] - 58:1,
62:22, 78:1, 78:7
**parties** [2] - 55:20,
79:18
**party** [1] - 70:22
**pass** [5] - 25:18,
25:20, 25:23, 27:11,
35:15

**passed** [1] - 26:14
**passes** [2] - 59:6, 84:16
**passing** [1] - 26:9
**past** [1] - 60:2
**path** [1] - 24:2
**patterns** [1] - 17:10
**pay** [1] - 57:6
**pending** [3] - 47:12, 65:5, 70:21
**people** [6] - 13:22, 22:5, 35:9, 76:9, 76:16, 81:25
**perfect** [1] - 29:9
**perfectly** [4] - 8:9, 8:10, 13:24, 53:21
**performed** [1] - 87:10
**perhaps** [9] - 12:10, 17:22, 33:5, 42:10, 55:2, 55:17, 61:4, 73:5, 73:19
**period** [2] - 7:8, 86:23
**permanent** [1] - 36:12
**permitted** [1] - 79:17
**perpetually** [1] - 84:1
**person** [2] - 30:2, 80:11
**personal** [1] - 74:7
**personally** [1] - 76:15
**personnel** [2] - 20:14, 80:16
**perspective** [3] - 4:2, 6:6, 7:12
**PI** [22] - 4:7, 4:17, 5:19, 6:25, 12:10, 14:4, 14:12, 15:19, 24:14, 24:20, 33:9, 34:5, 47:20, 47:22, 49:9, 54:10, 57:25, 58:1, 64:14, 70:13, 82:20, 85:20
**piece** [1] - 25:24
**pile** [1] - 66:22
**pin** [1] - 27:2
**Pls** [2] - 24:12, 70:9
**place** [2] - 28:19, 75:15
**placed** [1] - 81:7
**plainly** [1] - 7:6
**plaintiff** [2] - 2:8, 3:25
**plaintiff's** [2] - 2:17, 15:25
**plaintiffs** [2] - 9:11, 55:3
**plans** [1] - 14:20
**platform** [1] - 40:3
**play** [1] - 30:6
**pledges** [1] - 64:25
**plenty** [1] - 16:21
**point** [42] - 12:7, 16:3,

17:19, 18:5, 18:18, 21:7, 21:24, 22:17, 24:17, 25:17, 26:15, 26:22, 27:5, 35:21, 39:3, 46:11, 55:22, 55:23, 56:17, 56:19, 60:25, 62:13, 63:10, 63:21, 64:8, 64:16, 65:2, 66:15, 71:3, 71:17, 73:12, 78:17, 79:3, 79:8, 79:11, 81:1, 83:23, 83:24, 86:16
**pointed** [1] - 47:24
**points** [3] - 18:4, 22:3, 69:13
**poised** [4] - 17:3, 20:3, 21:19, 29:14
**policies** [1] - 48:11
**policy** [1] - 24:20
**position** [10] - 10:7, 34:8, 37:18, 38:9, 55:11, 58:12, 58:14, 86:6, 86:12, 87:9
**possibility** [3] - 57:9, 62:10, 63:14
**possible** [5] - 51:3, 51:4, 63:21, 87:24
**posture** [1] - 22:18
**potential** [6] - 4:10, 8:8, 19:22, 26:23, 62:14, 62:16
**potentially** [4] - 54:16, 63:5, 64:12, 76:6
**power** [1] - 35:5
**powerful** [1] - 34:7
**powers** [1] - 81:15
**PRA** [5] - 41:4, 41:5, 41:20, 42:10, 72:17
**practicable** [2] - 7:19, 7:20
**practical** [3] - 14:22, 14:23, 69:1
**practice** [1] - 27:1
**precedented** [1] - 48:4
**precisely** [1] - 52:18
**predictable** [1] - 48:8
**prefer** [1] - 6:19
**preliminary** [25] - 2:17, 6:22, 13:19, 15:3, 15:11, 17:9, 49:21, 50:23, 54:21, 55:25, 56:19, 58:16, 58:23, 60:14, 60:19, 63:18, 64:2, 69:23, 77:8, 78:12, 78:14, 84:2, 84:7, 86:1, 87:2
**premise** [3] - 14:19, 43:1, 44:24

**prerogative** [1] - 56:16
**presence** [1] - 19:10
**present** [3] - 18:20, 70:2, 70:16
**preservation** [18] - 36:19, 37:7, 37:17, 37:20, 38:24, 39:5, 39:16, 40:22, 41:9, 72:10, 72:18, 73:15, 74:20, 74:24, 75:6, 76:23, 77:13, 87:22
**preserve** [4] - 37:11, 37:14, 40:20, 76:3
**preserving** [1] - 73:7
**president** [1] - 63:20
**President** [7] - 11:25, 80:1, 81:2, 83:7, 83:17, 86:22, 87:12
**President's** [3] - 20:22, 80:8, 80:13
**Presidential** [4] - 17:15, 40:25, 41:19, 73:14
**press** [4] - 11:18, 12:4, 40:8, 80:20
**pressed** [1] - 40:7
**presumably** [3] - 46:11, 50:14, 57:11
**presuming** [1] - 52:2
**presumption** [8] - 38:17, 38:18, 38:22, 39:15, 40:17, 72:13, 73:6, 74:15
**presumptions** [1] - 76:25
**presupposing** [1] - 55:21
**pretty** [3] - 17:9, 56:8, 59:17
**prevent** [5] - 17:3, 28:20, 31:9, 34:8, 39:6
**price** [1] - 81:4
**primary** [1] - 80:8
**principle** [1] - 27:1
**priorities** [2] - 29:5, 32:1
**prioritize** [2] - 33:6, 71:1
**Privacy** [2] - 44:15, 82:23
**problem** [5] - 9:22, 14:24, 20:8, 32:17, 54:9
**problematic** [1] - 10:17
**procedurally** [2] - 4:15, 85:12
**proceed** [4] - 4:18, 14:16, 16:7, 43:1

**proceeding** [1] - 8:2
**PROCEEDINGS** [1] - 2:1
**proceedings** [3] - 60:22, 61:8, 88:17
**process** [34] - 4:19, 4:21, 7:16, 7:20, 11:4, 12:11, 12:22, 19:10, 19:23, 21:7, 21:18, 25:5, 26:17, 26:20, 31:24, 35:5, 44:17, 47:18, 48:25, 49:22, 51:2, 53:15, 54:24, 55:22, 60:8, 62:11, 64:12, 64:17, 65:22, 67:23, 69:1, 74:2, 74:10, 74:11
**processed** [1] - 48:17
**processes** [2] - 25:8, 60:19
**processing** [25] - 4:3, 4:11, 4:18, 5:3, 8:5, 11:12, 12:23, 13:13, 14:9, 14:10, 15:18, 32:14, 50:8, 50:13, 50:19, 51:15, 54:16, 55:19, 64:21, 64:22, 67:18, 67:20, 70:1, 71:22
**produce** [9] - 15:14, 33:10, 43:8, 46:14, 49:14, 49:20, 57:1, 84:7
**produced** [6] - 15:5, 48:17, 50:10, 51:4, 67:21, 78:15
**producing** [3] - 48:7, 69:17, 78:7
**production** [3] - 43:2, 68:10
**productions** [2] - 10:9, 70:24
**program** [3] - 30:1, 59:23, 83:1
**programs** [3] - 20:13, 32:23, 33:7
**prohibited** [1] - 2:24
**proposal** [1] - 53:12
**proposals** [2] - 35:22, 35:23
**proposed** [1] - 27:22
**proposition** [1] - 31:12
**protections** [2] - 36:3, 36:4
**provide** [4] - 31:16, 36:24, 76:4, 79:19
**providing** [1] - 24:5
**provisional** [1] - 8:16
**provisions** [2] - 42:10,

42:11
**public** [55] - 2:22, 10:1, 13:1, 13:15, 19:17, 21:11, 21:24, 22:17, 24:9, 24:11, 24:15, 25:19, 26:20, 27:9, 29:11, 29:15, 32:18, 33:21, 35:9, 35:13, 35:17, 36:1, 36:15, 40:2, 42:22, 43:1, 43:9, 45:18, 46:24, 47:14, 47:17, 47:19, 48:23, 51:5, 56:6, 59:9, 61:21, 62:22, 77:18, 77:21, 77:23, 78:3, 79:7, 81:25, 82:9, 82:13, 83:6, 83:12, 83:19, 83:22, 84:2
**Public** [1] - 60:22
**public's** [1] - 27:14
**publication** [1] - 68:15
**publicly** [2] - 32:12, 32:13, 32:14, 45:15
**publish** [1] - 45:17
**publishing** [1] - 46:1
**pulling** [2] - 45:19, 46:8
**purported** [1] - 7:4
**purpose** [4] - 24:13, 60:2, 61:17
**purposes** [9] - 10:2, 18:20, 21:4, 26:24, 50:6, 50:23, 69:5, 70:16, 73:2
**purse** [1] - 35:5
**put** [13] - 3:5, 11:6, 30:14, 31:7, 34:7, 41:8, 41:20, 49:2, 49:3, 53:7, 56:24, 71:24, 79:24
**putting** [2] - 32:25, 69:3

**Q**

**quarreling** [2] - 34:14, 34:15
**questioning** [1] - 75:4
**questions** [11] - 3:10, 12:17, 16:3, 23:11, 37:2, 40:11, 44:5, 47:2, 49:4, 66:24, 77:6
**queue** [2] - 43:15, 66:17
**quickly** [2] - 15:4, 55:3
**quite** [4] - 10:12, 12:12, 15:7, 19:6
**quo** [2] - 38:14, 39:7

**quote** [2] - 80:12, 84:15

# R

**raises** [1] - 4:14
**random** [1] - 37:1
**rather** [3] - 14:25, 56:11, 88:6
**ravages** [1] - 16:14
**reach** [2] - 70:17, 81:3
**read** [2] - 20:4, 59:7
**reading** [1] - 68:14
**realistic** [1] - 23:20
**realistically** [1] - 21:16
**reality** [1] - 79:5
**really** [17] - 19:14, 23:14, 24:8, 41:7, 44:9, 44:24, 46:22, 47:24, 51:14, 53:24, 57:21, 58:25, 61:2, 61:5, 67:16, 75:20, 78:16
**reapportionment** [1] - 18:12
**reason** [8] - 12:24, 24:1, 24:3, 60:16, 62:19, 69:23, 76:1, 77:17
**reasonable** [4] - 9:4, 65:21, 72:9, 86:24
**reasons** [9] - 13:1, 23:18, 52:21, 58:25, 60:15, 64:11, 68:24, 75:5, 75:9
**rebuttal** [2] - 77:10, 85:10
**receive** [1] - 53:17
**received** [4] - 45:12, 53:12, 68:2, 68:3
**recent** [1] - 39:24
**recipient** [1] - 51:25
**recognize** [5] - 5:5, 64:23, 67:10, 78:18, 79:4
**recognized** [3] - 24:11, 39:4, 83:5
**recommend** [1] - 24:2
**recommending** [1] - 29:25
**record** [18] - 2:7, 11:18, 13:1, 15:10, 32:8, 33:20, 40:6, 46:7, 59:19, 68:8, 70:10, 71:17, 75:25, 79:24, 81:25, 85:7, 88:17
**recording** [1] - 2:23
**Records** [8] - 40:25, 41:19, 41:22, 42:13,

72:22, 73:14
**records** [15] - 4:22, 17:11, 17:12, 24:22, 27:6, 27:13, 34:16, 37:12, 37:14, 38:21, 65:22, 74:11, 75:23, 76:3
**recovery** [1] - 37:25
**reduce** [1] - 26:24, 71:21
**reduced** [2] - 71:5
**Reed** [1] - 84:15
**refashioned** [1] - 85:24
**refer** [1] - 3:11
**reference** [3] - 54:23, 57:24, 65:23
**referenced** [1] - 58:4, 59:2, 63:15, 87:13
**referred** [1] - 40:14
**reflect** [2] - 22:22, 28:24
**refute** [4] - 13:3, 13:23, 33:20, 82:11
**refuted** [1] - 13:3
**regarding** [3] - 52:14, 54:15, 54:16
**regardless** [1] - 41:20
**regimes** [1] - 41:1
**regs** [1] - 14:1
**regularity** [2] - 40:17, 72:14
**related** [13] - 43:20, 43:21, 59:1, 60:21, 61:3, 61:7, 63:19, 67:2, 67:9, 67:13, 67:23, 68:20, 75:7
**relates** [1] - 40:18
**relating** [2] - 40:18, 47:13
**relationship** [4] - 28:13, 49:5, 59:3, 65:4, 51:14, 53:4, 53:10, 54:16, 54:17, 55:16, 56:3, 63:18, 65:17, 65:23, 66:3, 66:6, 66:7, 66:8, 66:10, 66:13, 66:14, 67:9, 67:12, 72:7, 72:8, 86:18
**relief** [7] - 12:14, 12:16, 53:25, 58:23, 78:19, 79:5, 84:12
**rely** [1] - 82:18
**relying** [1] - 77:24
**remain** [1] - 59:10
**remainder** [1] - 72:2
**remains** [4] - 65:16, 71:15, 86:11
**remind** [2] - 2:23,

74:17
**reorganizing** [1] - 81:14
**repeatable** [3] - 18:11, 18:23, 24:24
**repeated** [1] - 28:5
**repeating** [1] - 39:20
**reply** [17] - 7:4, 8:13, 18:18, 19:16, 31:7, 39:14, 39:20, 39:22, 40:5, 43:6, 43:10, 58:2, 77:16, 77:19, 83:24, 85:24, 87:5
**reported** [3] - 12:3, 21:4, 75:18
**Reporter** [1] - 3:19
**reporter** [1] - 16:19
**reporting** [4] - 20:24, 77:24, 80:20, 82:13
**reports** [13] - 11:19, 20:23, 22:5, 33:21, 39:22, 40:3, 55:17, 55:18, 70:1, 77:21, 78:3, 82:10
**represent** [1] - 76:8
**representation** [1] - 81:10
**representations** [2] - 76:16, 76:19
**representatives** [1] - 27:10
**reps** [1] - 52:6
**Republican** [1] - 35:23
**request** [51] - 3:3, 3:19, 3:21, 3:24, 3:25, 4:3, 4:23, 7:4, 7:5, 7:12, 7:16, 7:17, 8:4, 8:6, 12:11, 12:21, 14:8, 14:9, 14:11, 16:19, 19:17, 27:25, 36:19, 40:13, 44:17, 47:3, 48:22, 49:5, 51:14, 53:4, 53:10, 54:16, 54:17, 55:16, 56:3, 63:18, 65:17, 65:23, 66:3, 66:6, 66:7, 66:8, 66:10, 66:13, 66:14, 67:9, 67:12, 72:7, 72:8, 86:18
**requested** [3] - 17:11, 72:8, 78:21
**requester** [1] - 33:9
**requesters** [8] - 43:16, 43:18, 45:6, 47:5, 55:25, 67:21, 69:8, 82:24
**requesting** [3] - 62:24, 78:19, 86:19
**requests** [55] - 7:14,

7:21, 8:2, 8:11, 11:13, 13:17, 14:16, 19:16, 28:5, 30:16, 43:13, 43:21, 43:23, 43:25, 44:3, 45:5, 47:12, 47:23, 48:16, 49:6, 49:22, 50:19, 51:8, 51:9, 51:10, 51:13, 55:8, 55:10, 66:11, 66:20, 66:22, 67:1, 67:2, 67:3, 67:12, 68:2, 68:4, 68:5, 68:6, 68:19, 68:20, 69:2, 69:11, 69:15, 69:16, 69:18, 70:20, 71:1, 71:22, 85:23, 86:25, 87:2, 87:6
**require** [5] - 9:1, 13:17, 50:10, 65:24, 74:11
**required** [6] - 25:21, 46:23, 58:22, 59:2, 65:4, 65:9
**requirement** [1] - 75:1
**requirements** [2] - 41:2, 86:15
**requires** [1] - 70:17
**rescind** [1] - 35:23
**resistance** [1] - 37:16
**resolution** [7] - 10:4, 18:9, 35:1, 35:8, 36:8, 59:15, 84:20
**resolve** [1] - 72:6
**resolved** [4] - 5:11, 56:10, 57:13, 69:5
**resolves** [1] - 5:15
**resources** [4] - 48:15, 48:25, 49:2
**respect** [28] - 9:20, 15:4, 15:12, 15:17, 20:25, 21:1, 21:25, 24:17, 25:16, 27:25, 28:22, 31:23, 37:7, 37:16, 45:14, 46:3, 46:10, 47:1, 47:2, 53:3, 69:17, 77:13, 77:19, 78:6, 81:22, 83:23, 84:13
**respectfully** [1] - 69:22
**respond** [5] - 15:25, 18:2, 18:4, 43:17, 55:8
**responded** [1] - 12:21
**responding** [1] - 85:22
**response** [9] - 4:23, 5:9, 9:7, 11:5, 18:14, 45:12, 48:14, 53:18,

55:10
**responsibilities** [4] - 17:20, 76:2, 85:1, 85:8
**Responsibility** [1] - 2:4
**responsibly** [2] - 20:9, 84:22
**responsive** [3] - 38:21, 60:5, 84:24
**resulted** [1] - 68:10
**results** [1] - 22:2
**results-based** [1] - 22:2
**retained** [1] - 52:2
**retention** [1] - 15:14
**retract** [1] - 76:21
**reverse** [1] - 77:12
**review** [1] - 41:5
**reviewed** [1] - 8:12
**revised** [1] - 69:3
**revolving** [1] - 36:14
**rider** [1] - 36:12
**riders** [1] - 36:7
**RMR** [2] - 88:16, 88:20
**road** [1] - 55:12
**role** [4] - 19:11, 28:7, 41:20, 64:10
**rolling** [1] - 70:24
**room** [1] - 68:14
**routine** [1] - 48:8
**Rule** [1] - 5:11
**rules** [2] - 32:12, 32:14
**ruling** [4] - 14:20, 15:11, 15:13, 57:7
**run** [3] - 8:21, 10:13, 87:23
**rushed** [1] - 11:3

# S

**sake** [1] - 49:13
**satisfaction** [1] - 70:13
**saw** [1] - 85:4
**scale** [1] - 79:24
**scenario** [1] - 64:14
**schedule** [2] - 8:5, 55:19
**scheduled** [2] - 74:8, 78:18
**scope** [5] - 3:6, 12:13, 12:15, 30:18, 84:18
**scores** [1] - 82:9
**scour** [1] - 45:16
**searches** [4] - 8:22, 9:6, 10:16, 65:24
**searching** [1] - 67:20
**season** [1] - 64:1

**second** [4] - 23:24, 37:13, 51:7, 81:22
**Security** [2] - 82:4, 82:5
**see** [9] - 2:10, 2:11, 2:15, 12:24, 14:18, 14:23, 22:18, 76:11, 81:16
**seeing** [2] - 32:7, 52:11
**seek** [5] - 12:16, 15:11, 59:8, 61:9, 61:20
**seeking** [18] - 18:8, 21:15, 22:20, 24:22, 25:2, 27:7, 29:9, 37:6, 51:11, 51:20, 52:12, 53:3, 63:19, 64:1, 67:16, 82:24, 83:1
**seeks** [1] - 40:13
**seem** [1] - 34:14
**selected** [1] - 36:2
**selectively** [1] - 45:19
**Senator** [1] - 84:15
**sender** [1] - 51:25
**sense** [4] - 3:2, 8:20, 29:12, 59:17
**sensitivities** [1] - 8:24
**sent** [1] - 3:24
**separate** [1] - 8:3
**separately** [1] - 87:3
**separates** [2] - 19:9, 25:7
**served** [1] - 43:2
**server** [1] - 74:7
**servers** [1] - 40:4
**Service** [7] - 66:12, 67:13, 81:14, 86:20, 86:22, 87:10, 87:14
**Services** [1] - 2:5
**services** [1] - 16:15
**set** [8] - 2:22, 18:10, 19:5, 25:12, 62:10, 85:23, 87:5, 87:6
**sets** [1] - 8:2
**setting** [1] - 13:20
**several** [1] - 60:1
**shakes** [1] - 35:10
**share** [1] - 84:14
**shed** [2] - 66:24, 82:13
**shift** [1] - 10:3
**shopping** [1] - 28:18
**short** [1] - 88:5
**show** [5] - 12:7, 14:5, 24:21, 62:19, 70:13
**showing** [3] - 44:10, 59:4, 60:17
**shown** [2] - 58:21, 86:14

**shut** [2] - 27:12, 59:15
**shutdown** [5] - 16:23, 17:22, 26:8, 31:25, 59:16
**shuttering** [2] - 11:1, 16:16
**shutting** [3] - 30:4, 32:22, 32:23
**side** [2] - 36:8, 61:1
**sides** [2] - 24:18, 53:14
**Signal** [7] - 39:23, 39:24, 75:11, 75:22, 76:6, 77:21
**significant** [2] - 63:2, 84:5
**similarly** [1] - 34:6
**simple** [1] - 13:3
**simply** [13] - 10:19, 17:25, 19:2, 41:16, 42:9, 43:4, 45:5, 50:24, 53:17, 75:14, 78:12, 79:15, 79:21
**simultaneously** [1] - 16:22
**single** [2] - 23:21, 84:16
**sitting** [2] - 20:2, 26:6
**situated** [1] - 34:6
**situation** [7] - 10:6, 18:6, 23:20, 32:11, 32:19, 32:24
**six** [1] - 55:9
**size** [2] - 25:8, 25:9
**skin** [1] - 12:5
**skinned** [1] - 12:24
**slightly** [1] - 67:11
**slow** [1] - 16:20
**small** [1] - 66:18
**smaller** [1] - 48:13
**Social** [2] - 82:4, 82:5
**solely** [2] - 24:5, 80:15
**solicitor** [1] - 57:4
**solves** [1] - 14:24
**someone** [2] - 29:25, 31:25
**sometimes** [2] - 5:11, 64:6
**somewhat** [2] - 8:3, 71:19
**soon** [5] - 7:19, 65:7, 76:13, 87:20, 87:24
**sooner** [2] - 56:10, 88:6
**sorry** [4] - 27:18, 36:21, 49:16, 54:7
**sort** [19] - 4:24, 6:8, 8:2, 8:12, 8:22, 9:2, 9:9, 38:5, 54:12, 54:25, 55:1, 55:21,

58:3, 63:11, 67:8, 68:15, 76:15
**sought** [5] - 7:6, 7:7, 12:14, 18:16, 61:23
**sounds** [2] - 3:12, 3:13
**speaking** [2] - 4:15, 44:9
**specialists** [1] - 71:13
**specific** [13] - 25:11, 27:13, 34:22, 37:6, 60:23, 62:8, 62:13, 65:11, 73:24, 75:5, 83:12
**specifically** [7] - 10:16, 19:10, 28:7, 28:22, 30:11, 31:5, 84:8
**speculating** [1] - 57:9
**spending** [5] - 16:13, 16:24, 20:3, 25:4, 25:10
**spent** [1] - 17:4
**spoliation** [1] - 75:13
**spot** [1] - 56:24
**squarely** [1] - 57:19
**staff** [6] - 40:4, 48:8, 48:14, 71:5, 76:5, 82:6
**staffed** [1] - 80:16
**staffing** [3] - 48:3, 71:3, 84:18
**stage** [2] - 11:17, 70:1
**stages** [1] - 67:18
**stale** [8] - 17:12, 17:25, 39:23, 59:4, 60:1, 60:18, 60:25, 83:16
**staleness** [2] - 18:19, 64:17
**stand** [1] - 8:17
**standalone** [3] - 10:20, 13:5, 40:4
**standard** [6] - 7:20, 11:16, 63:25, 65:4, 68:24, 74:14
**standards** [3] - 63:8, 65:8, 70:19
**standing** [1] - 42:2
**start** [3] - 3:1, 9:17, 50:8
**started** [1] - 42:23
**starting** [1] - 66:10
**state** [2] - 85:7, 86:17
**statement** [3] - 13:4, 20:22, 82:22
**statements** [7] - 20:23, 31:7, 37:2, 37:4, 48:3, 48:12, 85:2

**States** [1] - 85:1
**status** [6] - 38:14, 39:7, 55:17, 55:18, 69:4, 70:1
**statute** [2] - 11:12, 14:1
**statutes** [1] - 74:16
**statutorily** [1] - 10:11
**still** [12] - 4:7, 38:23, 53:22, 61:4, 71:15, 72:16, 72:17, 73:14, 73:19, 74:24, 79:2
**stop** [3] - 13:8, 28:18, 50:24
**stored** [1] - 74:7
**straws** [1] - 10:22
**streamline** [1] - 67:23
**strictly** [1] - 2:24
**structural** [1] - 40:16
**structure** [1] - 24:8
**structured** [1] - 29:15
**subject** [45] - 2:18, 4:1, 4:20, 5:21, 7:13, 10:19, 11:11, 11:17, 11:23, 13:6, 13:19, 14:6, 41:5, 41:21, 42:1, 42:6, 42:7, 42:12, 49:10, 49:25, 50:17, 51:1, 55:11, 56:5, 58:5, 58:14, 63:2, 65:23, 68:14, 68:19, 69:16, 72:15, 72:16, 72:17, 72:20, 72:21, 73:4, 73:9, 73:14, 74:5, 75:14, 77:1, 79:12, 79:22, 86:7
**submission** [1] - 76:12
**submit** [3] - 55:17, 57:18, 85:3
**subsequent** [1] - 81:2
**subset** [2] - 52:4, 53:4
**substantial** [7] - 13:12, 39:17, 41:15, 50:25, 78:11, 79:25, 82:10
**substantially** [1] - 59:5
**succeed** [4] - 14:7, 15:17, 49:24, 86:9
**success** [6] - 12:8, 37:22, 37:24, 50:25, 65:15, 86:2
**suddenly** [1] - 46:24
**sufficient** [3] - 20:21, 50:5, 60:14
**sufficiently** [3] - 12:6, 12:7, 14:5
**suggest** [1] - 47:24

**suggesting** [1] - 72:25
**sum** [3] - 31:11, 71:1
**summarily** [1] - 16:17
**summary** [6] - 5:16, 5:25, 6:7, 10:13, 34:1, 55:8
**super** [2] - 34:7, 84:3
**supplemental** [1] - 59:14
**support** [3] - 10:21, 26:25, 79:25
**suppose** [1] - 5:19
**surely** [1] - 15:22
**surety** [1] - 42:3
**surveillance** [1] - 83:1
**Sus** [1] - 2:9
**suspect** [2] - 44:17, 44:19
**suspend** [1] - 28:16
**suspending** [1] - 11:2
**suspicious** [1] - 40:16
**sway** [2] - 29:18, 78:4
**systems** [1] - 53:6, 76:3

**T**

**table** [1] - 7:12
**target** [1] - 30:20
**taxpayers** [1] - 84:24
**teams** [1] - 20:25
**Teams** [2] - 80:16, 81:3
**technical** [1] - 46:4
**tee** [2] - 4:15, 49:10
**teed** [3] - 5:14, 5:15, 57:15
**Temporary** [1] - 80:14
**ten** [1] - 18:17
**tending** [1] - 40:21
**term** [1] - 47:4
**terminate** [1] - 20:13
**terminated** [1] - 72:1
**terminating** [1] - 16:16
**terms** [4] - 16:25, 46:19, 62:12, 72:2
**THE** [161] - 2:10, 2:14, 3:11, 3:16, 4:12, 5:18, 5:24, 6:7, 6:14, 7:10, 7:24, 8:19, 9:10, 9:13, 9:17, 9:24, 11:6, 11:10, 11:15, 12:19, 14:3, 14:22, 15:1, 15:6, 15:13, 15:20, 15:24, 16:6, 16:20, 17:6, 19:7, 19:12, 20:4, 20:8, 20:19, 22:25, 23:4, 23:6, 23:9,

23:14, 23:23, 23:25, 24:19, 25:1, 25:20, 26:1, 26:4, 26:13, 27:2, 27:5, 27:16, 27:19, 29:21, 29:23, 30:7, 30:10, 31:18, 31:20, 32:10, 32:25, 33:3, 34:13, 34:19, 34:24, 35:2, 35:20, 36:18, 36:21, 38:4, 38:16, 39:8, 41:10, 41:14, 42:8, 42:12, 42:15, 43:11, 44:12, 45:7, 45:10, 47:8, 49:4, 49:8, 49:13, 49:18, 50:2, 50:12, 50:21, 51:7, 51:21, 51:23, 51:25, 52:9, 52:15, 52:19, 53:1, 53:11, 53:19, 54:3, 54:5, 54:7, 54:14, 55:5, 56:4, 56:10, 56:21, 57:5, 57:14, 57:21, 58:6, 58:19, 59:12, 60:7, 62:6, 62:17, 64:8, 66:3, 66:23, 67:5, 67:20, 68:11, 68:13, 68:22, 69:13, 70:8, 70:15, 71:19, 72:10, 72:20, 72:24, 73:3, 73:17, 74:13, 75:8, 75:17, 76:4, 76:18, 76:21, 77:5, 77:10, 78:21, 79:2, 79:23, 80:19, 80:24, 81:6, 81:10, 81:16, 81:19, 83:9, 83:14, 85:4, 85:6, 85:15, 85:17, 85:25, 86:4, 87:7, 87:18, 88:2, 88:4
**themselves** [6] - 10:18, 17:1, 19:18, 21:9, 21:10, 37:5
**theory** [1] - 23:12
**therefore** [5] - 13:6, 14:6, 27:12, 79:21, 85:8
**they've** [5] - 45:12, 65:11, 66:14, 70:18, 72:8
**thinking** [3] - 6:10, 52:11, 81:6
**third** [2] - 79:8
**thousands** [3] - 16:18, 28:17, 34:2
**three** [6] - 5:18, 7:8, 7:16, 9:20, 11:13, 14:24
**three-month** [1] - 7:8

**threshold** [1] - 60:4
**throughout** [3] - 10:25, 31:15
**thrust** [1] - 21:20
**Thursday** [1] - 9:2
**timeline** [2] - 9:4, 9:25
**timeliness** [1] - 47:14
**timely** [1] - 48:23
**timing** [2] - 8:8, 32:3
**titled** [1] - 88:18
**today** [3] - 26:7, 42:2, 86:12
**together** [1] - 46:9
**toll** [1] - 19:19
**tomorrow** [1] - 23:10
**top** [4] - 5:17, 31:12, 31:13, 43:15
**topics** [2] - 67:14, 68:21
**total** [1] - 82:19
**touch** [1] - 36:18
**touched** [1] - 49:9
**tout** [2] - 45:22, 71:20
**touted** [1] - 46:17
**toward** [1] - 16:23
**towards** [1] - 40:21
**town** [1] - 2:20
**track** [4] - 14:17, 14:24, 79:10
**tracks** [1] - 8:3
**transcription** [1] - 88:17
**transferred** [2] - 66:13, 74:1
**transparency** [6] - 46:18, 46:20, 46:23, 71:21, 77:18, 84:16
**transparent** [1] - 46:19
**treat** [2] - 55:1, 55:15
**treated** [1] - 41:16
**tried** [3] - 8:15, 9:3, 23:2
**troublesome** [1] - 35:12
**troubling** [1] - 48:22
**true** [5] - 24:4, 44:23, 46:3, 52:3, 61:7
**truly** [1] - 34:12
**try** [1] - 28:15
**trying** [4] - 25:14, 32:17, 45:3, 56:12
**Tuesday** [2] - 8:11, 65:19
**tune** [1] - 33:25
**turn** [7] - 19:3, 45:24, 45:25, 54:11, 58:17, 68:8, 74:11
**turnover** [1] - 48:8

**turns** [3] - 17:1, 18:20, 84:9
**two** [27] - 6:19, 7:14, 7:21, 8:1, 8:2, 8:21, 12:17, 13:1, 14:24, 19:4, 35:22, 37:9, 37:20, 51:12, 51:16, 51:20, 51:23, 53:14, 64:4, 71:14, 71:15, 72:1, 80:3, 81:1, 81:2, 86:23
**two-and-a-half** [1] - 86:23
**tying** [1] - 83:12
**type** [2] - 58:21, 86:14
**types** [1] - 10:13
**typical** [4] - 19:9, 25:7, 32:14, 47:25

## U

**U.S** [7] - 2:5, 16:12, 67:13, 86:20, 86:22, 87:10, 87:14
**Ukraine** [3] - 60:21, 61:7, 63:20
**Ukraine-related** [1] - 61:7
**ultimately** [2] - 21:3, 73:4
**ultra** [1] - 34:6
**unable** [1] - 46:24
**uncomfortable** [1] - 13:21
**undefined** [1] - 83:21
**under** [18] - 7:20, 11:12, 11:16, 13:14, 13:25, 14:1, 15:19, 39:1, 40:21, 41:3, 41:4, 46:2, 73:5, 75:12, 79:19, 85:9, 87:19, 88:5
**underbrush** [1] - 9:14
**underscores** [1] - 72:7
**understood** [3] - 54:3, 60:10, 60:11
**undertake** [1] - 43:7
**undertaking** [1] - 7:18
**undisputedly** [1] - 28:1
**undo** [1] - 20:3
**undoubtedly** [1] - 83:20
**unfold** [1] - 35:19
**unfolds** [1] - 35:6
**unique** [3] - 25:11, 28:10
**United** [1] - 85:1
**universe** [2] - 9:7, 67:5

**unknown** [1] - 25:19
**unlike** [1] - 60:19
**unlikelihood** [1] - 86:2
**unprecedented** [1] - 34:12
**unreasonable** [1] - 65:13
**unrefuted** [2] - 32:9, 40:3
**unrefutedly** [1] - 28:2
**unreliable** [1] - 78:4
**unscrutinized** [2] - 19:14, 32:20
**unusual** [1] - 38:10
**up** [16] - 2:22, 4:16, 5:14, 5:15, 7:22, 9:4, 12:17, 14:3, 27:22, 40:10, 49:10, 50:14, 50:16, 57:15, 85:10
**upset** [2] - 74:14, 76:25
**urge** [1] - 5:6
**urgency** [1] - 13:14
**USDS** [62] - 3:14, 3:21, 4:1, 4:2, 7:8, 8:4, 10:16, 12:21, 13:2, 13:5, 13:18, 17:2, 30:17, 31:10, 32:20, 33:13, 33:18, 36:4, 37:23, 39:24, 40:1, 42:24, 43:6, 44:9, 44:10, 44:13, 44:23, 44:24, 45:5, 45:12, 46:5, 46:22, 50:8, 51:20, 52:12, 52:13, 52:14, 53:3, 53:8, 54:16, 59:9, 60:12, 61:18, 61:25, 62:23, 62:24, 63:1, 65:1, 66:13, 66:14, 67:9, 67:17, 67:19, 68:5, 68:20, 72:16, 73:14, 78:8, 79:12, 79:21, 80:9
**USDS'** [2] - 4:11, 69:4
**USDS's** [1] - 82:10
**USDS-related** [1] - 68:20
**USDS/DOGE** [4] - 31:4, 33:19, 37:2, 40:24
**useful** [1] - 18:16
**uses** [1] - 58:9
**utmost** [1] - 71:20

## V

**valuable** [1] - 18:16
**value** [5] - 18:19, 26:24, 63:5, 82:19,

**83:20**
**vast** [1] - 68:2
**vehicle** [1] - 5:8
**viability** [1] - 16:25
**view** [4] - 70:5, 72:17, 73:12, 75:6
**violate** [2] - 38:19, 38:20
**virtually** [2] - 16:14, 51:17
**vis** [2] - 55:24
**vis-a-vis** [1] - 55:24
**visit** [1] - 63:19
**vital** [1] - 84:5
**vitally** [1] - 17:25
**volume** [3] - 8:21, 9:8, 46:13
**voluntarily** [2] - 46:1, 72:1
**vote** [9] - 19:25, 27:13, 27:15, 27:16, 30:3, 32:4, 59:13, 59:20, 60:1
**voters** [1] - 63:25
**votes** [3] - 23:21, 27:22, 59:16
**voting** [2] - 19:25, 22:11
**vouch** [1] - 76:15
**vu** [1] - 59:17

## W

**waiting** [2] - 22:18, 54:8
**waived** [3] - 79:20, 85:15, 85:16
**waivers** [2] - 22:22, 64:25
**wants** [4] - 28:18, 28:19, 56:14, 76:9
**warrantless** [1] - 82:25
**warrants** [2] - 14:9, 83:2
**Washington** [2] - 2:5, 59:17
**waters** [1] - 62:11
**ways** [2] - 30:5, 79:7
**website** [2] - 45:15, 45:18
**Wednesday** [3] - 8:13, 53:13, 65:20
**week** [24] - 4:22, 8:21, 9:6, 10:5, 10:13, 14:14, 18:1, 19:4, 20:6, 25:22, 33:10, 37:4, 39:24, 54:24, 59:10, 59:13, 60:2, 61:13, 62:2, 62:21,

69:3, 76:13, 78:22
**weekend** [1] - 88:8
**weeks** [4] - 9:6, 19:15, 19:16, 19:17
**weigh** [1] - 27:10
**weight** [2] - 33:15, 44:22
**whatsoever** [1] - 44:10
**White** [3] - 33:6, 33:15, 41:4
**whole** [2] - 64:13, 79:3
**wields** [1] - 79:25
**willing** [2] - 42:25, 53:23
**withhold** [1] - 39:10
**words** [1] - 52:24
**workers** [1] - 34:2
**world** [1] - 73:6
**worth** [1] - 39:20
**wrap** [1] - 7:22
**wreak** [1] - 84:11
**wreaking** [1] - 36:17

## X

**X-hundred** [1] - 4:21

## Y

**years** [5] - 7:16, 18:17, 19:5, 55:12, 64:5
**yesterday** [4] - 2:20, 8:14, 67:8, 82:3
**yourselves** [1] - 2:7

## Z

**zero** [4] - 31:11, 59:22, 71:1
**zero-sum** [1] - 71:1